**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MAHA JASTRAM, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| NEXTERA ENERGY, INC., JAMES ROBO, ERIC SILAGY and DAVID P. REUTER, | |
| Defendants. | **Jury Trial Demanded** |

Plaintiff Maha Jastram ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation conducted by and through her attorneys, which included a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings made by NextEra Energy, Inc. ("NEE" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

1. Plaintiff brings claims against all Defendants for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5) on behalf of the class of persons and entities that purchased or otherwise acquired NEE securities between December 2, 2021, and February 1, 2023, inclusive (the "Class Period").

2. NEE is a Florida corporation headquartered in Juno Beach, Florida and one of the largest power and utility holding companies in North America. NEE's primary subsidiary is Florida Power and Light Co. ("FPL"), the largest vertically integrated regulated utility in Florida.

3. Beginning in December 2021, media outlets, including the Orlando Sentinel and Miami Herald, began reporting that FPL and its political consulting firm, Matrix LLC ("Matrix") had orchestrated a range of improper political expenditures including potential violations of state and federal campaign finance laws. Specifically, reports alleged that FPL's political consultants used had used a network of nonprofits to surreptitiously steer funding to spoiler "ghost candidates" intended to derail the campaign efforts of unfriendly legislators seeking reelection to the Florida state legislature during the 2020 election cycle. Later reports alleged that FPL had spied on journalists after the publication of unsupportive reporting, and improperly courted public officials with job offers while bidding to privatize certain public utilities. The Orlando Sentinel and Miami

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Herald further reported that Matrix's dirty tricks were undertaken for the express purpose of benefitting FPL and with the knowing approval of FPL executives.

4.      FPL responded to this reporting with blanket denials. For more than a year, FPL's executives and top corporate officers at NEE falsely claimed that, based on the findings of an internal investigation, the alleged political misconduct orchestrated by FPL did not expose the Company to any meaningful legal or reputational risk, but later acknowledged the opposite—when FPL President and CEO Eric Silagy ("Silagy") abruptly resigned and including a new risk disclosure in its SEC filings explicitly addressing the issue on January 25, 2023.

5.      On the same day that Silagy's resignation was disclosed, NEE filed a Form 8-K with the SEC which specifically acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives had orchestrated political misconduct. The Form 8-K stated in relevant part:

> FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL.

6.      On this news, NEE's stock dropped $7.31 per share, or about 8.7%, representing a loss of approximately $15 billion in market capitalization on unusually high trading volume.

7.      Analysts expressly linked NEE's drop to the risks posed by FPL's political misconduct. For example, Paul Patterson of Glenrock Associates said that the stock decline was "driven substantially by the unexpected management change and the update they gave on their review into political activity." A report published by Bank of America analyst Julien Dumoulin-Smith on January 26, 2023 concluded Silagy's exit was "rushed" and difficult to separate from recent political controversies.

8.      NEE's stock continued to drop of the next several trading days, until, on January 31, 2023, the Florida Times Union reported that NEE executives disclosed to analysts from Bank of America that Silagy's exit agreement included a multi-year "claw back on compensation for any

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

legal wrongdoing" tacitly acknowledging the link between Silagy's departure and the new risk disclosure statement concerning legal and reputational risk arising from political misconduct.

9. NEE's stock has traded well below $80 per share since January 25, 2023.

10. Throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that: (1) FPL's surreptitious orchestration of political misconduct exposed NEE to substantial legal and reputational risk; and (2) in light of the above, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted below arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

misleading statements into this District and the purchase of the Company's common stock by members of the Class who reside in this District. Additionally, the Company's principal offices are located in this District.

16.      In connection with the acts, transactions, and conduct alleged below, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

17.      Plaintiff Maha Jastram, as set forth in the accompanying certification, incorporated by reference herein, purchased NEE securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.      Defendant NEE is a Florida corporation headquartered in Juno Beach, Florida and one of the largest power and utility holding companies in North America, with more than $17 billion in annual revenues. Through its subsidiaries, NEE generates, transmits, distributes, and sells electric power to retail and wholesale customers in North America. NEE's common stock trades on the New York Stock Exchange under the symbol "NEE."

19.      Defendant Eric Silagy was FPL's Chief Executive Officer ("CEO") from May 2014 until February 15, 2023, and he resigned from FPL effective May 15, 2023.

20.      Defendant James Robo ("Robo") became NEE's CEO in July 2012 and Chairman in December 2013. Robo retired from both positions on March 1, 2022.

21.      Defendant David P. Reuter ("Reuter") was the corporate spokesperson for FPL during the relevant time-period.

22.      Defendant Robo because of his position in the Company, possessed the authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Robo was provided with copies of the Company's reports alleged herein to be misleading prior to, or

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to them, Robo knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### BACKGROUND: FPL'S EMPLOYMENT OF MATRIX LLC

23. In 2019, Silagy, in his capacity as CEO of FPL, hired Matrix LLC, a political consulting firm with deep ties to the utility and power industry in the Southeast, to engage in political activity on behalf of FPL.

24. Matrix's efforts on behalf of FPL were managed through Silagy's subordinates at FPL.

25. Employees FPL engaged in efforts to secretly divert corporate resources to support the political efforts coordinated by Matrix. Their efforts often involved the use of personal email accounts and even pseudonyms in an apparent attempt to conceal their communications.

26. During the 2020 election cycle, Matrix engaged in a range of questionable political conduct including surveilling journalists who authored negative stories about FPL and supporting non-profit entities that later contributed to "ghost candidates" to serve as spoilers to derail the campaign efforts of state legislators viewed unfavorably by FPL.

27. Matrix's efforts were part of an effort orchestrated by Silagy.

28. In 2021, Matrix's two principals had a contentious split. A lawsuit followed and negative stories explicitly linking FPL executives to Matrix's improper political conduct started leaking to the press. The Orlando Sentinel, Miami Herald, and Floodlight broke the story in late 2021 and continued to cover it through summer 2022.

29. On December 2, 2021, the Orlando Sentinel published an article linking FPL executives directly to the "ghost candidates" scheme based on documents anonymously delivered to the Sentinel, including memos, invoices and text messages confirming coordination between FPL executives and the network of Matrix consultants enacting the scheme.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

30.     On December 17, 2021, the Orlando Sentinel published a story revealing the existence of the November 2019 memo from Matrix to Silagy, outlining how FPL funds could be filtered through shell non-profits to conceal their source.

31.     Throughout June and July 2022, a series of articles in the Orlando Sentinel, the Miami Herald, and Floodlight further described FPL's alleged surveillance of journalists, use of paid media to attack regulators, and support for a "ghost candidate" challenging a state legislator.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

32.     On December 2, 2021, in response to the Orlando Sentinel's reporting, FPL spokesperson David P. Reuter denied the company had any role in the "ghost candidate" scheme. Reuter stated the following:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

33.     Reuter's statement in ¶32 above was misleading because it omitted key facts relating to FPL's provision of funding to organizations that later contributed to Grow United, Inc. a Delaware tax exempt organization created by Matrix, in support of Florida state-level political campaigns during the 2020 election cycle. Tellingly, Reuter's statement did not dispute the authenticity of the documents underlying the Orlando Sentinel's reporting, including billing records from Matrix LLC that show Grow United's fees for incorporation were billed to Florida Power & Light, and emails indicating Matrix's expenses for travel to update Grow United's mailbox were marked as "FPL Expenses for Grow United C4."

34.     On December 17, 2021, when confronted with the November 2019 memorandum by the Orlando Sentinel, Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle." Reuter continued: "Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

structure for 501C(4) organizations and we had no knowledge of this structure being used by Matrix. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020."

35.  Reuter's statements in ¶34 above were materially misleading. Notably, Reuter's statement does not deny that FPL or FPL employees used the structure outlined in the November 2019 memorandum, rather it claims merely that the Company "found no evidence" of that without clarifying what the Company's internal investigation consisted of. Additionally, Reuter does not clarify what timeframe constitutes the "2020 election cycle." Finally, Reuter's statements failed to acknowledge that FPL had been billed for the costs associated with establishing Grow United in the first place.

36.  On January 25, 2022, Robo made the following statement on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, **we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their–they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And** so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good that there is no basis to any of these allegations…[emphasis added].

37.  Robo's denial of wrongdoing in ¶36 above was materially false and misleading. Robo knew or should have known that FPL and Silagy's conduct with respect to orchestrating political conduct through Matrix created, at a minimum, the appearance of impropriety and a reputational risk to NEE.

38.  On February 18, 2022, NEE filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating performance for the year ended December 31, 2021 ("2021 10-K").

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

39.     The 2021 10-K was misleading by omitting material facts, specifically cautionary language warning investors that FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

40.     On April 22, 2022, NEE filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending on March 31, 2022 ("2022 Q1 10-Q").

41.     The 2022 Q1 10-Q was misleading by omitting material facts, specifically cautionary language warning investors that FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

42.     On June 24, 2022, when confronted by the Orlando Sentinel with FPL's covert monitoring of journalist Nate Monroe, Silagy stated, "I have never authorized or approved or been a party to following [Monroe] or any other reporter." When presented with text messages and emails indicating that a private investigator paid by Matrix had followed Monroe while updating Daniel Martell, FPL's Vice President of State Legislative Affairs, on the pursuit, Reuter cast doubt on the authenticity and completeness of the records saying FPL had "no digital record of these exchanges and cannot prove their veracity" and "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees."

43.     Reuter and Silagy's statements in ¶42 above were materially misleading. The direct involvement of a high-level FPL employee in the covert surveillance of a journalist contradicts their carefully worded efforts to distance themselves from the conduct. Martell's emails and text messages would have been available to FPL to confirm their authenticity. Additionally, Reuter's statement apparently construing "wrongdoing" as being limited to conduct that is plainly unlawful,

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

failed to acknowledge the substantial reputational risk to FPL created by its direct involvement in an unseemly effort to intimidate its critics.

44.     On July 27, 2022, NEE filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending on June 30, 2022 ("2022 Q2 10-Q").

45.     The 2022 Q2 10-Q was misleading by omitting material facts, specifically cautionary language warning investors that FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

46.     On October 26, 2022, Citizens for Responsibility and Ethics in Washington (CREW) filed an FEC complaint alleging that the individuals and entities implicated by the ghost candidate scheme violated federal campaign finance law.

47.     On November 3, 2022, NEE filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending on September 30, 2022 ("2022 Q3 10-Q").

48.     The 2022 Q3 10-Q was misleading by omitting material facts, specifically cautionary language warning investors that FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

## THE TRUTH EMERGES

49.     On January 25, 2023, NEE disclosed that Silagy would no longer serve as CEO of FPL as of February 15, 2023, and would retire effective May 15, 2023.

50.     NEE additionally disclosed that Silagy and NEE had entered into a "confirmation of post-retirement covenants agreement" (the "Severance Agreement") whereby Silagy agreed to, inter alia, a release of claims and various restrictive covenants, including non-competition and

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

non-disparagement covenants, in exchange for payments in the form of incentive awards calculated in accordance with NEE's annual incentive plan and equity awards consistent with what NEE characterized as "a normal retirement" of an employee at least age 55 following at least 10 years of service.

51.     As noted above, on the same day that Silagy's abrupt departure was disclosed, NEE filed a Form 8-K with the SEC which specifically acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives had orchestrated political misconduct. The Form 8-K stated as follows:

> FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL.

52.     Media and analysts covering NEE quickly connected Silagy's abrupt departure to the political scandals that had engulfed the Company during his tenure. Analysts surmised quickly that Silagy's departure was not of his own choosing and, as noted above, on January 31, 2023, media reports revealed that the Severance Agreement contained a claw back provision in case Silagy's misconduct gave rise to civil liability or fines as a result of "wrongdoing"—a hedge against precisely the same risk that was the subject of the Company's previous denialism.

**LOSS CAUSATION**

53.     Defendants' wrongful conduct was the direct and proximate cause of the losses suffered by Plaintiff and the Class.

54.     During the Class Period, Plaintiff and the Class purchased NEE securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. Defendants' false and misleading statements were the direct and proximate cause of such losses. The timing, scope, and scale of the drop in the share price for the Company's common stock following the publication of the Hindenburg Report establishes as much.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

55.     Silagy's abrupt departure from the role of CEO was widely publicized and immediately linked by several analysts to his role the political scandals involving FPL.

56.     Silagy's departure served as a corrective disclosure, identifying to the market that there were tangible and previously undisclosed risks posed by his political involvement and that the Company's exposure was sufficient to justify a rapid change in leadership at the highest level of NEE's principal subsidiary.

57.     Silagy's departure was announced before the market opened on January 25, 2023. On this news, on January 25, 2023, NEE's stock dropped $7.31 per share, or about 8.7%, representing a loss of approximately $13 billion in market capitalization on unusually high trading volume.

58.     On the same day, January 25, 2023, NEE released a Form 8-K acknowledging that FPL's orchestration of improper political conduct through Matrix had exposed the utility to legal and reputational risks.

59.     NEE's shares continued to slide over the next several days, dropping a further $1.96 per share, or 2.5%, between January 26, 2023, and January 31, 2023, with an unusually high volume of trading during that period.

60.     On January 31, 2023, NEE acknowledged to Bank of America analysts that Silagy's severance package included a unique claw back provision in case the Company needed to be compensated by Silagy for costs associated with "any legal wrongdoing"—tacitly acknowledging the link between Silagy's conduct and the legal and reputational risk described in the January 25th 8-K. On this news, NEE's stock dropped a further $0.39 per share on high trading volume.

61.     In total, over the course of the five trading days between January 25, 2023, when NEE announced Silagy's abrupt departure and disclosed that FPL's improper political conduct had exposed the Company to legal and reputational risks, and January 31, 2023, when NEE tacitly acknowledged the link between Silagy's exit and the legal and reputational risks identified in the January 25, 2023 8-K, NEE's stock plunged by $9.27 per share, representing a loss of approximately $18.63 billion in market capitalization.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## ADDITIONAL INDICIA OF SCIENTER

62.     Defendants knew that each of the public documents and statements identified above and issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NEE's false statements, their control over, and/or receipt and/or modification of the Company's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NEE's operations, participated in the fraudulent scheme alleged herein.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action individually and as a class action on behalf of all persons or entities, other than Defendants, who purchased or otherwise acquired NEE securities between December 2, 2021 and February 1, 2023, inclusive.

64.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(a) and (b)(3).

65.     The Class is so numerous that joinder of all members is impracticable.  Throughout the Class Period, millions of NEE's shares traded on the New York Stock Exchange.  Consequently, the number of Class members is believed to be in the thousands and Class members are likely scattered across the United States.

66.     The precise number of Class members is unknown to Plaintiff at this time but could be determined following discovery as Record owners and other members of the Class may be identified based on documents possessed by NEE or its transfer agent. Those persons and entities may be notified of the pendency of this action as is typically done in securities class actions.

67.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

68.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

69.     Additionally, common questions of law and fact predominate over questions affecting any individual Class member.  The common questions include, inter alia:

    a.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NEE;

    b.  whether Defendants thereby violated the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5); and

    c.  whether and to what extent Class members have been damaged by Defendants and the proper measure of damages.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for several reasons. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants. Also, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own and the number of Class members makes joinder impracticable.

71.     There will be no difficulty in the management of this litigation.

72.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## FRAUD ON THE MARKET

73.     The market for NEE's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NEE's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of NEE's securities and market information relating to NEE, and have been damaged thereby.

74.     During the Class Period, the artificial inflation of NEE's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NEE's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NEE and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result. At all relevant times, the market for NEE's securities was an efficient market for the following reasons, among others:

   a.   NEE shares met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

   b.   As a regulated issuer, NEE filed periodic public reports with the SEC and/or the New York Stock Exchange;

   c.   NEE regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. NEE was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

75.     As a result of the foregoing, the market for NEE's securities promptly digested current information regarding NEE from all publicly available sources and reflected such information in NEE's share price. Under these circumstances, all purchasers of NEE's securities during the Class Period suffered similar injury through their purchase of NEE's securities at artificially inflated prices and a presumption of reliance applies.

76.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

77.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NEE who knew that the statement was false when made.

<u>**COUNT ONE**</u>
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     By reason of the conduct herein alleged, each Defendant named herein violated Section 10(b) of the Exchange Act and Rule 10b-5.

80.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NEE's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

81.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NEE's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

82.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NEE's financial well-being and prospects, as specified herein.

83.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NEE's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NEE and its business operations and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

84.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NEE's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

85.     As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth herein, the market price of NEE's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NEE's securities during the Class Period at artificially high prices and were damaged thereby.

86.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NEE was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NEE securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

87.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

89.     Plaintiff and the Class have sustained damages because they purchased NEE stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

<u>**COUNT TWO**</u>
**Violation of Section 20(a) of the Exchange Act**
**(Against Robo)**

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91.     Robo acted as controlling person of NEE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position Robo had the power to influence and control and did influence and control, directly or indirectly, the decision-making of

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Robo was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, Robo had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93.     As set forth above, NEE and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Robo is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

1.   Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representatives and her counsel as Class counsel;

2.   For actual damages in an amount to be proven at trial;

3.   For pre-judgment and post-judgment interest on any such monetary relief;

4.   For reasonable attorneys' fees and costs;

5.   For costs of suit herein; and

6.   For such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

19

Dated : May 26 , 2023

/s/ Chris Gold
Chris Gold, Esq.
Florida Bar No. 088733
chris@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(786) 673-2405 phone


**BLOCK & LEVITON LLP**

Jeffrey C. Block, *pro hac vice forthcoming*
Jacob Walker, *pro hac vice forthcoming*
Brendan Jarboe, *pro hac vice forthcoming*
260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600
jeff@blockleviton.com

*Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

# DOCUMENT 1

**Certification Pursuant to Federal Securities Laws**

1. I, Maha Jastram, make this declaration pursuant to Section 27(a)(2) of the Securities act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against NextEra Energy, Inc. ("NEE" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3. I did not transact in NextEra Energy, Inc. securities at the direction of plaintiff's counsel, or in order to participate in any private action under the federal securities laws.

4. I am willing to serve as a representative party on behalf of a class of investors who purchased or otherwise acquired: NextEra Energy, Inc. securities during the Class Period, as specified in the Complaint; including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. Attached hereto as Exhibit 1 is a list of all of my transactions in NextEra Energy, Inc. securities during the Class Period, as specified in the Complaint.

6. During the past three years, I have not sought to serve as a representative party on behalf of a class under federal securities laws.

7. I will not accept payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court in accordance with 15 U.S.C. 78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     05 / 25 / 2023


Maha Jastram

# Exhibit 1

Doc ID: 9d2db4c1564d0d051f6cae72231ffee46ac161c2

| Date | Transaction | Shares | Price |
|------|-------------|--------|-------|
| 1/11/23 | Bought | 50 | $   84.80 |

Doc ID: 9d2db4c1564d0d051f6cae72231ffee46ac161c2