**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| MAHA JASTRAM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEXTERA ENERGY, INC., JAMES ROBO, ERIC SILAGY and DAVID P. REUTER, <br><br> Defendants. | Case No. 9:23-cv-80833-AMC <br><br> <u>CLASS ACTION</u> |

**OPPOSITION TO JACKSON COUNTY EMPLOYEES' RETIREMENT SYSTEM'S AND RICHARD BARCELONA'S MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF**

Three movants[1] are competing for appointment as Lead Plaintiff in this securities action: (1) the City of Hollywood Police Officers' Retirement System and the Pembroke Pines Firefighters & Police Officers Pension Fund (collectively, the "Florida Retirement Funds"), which purchased the *common* stock of NextEra Energy, Inc. ("NextEra," "NEE," or "Company"), which accounts for 98.5% of investor losses in the class period; (2) Richard Barcelona, a common stock purchaser with significantly smaller losses; and (3) Jackson County Employees' Retirement System ("Jackson County") which purchased only one of several kinds of *preferred* NEE stock, accounting for less than 0.6% of investor losses. As explained in detail below, there are far fewer preferred shares affected by the allegations in this case, with far lower potential damages available to preferred shareholders such as Jackson County.

There are dramatic differences between common and preferred stock and, as best as we are

---

[1] See ECF No. 31 (withdrawing motion of Marvin May for appointment as lead plaintiff).

aware, no court has ever appointed a movant who purchased only preferred stock to be the sole lead plaintiff of a class primarily composed of common stockholders. *See* Declaration of Jeffrey C. Block ("Block Decl.") at ¶ 11; *Zirkin v. Quanta Cap. Holdings, Ltd.*, No. 1:07-cv-00851 (S.D.N.Y. May 7, 2007) ("*Quanta* Tr.") (Block Decl. Ex. A) ("I haven't seen any case where preferred shareholders have been appointed to represent common shareholders. It's always the other way around...") Common stock represents an equity interest in a company, while preferred stocks typically pay substantial dividends at a fixed rate, functioning more like bonds. Thus, the price of preferred shares is more responsive to market-wide factors like national interest rates and is generally less sensitive to news about the company. An analysis of the vast differences in the financial interests of the common versus preferred stock underscores why the Florida Retirement Funds have the largest financial interest in the relief sought by the class and should be appointed as lead plaintiff.

There are 2.01 billion shares of NEE common stock outstanding and available for trading while, in contrast, there are only 40 million outstanding shares of the 6.219% preferred stock purchased by Jackson County. The common stockholders collectively suffered over $19 billion in potential losses while the 6.219% preferred stockholders collectively lost $119.2 million. Appointing a preferred stockholder to lead this case would be the tail wagging the dog.

The common and preferred stock reacted differently when the corrective information was revealed. As alleged in *Jastram v. NextEra Energy, Inc.*, the truth concerning NextEra began to emerge on January 25, 2023. ECF No. 14 at ¶ 6. NextEra's common stock fell by $7.22 per share on that day, or 8.7%, and continued to fall through February 1, 2023, for a total decline of $9.54 per share, or 11.5%. *Id.* at ¶¶ 60–61. In contrast, NextEra's 6.219% preferred shares fell only 5%, or $2.50 per share on January 25, 2023, and only fell another $.48 per share between January 25,

2023, and February 1, 2023, for a total decline of $2.98 per share, or 5.9%. *See* Block Decl. ¶ 5.

Not only does this demonstrate how different these securities are, as they reacted differently to the same news and information, but the "financial interests" of the movants are very different based on the recoverable losses suffered by each class of stock. Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005), a securities plaintiff can only recover the losses proximately caused by the revelation of the corrective news. As detailed below, applying *Dura* shows that the Florida Retirement Funds could recover approximately $439,501.32 whereas Jackson County could recover only $53,008.20.

The Florida Retirement Funds' "financial interest in the relief sought by the class" dwarfs the financial interest of Jackson County and Richard Barcelona, and the Florida Retirement Funds are the "most adequate plaintiff" under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B).[2] Even if the Court does not consider the dramatic differences between the common and preferred shares and simply looks at the LIFO losses submitted by both movants,[3]

---

[2] The Florida Retirement Funds have filed revised certifications to include transactions that were inadvertently omitted from their initial certification filed on July 25, 2023 and to correct other information. *See* ECF No. 32. The revised certifications do not alter the Florida Retirement Funds' relative position with respect to any other movant seeking appointment as lead plaintiff, nor do they materially alter their combined estimated LIFO losses. The search conducted by counsel for the Florida Retirement Funds failed to return relevant results with respect to all appropriate accounts, but the error was made in good faith, inconsequential, and self-corrected in short order. The correction of ministerial errors does not weigh at all with respect the Florida Retirement Funds' status as presumptive lead plaintiff. *See Banerjee v. Avinger, Inc.*, No. 17-cv-03400-CW, 2017 WL 4552063, at *8 (N.D. Cal. Oct. 11, 2017) ("clerical error" in certifications was inconsequential where "no indication that the error was committed in bad faith."); *Pampena v. Musk*, No. 22-CV-05937-CRB, 2023 WL 3082341, at *3 (N.D. Cal. Apr. 24, 2023) (failure to include all trades in PSLRA certification that movant fixed with supplemental certification did not undermine adequacy); *Niederklein v. PCS EdventuresA.com, Inc.*, No. 1:10-CV-00479, 2011 WL 759553, at *11 (D. Idaho Feb. 24, 2011) ("[M]inor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement.").

[3] As discussed below, Courts typically use the LIFO (Last-In-First-Out) accounting method to calculate estimated losses when comparing movants' losses involving the ***same security***. Here,

Jackson County is atypical and inadequate to represent common stockholders.

**First,** the common and preferred stock reacted very differently to news concerning NextEra, so a preferred stockholder would be an atypical representative for a class made up almost entirely of common stockholders. **Second,** preferred stockholders are inadequate because of the looming prospect of a conflict of interest with common shareholders concerning both the size and distribution of any recovery. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 624 n.3 (S.D.N.Y. 2015) (movant's preferred holdings "call[ed] into question [its] adequacy" to represent the class). Here, for example, any recovery greater than $119.2 million would make the preferred shareholders 100% whole, diminishing the preferred holder's interests to vigorously prosecute the case to make the common stockholders whole. Finally, the unique characteristics of NEE preferred shares and the timing of Jackson County's purchases make it "subject to unique defenses" that render it incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii).

Accordingly, the Court should appoint the Florida Retirement Funds as lead plaintiff to represent the entire class. In the alternative, the Court could appoint Jackson County as lead plaintiff of a sub-class of preferred stockholders alone. *See Wang v. Athira Pharma, Inc.*, No. C21-861 TSZ, 2021 WL 4726458, at *3 (W.D. Wash. Oct. 5, 2021) (collecting cases).

## I.   Argument

### A. The Florida Retirement Funds Are the Most Adequate Plaintiff Under the PSLRA

The "most adequate plaintiff" in a securities class action is presumptively the person who

---

where there are different securities that suffered different degrees of loss because they are subject to different factors affecting their respective market price, the LIFO methodology is inapt. *See Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, No. 2:20-cv-00368-JNP-DBP, 2021 WL 913934, at *4 (D. Utah Mar. 10, 2021) (explaining that "comparing damages calculations" between two different types of securities "is like comparing apples to oranges"). Looking at the overall recoverable amount better represents each movant's true financial interest in the relief sought by the class.

"(aa) has either filed the complaint or made a motion in response to a notice . . . ; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also In re Oxford Health Plans, Inc. Secs. Litig.*, 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998) (explaining that the goal of the PSLRA is to ensure that "parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs['] counsel") (citation and quotation marks omitted).

The presumption may be rebutted upon proof that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL-ALTONAGA/Torres, 2021 WL 4840857, at *2 (S.D. Fla. Oct. 15, 2021) (quoting 15 U.S.C. § 78-u4(a)(3)(B)(iii)(II)). Here, the Florida Retirement Funds are the presumptive lead plaintiff.[4]

**B. The Florida Retirement Funds Have the Largest Financial Interest in the Relief Sought by the Class**

The PSLRA does not prescribe a method of calculating which movant has the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Absent statutory guidance, courts in the Eleventh Circuit consider, among other factors, "(1) the number of shares purchased during the class period, (2) the amount of the investment or net funds expended during the class period, and (3) the estimated losses suffered." *Steppacher v. Alfi, Inc.*, No. 21-cv-

---

[4] Counsel to the Florida Retirement Funds have continued to independently investigate the claims and have obtained information they believe strongly supports the allegations made in the complaint on file.

24232, 2022 WL 1115049, at *6 (S.D. Fla. Apr. 13, 2022). Many courts add a fourth factor: the number of net shares purchased. *See Lax v. First Merchants Acceptance Corp.*, No. 97-cv-2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997).

Aggregating the losses of co-movants is appropriate in securities class actions. *See Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 503 (S.D. Fla. July 31, 2002) (collecting cases). Aggregation is especially reasonable where two or more entities have a pre-litigation relationship and agree to jointly prosecute the action. *See id.* (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001)). Here, the Florida Retirement Funds have maintained a longstanding professional relationship predating this litigation, and each has experience serving as a lead plaintiff in prior securities class actions. ECF. No. 25-5. In addition, both funds are members of the Florida Public Pension Trustees Association and the National Conference on Public Employee Retirement Systems and agreed to jointly prosecute this action before moving for lead plaintiff status. *See id*. The Florida Retirement Funds' combined total of shares purchased, funds expended, and losses incurred is the starting point for the lead plaintiff analysis.

Here, each movant submitted their loss estimates using the LIFO methodology. But this is not a proper method to *compare* each movant's true financial interest in different securities because it "takes into account losses that resulted from fluctuations in [the defendant company's] stock prior to the Corrective Disclosure that potentially have nothing to do with the inflation resulting from the alleged fraud." *Mehedi v. View, Inc.*, No. 21-cv-06374, 2022 WL 377406, at *5 (N.D. Cal. Feb. 8, 2022). NextEra's common stock fell by $9.54 per share between January 25, 2023 and February 1, 2023, while the 6.219% preferred shares fell just $2.98 in the same period. NextEra's common stock therefore lost over three times as much value per share as preferred shares once the fraud was revealed—which is the true measure of a securities plaintiff's recoverable losses, *i.e.*,

6

"financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) ("only losses actually attributable to a given misrepresentation are cognizable.").

The text of the PSLRA supports weighing such merits-oriented considerations more heavily than simplified estimated LIFO losses, especially when analyzing losses suffered from purchasing different types of securities, as the statute directs courts to look ahead and consider each movant's relative financial interest in the "*relief* sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added); *see also In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1108 (N.D. Cal. 2001) ("the PSLRA defines financial interest in terms of 'recovery sought'"). To establish loss causation on the merits, a plaintiff must show that the defendant's misrepresentations proximately caused its losses. *See Dura*, 544 U.S. at 343. The lead plaintiff is required to prove "that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011). The method for establishing recoverable losses requires "showing that the stock price dropped soon after the corrective disclosure" and "eliminating other possible explanations for this price drop." *Id.* at 1311–12. Under this approach, "the Court considers the value of each party's retained stock just before the Corrective Disclosure and subtracts the party's sale proceeds for that stock (or, for stock retained past the 90-day post-Disclosure period, the number of shares multiplied by the average stock price)." *Mehedi,* 2022 WL 377406, at *6; *see also Colwell v. Exicure Inc.*, No. 21-cv-06637, 2023 WL 2572454, at *4 (N.D. Ill. Mar. 20, 2023) (applying same method for calculating *Dura* losses at lead plaintiff stage); *Pelletier v. Endo Int'l PLC*, 316 F. Supp. 3d. 846, 849 (E.D. Pa. June 19, 2018) (using *Dura* recoverable losses to calculate financial interest because "[i]ncluding losses

that were incurred before any disclosure could not have been caused by any disclosures and are not recoverable. Thus, those shares are not included in the 'largest financial interest' calculus.")

Here, Jackson County's recoverable losses are a fraction of the Florida Retirement Funds'. Jackson County's 6.219% preferred stock was valued at $50.78 on January 24, 2023, before the first and most significant corrective disclosure. Block Decl. ¶ 5. Jackson County's total potentially recoverable losses under *Dura* are the total value of its 21,035 shares before the corrective disclosure minus the total value after the 90-day look-back period, or $53,008.20.[5] In contrast, NEE common stock was valued at an adjusted closing price of $82.83 on January 24, 2023. Block Decl. ¶ 3. The Florida Retirement Funds possessed 54,768 common shares as of that date, which were valued at $4,536,433.44. The Florida Retirement Funds sold 330 shares on February 1 for $73.79 per share, another 210 shares on February 1 for $73.84 per share, and 4,782 shares on March 3 for $72.49 per share. The 90-day look-back price of $75.04 applies to the remaining 49,446 shares. After subtracting the value of the sales and the product of the remaining 49,446 shares and the look-back price, the Florida Retirement Funds' *Dura* losses are estimated at $439,501.32. This measure captures the vast disparity in the share price drops between common stock and preferred stock upon the corrective disclosure, and thus more accurately depicts the degree to which the common and preferred shares were each affected by the fraud once it was revealed.[6] Indeed, the smaller stock price drop in the preferred shares strongly suggests that it

---

[5] (21,035 shares×$50.78 on January 24, 2023) - (21,035 shares×$48.26 90-day look-back price)

[6] Because preferred shares are similar to debt securities like bonds, their market price is strongly influenced by general market factors not affected by company-specific news, such as national interest rates. Sean Ross, *Why do preferred stocks have a face value that is different than market value?*, INVESTOPEDIA (July 19, 2022), https://tinyurl.com/2n4xehdp; *see also* Christopher Girdler, CFA, *A guide to preferred shares*, RBC DOMINION SECURITIES INC., at 7 (2018), https://tinyurl.com/3f4cnd6b ("One of the most important risks to understand with preferred shares relates to changes in interest rates . . . For example, a fixed rate perpetual would typically suffer

suffered lower damages because of the fraud than purchasers of common stock like the Florida Retirement Funds. *See Mehedi*, 2022 WL 377406, at *5. Thus, using the most appropriate measures, the Florida Retirement Funds have the greatest losses. A more comprehensive examination of what losses are recoverable is more informative because a surface-level LIFO loss analysis fails to account for the differences between two very different securities.

The table below summarizes each movants' financial interest in the litigation:

| Movant | Shares Purchased | Net Shares Purchased | Net Expenditure | Estimated LIFO Loss | Estimated *Dura* Losses |
|---|---|---|---|---|---|
| Florida Retirement Funds | 57,777 | 54,228 | $4,187,297.15 | $122,118.81 | $439,501.32 |
| Jackson County | 21,035 | 21,035 | $1,144,335.55 | $129,184.89 | $53,008.20 |
| Richard Barcelona | 6,215.94 | 6,215.94 | $474,081.00 | $3,869.00 | $48,422.17 |

Even if the Court accepts the LIFO methodology as the sole measure of losses, notwithstanding that much of Jackson County's reported loss is not recoverable, the Florida Retirement Funds still have the largest financial interest in the relief sought by the class. When estimated LIFO losses between movants are close and shares purchased and net expenditure heavily favor one movant, the number of shares purchased and net expenditure factors "provide a more objective assessment of a movant's financial interest than the losses suffered" because they "are static markers set in stone during the class period, whereas losses suffered may be subject to future changes in the price per share." *Westchester Putnam Cntys. Heavy & Highway Laborers Loc. 60 Benefit Funds v. Brixmor Prop. Grp., Inc.*, No. 16-cv-02400, 2016 WL 11648466, at *2 (S.D.N.Y. Nov. 29, 2016) (appointing plaintiff whose losses were 16% lower than competing

when interest rates rise because the fixed dividend will compare poorly to alternative investments…").

movant but whose net shares purchased and net expenditures were each 185% higher); *see also Arias v. Bird Glob., Inc.*, No. 22-cv-08406, 2023 WL 3814040, at \*4 (C.D. Cal. June 2, 2023) (treating competing movants whose claimed losses were "roughly equal" as "equivalent" and looking to the other three *Lax* factors to determine which movant had the largest financial interest.); *Alkhoury v. Lululemon Athletica, Inc.*, No. 13-cv-04596, 2013 WL 5496171, at \*1 (S.D.N.Y. Oct. 1, 2013) (finding movant's slight lead in losses "insufficient to outweigh the substantial financial interest of [the competing movant] that is evidenced by the other factors."). Although some courts accord the estimated loss factor the greatest weight, "such pronouncements are often made in cases in which the competing movants are not competitive as to the other three accepted factors." *Cambridge Ret. Sys. v. Mednax, Inc.*, No. 18-cv-61572, 2018 WL 8804814, at \*4 (S.D. Fla. Dec. 6, 2018), *report and recommendation adopted by* 2018 WL 6978626 (S.D. Fla. Dec. 21, 2018) (appointing lead plaintiff with highest net shares and net expenditure, but lower losses).

The Florida Retirement Funds purchased more shares and expended more funds than both other movants *combined*—buying more than twice as many shares and expending more than triple the funds of Jackson County. Jackson County has a slight lead in its reported LIFO loss, but "minimal" differences in estimated losses are "insubstantial" and in circumstances where—as here—losses are neck-and-neck, courts treat them as equivalent. *See Carvelli v. Ocwen Fin. Corp.*, No. 17-cv-80500, 2017 WL 11068524, at \*5 (S.D. Fla. July 14, 2017) (collecting cases); *see also Randall v. Fifth St. Fin. Corp.*, No. 15-cv-07759, 2016 WL 462479, at \*3 (S.D.N.Y. Feb. 1, 2016) (treating losses separated by 18% difference as "approximately equal"). Here, simply using LIFO, the Florida Retirement Funds' estimated losses and Jackson County's estimated losses are only $7,066.08 apart, a difference of around 5%. But when considering how much the Florida Retirement Funds were affected by the loss, which is underscored by their exponentially higher

10

net shares purchased, funds expended, and dramatically greater *Dura* losses, they have the greatest financial stake in the relief sought by the class and are the most adequate plaintiff.[7]

The shares purchased factor in particular is a more appropriate measure of financial interest in this case because it more closely approximates the potential losses each movant will be able to prove at trial. *See Cambridge Ret. Sys.*, 2018 WL 8804814, at *4 (collecting cases holding that the number of net shares is "determinative" because it "equates directly with potential recovery"). Estimated loss at the lead plaintiff stage, in contrast, "is heavily dependent on the method applied and numbers chosen to calculate losses," *Pio v. Gen. Motors Co.*, No. 14-cv-11191, 2014 WL 5421230, at *4 (E.D. Mich. Oct. 24, 2014), and does not equate to "the damages attributable to the fraud," *Cambridge Ret. Sys.*, 2018 WL 8804814, at *2. Accordingly, the Court should find that the Florida Retirement Funds have the largest financial interest in the relief sought by the Class.

**C.  The Florida Retirement Funds Are Typical and Adequate**

On a motion to serve as lead plaintiff, a movant need only make a "preliminary showing" that they satisfy Rule 23's typicality and adequacy requirements. *Mulvaney v. Geo Grp., Inc.*, 2016 WL 10519276, at *2 (S.D. Fla. Nov. 21, 2016). Here, the Florida Retirement Funds are both typical and adequate. They bought their Next Era common stock during the proposed Class Period just like virtually all class members and have no interests that are antagonistic to or not in-line with other class members.

In enacting the PSLRA, Congress clearly expressed a preference for institutional investors to serve as Lead Plaintiffs and the Florida Retirement Funds are the quintessential lead plaintiff——particularly since they "resid[e] within the District." *City Pension Fund for Firefighters & Police Officers in the City of Mia. Beach v. Aracruz Cellulose S.A.*, No. 08-23317-CIV, 2009 WL

---

[7] Richard Barcelona has a far lower financial interest by every relevant measure.

10664427, at *5 (S.D. Fla. Aug. 7, 2009). Accordingly, the Florida Retirement Funds are the presumptive lead plaintiff.

### D. Jackson County is Inadequate and Atypical Because It Traded *Only* in Preferred Shares of NEE During the Class Period

Jackson County is neither adequate nor typical of the class and cannot be appointed lead plaintiff for a class overwhelmingly composed of common shareholders. *See Miller v. Dyadic Int'l, Inc.*, No. 07-80948-Civ, 2008 WL 2465286, at *6 (S.D. Fla. Apr. 18, 2008) ("[O]f [Rule 23's] prerequisites, only two—typicality and adequacy—are relevant in deciding a motion for appointment of lead plaintiff." (citations omitted)).

#### i. Jackson County Lacks Standing to Pursue Securities Fraud Claims for Common Shares of NEE

Where a plaintiff seeks to represent a class, the Eleventh Circuit requires that they "establish a case or controversy 'between himself and the defendant by virtue of having standing as to all the claims he seeks to assert, not just one.'" *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14-CV-20880-UU, 2016 WL 4006661, at *7 n.5 (S.D. Fla. Mar. 16, 2016) (quoting *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (plaintiffs with one sort of injury lack standing to challenge a different injury because "standing is not dispensed in gross"). Put another way, "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin*, 823 F.2d at 1483. Here, Jackson County purchased only preferred shares and purchased and owned zero shares of common stock. Jackson County thus did not suffer injury as a result of the decline in the price of common shares and lacks standing to pursue claims on behalf of investors who purchased common shares—virtually the entire class by any measure. *Thorpe*, 2016 WL 4006661, at *7 n.5.

After all of the alleged corrective disclosures, the holders of the 2.01 billion common shares of NEE lost over $19 billion in value. By contrast, holders of the 40 million NEE 6.219% preferred

12

shares, like Jackson County, lost $119.2 million. The chart below displays the portion of the potential damages at issue in this action that Jackson County lacks standing to pursue in blue and grey, while the damages they have standing to pursue are displayed in orange:



*See* Block Decl. ¶ 10 (summarizing losses in market capitalization in NextEra securities).

If Jackson County were selected as the sole lead plaintiff, the "constitutional standing issues" that arise "where a class representative asserts claims on behalf of purchasers of securities that the class representative himself or herself did not purchase" could prevent it from representing, much less certifying, virtually the entire class. *Thorpe*, 2016 WL 4006661, at *7 n.5 (citing *In re Bank Of Am. Corp. Sec., Derivative, And Employee Ret. Income Sec. Act (ERISA) Litig.*, 2011 WL 3211472, at *13 (S.D.N.Y. July 29, 2011)); *see also In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 723–24 (S.D. Tex. 2006) (denying class certification with respect to holders of a subset of debt securities where there was no appropriate class representative). This defect speaks directly to Jackson County's typicality and adequacy to serve as lead plaintiff.

### ii. Jackson County's Claims are Atypical and it is Inadequate to Represent the Interests of the Common Shareholders

Jackson County's claims are atypical because it shares essential characteristics with only a small fraction of the class as a whole. Courts have routinely rejected efforts to seek appointment as lead plaintiff on the part of holders of marginal securities when common shares made up the vast majority of losses. *See In re Delphi Corp. Sec., Derivative & "Erisa" Litig.*, 458 F. Supp. 2d 455, 462 (E.D. Mich. 2006) (appointing common shareholders as lead plaintiffs and rejecting preferred shareholders' attempt to be appointed co-lead); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D. Tex. 2002) (rejecting preferred shareholders' and other "niche plaintiffs'" requests to be appointed lead plaintiffs of separate classes where common shareholders had largest losses and were otherwise adequate and typical). In the archetypical case, holders of niche securities seek appointment as either co-lead plaintiffs or as the representatives of sub-classes of preferred shareholders, bondholders, or other instruments that typically make up a fraction of overall losses. *See, e.g., In re Enron Corp.*, 206 F.R.D. at 451 (describing such requests as seeking the "splintering the action" for the purpose of "represent[ing] special interests").

Jackson County's motion for appointment as lead plaintiff inverts the usual niche plaintiff dynamic: rather than seeking to peel off a sub-class, they seek to lead the entire case. But while investors trading only in common stock are routinely appointed as sole lead plaintiff in cases involving both common and preferred securities, *see, e.g., id.*, the extensive legal research by the Florida Retirement Funds' counsel has not identified a single instance in which the reverse was true—even accounting for cases where movants with only preferred securities had the most substantial financial losses. Block Decl. ¶ 11.

Courts in similar circumstances have recognized the inherent adequacy and typicality defects of such niche plaintiffs. In *Zirkin v. Quanta Cap. Holdings*, for example, as here, the

preferred shares were a minuscule percentage of the overall securities in the case. The defendant company had 73 million outstanding shares, 70 million of which were common (96%) and just 3 million of which were preferred (4%). *Quanta* Tr. at 17:25-18:4. Although a preferred shareholder was the movant with the greatest losses by far, the Court commented at oral argument that the preferred shareholder's request to be appointed lead over the entire class was entirely unprecedented:

> THE COURT: Let me ask Mr. Bernstein one question, I haven't seen any case where preferred shareholders have been appointed to represent common shareholders. It's always the other way around; that the class representative of the common shareholders is appointed to represent the preferred. Do you have any cases that show it the other way?
>
> MR. BERNSTEIN: None come to mind.

*Id.* at 30:4-10. Accordingly, the court opined that although the preferred shareholder had "the largest financial interest in the action," it was "not a typical common shareholder" and could not be given sole control as lead plaintiff. *Id.* at 31:1-4. The court reached this conclusion even though: (i) the preferred shareholder's losses were *twenty times* greater than the competing movant's losses on common stock, *id.* at 5:1-5, 30:16, and (ii) the preferred shareholder held some common shares, although the timing of its transactions exposed it to unique defenses as to those shares, *id*. at 31:4-10. The court appointed both the preferred shareholder and a competing common shareholder as lead plaintiffs of classes composed of their respective securities. *Id.* at 31:11-15.

Similarly, in *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (May 21, 2004 S.D.N.Y.) (Block Decl. Ex. B), bondholders were appointed as co-lead plaintiffs alongside stock traders in a case in which bonds accounted for approximately 85% of overall losses. *See id.* at 42:23. The court explained that the "problem of stock versus bonds" was that, in light of vastly unequal relative damages and the certainty of finite resources available in a prospective settlement, "there is going to be an issue, both in negotiating the size of the pot and in whacking it up, as to

the respective interest of stockholders and bondholders." *Id.* at 42:21-43:3. Identical concerns are present here. Common shareholders account for over 98% of overall losses and the preferred shareholders account for less than 2%, and the distribution of a common fund made available via settlement would inevitably give rise to precisely the kind of "substantial conflicts of interest . . . between the representative and the class" that preclude a finding of adequacy. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (quotations omitted).

Identical concerns about a potential conflict of interest between preferred shareholders and common shareholders drove the result reached by Judge Gerard E. Lynch in *In re Fannie Mae Matters*, No. 08-cv-7831 (S.D.N.Y. Feb. 13, 2009) (Block Decl Ex. C). There, a preferred shareholder claimed greater losses than a movant with common stock holdings. *Id*. Reading his decision into the record during the lead plaintiff hearing, Judge Lynch explained:

> I am persuaded that in this case it may not be desirable to have a single lead plaintiff because there may be substantive conflicts of interest among those comprising the largest hypothetical class. The biggest source of conflict seems to me to be between the holders of common and preferred shares. **I do not think it's possible for a lead plaintiff that has primarily suffered losses on preferred stock to fairly represent the interest of common shareholders…**

*Id*. at 7:25-8:7 (emphasis added). Judge Lynch then observed that "the reverse may not be true. It may be possible to have a single lead plaintiff with primarily losses in common stock" but, because of the unique circumstances of the case, elected to appoint "separate lead plaintiffs to represent the interests of common and preferred shareholders." *Id.* at 8:10-15; *see also id.* at 10:22-25. Here, precisely the same circumstances are present and the same reasoning would counsel against the appointment of Jackson County as sole lead plaintiff.

More recently, other courts have reached the same conclusions. A district court in 2015 drew on this precedent in rejecting a lead plaintiff movant whose losses "[we]re in preferred"

shares, given the potential for a future conflict with the interests of common shareholders, although individualized reliance defenses applicable to the preferred shareholder also factored into the Court's analysis. *In re Petrobras*, 104 F. Supp. 3d at 623, 624 n.3. That Court found the movant's preferred holdings "call[ed] into question [its] adequacy" even though "no bankruptcy [wa]s imminent." *Id.*

Another district court in 2021 reached a similar conclusion about a class overwhelmingly composed of common shareholders where "one hundred percent" of the presumptive lead plaintiff's "losses stemmed from option contracts." *Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 568 (E.D. Tex. 2021). Observing that "the average Reata investor acquired common stock rather than options during the Class Period," *id.* at 566 n.4, the Court found the fact that the movant with the largest financial interest suffered its losses "solely on option contracts render[ed it] atypical of the putative class," *id.* at 567, and its trades "materially different from the putative class consisting largely of common stockholders," *id.* at 568. For the same reason, it was subject to "'unique defenses' concerning damages" that would rebut a finding of adequacy. *Id.* at 568; *see also Gelt*, 2021 WL 913934, at *5 (movant who purchased options inadequate lead plaintiff of class that primarily purchased common stock). The same is true here, where Jackson County traded in a security that is not representative of the broader class whose price is affected by different factors.

Any suggestion that Jackson County could remedy this defect by bringing in an additional named plaintiff who traded in common stock should be rejected. First, any such suggestion would be a tacit admission by Jackson County that it cannot represent common stockholders. Second, even if the standing issue were resolved, it would undermine the PSLRA to allow an unnamed and as yet unidentified class member, with potentially small losses, to lead the case on behalf of

17

common stockholders even though an adequate and typical representative, with substantial losses, and who timely moved to be appointed lead plaintiff, is already before the Court.

There is no reason here to diverge from the well-reasoned decisions of other courts who have confronted the present situation. At best, Jackson County may be fit to serve as the lead of a subclass comprised of purchasers of NEE 6.219% preferred shares. *See In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2010 WL 4316754, at *5 (D. Nev. Oct. 25, 2010) (appointing co-lead plaintiffs to represent purchasers of debt securities alongside common shareholders).

### iii. The Characteristics of the Market for NEE's Preferred Shares Underscores the Differences Between Common and Preferred Shares.

Here, as in securities class actions more broadly, if the action proceeds past a motion to dismiss, the lead plaintiff will invoke the fraud-on-the-market doctrine to establish class-wide reliance, and thus predominance, at class certification. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *Erica P. John Fund, Inc. v. Halliburton Co.*, 573 U.S. 258, 268 (2014) ("[S]ecurities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance…"). The economic theory that underlies *Basic* reliance is that full and complete capital markets are efficient and that stocks in an efficient market automatically incorporate all publicly available information into stock prices, including material misrepresentations. *See id.*; *Basic*, 485 U.S. at 246. If capital markets are not efficient, then the *Basic* presumption of reliance fails.

Courts in the Eleventh Circuit rely on a "flexible approach" to determine market efficiency. *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014). This approach is grounded in a recognition that "the market for a stock is generally efficient when 'millions of shares change hands daily and a critical mass of' investors and/or analysts 'study the available information and influence the stock price through trades and

18

recommendations.'" *Id.* at 1255 (*quoting FindWhat*, 658 F.3d at 1310). Additionally, this analysis may include a review of the *Cammer* factors, *id.*, which include, among other things, average weekly trading volume, analyst coverage, and, critically, "a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer v. Bloom*, 711 F. Supp. 1264, 1291 (D. N.J. 1989).

In light of these factors, establishing market efficiency for the preferred shares of NEE stock purchased by Jackson County, is substantially different than establishing market efficiency for more widely traded securities, such as common stock. NEE's preferred shares traded in substantially lower volumes than NEE's common shares, Block Decl. ¶¶ 4, 6, were subject to less analyst coverage, Block Decl. ¶ 12, and, as Jackson County itself acknowledges, were less reactive following the disclosure of new information. *See* Mot. at 3 (noting that NEE's common stock fell approximately 9% while its preferred stock by only 5%). Because NEE's preferred shares are a "hybrid security" that pay a substantial dividend, much like a corporate bond, they are subject to different, non-company-specific factors, like changes in interest rates, that affect their price in a manner distinct from common shares. *See* Michael L. Hartzmark and H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev. 149, 164–65 (2014). The additional legal risk associated with establishing market efficiency for preferred shares constitutes a "unique defense" against Jackson County that weighs against its appointment as lead plaintiff. *In re Safeguard Scientifics*, 216 F.R.D. 577, 581–82 (E.D. Pa. 2003) ("[W]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative."). If the defense were to succeed with respect to preferred shares but the common shareholder class remained intact, the class would be left to "essentially start from scratch and the proceedings would

be significantly delayed." *Wang*, 2021 WL 4726458, at *3 (appointing co-lead plaintiffs and rejecting "notion that an inadequate lead plaintiff could simply be replaced at a later time.").

Plus, the 6.219% preferred shareholders collectively lost a mere fraction of the potential losses sustained by common stockholders. Jackson County simply does not have the incentive to seek to recover more than $119.2 million, which would make the 6.219% preferred shareholders whole. As such, it is inadequate to represent common stockholders.

### iv.     The Timing of Jackson County's Trades Give Rise to Unique Defenses

Jackson County sold its entire holdings of 4.872% NEE preferred stock on August 26, 2022, and that same day bought its 21,035 shares of 6.219% preferred shares. Tellingly, the 4.872% preferred shares it sold on August 26, 2022, were set to expire on September 1, 2022, and were replaced with cash and common stock. *See* ECF No. 28-2; Block Decl. Ex. D. Jackson County is therefore subject to the unique defense that it did not rely on the integrity of NEE's market price when purchasing its 6.219% preferred shares but, instead simply engaged in the transaction to maintain its holdings of NEE preferred stock and would have purchased those shares regardless of its stock price and not in reliance on the integrity of the market price. Jackson County's exposure to unique defenses weighs against its appointment. *See Aracruz Cellulose*, 2009 WL 10664427, at *5 (rejecting movant as "atypical trading may expose the class to unique defenses").

## III.     Conclusion

For all these reasons, the Court should appoint the Florida Retirement Funds as Lead Plaintiff. While the Florida Retirement Funds are more than capable of representing all NEE investors, the Court could consider appointing Jackson County as lead plaintiff for a sub-class of NEE Preferred stockholders.

Dated: August 8, 2023

Respectfully submitted,

*/s/ Chris Gold*
Chris Gold, Esq.
Florida Bar No. 088733
chris@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(786) 673-2405 phone

Scott Edelsberg, Esq.
Florida Bar No. 0108039
scott@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(305) 975-3320 phone

*Liaison Counsel for Movant Florida
Retirement Funds and Proposed Liaison
Counsel for the Class*

**BLOCK & LEVITON LLP**
Jeffrey C. Block, Esq. (*pro hac vice*)
Jacob Walker, Esq. (*pro hac vice*)
Brendan Jarboe, Esq. (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
(617) 398-5600 phone
(617) 507-6020 fax

*Counsel for Movant Florida Retirement Funds
and Proposed Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON, P.A.**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

21

*Additional Counsel for Movant Florida
Retirement Funds*

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 8th day of August, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Chris Gold*
Chris Gold