# EXHIBIT A

757nzirn

1

757nzirn                    Argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HAROLD ZIRKIN,

                    Plaintiff,          New York, N.Y.

            v.                          07 Civ. 851 (RPP)

QUANTA CAPITAL HOLDINGS, LTD.
et al.,

                    Defendant.

------------------------------x
                                        May 7, 2007
                                        10:10 a.m.
Before:
            HON. ROBERT P. PATTERSON, JR.,

                                        District Judge

                    APPEARANCES

BERNSTEIN LIEBHARD & LIFSHITZ
      Attorneys for Plaintiff
BY:   STANLEY BERNSTEIN
      JOSEPH SEIDMAN

COVINGTON & BURLING
      Attorneys for Defendants
BY:   MICHAEL SCHLANGER

WILLIAMS & CONNOLLY
      Attorneys for Defendant Friedman Billings & Ramsey, Ltd.
BY:   JENNIFER LEE

LABATON SUCHAROW & RUDOFF LLP
      Attorneys for Movant Washington State Plumbing and
      Pipefitting Pension Trust
BY:   JOHN KEHOE
      ANDREI RADO

THE BRUALDI LAW FIRM
      Attorneys for Jorge Coronel
BY:   GAITRI BOODHOO

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

757nzirn                    Argument

            (Case called)
            THE COURT:  I am trying to think who I should hear
from first, whether it should be Washington State or Mr.
Zirkin's firm.  I guess it's Mr. Zirkin's firm.
            Mr. Bernstein.
            MR. BERNSTEIN:  Good morning, your Honor.
            I think everyone in the courtroom at least agrees to
one ministerial act.  There is no opposition to the
consolidation of the two securities class actions relating to
Quanta Capital.
            THE COURT:  I may.  I am not sure that they should be
consolidated, except for discovery purposes.

757nzirn

MR. BERNSTEIN: OK.

THE COURT: So you may want to address the issue. In other words, for discovery purposes it makes sense because you will be engaging in virtually the same discovery in both actions. But one action is brought on solely on behalf of a preferred shareholders, at least as I read the complaint, and the other action is based on the common shareholders.

MR. BERNSTEIN: That may tie into the whole argument, so let me explain. Traditionally, no matter what would happen today, whoever is appointed lead plaintiff and lead counsel would file a consolidated complaint to merge whatever differences there might be in the complaint. So I don't think that the scenario your Honor anticipates would actually happen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

757nzirn                    Argument

In fact, both complaints, the Zirkin complaint is on behalf of all securities purchasers, preferred and common, not just preferred or common. It combines both. The proposed lead plaintiffs bought both preferred and common shares, paragraph 1 of the complaint.

THE COURT: The other complaint is solely on behalf of common?

MR. BERNSTEIN: Common because they didn't have any preferred shareholder, but the Zirkin covers all the securities.

MR. SCHLANGER: Excuse me, your Honor. The only reason I came forward was to say there hasn't been a motion to consolidate to my knowledge. We'll address whatever is directed to the defendants at such time as it is, but I think it's premature.

THE COURT: So you would oppose the motion to consolidate?

MR. SCHLANGER: I would agree with your Honor that for purposes of efficiency there should be consolidated discovery.

MR. RADO: Just one point of clarification?

THE COURT: They will be handled as related actions in this court in any event.

MR. SCHLANGER: Yes, your Honor. Certainly.

MR. RADO: Good morning, your Honor. Andrei Rado from Labaton. One point of clarification. I'm looking at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

757nzirn                    Argument

Zirkin complaint, 07 Civ. 851, in paragraph 21, which defines the class. It says, The class consists of all those who purchased or otherwise acquired the preferred, it says preferred or common shares of Quanta stock pursuant to or traceable to one of the prospectuses. So it purports to be on behalf of only '33 Act claims that are traceable to a prospectus as opposed to open market purchasers of the common stock.

THE COURT: There is that difference in the complaints.

MR. RADO: Yes, sir.

THE COURT: You are perfectly correct. The Coronel action would cover earlier purchases, and it covers earlier events than the Zirkin complaint.

MR. BERNSTEIN: To move to the lead plaintiff motion, the Zirkin Cutler and Zirkin individual lead plaintiff movant has moved in both actions, has the largest financial interest under any measure of class period, whether it goes back to the IPO or goes forward. This happens quite frequently in securities class actions, where different firms, different plaintiffs file different class periods, have different

757nzirn

theories, but the PSLRA says that the Court should appoint the movant with the largest financial interest in the totality of the circumstances, which by one measure -- I know your Honor read the papers over the weekend -- the Zirkin Cutler funds has

757nzirn                    Argument

over $1 million of losses, which have not been attacked or challenged under any argument.  The Washington Pipefitters have about $50,000 in claimed losses.  So if we just stopped right there, we are the presumptive lead plaintiff, and we have the largest financial interest.

THE COURT:  Let me ask you the question that was raised by the other parties' papers.  That is, why isn't there a conflict with respect to Mr. Zirkin?

MR. BERNSTEIN:  The issue, your Honor, in securities class actions since the PSLRA, while the language is very clear, appoints the party with the largest financial interest, since then very creative counsel have tried to carve out niches for themselves in virtually every class action because they know that if they don't have the largest financial interest, let me see if I can attack this way or attack that way.

The attacks come very frequently with respect to what we call a niche.  I want to represent the people that bought options.  I want to represent the people that bought the preferred.  I want to represent this and that.

Your Honor, I don't stand here and say there can never be a conflict.  What I say is under the PSLRA and the body of cases in this district and throughout the country, the courts say we appoint the lead plaintiff that has the largest financial interest, even if he or she does not have the right to even bring a particular claim, let alone when there is a

757nzirn                    Argument

conflict, even if they never even bought a particular niche of security.  Then, if there is a conflict or if there's any need, at the class certification stage additional class representatives are added to the case.  For that in the Southern District we have the WorldCom case, we cite DVCI, KPMG, and the IPO case.

THE COURT:  What were the terms of the preferred stock in the WorldCom case?  What were the terms of the preferred stock?  Was it just a preferred dividend, or was it a situation where they had a right to a liquidation value?

MR. BERNSTEIN:  As I stand here, I don't know the answer to that.  But I do know this answer.  At that time WorldCom was already bankrupt.  So the conflict was --

THE COURT:  You are almost taking on the situation of being a bondholder in a sense if this company is going to be liquidated.

MR. BERNSTEIN:  We have no indication that this company is being liquidated.

THE COURT:  If you didn't think it was going to be liquidated and you were going to get less than $25 a share, why did you bring the action?

MR. BERNSTEIN:  The stock value went down.  The stock value, both the common and the stock went down.

THE COURT:  But you haven't sold yet as far as I can tell.

757nzirn                    Argument

MR. BERNSTEIN:  Not during the class period.  I don't

757nzirn

believe even after the class period.

THE COURT: Have they sold?

MR. BERNSTEIN: Post-class period. Post-class period, but not during the class period.

THE COURT: They have sold?

MR. SEIDMAN: Post-class period I believe everything was sold. You only have to list your class period transactions for certification.

THE COURT: I know. But it makes a difference on how I view the action.

MR. BERNSTEIN: If you have a separate lead plaintiff for common and preferred, then we are throwing out PSLRA jurisprudence which says let's not have niche plaintiffs. Let's have one lead plaintiff and address this later at the class certification stage if there is a conflict.

If there is a conflict, your Honor, may I just say one thing, the Washington plaintiff is not the right class representative to represent common or preferred because of something we learned, what we suspected early but we now learned in Friday's papers, we were apparently wrong, that they were a short seller. What we now discover is they may not have been a short seller. They may have purchased their stock even before the initial public offering in a private placement. This is what we are gleaning from their papers that were served

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

757nzirn                    Argument

Friday. We don't have discovery yet. But it seems to us either they are a short seller, so they are atypical, and shouldn't be appointed for common or preferred or either as a short seller, or as having purchased stock before the IPO and having access to nonpublic information.

THE COURT: What do the cases say about a private offering?

MR. BERNSTEIN: The cases are pretty clear that if you have access to information that wasn't publicly available, you are not a typical class representative.

THE COURT: They were talking about a period that's quite a bit before the period when the alleged disclosures were made.

MR. BERNSTEIN: We don't know when they got the stock. We don't know what information they had. If they bought in a private placement, you have access to information and to people that's not typical in the marketplace.

If you need a separate common shareholder strictly, you can get a separate common; if you need a separate preferred, maybe you can. I don't believe you do for lead plaintiff, maybe for class representative. But it's not the Washington funds. I cite the Network Associates case, which says if you made an off-market purchase, you are just not typical for lead plaintiff purchases.

THE COURT: That is often the case, but they have had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

757nzirn                    Argument

other purchases and sales within the class period of the Coronel complaint. I mean, they have purchases and sales made on October 28th, 29th, 31st, November 1, 2, 3, after there were disclosures by Quanta that things were not as they previously expected.

MR. BERNSTEIN: We would argue those sales reduce the damages. When it is a million to 50,000 or a million to 6,000, those losses probably aren't recoverable under Dura because there's no allegation that the artificial inflation had, or that there had been any disclosure of the fraud during the

757nzirn

class period, that the stock had dropped during the class period as a result of any of the fraud. The fraud was revealed at the end of the class period. That's the Dura Comverse argument that we have in our papers, Comverse Technology, that you can't include in your losses for PSLRA purposes.

THE COURT: I actually had the Comverse case and transferred it over to Brooklyn. But I had preliminarily in my own mind decided the case just as Judge Garaufis did, so several months later I was pleased to read his decision.

MR. BERNSTEIN: The PSLRA says appoint the lead plaintiff that can monitor counsel, can supervise the theories of the case, does not have to have standing on every claim. In WorldCom Alan Hevesi and New York State did not purchase every security that was at issue. There are always tensions between the securities, and then they get addressed in the class

10

757nzirn                    Argument

certification stage.

THE COURT: Let me go back to their point on liquidation value.

Doesn't your complaint clearly indicate that you all had determined that you weren't going to get full value for your shares by holding on until the liquidation?

MR. BERNSTEIN: We clearly thought that the shares were artificially inflated and the stock dropped as a result of the disclosures.

THE COURT: Right.

As a result doesn't that mean that the common stock and the preferred stock were going to be at loggerheads in terms of any value that may be received?

MR. BERNSTEIN: I don't think it's any different than in any other cases where common and preferred had one lead plaintiff. I just don't see any difference. If you accept that theory, your Honor, we will always have a separate lead plaintiff for common and preferred. Then you may land up with a separate lead plaintiff.

THE COURT: No. Because oftentimes the preferred stock is just a preferred dividend, not necessarily a preferred value at the time of liquidation.

MR. BERNSTEIN: I think it is a treacherous path that can be addressed at the class certification stage. The Bruce Green affidavit would lead to separate lead plaintiffs in

11

757nzirn                    Argument

virtually every case. The option holders would say we need separate counsel, and that's been rejected by the courts.

THE COURT: Yes.

MR. BERNSTEIN: Generally rejected by the courts, certainly in this district. In Enron it was rejected. In the largest cases around the country, Dynergy, Waste Management, Cendant, WorldCom -- WorldCom was the only one in the southern District. You appoint the lead plaintiff with the largest financial interest. It is not close here. 50,000 or 6,000, a million dollars. Zirkin Cutler is an investment manager. It is the ideal lead plaintiff under the PSLRA and shouldn't be penalized because it covers both the common and preferred universe.

THE COURT: What did Judge Kaplan do in Parmalat?

MR. SEIDMAN: In Parmalat, which was really an anomalous case, he did, in view of the bankruptcy of Parmalat, carve out a niche there. But Parmalat is really sort of a one-in-a-million case. Also, in Parmalat the company was actually bankrupt.

757nzirn

Here there's a runoff going on. That could go on for years. It really does not warrant undermining the PSLRA making this a situation for separate representation. It's really not warranted.

MR. BERNSTEIN: You caught me off guard. Parmalat was one that goes against WorldCom. In Parmalat you already had a

757nzirn                    Argument

bankrupt companies. This is a company that is in runoff. It is not in bankruptcy. There is no indication that it is going to be bankrupt. If it were, WorldCom and Enron give models for major cases.

THE COURT: What's the insurance here?

MR. BERNSTEIN: That we don't know.

THE COURT: You don't know the insurance?

MR. BERNSTEIN: You mean the D & O insurance?

THE COURT: You know there is D & O insurance?

MR. BERNSTEIN: We would suspect there is.

THE COURT: Isn't that what you are looking at?

MR. BERNSTEIN: They are individuals, there are investment banks, and there was a company. Often there is D & O insurance. Your Honor, I don't want to sit down before saying it's been 15 years since I have been before you. It was Popp & Nikolow (phonetic) v. Chase Manhattan bank. I can say you haven't changed much. I am afraid I might have. But it's nice to see you.

THE COURT: You haven't changed much. Popp & Nikolow, I hope I don't get into that issue again.

MR. BERNSTEIN: I'm still in touch with him. I see him every year or two when he comes to visit.

THE COURT: All right.

MR. BERNSTEIN: It is very important, no matter what your Honor thinks about common versus preferred, to focus on

757nzirn                    Argument

the cases that point --

THE COURT: I thought Judge Kaplan made a pretty good point. Maybe Mr. Seidman is right, that it only applies in the case of bankruptcy, but it seems to me that that's just about what, at least that your cocounsel, or not cocounsel --

MR. BERNSTEIN: Everybody's creative.

THE COURT: -- are arguing for.

MR. BERNSTEIN: There are several cases that say if you purchase stock prior to an IPO or you are a short seller, I think either way these people are not the right people. If we need an additional class representative, we have been contacted by many people recently since the press releases went out who don't have the losses of the size of a Zirkin who would fit the bill and don't have the atypical issues of either being a short seller, selling more stock during the class period than they bought, profiting from the fraud by selling stock during the fraudulent class period.

THE COURT: Are you suggesting that their position is they've got a large block of stock here that was bought in private placement and are holding on to it and are only showing the sales and purchases that are occurred during the alleged class period? Is that what you are saying?

MR. BERNSTEIN: We don't know yet. I'm sure Mr. Rado would be happy to answer the question. We know that they sold more stock during the class period than they bought.

757nzirn

757nzirn                    Argument

MR. RADO:  That's incorrect.

THE COURT:  Well, if you keep out the purchase of stock in December, the last purchase, if you disregard that, then Mr. Bernstein is right.

MR. RADO:  No.  If you look at the class period as a whole, even if you exclude all the pre-class period purchases, they are still net purchasers.  I believe at one point during the class period, at one point they had sold more than they bought.  However, after that they continued to make purchases.  If you look at the class period as a whole, they continued to hold the stock.

THE COURT:  I have your papers in front of me.  I think that you are mistaken.  If you disregard the purchase on the 14th of December, 2005 of 24,200 shares, you only have something over 6,000 shares bought on here listed, and you have, well, some 28,000 shares sold.

MR. RADO:  Your Honor, if I may, the December 14, 2005, purchase of 24,000 shares, that was during the class period.  I believe what Mr. Bernstein is referring to --

THE COURT:  It is.  But it's after all the other purchases and sales that Mr. Bernstein is talking about.

MR. RADO:  Right.  But it's still within the class period.  My point was it's within the class period.  I guess if what he's trying to say is, well, at one point during the class period you sold more than you had up to that point, then, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

757nzirn                    Argument

But I think as far as the jurisprudence on the in and out, as far as adequacy, what the courts look at is are they in and out completely during the class period, and they are not.

They purchased more shares during the class period than they sold.  As for the argument that pre-class period purchases in private offering somehow make a movant inadequate is simply untrue because we are not seeking to recover on those shares.

The problem with private placement sometimes is that it would be difficult to show reliance on the market.  One wouldn't be able to avail one's self on the fraud on the market reliance because this were purchased not on an open market.  We are not trying to get money back on the --

THE COURT:  When were your shares purchased off the market in the private placement?

When did you acquire the shares in the private placement?

MR. RADO:  I don't have the exact date.  I think it was within this six months preceding the class period.  I don't have the --

MR. KEHOE:  Your Honor, I don't have the exact date.

THE COURT:  But it was a private placement?

MR. RADO:  It was.  Those shares are not included in this loss calculation.

THE COURT:  I understand.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

757nzirn                    Argument

MR. RADO:  We excluded those.

THE COURT:  Do you have a holding for those shares to date?  In other words, are you going to come in with --

MR. RADO:  We will not be seeking a recovery on those shares in the private placement in this action.  I think that resolves any potential issue.

If I may speak to some of the things that we've discussed here?

757nzirn

MR. KEHOE: May I just make one point about those shares. Mr. Bernstein had noted that it was only revealed, I believe, in the reply brief. I think it was Exhibit C to our initial papers there's a footnote that reveals quite clearly that Washington State Plumbers and Pipefitters had purchased in the private placement. So I don't think that was exactly correct. I just want to make sure the record is clear on that, your Honor.

MR. RADO: When it comes to the common versus the preferred issue that we have been talking about, I think Mr. Bernstein is right, that in the ordinary case the court doesn't want to appoint five, ten lead plaintiffs for each class of securities. There's been an exception made when there's a limited fund. The PSLRA doesn't say anything about the situation. It doesn't say anything about classes of securities. The law on this point is all judge-made. The Second Circuit has not ruled on the point. It is essentially a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

757nzirn                    Argument

fact-based analysis.

Judge Kaplan applied it in bankruptcy, and we saw that in WorldCom it didn't apply. I would argue those cases are different.

First of all, in those cases the defendant was essentially judgment proof. Everybody knew that. They didn't get a dime out of WorldCom. They got everything out of the investment banks, out of the brokers, and out of the individual defendants. The same happened in Enron, where you literally had hundreds of securities. I don't think Judge Harmon wanted to appoint hundreds of lead plaintiffs.

That is not what we are asking for here. This is not a WorldCom. This is not an Enron. I think the Court's point that Judge Kaplan had right it is correct. One important fact --

THE COURT: I haven't made up my mind yet. Don't rely on me.

MR. RADO: One point that Judge Kaplan made is that something in the neighborhood of 85 percent of the losses were suffered with respect to the bonds. So he's looking at the overall losses, and he's saying, well, most of the losses happened in the bonds. Why would I appoint someone who didn't purchase the bonds as the plaintiff?

That is one of the points that we have argued here, your Honor. There are 73 million shares total of Quanta stack

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

757nzirn                    Argument

outstanding. Of those 73 million shares, 70 million are common and 3 million are preferred. So less than 5 percent of the overall shares are preferred shares. They account for a very, very small portion of the overall losses.

THE COURT: When were the preferred shares issued?

MR. RADO: They were issued, I believe, in December of '05.

THE COURT: All of them?

MR. RADO: Yes. There were 3 million shares offered at $25 a share with a liquidation preference.

THE COURT: All the purchases and sales would have to be between December 15, '05, and March 2 or 3, '06.

MR. RADO: Yes. So we have this very small part of the overall case that wants to take control. I think that's problematic where you have a limited fund, because the preferred stockholders essentially have two roads to recovery for any loss that they sustain. One of them is the litigation,

757nzirn

and the other one is the liquidation preference.

If there is a recovery at the end of this case --

THE COURT: Won't they have to be coordinated for the recovery? Won't the recovery depend on, as far as the preferred shares, aren't they concerned with what they get on liquidation and whatever they get in this action?

MR. RADO: I think that is another point. What happens if the company does liquidate and Zirkin gets back

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

757nzirn                    Argument

their $25 per share? They will be made whole. What is going to happen to the litigation if that happens a year from now?

MR. BERNSTEIN: Zirkin individually bought common shares only, I believe, and Zirkin Cutler bought both common and preferred. So the case wouldn't disappear by any measure, nor would counsel disappear by any measure. Under no scenario, if the common needs to be represented separately, should it be Washington, who bought in a private placement, which if it was clear before, I must have missed that footnote. It makes them an atypical class representative. To be a lead plaintiff you have to meet the typicality requirements. There are three cases I picked up over the weekend.

THE COURT: I don't see why it matters if they're not seeking to recover on the private placement shares.

MR. BERNSTEIN: Because it shows they had information that was not available to the market generally even if when they bought their public shares --

THE COURT: That's outside the class period. The information that they got was six months prior thereto.

MR. BERNSTEIN: Six months is not a long time for an insurance company. They had access. They presumably got into the private placement because they had meetings with people, with board members. In Network Associates, and Dec v. Status (phonetic) in the Southern District, Network Associates said an off-market purchase makes you atypical for a lead plaintiff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

757nzirn                    Argument

Dec v. Status says --

THE COURT: Weren't all the purchases within the class period?

MR. BERNSTEIN: I will double check.

And Independent Energy in the Southern District, communications between defendant and the plaintiff make the plaintiff atypical.

So if it is a couple of months before or during the class period, that is, before the company went public, the private placement is all part of the process to take the company public. That's why people --

THE COURT: The company was public before that, wasn't it?

MR. BERNSTEIN: No. This was before the IPO, the private placement right before the IPO.

THE COURT: Not right before it, because the class period goes back -- the IPO is in December '05, and they got purchases and sales going back to '04.

MR. BERNSTEIN: The IPO was in May/June of '04, May of '04. So the private placement would have been a couple of months before that.

THE COURT: All right.

MR. BERNSTEIN: We are not sure exactly when it was, but we know it's not a typical investor who gets to buy in a private placement prior to an IPO. If your Honor wants to have

SOUTHERN DISTRICT REPORTERS, P.C.

757nzirn
(212) 805-0300

21

757nzirn                    Argument

an investor there who strictly bought the common, then Zirkin Cutler will be charged with that responsibility as the lead plaintiff to get a class representative who would represent singularly those interests, even though Mr. Zirkin singularly represents common, they only bought common, Zirkin Cutler bought both -- Zirkin bought preferred, Zirkin Cutler, both. I misspoke. If your Honor thinks you need the third, just the common, it should be someone who's typical, and that would be at the class representative stage.

THE COURT: That would also mean that he wouldn't be particularly interested in what happened prior to December 12 or 14, '05, and that these sales that were made by Washington state on October 27, October 28, October 31, November 1 and November 2 and November 3 wouldn't be of much interest.

MR. BERNSTEIN: I don't know about that, your Honor. Once you assume a fiduciary duty -- we drafted the first complaint. Mr. Zirkin came to us. We investigated it.

THE COURT: It doesn't even include the common shares.

MR. BERNSTEIN: Yes, we did.

THE COURT: In the original complaint?

MR. BERNSTEIN: The original complaint, your Honor, the first paragraph, second paragraph, and even Mr. Rado read it.

THE COURT: He says in his affidavit, I recently discovered that I own common shares also.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

757nzirn                    Argument

MR. BERNSTEIN: No. That's something different.

THE COURT: All right.

MR. BERNSTEIN: Let's break it down.

The complaint was drafted for preferred and common shares. That's what it says in paragraph 1. This is a federal securities class action on behalf of purchasers of the preferred and common shares.

THE COURT: That is what it says. I understand that.

But you understood that there were common shares outstanding. After all, they were issued at the same time as the preferred shares. I thought I read in his affidavit that recently, on going back over the papers, he recognized that he had purchased common shares also.

MR. BERNSTEIN: There was a ministerial error in their office with respect to this. They are running a $2 billion fund. It wasn't for lack of interest in representing all shareholders and maximizing the recovery. Certainly now, common, preferred, and if we need a common class rep, you know, we could take that and find a class representative at the appropriate time or even a lead plaintiff, if your Honor felt, singularly without the warts of having bought prior to the class period in a private placement, having access to nonpublic information, having sold many shares during the class period that may not be recoverable under Dura. There are just lots and lots of warts here. But, again, I believe that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

757nzirn                    Argument

overwhelming weight of the authority would not require any separate representation at this time under the PSLRA. You find the lead plaintiff that has the largest financial interest in the totality of the circumstances, and the rest evolves at the appropriate time.

THE COURT: Let me hear from Mr. Rado. You have been

757nzirn

very patient. Go ahead.

MR. RADO: Thank you, your Honor.

First of all, I don't think that we can, if there is an issue, I don't think it's wise to simply say, well, we will deal with it later for a number of reasons.

First of all, the PSLRA says there has to be a finding of adequacy and typicality. While it's not the same type of searching, deep analysis of the issue, you can't just gloss over it and say, well, gee, there is a problem, but we will deal with it at class certification.

That's not what the statute says. I don't think it's wise from simply a case management point of view, when you know that there are issues to simply say, well, we'll deal with them later. I think the earlier we deal with them, the bitter it would be for all the class members and efficiency in general.

If I could simply go back to, I guess, the crux of the conflict here, it's that there's one pot of money. The liquidation preference is going to draw from that same pot of money. The litigation is going to draw from that same pot of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

757nzirn                           Argument

money.

Yet, whatever they recover in the litigation, Zirkin is going to have to split 73 million different ways. It's going to have to satisfy damaged shares in the amount of 73 million. It's going to be much more diluted than simply if he were to receive his money back on the liquidation preference, because there are only 3 million shares that are entitled to the liquidation preference.

It doesn't even make sense to me as to why a preferred stockholder would want a big recovery in the litigation, because the bigger the recovery the less there's going to be for the liquidation preference. It's the liquidation preference where the preferred stockholders really have a good chance of getting their money back, because it's guaranteed contractually.

If the contract has the money, it will pay it. If they don't pay it, they have a simple contract action versus a securities fraud class action, which is much more complex. So I think that's really the crux of it.

I think that is what makes this case different than all the others which were cited, which I agree with. I think in the ordinary case, I wouldn't be standing up here if Quanta was not in runoff mode and was not going to liquidate. It is clear that it is in runoff mode. They are not taking in new business except for an immaterial Lloyd's' London part. I just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

757nzirn                           Argument

looked at the financials on Yahoo. Their last quarter they lost $43 million. They are in negative cash flow. This is a company that's basically paying off its insurance claims, and when it's done it is going to close shop and probably divvy up whatever is left.

THE COURT: What's the stock selling for these days?

MR. RADO: It is at $2.00, which is precisely what the cash position is, so it is trading for cash.

THE COURT: What do you mean cash position?

MR. RADO: The company's cash, the cash per share is $2.00. That's what the stock is trading at. So, in other words, investors in the common stock are not expecting it to grow. The only reason they are in it I guess --

THE COURT: What's the preferred share selling at.

MR. RADO: The preferred shares are selling at $19 per

757nzirn

share, which to me indicates that if the company were to liquidate today they think they are going to get $19 back. Clearly, the more the company spends of their money, the less that's going to be.

THE COURT: What's the date of the financial that you are referring to?

MR. RADO: I got it off of Yahoo. I think it was the current snapshot of the assets of the company, so I would say it was the last reporting statement, which I think would have been the 10-K for the year.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

757nzirn                          Argument

So I just think in the ordinary case, the lead plaintiff, the bigger the loss, the more the incentive to recover the large pot of money. That's not true here because the bigger the loss for the preferred stockholders the better off they are simply conserving the company's assets and hoping that they are going to get the liquidation preference, which is going to be, it is going to have to satisfy 3 million shares, not 73 million shares.

So I think there is a conflict here. There is no law that says someone who purchased in a private offering is not adequate unless those are the shares that they're trying to recover for in the class action.

I mean, if they purchased everything in a private offering and I was here standing up and saying they have a financial interest, all of which was traceable to a private offering, we might have an issue with respect to showing reliance. But there is no problem with the private offering that happened before the class period.

Mr. Bernstein mentioned nonpublic information. That's nonsense. There was no nonpublic information. This was a massive private offering. If you would like, I can supplement the record and put it in. It wasn't a phase of this transaction where shares were handed out to friends of the CEO. This was a massive private offering worth -- literally thousands of institutions and individuals bought shares. I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

757nzirn                          Argument

think that's markedly different from what happened in Network Associates and other cases.

This is not an issue that Mr. Bernstein sought to brief, even though we noted clearly in our initial papers that Washington "has a pre-class balance of 21,900 shares that were purchased through a private placement."

He was implying that we didn't tell the Court this. We told the Court, we told Mr. Bernstein in our initial papers that we did this. He didn't say anything about it.

As for the common shares that Zirkin purchased, I just want to point out that he purchased, he spent $111,000 purchasing the common stock versus billions of dollars purchasing 179,000 shares of preferred stock.

THE COURT: He purchased them on December 14.

MR. RADO: Yes. So it's completely lopsided. I don't think he has any interest in seeing a large recovery in this litigation, most of which, 90 percent, 95 percent of which will go to the common stockholders and will deprive the preferred stockholders of the liquidation preference.

The Court has in its discretion to appoint co-lead plaintiffs and co-lead counsel. It happens all over the country. It happened in the cable and wireless case which involves an English company.

THE COURT: If I appoint co-lead counsel, I'm not

757nzirn

going to allow more than one attorney.

757nzirn                    Argument

MR. RADO:  OK.  I understand that.

THE COURT:  Plaintiffs will have to select one firm over the other.

MR. RADO:  We can talk to the client about that.  I think there needs to be separate representation.  The Court has authority to do that.  It is an issue that should be dealt with now as opposed to let's wait 12 months and see what happens at class cert. and then deal with it then.  I don't see a reason why this litigation should be under a cloud from the get-go when we can take care of it now as the statute requires.

MR. BERNSTEIN:  I just want to point out one thing.  You have been very patient, your Honor, but Zirkin Cutler's losses on its common shares are about $47,000, just on its common shares.  The Washington fund's losses, adjusted for the Dura issue and the Comverse issue, would be about $6,000.

So, when you examine just the common or the totality as the PSLRA, we believe, requires, the Zirkin Cutler movant dwarfs the Washington movant.  If there is a need for strictly a common representation, I don't believe Washington should be it either now or at the class representation.

THE COURT:  There is no one else.

MR. BERNSTEIN:  Oh, there are other plaintiffs that have contacted us, but they didn't make a motion because they felt that they were well represented by a movant that had over a million dollars in losses.  Traditionally, the class

757nzirn                    Argument

representative steps up at the later stage if necessary.

THE COURT:  No one else has applied.

MR. BERNSTEIN:  The class representative would not make a motion for lead plaintiff.  He would join the action later.  That's how it traditionally happens.  It happens very, very frequently.  I think it was done in WorldCom.  It's done in almost every class action where you need to cover a particular security or issue, a class representative is added then.

MR. RADO:  If I may, just one more minute.

Mr. Bernstein is right that Zirkin's loss is 47,000.  We don't believe the Dura issue is an issue.  It is not a unique defense to us.  Numerous class members sold during the class period.  It is not a unique defense.  It is not something that's commonly dealt with at this point.  Really the point of the conflict that I raised doesn't go to the financial interest.  It goes to the adequacy.  The PSLRA and the cases are clear that you have twin requirements:  You have the largest financial interest and you've got adequacy.  If you are not adequate, it doesn't matter how big your financial interest is.  It could be a billion dollars to two dollars.  You are not adequate.  That's the point.  Zirkin's relative interest lies in the preferred.  He has over a $1 million interest in that stock versus a $47,000 interest with respect to the common stock.

757nzirn                    Argument

So I don't think the fact that he purchased some common shares does anything as far as the conflict presented by his much larger preferred stock.

THE COURT:  Let me ask Mr. Bernstein one question,

757nzirn

that is, I haven't seen any case where preferred shareholders have been appointed to represent common shareholders. It's always the other way around; that the class representative of the common shareholders is appointed to represent the preferred. Do you have any cases that show it the other way?

MR. BERNSTEIN: None come to mind. I think it's just traditionally that the investor with the largest financial interest is appointed, and if that has happened to be common over time -- I would be happy to go and study that question, but it just happens in this particular case the common losses are about the same as their common losses accepted at a face value, and then you have 20 times more in preferred losses, and the PSLRA says the investor with the largest financial interest in the subject matter of the litigation. Obviously, I mean, we haven't addressed that. The issues are overlapping 100 percent, the same types of disclosures and the same fraudulent statements. So there is complete overlap in that regard.

So I don't think it makes any difference under the PSLRA which type of investor has the largest financial interest as long as there is the large financial interest in the subject matter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

757nzirn                    Argument

THE COURT: I agree with the Zirkin position that they have the largest financial interest in the action; however, I also agree with Mr. Rado that they are not a typical common shareholder. They purchased all their shares December 14, 2005. And the Coronel complaint alleges that prior to that there were a number of actions by the defendants that were misleading as far as they were concerned, and the funds that they were after, they took action to sell when the proper disclosure was made, particularly in October, November, 2005, before the final denouement which Zirkin seems to rely on.

So I am going to appoint the Washington State Plumbing and Pipefitting Trust to represent the common shareholders. They will have to select one counsel, not two, and I am going to appoint Zirkin Cutler as the representative of the preferred shareholders.

I am not going to consolidate the actions. I am going to permit joint discovery, consolidated discovery without prejudice to your moving to consolidate if both counsel feel that -- there will be an opportunity by the defense to oppose the consolidation if they wish to. It seems to me that the two cases shouldn't be consolidated at this point.

Is there anything I left out?

MR. RADO: Your Honor, we will send a letter to the Court with the client's decision on the counsel. Is that the way the Court would like us to proceed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

757nzirn                    Argument

THE COURT: All right.

MR. RADO: Thank you.

THE COURT: Is there anything else?

MS. LEE: Your Honor, this is Jennifer Lee from Williams & Connolly on behalf of Friedman Billings & Ramsey. We just want to state for the record that we do not waive any arguments with respect to any plaintiffs' arguments expressed today to the extent that they bear on the adequacy of the pleadings or any class certification issues.

THE COURT: Of course.

MS. LEE: Thank you.

THE COURT: I may be difficult, but I am not that difficult. Thank you very much.

757nzirn

(Adjourned)