**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-CIV-80833-CANNON**

MAHA JASTRAM, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,                                                  <u>CLASS ACTION</u>

v.

NEXTERA ENERGY, INC., FLORIDA
POWER & LIGHT COMPANY,
JAMES ROBO, ERIC SILAGY, and
DAVID P. REUTER,

Defendants.
_____/

**SECOND AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 7

THE PARTIES.................................................................................................................... 7

BACKGROUND ................................................................................................................ 9

    A.   Matrix ...................................................................................................................... 9

    B.   Lead Counsel's Investigation............................................................................. 11

FPL'S CONNECTION TO AND INVOLVEMENT  IN THE POLITICAL SCANDALS ....... 14

    A.   FPL's Failed Effort to Buy the Jacksonville Electric Authority....................... 14

       a. Matrix Extended a Phony Job Offer at "Grow United" to a Jacksonville City Councilor to Try to Get Him Out of the Way.................................................. 16

       b. FPL's VP of State Legislative Affairs, Daniel Martell, Was Contemporaneously Aware of Matrix's Covert Surveillance of a Journalist. .................................... 19

    B.   FPL and Matrix Orchestrate the "Ghost Candidate" Scheme........................... 20

       a. Spoiler Candidates in the 2018 Election Cycle................................................ 21

        i.    State Senate District 8................................................................................ 21

        ii.   Miami-Dade County Commission District 8................................................ 27

       b. Ghost Candidates in the 2020 Election Cycle.................................................. 30

        i.    The Ghost Candidate Scheme.................................................................... 30

        ii.   Matrix and FPL Set Up and Funded the Funding Structure for The Ghost Candidates ................................................................................................ 33

        iii.  The 2020 Funding Structure for FPL's Spending with Matrix Was Designed to Facilitate the Evasion of Federal Campaign Finance Law........................ 46

    C.   Silagy Used Matrix to Covertly Gain Control of an "Independent" News Website Which FPL Used to Attack Rivals ....................................................................... 49

    D.   Media Outlets Begin to Report on FPL's Connections to Matrix and the Ghost Candidate Scheme................................................................................................ 56

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS........................................................................... 57

    A.   FPL Falsely Denied Having a Role in the Ghost Candidate Scheme ............... 57

    B.   FPL Misleadingly Denied Having Involvement with the Creation of Grow United........ 59

    C.   FPL, Through Reuter, Falsely Denied Any Involvement in the Extension of a Job at Grow United to Jacksonville City Councilor Garrett Dennis ........................... 61

    D.   Robo's False and Misleading Statement Denying That There Was Any Basis for Allegations of Wrongdoing................................................................................. 62

    E.   Silagy and FPL's False and Misleading Statements Regarding Surveillance of Reporters .............................................................................................................. 62

    F.   FPL's False and Misleading Statements Regarding the Capitolist.................... 63

i

THE TRUTH EMERGES ........................................................................................................ 64

LOSS CAUSATION ............................................................................................................... 65

ADDITIONAL INDICIA OF SCIENTER ............................................................................. 73

CLASS ACTION ALLEGATIONS ....................................................................................... 80

NO SAFE HARBOR .............................................................................................................. 82

FRAUD ON THE MARKET ................................................................................................... 82

CAUSES OF ACTION ........................................................................................................... 84

PRAYER FOR RELIEF .......................................................................................................... 87

DEMAND FOR A JURY TRIAL ............................................................................................ 87

The City of Hollywood Police Officers' Retirement System and the Pembroke Pines Firefighters & Police Officers Pension Fund ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, bring this securities class action on behalf of the class of persons and entities that purchased or otherwise acquired NextEra Energy, Inc. ("NEE") securities between December 2, 2021, and January 30, 2023, inclusive ("Class Period"). Lead Plaintiffs assert claims against NEE and Florida Power & Light Company ("FPL," and collectively with NEE, the "Company") and certain current and former executives thereof (collectively "Defendants") for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5). Lead Plaintiffs allege the following based on the investigation conducted by and through their attorneys, which included (i) a review and analysis of SEC filings made by NEE and FPL, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports, and other publicly available information about the Company; (ii) review and analysis of Company documents obtained through counsel's investigation, as described below; and (iii) an interview with a former employee of Matrix LLC, FPL's political consulting firm. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

1.      NEE is the parent company of FPL, the largest public utility in the State of Florida. Publicly regulated utilities are generally regarded as safe and conservative investments and investors look to invest in utilities for their predictability and security. People invest in public utilities because of "the combination of predictable profitability and income generation [which] makes utility stocks lower-risk options for investors because they're less volatile. As a result, they're often ideal choices for retirement income strategies. That lower volatility also makes

1

utilities more defensive, making them ideal holdings during uncertain economic times."[1]

2.      This action concerns political scandals that FPL allegedly engaged in by secretly using corporate funds to influence state and local elections, target elected officials who opposed certain FPL initiatives, and intimidate journalists who scrutinized FPL's actions. When information about FPL's alleged connection to the scandals was reported by media outlets, Defendants categorically denied any such connection, falsely and misleadingly covering up FPL's connection to those scandals. Ultimately, Eric Silagy, alleged to have orchestrated the conduct that gave rise to the scandals, was removed as FPL's long-time CEO. The same day as his removal, January 25, 2023, NEE issued a new risk disclosure informing investors that the scandals might "ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws" and could "result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE," or "have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities."

3.      NEE's common stock price plunged 8.7% on this news, wiping out over $14 billion in investor value, the single largest one-day decline in the last 25 years at NEE other than major market moving events such as the Global Financial Crisis and the shuttering of world economies due to COVID-19. Investors who purchased NEE common stock after Defendants' false statements which attempted to cover-up FPL's possible role in the scandal, were harmed when the truth emerged on January 25, 2023.

4.      On December 2, 2021, media outlets, including the *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union* began reporting that FPL and its political consulting firm,

---

[1] *Investing in Top Utility Stocks*, MOTLEY FOOL, available at https://www.fool.com/investing/stock-market/market-sectors/utilities/ (last accessed Dec. 1, 2023); *See also What Kind of Investors Buy Utility Stocks*, INVESTOPEDIA, available at https://www.investopedia.com/ask/answers/122314/what-kind-investors-buy-utility-stocks.asp (last accessed Dec. 1, 2023)); *How to Invest in Utilities*, U.S. NEWS AND WORLD REPORT, https://money.usnews.com/investing/investing-101/articles/how-to-invest-in-utilities (last accessed Dec. 1, 2023) ("Utility stocks are viewed as a safe investment to add to a portfolio since these companies are part of a regulated industry and often have fewer competitors.").

Matrix LLC ("Matrix") orchestrated a range of improper political expenditures, including potential violations of state and federal campaign finance laws, during the 2018 and 2020 election cycles. State and national media outlets published articles alleging that Matrix, acting on behalf of FPL, used a network of nonprofits to surreptitiously steer funding to spoiler "ghost candidates" intended to derail the campaign efforts of certain candidates seeking election or reelection for the Florida state legislature. It was reported that FPL had also secretly taken control of a supposedly independent news website and directed it to publish attacks on candidates running for office as well as reporters who had previously investigated FPL. Later reports alleged that Matrix had spied on journalists with the active participation of FPL employees after the publication of negative reporting. Journalists further uncovered that Matrix had allegedly improperly courted a Jacksonville City Councilor opposed to the privatization of the Jacksonville Electric Agency with a phony job offer, characterized as an "attempted bribe" in Matrix documents, to pave the way for NEE's potential acquisition of the utility.

5.      These are types of allegations and scandals that shatter the belief that this publicly regulated utility is a safe, secure, and non-volatile investment.

6.      FPL responded to reports of its alleged involvement in any potential scandal by denying any such involvement. NEE's corporate spokesperson, David Reuter, speaking on behalf of the Company, stated on December 2, 2021, in response to an *Orlando Sentinel* story that "Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false."

7.      Defendant James Robo, NEE's former Board Chairman, addressed the controversy during a conference call with stock market analysts and investors on January 25, 2022, stating that NEE had "conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their–they've all provided access to their personal e-mails and text to us as part of that investigation. And **the bottom line is we found no evidence of any issues at all** . . . I feel very good that **there is no basis to any of these allegations**…" (Emphasis added.)

8.      After these denials by Robo and Reuter, NEE and FPL did not address any of these

3

allegations in any filing with the SEC, including any denial or risk disclosure or other warning to investors regarding potential legal or reputational liability concerning the allegations until January 25, 2023. On that day, however, in a Form 8-K filed with the SEC, for the first time, NEE formally addressed the allegations reported in the *Orlando Sentinel, Miami Herald,* and *Florida Times-Union.* NEE informed its investors:

> FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL. These articles are referenced in a complaint subsequently filed with the Federal Election Commission (FEC) that alleges certain violations of the Federal Election Campaign Act. FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.

> In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

9.      NEE's stock price fell by $7.31 per share, falling from $83.90 to $76.59 per share, or 8.7%, on January 25, 2023, wiping out more than $14 billion in market capitalization in a single day.

10.      Stock market analyst Paul Patterson of Glenrock Associates said that NEE's stock decline was "driven substantially by the unexpected management change and the update they gave on their review into political activity." The "unexpected management change" Patterson referred to was the announced departure of Silagy. Bank of America stock market analyst Julien Dumoulin-Smith wrote on January 26, 2023 that Silagy's exit was "rushed" and "difficult to separate from recent political controversies."

4

11.     On January 31, 2023, the *Florida Times-Union* reported that NEE executives disclosed to analysts from Bank of America that Silagy's exit agreement included a multi-year "claw back on compensation for any legal wrongdoing," tacitly acknowledging the link between Silagy's departure and the new risk disclosure statement concerning legal and reputational risk arising from political misconduct. NEE's stock price fell an additional $0.42 per share on January 31, 2023, representing another $850 million in lost market capitalization. All told, between January 25, 2023, and January 31, 2023, NEE lost $15.77 billion in market capitalization.

12.     Defendants' statements denying any connection with the publicly reported allegations of possible wrongdoing were materially false and misleading when made. Approximately one month before the *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union* reported on alleged wrongdoing by FPL, Robo received a FedEx package containing a memorandum and documentation linking FPL, Silagy and other FPL employees to the scandals later reported on (the "Robo Memorandum"). The Robo Memorandum is dated November 3, 2021 and it states it was sent to Robo "via FedEx Overnight." It is entitled "Florida Power & Light Officers' Potential Unlawful Conduct Through Third-Party Consultants and Vendors."

13.     The Robo Memorandum states that Matrix's own internal investigation "quickly identified the involvement of FP&L president Eric Silagy . . . vice president for state legislative affairs Daniel Martell, vice president for external affairs and economic development Pam Rauch and NextEra Energy, Inc. vice president for integrated clean energy solutions Julie Holmes" as having been "engaged in an ongoing scheme with [former Matrix CEO Jeff] Pitts and others to secretly divert corporate resources to off-the-books communications and political campaigns." The Robo Memorandum contained 155 pages of exhibits, including emails, text messages, checks, invoices, tax records, bank statements, legal memoranda, and an internal financial ledger to support its conclusions.

14.     The *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union* each reported that Robo was sent a copy of the Robo Memorandum and, as part of their investigation into this action, Lead Counsel obtained a partially redacted copy of the memorandum and its supporting exhibits and reviewed those documents in support of the allegations herein.

15.     The Robo Memorandum and its supporting exhibits and associated documents described, in detail, that (1) Matrix specifically outlined for FPL executives how it would use a daisy-chain of 501(c)(4) and other entities controlled by its operatives or affiliates to conceal FPL political expenditures for the 2020 election cycle; (2) emails, text messages, and financial records confirmed that FPL executives, including Silagy, approved and orchestrated the selection of which elected officials should be the subject of FPL's concealed political expenditures; and (3) financial records, including invoices, bank statements, checks, and internal ledgers, demonstrated that FPL funds flowed through a series of intermediaries to dark money groups and vendors responsible for recruiting or bolstering the "ghost candidates" who served as spoilers in the 2020 election. Many of the underlying emails, text messages, memoranda, invoices, bank statements, checks, and other documents supporting the Robo Memorandum's conclusions were appended, in full, as exhibits. The Robo Memorandum also stated, in part, that "communications, primarily between [Matrix CEO] Pitts and Silagy, demonstrate[] Silagy's knowledge and control of dark money donations."

16.     The Robo Memorandum provides not only allegations, but evidence connecting Silagy and other FPL employees to the "ghost candidate" scheme and the use of various shell companies to influence local elections. It was materially false and misleading for Reuter, on behalf of FPL, to represent that the "suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false." It was also materially false and misleading for Robo to represent that "we found no evidence of any issues at all . . . I feel very good that there is no basis to any of these allegations…" Contrary to what Robo said, there was evidence of issues and there was a basis to the allegations.

17.     As discussed herein, Matrix likely sent the Robo Memorandum to Robo as Matrix's founder, Joseph Perkins, subsequently admitted that Matrix "notified (FPL parent company) NextEra" that "[w]e had rogue employees that from 2016 forward were engaged in activities that we feared could be illegal."

18.     NEE's Form 8-K disclosures stood in stark contrast to Reuter's and Robo's categorical denials of any connection to the alleged scandals. Indeed, NEE admitted that "it could not guarantee" against an adverse finding from the FEC complaint nor could it "provide assurance"

against potential fines, penalties or sanctions. On this news, the price of NEE's securities declined and investors who purchased after Reuter's and Robo's false denials – covering up FPL's connection to the scandal – suffered substantial losses.

<strong>JURISDICTION AND VENUE</strong>

19.     The claims asserted below arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class who reside in this District. Additionally, the Company's principal offices are located in this District.

23.     In connection with the acts, transactions, and conduct alleged below, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the New York Stock Exchange, a national securities exchange.

<strong>THE PARTIES</strong>

24.     The City of Hollywood Police Officers' Retirement System and the Pembroke Pines Firefighters & Police Officers Pension Fund are the appointed Lead Plaintiffs. Their trading in NEE common stock during the Class Period is set forth in their revised certifications. *See* ECF

7

Nos. 32-1, 32-2.

25.     The City of Hollywood Police Officers' Retirement System is a pension plan charged with securing the retirement benefits of Hollywood, Florida's police officers. It oversees over $400 million in assets that it invests for the welfare of its members and their families.

26.     The Pembroke Pines Firefighters & Police Officers Pension Fund is a pension plan that administers retirement, disability, and death benefits for Pembroke Pines, Florida's police officers and firefighters. It manages over $750 million in assets that it invests for the welfare of its members and their families.

27.     Defendant NEE is a Florida corporation headquartered in Juno Beach, Florida and one of the largest power and utility holding companies in North America, with more than $17 billion in annual revenues. Through its subsidiaries, NEE generates, transmits, distributes, and sells electric power to retail and wholesale customers in North America. NEE's common stock trades on the New York Stock Exchange under the symbol "NEE."

28.     Defendant FPL is a Florida corporation headquartered in Juno Beach, Florida and a wholly owned subsidiary of NEE. It is the largest electric utility in Florida, serving more than 12 million people across Florida's east coast, lower west coast, and northwest regions. FPL typically accounts for more than 80% of NEE's annual revenue, the majority of which it earns through residential customers. FPL and NEE submit joint quarterly and annual financial reports to the SEC.

29.     Defendant James Robo became NEE's CEO in July 2012 and Chairman in December 2013. Robo retired from both positions on March 1, 2022.

30.     Defendant Eric Silagy was FPL's Chief Executive Officer from May 2014 until February 15, 2023. Silagy resigned from FPL effective May 15, 2023.

31.     Defendant David P. Reuter has been NEE's Vice President & Chief Communications Officer, and has served as the primary corporate spokesperson for NEE and FPL, since 2018.

32.     Defendants Robo and Silagy, because of their positions in the Company, possessed the authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e.,

the market. Both Silagy and Robo signed SEC filings made on behalf of the Company during the Class Period, including, for example, the Company's Form 10-K for fiscal year 2021 filed on February 18, 2022. Reuter, because of his position in the Company, possessed the authority to control the contents of the Company's press releases and statements to journalists. Robo, Silagy, and Reuter made or controlled the Company's statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Robo, Silagy and Reuter knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

### A.  Matrix

33.     Matrix is a political consulting, lobbying, and strategic communications firm headquartered in Montgomery, Alabama, founded by Dr. Joseph Perkins. Matrix employed Jeff Pitts beginning in 1995 and Pitts became Matrix's CEO in 2000.

34.     Matrix Employee 1 ("ME 1") is a former Vice President of Matrix who worked at Matrix for approximately 20 years. ME 1 worked at Matrix from the early 2000's until their departure in 2023.

35.     According to ME 1, Pitts aggressively worked to expand Matrix's business and opened an office in Tallahassee, Florida for Matrix as part of that expansion. Pitts ran the office and brought with him three associates: Greg Gilbert (Perkins' godson), April Odom, a contractor who regularly worked with Pitts, and Abigail MacIver. According to ME 1, "only a few Matrix people got to do stuff in Florida. It was a black box. Pitts kept it to himself. That was the source of the problems." "

36.     Matrix began to provide strategic communications to NEE in the early 2010s. From that relationship, Pitts met Silagy and Matrix, via Pitts, began to provide work directly for FPL. "

37.     In December 2020, Pitts advised Perkins that he was leaving Matrix to start a new firm, Canopy Partners LLC ("Canopy"). After Pitts left Matrix, Matrix discovered that "a server was

left in Birmingham," Alabama that someone had tried to destroy with a "hammer" in an apparent effort to prevent access to the server's contents, according to ME 1. Despite the attempt to destroy the server, however, Matrix employees were able to gain access to the server which provided evidence and information of all the work Pitts was doing for FPL which was hidden from most Matrix employees and from Perkins, according to ME 1. ME 1 said that on the server there "were connections to Google Drives, cloud-based stuff. Personal laptops ran through it." As discussed below, ME 1's statements are consistent with statements made by Perkins to reporters investigating the FPL scandal."

38.     ME 1 was one of the Matrix employees who was brought in to assist with the evaluation of the information recovered from the damaged server. ME 1 said that Matrix discovered "another set of books" that was kept and maintained by Pitts' subordinate Gilbert for the FPL schemes. According to ME 1, Pitts' team in Tallahassee "did the spreadsheets" and "kept the separate books" for the scheme. "There was a lot of misbehavior by the Florida crew. The FPL executives are tied up in it. There was a lot of money going into LLCs and disappearing."

39.     ME 1 stated that the Matrix investigation uncovered a scheme concerning the political campaign in Miami-Dade County, the late filing of Form 990s, and money flows that were highly suspicious. "

40.     After Pitts left Matrix, Perkins filed suit against Pitts in the Circuit Court of Jefferson County, Alabama against Canopy, Pitts, Gilbert, MacIver, and Odom, each of whom left Matrix to join Canopy. ME 1 stated that as support for the lawsuit, he was part of the team that uncovered Pitts' conduct. The team discovered Pitts' (and others) involvement in the "ghost candidate" scheme. ME 1 stated that the scheme, as reported by the press, was masterminded by Pitts and ME 1 was "sure Eric Silagy was aware of the scheme." "

41.     As discussed further below, *see* ¶¶43–54, in late 2021 and early 2022, media outlets obtained many internal Matrix documents concerning Pitts' work for FPL. In subsequent reporting, Perkins confirmed the authenticity of portions of the documents, which include the documents obtained by Lead Counsel, which are part of the Robo Memorandum. *The Orlando Sentinel* published an interview it had with Perkins on June 24, 2022, and reported that "Perkins declined

to say whether he is the source of the documents leaked to journalists but **verified that the records are legitimate**. He confirmed that Matrix was able to locate the records on Pitts' former laptop."[2] (Emphasis added). Similarly, the *Miami Herald* reported "the ledgers leaked to the Herald were **discovered on an internal server at Matrix, according to Matrix founder Joe Perkins**, who says Pitts went rogue on behalf of FPL without his knowledge."[3] (Emphasis added). On July 25, the Orlando Sentinel reported that the "Matrix records, [were] **verified as authentic by the firm's founder, Joe Perkins**. . . ."[4] (Emphasis added).

42.     The *Florida Times-Union* reported on June 24, 2022, that in an interview Perkins said that Matrix "notified (FPL parent company) NextEra" that "[w]e had rogue employees that from 2016 forward were engaged in activities that we feared could be illegal."

**B.  Lead Counsel's Investigation**

43.     Lead Plaintiffs, through Lead Counsel, reviewed publicly available sources of information relating to Defendants including filings with the SEC and media reports. Lead Counsel examined dozens of news articles reporting on NEE and FPL's political activities, including articles in the *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union*, from 2021 through the present. These news articles reported that journalists had reviewed internal Matrix documents, including, among other things, memoranda, emails, and text messages between Matrix and Company personnel (including Defendants), invoices, and checks revealing payments to nonprofit organizations. These documents evidently came to light after the ugly corporate breakup of Matrix."

---

[2] Annie Martine and Mario Alejandro Ariza, *Consultants for FPL Covertly Monitored Journalist After Critical Coverage*, THE ORLANDO SENTINEL (June 24, 2022 5:00 AM), available at https://www.orlandosentinel.com/2022/06/24/consultants-for-fpl-covertly-monitored-journalist-after-critical-coverage/ (last accessed Dec. 1, 2023).

[3] Nehamas, *'Our Plan Might Have Paid Off': How FPL dollars secretly funded a spoiler vs. Levine Cava*, THE MIAMI HERALD (August 25, 2022 8:12 AM), available at https://www.miamiherald.com/news/local/community/miami-dade/article264312341.html (last accessed Dec. 1, 2023).

[4] Annie Martin and Mario Alejandro Ariza, *Firm Working for FPL Took Control of News Site, Let Execs Influence Coverage, Records Show*, THE ORLANDO SENTINEL (July 25, 2022 5:54 PM), available at https://www.orlandosentinel.com/2022/07/25/firm-working-for-fpl-took-control-of-news-site-let-execs-influence-coverage-records-show/ (last accessed Dec. 1, 2023).

44.     Lead Counsel also contacted various news reporters, nonprofits, and individuals who were either directly involved in NEE's alleged misconduct as reported in media articles or who were publicly commenting on it. Lead Counsel obtained the same documents that were sent to the *Miami Herald*, *Orlando Sentinel*, *Florida Times-Union*, and other civic groups and nonprofits, including voluminous and detailed contemporaneous records of FPL and Matrix's involvement in the 2018 and 2020 Florida elections. As described below, the documents obtained by Lead Counsel consisted of memoranda, communications between Matrix and Company personnel, checks, bank statements, emails, text messages, invoices, memoranda, and internal ledgers covering a time period between 2016 and 2021.

45.     Lead Counsel contacted both media and other organizations who had received and reported on the internal Matrix and Company records and confirmed that the documents in Lead Plaintiffs' possession are the same documents that formed the basis of public reporting.

46.     Where possible, Lead Counsel independently corroborated details in the records— matching bank routing numbers and EINs, campaign contributions, transfers between nonprofits, records of incorporation, names, job titles, phone numbers, and transaction dates based on available public records, including those produced pursuant to public records requests in ongoing criminal matters.

47.     Additionally, both FPL and NEE have made statements confirming the authenticity of some documents. For example, many documents in Lead Plaintiffs' possession are communications between Matrix personnel and "Theodore Hayes," a pseudonymous email used by Silagy. Reuter confirmed that Silagy used the "Theodore Hayes" email address, which Matrix created on his behalf.

48.     One critical document Lead Counsel obtained was a partially redacted copy of the Robo Memorandum. It shows that on November 3, 2021, Robo was sent a memorandum via FedEx to NEE's corporate headquarters in Juno Beach. The Robo Memorandum, with subject line being "Florida Power & Light Officers' Potentially Unlawful Conduct Through Third-Party Consultants and Vendors – Confidential," summarized the internal Matrix investigation into Pitts' and other Matrix personnel's work with FPL to create and fund dark money groups that would advance

12

FPL's political interests. The Robo Memorandum contained more than 50 exhibits as attachments including invoices, bank statements, wiring instructions, emails, text messages, and additional evidence substantiating the investigation's findings. Including attachments, the memorandum was 181 pages long. While portions of the Robo Memorandum were described in the media, the complete contents of the document have not been made public.

49.     The Robo Memorandum identified specific NEE and FPL employees who worked with Matrix to advance FPL's political interests through allegedly illicit means. According to the Robo Memorandum, an "internal investigation" at Matrix,

> quickly identified the involvement of FPL president Eric Silagy ("Silagy"), vice president for state legislative affairs Daniel Martell ("Martell"), vice president for external affairs and economic development Pam Rauch ("Rauch"), and NextEra Energy, Inc. ("NextEra") vice president for integrated clean energy solutions Julie Holmes ("Holmes"). In summary, these NextEra/FP&L employees appear to have engaged in an ongoing scheme with Pitts and others to secretly divert corporate resources to off-the-books communications and political campaigns. Most of these communications may not be directly accessible to you because the NextEra/FP&L employees involved frequently used personal email accounts and even pseudonyms in an apparent attempt to conceal their communications.

50.     The Robo Memorandum also described the use to which FPL and Matrix put the funds they diverted from FPL. Notably, it identified documents showing that "Silagy, Martell, and Holmes worked with Pitts and others to use Grow United, other 501(c)(4) organizations, and Pitts' company TMP Interactive LLC to funnel FP&L funds to various political campaigns for the Florida State Senate that have been described as 'ghost candidates' by Florida media outlets." The total funds diverted from FPL numbered in the "tens of millions of dollars," some of which was also funneled through 501(c)(4) organizations to "covertly pay consultants and third-party vendors handsomely from funds that appear to have originated from FP&L."

51.     As described in greater detail below, many of the conclusions drawn by the Robo Memorandum are consistent with financial records and testimony provided in the course of criminal investigations of the "ghost candidate" scandal by the State Attorney's Office for Miami-Dade and Seminole Counties.

52.     As further revealed below, the Robo Memorandum explained how Matrix

13

personnel created and FPL funded numerous 501(c)(4) and other organizations in the months leading up to Florida's 2020 elections.

53.     Perkins' admission that Matrix "notified (FPL parent company) NextEra" that "[w]e had rogue employees that from 2016 forward were engaged in activities that we feared could be illegal," strongly suggests that Matrix sent Robo the Robo Memorandum.

54.     On December 17, 2021, Defendant Reuter acknowledged to the *Orlando Sentinel* that the Robo Memorandum was "shared with us" and that he and others were therefore aware of the funding structure described therein.

### FPL'S CONNECTION TO AND INVOLVEMENT IN THE POLITICAL SCANDALS

55.     Below are the facts connecting FPL, Silagy, Martell and others at FPL to the alleged political conduct reported on by the *Orlando Sentinel, Miami Herald* and the *Florida Times-Union* which Defendants sought to cover-up and distance FPL from. When NEE finally acknowledged the potential for a connection and resulting harm to NEE and FPL, NEE's stock price plummeted, causing investor losses.

### A.  FPL's Failed Effort to Buy the Jacksonville Electric Authority

56.     In 2019, the Company bid $11 billion to purchase the Jacksonville Electric Authority ("JEA") during a privatization effort that ultimately imploded in a scandal that is the subject of two ongoing federal criminal prosecutions. Throughout its efforts to acquire JEA, FPL and its officers relied on Matrix and its network of associates to facilitate a range of unseemly tactics to push the purchase forward. Matrix continued to keep FPL informed of developments in the multiple investigations into the JEA privatization process well into 2020.

57.     JEA is one of the largest publicly owned utility companies in the country, with nearly half a million electric, water, and sewer customers in the Jacksonville area. JEA is a not-for-profit, community-owned utility and independent agency of the City of Jacksonville governed by a seven-member board appointed by Jacksonville's Mayor and confirmed by the City Council.

58.     FPL's service area in Florida abuts and encircles the area serviced by JEA, making the utility the "hole in FPL's donut" according to media reports.

59.     Beginning in late 2017, JEA began exploring the possibility of privatizing the utility. Following more than a year of internal deliberations, on July 23, 2019, the JEA Board of Directors authorized JEA's senior leadership to start the process of selling JEA by issuing an Invitation to Negotiate (the "ITN"), a statutorily required procurement process under Florida law that applied to JEA. The ITN required a written solicitation for competitive sealed replies to select one or more vendors or bidders for negotiations. Before a transaction to privatize JEA could be completed, a bidder would be required to obtain JEA Board approval, approval by the Jacksonville City Council, and a successful referendum vote in which voters in Jacksonville approved the transaction.

60.     At the same meeting on July 23, 2019, the JEA Board also authorized senior leadership to implement a long-term incentive plan and Performance Unit Plan ("PUP") that would compensate participants based, in part, on the amount of proceeds the City of Jacksonville received from the sale of JEA.

61.     JEA was an attractive potential acquisition for NEE and FPL because of its sizable customer base and service area. The Company moved quickly to position itself for success with respect to the ITN and the broader political challenges of securing the approval of the Jacksonville City Council and a potential referendum.

62.     FPL and Silagy covertly relied on Matrix and its network of associates to engage in alleged improper tactics during FPL's efforts to purchase JEA. Those tactics included (1) the extension of a phony job offer to a City Councilor opposed to privatization in order to get him out of the way, and (2) the surreptitious surveillance of a journalist critical of FPL's bid and the privatization of JEA.

63.     Ultimately, the JEA privatization bid imploded in scandal following revelations by the Council Auditor that JEA's CEO Aaron Zahn ("Zahn") and CFO Ryan Wannamacher ("Wannamacher") stood to personally gain millions in bonus pay if the privatization of JEA went forward under the terms of the PUP. After this information became widely known, the JEA Board

15

canceled the PUP and halted the JEA auction process. On March 2, 2022, Zahn and Wannamacher were indicted for conspiracy and wire fraud by the United States Department of Justice.

64.     Notably, FPL took extraordinary steps to conceal Matrix's role in supporting the Company's efforts to acquire JEA. For example, NEE did not include Matrix in the list of firms it identified as engaged to work on its bid or lobby on its behalf in response to a subpoena issued April 7, 2020 by a special Jacksonville City Council committee investigating the collapse of the JEA privatization process. When confronted with evidence of Matrix's conduct undertaken during the attempted purchase of JEA, FPL and NEE acknowledged that Matrix had been engaged to "assist our company with due diligence, public outreach and communications efforts during the sale process" but also offered a series of false denials to distance the Company from the alleged conduct. Additionally, as set out below in ¶¶324–326 when asked directly by reporters whether he had been subpoenaed by federal prosecutors in connection the criminal case against Zahn and Wannamacher, Silagy falsely claimed in May 2022 that "we've never been subpoenaed," in connection with the prosecution of JEA's former executives when, in fact, federal prosecutors had issued a subpoena to NEE regarding the JEA scandal on April 21, 2020.

   **a. Matrix Extended a Phony Job Offer at "Grow United" to a Jacksonville City Councilor to Try to Get Him Out of the Way.**

65.     In late 2017, Rev. Deves Toon ("Toon"), a National Field Director for the National Action Network who had recently arrived in Jacksonville, began to organize a new group called "Fix JEA Now."

66.     Fix JEA Now was funded largely, but covertly, by FPL, through a network of intermediary organizations organized and controlled by employees at Matrix. Documents obtained during Lead Plaintiffs' investigation include ledgers for various entities controlled by the former Matrix employees that show more than $180,000 in combined payments to Toon in 2018. Some of those payments are explicitly associated with the JEA effort. Most of them reference FPL as the client invoiced for the various payments.

67.     FPL has since acknowledged that it was "aware that Matrix was paying Rev. Toon to support a number of polling and outreach efforts for multiple clients" and that FPL "had

knowledge of the Fix JEA Now organization." ME 1 confirmed that they worked to create a website for "Fix JEA Now" at Pitts' direction and on behalf of FPL in order to "get people fired up to divest from JEA."

68.     In 2019, as the JEA privatization process was unfolding, Toon was the conduit for a suspicious job offer made to Jacksonville City Councilor Garrett Dennis, a staunch opponent of privatizing JEA.

69.     According to reporting by the *Florida Times-Union*, Toon asked Dwight Brisbane, a consultant of his with ties to Councilor Dennis, to contact Dennis to relay an offer to work for "Grow United," an organization purportedly advocating for marijuana decriminalization. The job offer included a $180,000 annual salary and paid travel expenses but was explicitly conditioned on Dennis leaving the City Council.

70.     Dennis later told reporters that the offer struck him as suspicious. After finding that Grow United had no meaningful online presence, Dennis quickly dismissed the offer as a scam and moved on.

71.     Although it was unknown to Dennis at the time, documents obtained by Lead Counsel during their investigation confirm that Grow United was a Matrix-controlled front group funded by FPL. As described below in ¶¶260–261, FPL has since admitted that its executives had advanced notice of the plan to extend Dennis the phony job offer.

72.     On June 20, 2019, FPL's Vice President of State Legislative Affairs, Martell, sent an email message to Pitts with the subject line "things to go over." The first item on the list was "JEA - DG." On information and belief, "DG" refers to Garrett Dennis, reflecting a typographic error inverting the City Councilor's initials.

73.     A June 29, 2020, email from Odom emailed to another Matrix employee, Greg Gilbert, contained the subject line "FPL Expenses for Grow United c4." The Robo Memorandum describes an invoice attached to the email as being in an electronic folder Gilbert maintained named "FPL_2019 Vendor Invoices" which contained "numerous other vendor invoices paid with FPL funds." The Robo Memorandum also states that "text message correspondence between

Odom and Pitts" demonstrates that "Odom opened a bank account for Grow United," in the same time period.

74.     An internal Matrix planning document dated July 21, 2019, and written by Odom describes one of Matrix's two "Project Goals" in creating Grow United was to "create a job opportunity for District 9's Garrett Dennis." The document featured a picture of Councilor Dennis next to the text describing the "Project Goals." An attached proposed budget included a proposed $180,000 salary for Grow United's Director and $50,000 travel budget.

75.     On July 24, 2019, three days after the date on Odom's memorandum, Grow United, Inc. was incorporated as a 501(c)(4) organization in Delaware. The incorporation documents listed a UPS Store in Denver, Colorado as the organization's principal place of business. Richard Alexander, the brother of April Odom, was officially listed as Grow United's chairman. According to a ledger included in the documents obtained by Lead Plaintiffs, FPL was billed for the fees charged by the Delaware Secretary of State's Office for Grow United's incorporation.

76.     Contemporaneous text messages also link Toon and Pitts to the effort to get Councilor Dennis to resign in the late summer of 2019. On Friday, September 13, 2019 at 10:40 AM, Toon texted Pitts asking "Jeff any word on this Months [*sic*] payment." On Wednesday, September 18, 2019, at 7:07 PM, Toons texted Pitts saying "Jeff I found out what this bill is that Dennis is putting forth." On Friday September 20, 2019 at 11:55 AM Toon texted Pitts saying "Dennis is willing to resign from the city Council call me."

77.     The Robo Memorandum describes Grow United as "an entity funded by FP&L" and "used by Pitts, the other former Matrix employees, and their FP&L cohorts as a vehicle for covert financial transactions, including an apparent attempted bribe of a public official…" On information and belief, the "apparent attempted bribe of a public official" refers to the job offer at Grow United extended to Garrett Dennis. The Robo Memorandum also explicitly linked Grow United's creation and purpose with Dennis' opposition to the sale of JEA stating the entity "served a dual purpose of creating an entity for political contributions and also an opening to allow Garrett Dennis (who was opposed to FP&L's position on the JEA sale) to leave the City Council."

**b.   FPL's VP of State Legislative Affairs, Daniel Martell, Was Contemporaneously Aware of Matrix's Covert Surveillance of a Journalist.**

78.    Throughout the purported sale process, *Florida Times-Union* reporter Nate Monroe wrote a series of columns criticizing JEA for its attempted sale to a private buyer. These columns criticized both the sales process and its potential impact on the people of Jacksonville. In one column, for example, he wrote, "Even in this town, the total secrecy of the negotiation process is a hard sell . . . . Everyone is simply supposed to rejoice and ask no questions when [JEA CEO Aaron] Zahn emerges from the shadows with a fully negotiated deal." His criticism of a potential deal was especially sharp when he covered FPL's bid:

> So let's say Zahn gets his way and JEA is sold to our fake power company, Plorida Flower and Bright. And let's say Plorida Flower and Bright owns all the service territory around Jacksonville, as well as the territory including millions of more customers elsewhere in the state. Who actually thinks our made-up utility won't be cutting significant staff after it acquires JEA? Will Plorida Flower and Bright promise that by 2030 it will still employ 2,000 people? Or will Plorida Flower and Bright — with a robust network of its own power plants, transmission lines, offices and customer-service centers — shuffle around a few regional resources and decide it can save money by cutting its newly acquired utility?

79.    Monroe's coverage threatened to undermine public support for FPL's bid to purchase JEA. Thus, in fall 2019, Matrix began to dig up information that could discredit Monroe on FPL's behalf. Matrix's methods involved both traditional opposition research and in-person surveillance. On October 24, 2019, Pitts sent FPL vice president of state legislative affairs Daniel Martell an email attaching a "Comprehensive Report" on Monroe. Pitts sent the email to a personal email address for Martell rather than his official FPL email address. The attached 72-page report contained sensitive personal data, including Monroe's financial history, political party affiliation, the names and phone numbers of his relatives and neighbors, his unredacted social security number, the make of his car, his driver's license and license plate numbers, and places where he had lived since childhood. The report found no criminal or traffic records, bankruptcies, liens, or judgments.

80.    Weeks later, on November 9, 2019, Matrix personnel tracked Monroe's movements while on vacation in Pensacola, Florida for a friend's wedding. On that day, Monroe posted on his Twitter account a picture of himself and his girlfriend in front of a mural that clearly identified

their presence in Pensacola. In the evening, Monroe again tweeted, "Ok. Time to get drunk." A Matrix operative sent a screenshot of this post to Martell's phone via text message. Martell immediately responded approvingly, "Awesome." The Matrix operative later wrote, "He's in an Uber ☹"

81.     On information and belief, it appears that Matrix was following Monroe at FPL's behest and was disappointed that (1) they could not observe his activity in an Uber and/or (2) Monroe used a ridesharing service rather than driving potentially while under the influence of alcohol. Monroe later confirmed that he had an Uber receipt for a ride taken on November 9, 2019.

82.     ME 1 stated that on numerous occasions Martell travelled to Matrix's offices for in-person meetings. ME 1 stated that it seemed Martell "reported directly to Silagy" and no intermediaries stood between the two FPL executives.

83.     Monroe's coverage of FPL continued into 2020, and Matrix continued to stalk him. On October 1, 2020, for example, he wrote a column titled "Dear FP&L: It's Not Really Charity if You Get Something Out of It." The column criticized FPL for one aspect of its 2019 campaign to purchase JEA: attempting to influence Jacksonville city councilors' votes by making donations to charities they led. This article precipitated another round of surveillance. According to reporting by the *Florida Times-Union*, Matrix obtained a photograph of Monroe, his girlfriend, and his dog outside their apartment timestamped 5:48 PM on October 14, 2020—two weeks after the column.

84.     Matrix records obtained during Lead Counsel's investigation include a ledger noting multiple invoices totaling thousands of dollars of payments made to Clear Capture Investigations, a private investigation firm in Gainesville, Florida that advertises "political/corporate surveillance" as one of its specialties. Several of the entries included in the ledger identify "FPL" as the client associated with invoices from Clear Capture Investigations.

85.     As described in greater detail below, when confronted with evidence of the surveillance of Monroe, FPL and Silagy made false and misleading statements and additionally denied having requested the report on Monroe or authorizing his surveillance.

**B.  FPL and Matrix Orchestrate the "Ghost Candidate" Scheme**

86.     Documents from Matrix's servers reveal that Matrix personnel kept detailed ledgers

of FPL's political spending, which Pitts' team helped direct to at least five spoiler or "ghost" candidates—two in the 2018 election cycle, and three in the 2020 election cycle—used to siphon off votes from candidates FPL opposed.

87.     Most of the races targeted by Matrix and FPL involved candidates to the state Senate. State Senate seats in Florida were particularly important to FPL because the Florida Senate is responsible for confirming members to the Florida Public Service Commission, the entity which regulates FPL and other utility companies.

88.     With Silagy's direct participation in planning and FPL personnel's involvement in the execution, Pitts and his subordinates at Matrix created at least 19 different non-profit entities to form a "daisy chain" through which FPL money could effectively be laundered to support or oppose political candidates. FPL and Matrix put a premium on concealing FPL as the source of funding and used the orchestra of nonprofit entities to hide FPL's involvement.

### a.   Spoiler Candidates in the 2018 Election Cycle

#### i.   *State Senate District 8*

89.     In the lead-up to the 2018 race for Florida State Senate District 8, an incumbent Senator favored by FPL faced a serious threat of losing to a challenger, Kayser Enneking.

90.     FPL and Matrix initially tried and failed to defeat Enneking during her primary election. Matrix and FPL, with Silagy's direct involvement, used a 501(c)(4) entity, Mothers for Moderation, to covertly funnel FPL money into the 2018 elections and beyond, starting with Enneking's primary in early 2018. Mothers for Moderation reportedly spent $100,000 on mailers and television advertising supporting a political committee called Liberation Ocala that backed Enneking's primary opponent. Mothers for Moderation provided Liberation Ocala with all of its funds that year.

91.     In turn, Mothers for Moderation was almost entirely funded by FPL. An internal Matrix ledger obtained by the *Orlando Sentinel* and covered in a December 2, 2021 story showed that FPL donated over $14 million to Mothers for Moderation between August and December 2018 alone, nearly all of the organization's revenue that year. This funding and ledger were also discussed in the Robo Memorandum.

92.     The Robo Memorandum provided that Mothers for Moderation was an organization previously formed by Pitts and April Odom, "the only purpose of which appears to be obscuring the source of contributions to political campaigns and third-party vendors." Odom's sister Stephanie Egan, an elementary school teacher, was officially listed as the organization's "executive director."

93.     The Robo Memorandum attached as exhibits numerous letters sent on Mothers for Moderation letterhead, but originating from Matrix agents, requesting that FPL donate millions of dollars "for general mission support." While the letters were addressed to FPL, they were sent directly to Silagy's and Martell's *personal* email addresses, including a pseudonym account Silagy used under the false name "Theodore Hayes." These letters include:

- A November 5, 2018 letter, addressed to "Florida Power and Light (FPL) Attn: Eric Silagy," requesting $4.3 million for Mothers for Moderation;

- A November 14, 2018 letter, addressed to "Florida Power and Light (FPL) Attn: Eric Silagy," forwarded via email by Jeff Pitts to Eric Silagy's pseudonym "Theodore Hayes" email account at 5:09 PM that day, requesting $2.4 million for Mothers for Moderation;

- A December 17, 2018 letter, addressed to "Florida Power and Light (FPL) Attn: Eric Silagy," requesting $500,000 for Mothers for Moderation;

- A December 26, 2018 letter, addressed to "Florida Power and Light (FPL) Attn: Daniel Martel," requesting $45,000 for Mothers for Moderation;

- Three April 9, 2019 letters, addressed to "Florida Power and Light (FPL) Attn: Eric Silagy," requesting $6.6 million, $6 million, and $3 million, respectively, for Mothers for Moderation.

94.     The Robo Memorandum also described and attached invoices, ledgers, bank statements, and communications showing that FPL funds flowed through Mothers for Moderation to pay Pitts and other Matrix associates for purported "consulting" services.

95.     According to the Robo Memorandum, Pitts used Mothers for Moderation and other 501(c)(4) organizations to make disguised political donations and engage in other political activity on behalf of FPL, with Silagy and Martell as "active participants in these contributions."

96.     For example, the Robo Memorandum attached text messages and emails between Silagy and Pitts dated between October 12, 2018 and October 15, 2018 arranging a $10,000 donation to a political action committee to be routed through Mothers for Moderation apparently in order to conceal Silagy's participation.

97.     On Friday, October 12, 2018, at 8:14 AM, using his personal Yahoo.com email address, Silagy forwarded to Pitts an email from Sarah Russell, an employee of the House Majority PAC, regarding a "pledge of support" to the PAC to be earmarked in support of Lauren Baer, a candidate running in 2018 for the U.S. House of Representatives in Florida's 18th Congressional District. In his message, Silagy wrote to Pitts "See below. Can you coordinate? Just want to make sure they don't triangulate this donation to others we have done. So many of these fundraisers/staff crossover to different campaigns."

98.     Pitts responded on Saturday October 13, 2018, at 8:14 AM: "Should be able to but will call you Monday [October 15, 2018] to walk through before anything is wired." Silagy responded the same day: "Good. Thanks[.]"

99.     On Monday, October 15, 2018, as shown by a text message chain beginning at 8:34am that day which is attached as an exhibit to the Robo Memorandum, Silagy texted Pitts: "When you get a chance, send me the info of where Pike should send the 10." Pitts replied that he had sent to Silagy's "personal email where the 10 goes. Mothers for Moderation. Advancement for Integrity and Justice will be supporting the House Majority PAC. I will contact Sarah [Russell] and let her know." The Center for Advancement for Integrity and Justice was a non-profit entity controlled by Odom. The Internal Revenue Service revoked its tax-exempt status in May 2021 after it failed to file a Form 990 for three consecutive years.

100.     The Robo Memorandum also attached and described an email sent at 9:21 am on the same day, October 15, 2018, from Pitts' Matrix email address to Silagy's Yahoo.com personal email address with the subject line "Mothers for Moderation Info." In the email, Pitts provided Silagy with wiring information "For the $10K donation" to Mothers for Moderation. The email listed Mothers for Moderation's address, EIN, and bank routing and account numbers.

23

101.    According to the Robo Memorandum, and as evidenced by an internal ledger maintained by Odom appended to it, FPL paid $14.15 million to Mothers for Moderation between August and December 31, 2018. FPL contributed $250,000 of this amount in August 2018. For reference, the total deposits from all sources made to Mothers for Moderation between July 19, 2018, and December 31, 2018, according to the ledger, were $16.335 million.

102.    Mothers for Moderation used its funds to run attack ads during the 2018 election cycle characterizing Enneking as an "out of touch millionaire."

103.    On August 28, 2018, despite FPL and Matrix's intervention, Enneking won a lopsided victory in her primary election to challenge the incumbent Senator who was supported by FPL. The very next day, Pitts formed a 501(c)(4) entity called "Broken Promises" to oppose Enneking in the general election. Broken Promises' official registered address was a UPS Store in Washington, D.C.

104.    Broken Promises was nominally chaired by a friend of Pitts named Sean Jason Anderson. Anderson, who was also a political consultant based in Alabama, had been similarly used as a figurehead to mask Matrix's and FPL's involvement in other nonprofit organizations. In a text message chain from December 6, 2016, as reported on August 8, 2022 by the *Tampa Bay Times*, Pitts assured FPL vice president of state legislative affairs, Daniel Martell, that Anderson's on-paper authority over a similar non-profit was an illusion. Matrix was in fact in control of how money sent to Anderson-run entities would be spent. In the text chain, Martell urgently asks for information on 501(c)(4) entities, writing "We need to know who the board members are" and requesting a response "asap," adding that he was "On phone with eric [Silagy]." Pitts assured him that the organizations each had a single board member who were personally close to Pitts, including Anderson and Pitts' former college roommate, so Pitts could in reality be the one pulling the strings and directing funding on FPL's behalf. "Bottom line is We are the one with the check books and in control 100percent," Pitts wrote. Acknowledging the impropriety, Martell replied: "This text is self-destructing in 30 seconds." "Yep that's why I like face to face," Pitts texted back. This chain of text messages was attached to the Robo Memorandum.

105.    According to an internal Matrix ledger attached to the Robo Memorandum, FPL contributed $200,000 to Broken Promises in the fall of 2018. The contributions came in two installments: $100,000 on September 26, 2018, and another $100,000 on October 16, 2018. According to a *Tampa Bay Times* story published in August 2022, these amounts constituted Broken Promises' entire revenue for 2018. Because of its non-profit status, Broken Promises was not required to disclose that FPL was the source of its funding unless political activity constituted its primary activity.

106.    Three days after the September 26, 2018 contribution from FPL, Broken Promises contributed $20,000 directly to the political committee of Charles Goston, a no-party straw candidate with similar political leanings to Enneking who had entered the race in the hopes of splitting Enneking's base. Broken Promises was the only contributor to this committee.

107.    Two weeks later, Broken Promises spent $52,000 to promote Goston through mailers. Then, after receiving the second $100,000 installment from FPL, Broken Promises spent about another $63,000 on advertising in support of Goston. The two "in-kind" contributions for advertising totaled over $115,000. These expenses amounted to 71.7% of Broken Promises' entire spending in 2018.

108.    Organizations organized under 26 U.S.C. § 501(c)(4) like Broken Promises are permitted to engage in some political activity alongside their general promotion of "social welfare" activities. However, the IRS does not consider political activities to be in furtherance of the social welfare. To maintain their tax-exempt status, and in turn conceal their donors, a 501(c)(4) organization's primary purpose cannot be to engage in political activity. One general rule of thumb the IRS uses to determine whether an organization's primary activity is political is to assess whether political spending accounts for over half of the organization's expenditures.

109.    In its federal tax filings on Form 990, Broken Promises recorded only $45,000 in expenses as "Lobbying," which would account for the $20,000 contributed to Goston's political committee and $25,000 Broken Promises contributed to another PAC, Consumers for Energy Fairness. Broken Promises' tax filings also disclosed $115,510 (approximately equal to the total spent on the in-kind advertisements supporting Goston) as "other" spending but did not disclose

25

any of these sums – which collectively amounted to 99.6% of the organization's overall spending in 2018 – as political spending. Instead, in response to the question "Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?" Broken Promises responded "No," and accordingly did not file the required Form C disclosure with its Form 990 reporting any political spending. A tax law professor from Loyola Marymount University interviewed by the *Tampa Bay Times* in August 2022 confirmed, upon reviewing Broken Promises' tax statements, that this representation did "not seem accurate at all" given Broken Promises' spending in 2018 would qualify as "political activity."

110.    Corporations like FPL likewise are allowed to make political contributions. However, both federal and Florida law prohibit using "straw" donors like Broken Promises to hide political contributions. The Federal Election Campaign Act ("FECA") prohibits knowingly making or accepting a contribution in the name of another person, and Florida law similarly forbids making contributions "through or in the name of another, directly or indirectly, in any election." Fla. Stat. § 106.08(5)(a).

111.    When FPL's involvement in the 2018 District 8 race came under media scrutiny in August 2022, FPL did not deny that it had funded Broken Promises.

112.    A University of Pittsburgh Law School expert on tax law interviewed by the *Tampa Bay Times* for its August 8, 2022 story explained that FPL's use of Broken Promises to conceal contributions supporting Goston "tells you they have concerns about disclosing their support of this candidate to voters and they had some intention to hide it."

113.    Enneking lost her race by fewer than 2,000 votes. The spoiler candidate, Goston, received 4,319 votes, more than accounting for the difference in the election. In reporting on the episode on August 8, 2022, the *Tampa Bay Times* quoted Enneking as saying that in "policy debates" with Goston, "there was not one iota of difference between what he was advocating for and what I was advocating for," except to the extent the similarities would help to effectively siphon votes from Floridians who could not distinguish between the two.

114.    Goston's campaign was relatively inexpensive compared to his purported rivals in the District 8 race, coming in at just $145,000. Enneking told the *Times* in August 2022 that she

believed the District 8 race was a "test run" for the 2020 election cycle, proving to FPL that running a spoiler candidate was a "cheap way to siphon votes off."

115.    On December 17, 2020, Citizens for Responsibility and Ethics in Washington ("CREW"), a non-partisan, non-profit watchdog organization, filed a complaint with the IRS requesting an investigation into whether Broken Promises "violated federal law by failing to properly disclose its political contributions" in 2018. The complaint alleged that Broken Promises violated 26 U.S.C. §§ 501(c)(4) and 6652 by engaging in political activity as its primary activity in 2018, and by failing to disclose its political spending in its 2018 Form 990. Broken Promises filed for dissolution two weeks later.

*ii.    Miami-Dade County Commission District 8*

116.    FPL opposed an incumbent candidate in the 2018 Miami-Dade County Commission District 8 race, Daniella Levine Cava. Levine Cava had previously fought FPL plans related to its Turkey Point nuclear power plant.

117.    In early 2018, a website smearing Levine Cava as an elitist, KeepingUpWithCava.com, went live. Unbeknownst to the public, Matrix, funded by FPL, set up the website. An internal Matrix ledger attached to the Robo Memorandum shows that FPL and Matrix were secretly behind KeepingUpWithCava.com and an associated Facebook page. In columns nested under headings such as "TOTAL FPL Budget BALANCE" and "FPL Amt" are three expenses, invoiced and paid for between February 23–28, 2018: an "Annual Domain Host Charge," "Domain Privacy Fee," and "Cava Site." The "Project Notes" column for all three expenses states: "KeepingUpWithCav[a]." The ledger shows additional funds for "KeepingUpWithCav[a]" paid on March 1, 2018, March 14, 2018, and July 1, 2018.

118.    According to the ledger, far more FPL money was used to challenge Levine Cava. FPL payments of $8,000, $6,620, $6,500 and $6,500, dated February 6, 2018, June 18, 2018, July 25, 2018, September 10, 2018, and September 14, 2018, went to an entity called Front Line Strategies, a communications firm, with the "Project Notes" field simply stating "Cava" or "Cava [month]." The ledger also lists $4,250 and $2,750 as amounts FPL paid on February 1, 2018 and March 1, 2018, respectively, both for "Cava Monitoring/Commission." Several other weekly

entries went to projects labeled with Levine Cava's name starting in July 2018, such as "Cava, Week of 7/2" and "Cava Week of 8/20."

119.    Unfortunately for FPL, Levine Cava's base of support remained strong and she seemed likely to win outright in the upcoming August 2018 election. Pitts and his associates at Matrix therefore hatched a plan to split Levine Cava's base in two by introducing a politically similar challenger. Matrix did not have any hope or desire for the challenger to win, but believed he could eat into Levine Cava's support enough to force her into a run-off with her opponent, Gus Barreiro.

120.    According to a story published on August 25, 2022 by the *Miami Herald*, Matrix focused its efforts on Johnathan Burke, a 33-year old man with several arrests on his record who had never run for office before. Pitts had met Burke on June 11, 2017. The next day, Pitts texted Burke: "look forward to working together."

121.    A little over a week after meeting Pitts, on June 20, 2017, Burke spoke at a city commission meeting in South Miami in opposition to a proposed ordinance which would require contractors to install solar panels on newly constructed residences. FPL at the time was strongly against the ordinance.

122.    To support Burke's 2018 candidacy, Matrix secretly sent $12,000 in FPL funds to a political strategy firm called PDG Strategies brought in to advise Burke's campaign. An executive at PDG Strategies confirmed that Matrix paid PDG Strategies to work on Burke's campaign, as reported in the August 25, 2022 *Miami Herald* story.

123.    These funds were not, however, the only support FPL provided for the candidate. Using $120,000 in FPL funds, routed through an Alabama-based company called Tarella, Inc., Pitts (i) paid Burke a $60,000 salary in 2017 and (ii) paid $2,300 per month starting in 2017 to cover the rent for Burke's home in Miami-Dade District 8, according to internal Matrix financial records, emails, and text messages the *Miami Herald* obtained and reported on in the August 25, 2022 story. The *Miami Herald* reported in the August 25, 2022 story that "[s]everal of the payments to Tarella [we]re marked 'Miami Dade Election' or 'County Commission,'" and "[a]ll the transactions were listed as being made with FPL funds."

124.    Because Burke needed to live in Miami-Dade Commission's District 8 for six months to be able to run against Levine Cava, Pitts made arrangements to move him to a home in Cutler Bay on FPL's dime. Tarella—a firm founded by a former Matrix lobbyist, Paul Hamrick, who was working closely with Pitts and sometimes out of Matrix's office—wrote a letter to Burke's landlord on August 23, 2017 memorializing an oral agreement for Tarella to pay Burke's $2,300 rent, according to documents obtained by the *Miami Herald*. The letter suggested that it was important to Burke to stay in the area because of the "school district," and added "it certainly is important to this company for his residence to be resolved."

125.    On February 6, 2018, Hamrick texted Pitts, alerting him that Burke's rent was due but Tarella had insufficient funds to pay it. Pitts asked for Hamrick to forward along the invoice so he could "take care of it." A Matrix ledger obtained by the *Miami Herald* showed that, the next day, Matrix sent $2,500 to Tarella with a note that the money had come from FPL funds. This transaction is also shown in the internal Matrix ledger of expenses attached to the Robo Memorandum.

126.    On March 13, 2018, according to the Matrix documents obtained by the *Miami Herald*, Hamrick sent an email message to Pitts with the subject line "Miami." Hamrick told Pitts they needed to get Burke to announce his candidacy for the upcoming election, and that he thought Burke would be "effective if we just have a plan we make him follow."

127.    On August 28, 2018, Levine Cava was reelected with 62% of the vote. Matrix's plan failed, but this was primarily due to Barreiro's poor showing (he received just 21% of the vote). The spoiler candidate, Burke, had successfully attracted 17% of votes.

128.    Another individual, Dan Newman, also worked to advise Burke. Newman was a Matrix subcontractor who had previously worked as a lobbyist at a firm representing FPL and as a fundraiser for the Florida Democrats' Legislative Campaign Committee. Newman sent a text message to Pitts and MacIver sharing the election results on August 28, 2018. MacIver responded: "Well that's a respectable vote number for JB. If [B]arriero had done a decent job our plan might have paid off."

129.    After the election, Pitts suddenly ceased almost all contact with Burke. On October

26, 2018, Burke texted Pitts stating that he had "not heard much since Election Day" and asking if he should "expect to see or hear from anyone again or is this the end of the road?" Pitts did not respond. Then, on Wednesday, February 27, 2019, Burke texted Pitts acknowledging that "Friday March 1st marks the conclusion of our agreement and will be the last time I have to bug you about funds, unless further work is agreed upon." Again, Pitts did not respond.

130.    Levine Cava ran for Mayor of Miami-Dade County in 2020, winning the election on November 3, 2020. While a candidate in the lead-up to the mayoral election, a news website called "the Capitolist" ran a piece attacking Levine Cava on June 4, 2020. As described more fully in Section C below, the Capitolist at the time was being funded by FPL, through a Matrix shell entity which had executive and editorial control over the news website. Silagy and Martell in particular were frequently consulted for approval or edits to stories and requested pieces on particular subjects.

131.    According to the August 25, 2022 report in the *Miami Herald*, the day the June 4, 2020 Capitolist piece attacking Levine Cava was posted, FPL vice president of external affairs and economic development Pam Rauch texted Pitts: "She deserves this!" in response to the story. Silagy responded to the story via a text to Pitts the next day: "Love it!"

### b.  Ghost Candidates in the 2020 Election Cycle
#### i.  *The Ghost Candidate Scheme*

132.    In mid-2020, several of FPL's favored candidates for Florida State Senate seats were locked in tight races with candidates the Company disfavored and actively wished to unseat. Matrix and FPL took the lessons learned in the 2018 election cycle with them into 2020, using similar, albeit refined, stealth tactics to siphon off votes from FPL's political adversaries.

133.    The scheme centered on running and promoting at least three "ghost" candidates—persons who had no interest in campaigning or actually holding elected offices but who were paid or otherwise induced to enter the race merely to divert votes away from legitimate candidates. The ghost candidates would be promoted with purported names, platforms, or other attributes similar to the disfavored candidates in order to siphon off enough votes in a close election to determine the outcome.

30

134.    The three ghost candidates were Jestine Iannotti in Senate District 9, Alex Rodriguez in Senate District 37, and Celso Alfonso in Senate District 39.

135.    Former District 40 Senator Frank Artiles played a prominent role in the scheme. According to prosecutors in the Miami-Dade State Attorney's Office, Artiles offered Alex Rodriguez $50,000 to enter the District 37 race. Celso Alfonso's wife told investigators that her husband had not been paid to run in District 39, but that Artiles "guided" her husband, filed Alfonso's campaign finance reports, and delivered his qualifying check to the Division of Elections.

136.    At the time, Artiles was working as a contractor for a nonprofit entity called "Let's Preserve the American Dream," ("LPAD") where he reported to a political operative named Alex Alvarado.

137.    Based on records released by the Miami-Dade State Attorney's investigation, LPAD has paid Artiles $125,000 for "South Florida research services" since 2017. The last payment to Artiles was Nov. 15, 2020, three days after District 37 incumbent Senator Jose Javier Rodriguez lost in a manual recount.

138.    LPAD, in turn, was associated with a lobbying entity called "Associated Industries of Florida," or "AIF." LPAD operated out of AIF's building, and AIF's former vice president, Ryan Tyson, was listed as LPAD's executive director in 2020 according to LPAD's 2020 Form 990, filed on November 17, 2021. The *Orlando Sentinel* reported on July 30, 2021 that "Alvarado sometimes forwarded Artiles' invoices to an executive at AIF," and reported on November 18, 2021 that FPL was an AIF member and one of AIF's biggest donors.

139.    LPAD did not disclose its donors in 2020. A prior entity with the same name as LPAD, however, was run by the same person and out of the same address from 2014 to 2016. That entity, which was organized at the state level in Florida and was required to disclose its donors, was funded by FPL, according to a November 18, 2021 *Orlando Sentinel* story.

140.    The ghost candidates were promoted by two political committees: "The Truth," which sent mailers supporting Jestine Iannotti in Senate District 9, and "Our Florida," which sent similar materials in support of Alex Rodriguez and Celso Alfonso to voters in Districts 37 and 39,

respectively. Both committees were run by LPAD's Alex Alvarado, and like LPAD were run out of AIF's headquarters.

141.   Unlike the 2018 spoiler candidates backed by FPL, who at least engaged in the façade of minimal self-promotion through cheap, bare-bones campaigns, the 2020 ghost candidates did virtually no campaigning on their own behalf. Instead, The Truth and Our Florida spent $550,000 promoting the ghost candidates. For example, as the *Orlando Sentinel* revealed over a year later, residents of Seminole and Volusia counties received mailers in the weeks leading up to the 2020 elections promoting Jestine Iannotti. The woman pictured on the mailers was Black, and the mailers stated she was in favor of social justice and campaign finance reform. In fact, Iannotti was Caucasian and at the time was planning to move to Sweden.

142.   The official chairperson of the committee behind the promotional material supporting Iannotti, "The Truth," was also merely a figurehead. Because political committees must disclose their chairs, the LPAD political operative behind "The Truth," Alex Alvarado, paid a 25-year-old college student named Hailey DeFilippis $1,500 to sign the registration forms for the committee. Alvarado paid another woman, 23-year-old Sierra Olive, $2,000 to sign the paperwork to be the official chairperson for "Our Florida."

143.   Both "The Truth" and "Our Florida" were funded entirely by a nonprofit named Grow United, an entity incorporated in Delaware in July 2019 and with a listed address in a UPS Store in Denver, Colorado. Grow United is the same 501(c)(4) organization that FPL and Matrix had used the previous year to attempt to entice Jacksonville City Councilor Garrett Dennis to give up his seat. Grow United collectively provided $550,000 to The Truth and Our Florida to fund the ghost candidate scheme. The payments were coordinated by April Odom, then working for Matrix, and LPAD's Alvarado. Odom's brother, Richard Alexander, was officially listed as Grow United's chairman, but like the others, Alexander too was a figurehead masking Odom's and Matrix's involvement.

144.   Tyson, in a sworn statement on September 30, 2021 to the Miami-Dade State Attorney's Office in the criminal prosecution of Frank Artiles, stated that it was his "understanding" that Jeff Pitts "was running" Grow United. Tyson further testified that he spoke

with Pitts before LPAD contributed funds to Grow United. Tyson also testified that he understood that Alvarado wanted to support the "independent candidates" running for state senate in Florida with independent expenditures, and that he "had a hunch" Grow United would "help" and "likely be supportive" of Alvarado's efforts. Tyson also testified that Artiles had been a subcontractor of LPAD since 2017. Tyson's testimony was obtained by the Florida Center for Government Accountability by way of a public records request to the Miami-Dade State Attorney's Office and provided to Lead Counsel.

145.    Grow United received $1.15 million in "general support" funding from LPAD in 2020, according to LPAD's 2020 Form 990. At least $600,000 of that amount was earmarked for the political committees which promoted the ghost candidates.

> ii.    _Matrix and FPL Set Up and Funded the Funding Structure for The Ghost Candidates_

146.    Although FPL and Matrix took pains to hide their involvement from the public, behind the scenes the funding that flowed through Grow United to prop up the ghost candidates came down a path carefully planned by Pitts, Silagy, and their associates. Reporting by the _Orlando Sentinel_ on December 2, 2021, and as confirmed by documents obtained by Lead Counsel, showed that Matrix consultants who controlled Grow United, "the dark-money nonprofit at the center of the 'ghost' candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity." Specifically, Matrix submitted invoices to FPL through several entities, including TMP Interactive, People Over Profits, and ENH Industries, and directed such funds to Grow United, which in turn funded the two committees which paid for the mailers promoting the ghost candidates' campaigns. The same article continued: "FPL has donated more than $10 million in recent years to other dark-money non-profits controlled by some of the same consultants [Matrix] – and FPL CEO and President Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits."

147.    In the lead-up to the 2020 election, FPL was especially concerned that incumbent Senator Jose Javier Rodriguez might retain his seat in District 37. In office, Rodriguez had opposed FPL's plans to expand a nuclear plant in South Florida and frequently drawn the ire of FPL's

33

executives with his policy stances in support of deregulating private energy production and sale. FPL has conceded that it "wanted the veteran senator out of office," according to a July 22, 2022 *Orlando Sentinel* report.

148.    On January 7, 2019, Defendant Reuter sent an email message to Defendants Robo, Silagy, and other NEE personnel with the subject line "Florida Lawmaker Again Files Bill That Would Help Break Monopoly-Solar Stranglehold." The message contained a *Miami New Times* story on a bill filed by Sen. Jose Javier Rodriguez which would allow "property owners to sell home-generated solar power to others, including tenants" without being regulated like a traditional "public utility." The story explained that Florida's energy utilities, including FPL, felt threatened by the potential for individual property owners to compete in the energy marketplace. Sen. Rodriguez was quoted in the story saying: "Simply put, the big utilities use their political muscle to maintain outdated monopolies."

149.    Later that morning, also on January 7, 2019, Defendant Silagy forwarded Reuter's email regarding Sen. Rodriguez's bill to FPL vice president of state legislative affairs Daniel Martell and John Holley, FPL vice president of government affairs. Silagy's message, in its entirety, read: "**JJR at it again. I want you to make his life a living hell....seriously**."

150.    That same day, Martell forwarded Silagy's message to Jeff Pitts.

151.    Matrix asked Dan Newman, the Matrix subcontractor who had previously been an FPL lobbyist, to draft a plan to oust Sen. Rodriguez. Records released on January 18, 2022, stemming from a criminal investigation into the ghost candidate scheme, revealed that Tyson told prosecutors Newman was working as a contractor for LPAD.

152.    Documents uncovered in Lead Counsel's investigation show Newman wrote a memo on June 5, 2019, addressed to Pitts, suggesting that a competing primary candidate could defeat Sen. Rodriguez. The memo warned that Sen. Rodriguez would "have increased significance" after the 2020 election if he retained his seat, due to his increased seniority relative to other officials. Although Newman's memo focused on a primary challenge, and no primary challenge was mounted to Sen. Rodriguez, it suggested a strategy similar to that ultimately employed by the ghost candidate scheme in the general election: support a legitimate opponent to

34

Sen. Rodriguez while simultaneously bringing in a third candidate to "Capture His Base" by "run[ning] a campaign to reduce JJR's support among" his own core voters. Newman warned, however, that more research was needed to determine whether the spoiler candidate would steal more votes from Rodriguez or his challenger.

153.    Newman's memo anticipated that challenging Sen. Rodriguez could cost $3.35 to $3.8 million, including $500,000 needed to support the third, spoiler candidate. Because "[i]n all likelihood, they will not have their own fund," Newman's budget set aside $450,000 for the third candidate's promotion, and $50,000 to create a "credible team." The memo called for $3 million of the overall budget to come "from the client." These amounts are, notably, nearly exactly what FPL contributed to Grow United right before it funded the ghost candidate committees ($3 million), and just shy of what Grow United ultimately contributed to the committees supporting the ghost candidates ($550,000).

154.    On June 20, 2019, Martell sent an email message to Pitts with the subject line "things to go over." Two of the four items on Martell's list were: "SD 39" and "SD 37."

155.    A month later, on July 19, 2019 at 1:30 PM, Pitts met with Silagy, Julie Holmes (an NEE vice president), and others to discuss "Dereg Budget," according to an internal Matrix calendar. Pitts' calendar specified that the meeting took place in "Eric's office."

156.    On October 3, 2019, Tyson sent an email message from his LPAD email address to Martell's FPL email address, with the subject line "Items you requested." The email attached Newman's June 2019 memo. The email began with the salutation "Danny—" and Tyson wrote that the attached memo was "our original proposal into SD 37…" The attachment was titled "SD37 JJR PROPOSAL.pdf."

157.    Then, on October 9, 2019, Martell sent Pitts a text message reading: "We need to catch up this pm. Eric has an ask." The two arranged to have a phone call at 5 PM that evening.

158.    Shortly thereafter, Pitts retained an attorney to help create legal entities for use as funding vehicles for FPL's activities related to the 2020 election. On October 16, 2019, Pitts sent an email to an attorney at Foley & Lardner LLP, copying two of his Matrix colleagues, stating that he wanted to retain Foley & Lardner to "setup one LLc that would do work directly for the client"

and another LLC or 501(c)(4) organization to be called "Proclivity Research" to provide "research and consulting" to the first entity. Pitts cautioned the email recipients "we need this to be strictly confidential between the three of us and those employed by the firm to work on this project." This email message was described in and attached as an exhibit to Robo Memorandum.

159.    On October 21, 2019, Pitts met with at least Martell and Tyson. Pitts picked Martell and Tyson up from the airport, according to text messages between Pitts and Martell obtained by Lead Counsel in their investigation. "Onboard plane. See you soon. Tyson coming with us from airport," Martell said in a message to Pitts, to which Pitts affirmed that he would be waiting "outside baggage claim."

160.    On November 8, 2019, Pitts sent an email message to Defendant Silagy's "Theodore Hayes" pseudonym account, with the subject line "Updat–d - Funding Structure." The email stated that the "best structure to use" to fund FPL's 2020 political activities would be an S Corporation, in part "because: . . . The SCorp can fund C4 activities without any tax liabilities or public reporting" and "There are no public documents that identify the owner of this SCorp."

161.    Attached to the email described above, Pitts included a memorandum with himself listed as the author, entitled "FUNDING STRUCTURE FOR 2020" and dated November 7, 2019. The memo outlined plans to develop a structure for FPL to provide political campaign spending and repeatedly stressed the need to "minimize public reporting." Among the listed "Goals" were: "Provide funds that can be used for political activities in 2020 – **specifically support of Political Committees in Florida** and other states at the state level," "Provide funds that can be used for Federal Political purposes," and "Minimize all public reporting of entities and activities." (Emphasis added).

162.    Both the November 8, 2019 email from Pitts to Silagy and the November 7, 2019 memorandum outlining the proposed funding structure described above were attached to the Robo Memorandum.

163.    By November 18, 2019, as revealed by an email message sent to Pitts by the attorney at Foley & Lardner on that date, the planned S Corporation had a name: SUN Marketing, although the corporate structure was still being determined. The plan as of that time, according to

the email, was for FPL vice president for external affairs and economic development Pam Rauch to serve as the sole owner of SUN Marketing. However, this created a problem. The Foley & Lardner attorney informed Pitts that if Rauch were made sole owner, it was possible that FPL's auditors would require Sun Marketing's assets and liabilities to appear on FPL's financial statements because as an FPL officer, Rauch would have been "an officer of the entity that gave the money."

164.    On November 22, 2019, the Foley & Lardner attorney sent another email message to Pitts, attaching a revised plan to create SUN Marketing as a C Corporation rather than an S Corporation. The email stated that "Pam sent an email earlier today . . . suggesting that the project was on hold. . . . I think that the whatever decision was made was from an internal FPL perspective..." The email suggested, "[i]f FPL is getting concerned about having an officer in the ownership role," Foley & Lardner could serve as directors for a fee.

165.    The November 22, 2019 email also stated: "Yesterday you asked me a series of questions about how a C Corp would be handled." Below, the attorney provided answers to a number of these questions, including: "Is the owner's name still free from public inspection? Yes," and "Does this affect the possibility that FPL would have to report the revenue of SUN on their balance sheet? Unfortunately, as long as an officer of FPL is the owner, the reporting requirements may still apply."

166.    A slide deck attached to the November 22, 2019 email contained a description of 501(c)(4) organizations which listed one benefit as: "Contributions to the general operating fund of a (c)(4) are <u>generally</u> not publicly disclosed." (Emphasis original). Another slide on 501(c)(4) organizations stated: "<u>Political activity</u> can include activity supporting or opposing candidates as long as these activities are not the entity's **primary purpose**." (Emphasis original). Yet another slide stated: "Federal and Florida law does not require donor disclosure if contributions are made for general purposes without being earmarked for a particular purpose."

167.    On November 26, 2019, Pitts sent an email to Silagy's "Theodore Hayes" pseudonym account with the subject line "Fwd: Updated Funding Memo PDF." Pitts stated that he had the "attorneys looking at a structure that would have the C corp owned by the [law] Firm…"

The email attached two memos, the first an updated version of the November 7, 2019 memo on establishing a "structure for funding 2020 activities" (the "Funding Memo") and the second regarding legalities related to "federal elections support" (the "Legal Memo").

168.   The Funding Memo listed Jeff Pitts as the author, was dated November 26, 2019, and was titled "FUNDING STRUCTURE FOR 2020." It listed the same goals as the previous version, discussed above in ¶161, again with an overriding focus on minimizing public reporting, but described the use of a C Corporation rather than an S Corporation in order to achieve these goals.

169.    The Funding Memo also included a flow chart demonstrating the flow of funds from FPL to several layers of entities. The initial step was from FPL to SUN Marketing, described in the flow chart as "an LLC filed in Delaware requiring one individual & no public disclosure of that individual's name."

170.   From SUN Marketing, the money would then pass through three layers of 501(c)(4) organizations, according to the flow chart. The first was identified as "LPAD C4 (Tyson)," referring to Let's Preserve the American Dream and Ryan Tyson. Funds would flow from LPAD to the next entity, then identified as "Broken Promises C4," the same entity used to support Goston as a spoiler or ghost candidate in the 2018 election cycle, which was listed as being controlled by "Matrix/Foley." From there, money would flow to various (c)(4) organizations focused on funding "political activities" in federal, Florida, and other state elections, including "Florida Promise PC," an entity Matrix formed in December 2018. Odom's brother, Richard Alexander, was designated as the chairman of Florida Promise in its official records, as with Grow United, but tellingly Florida Promise and the other two political committees in the chart were listed as being controlled by "Matrix/Foley." The chart suggested Florida Promise could contribute to political activities directly.

171.    The November 26, 2019 Funding Memo included the chart below:



172.    As described below, in the lead up to the 2020 election in Florida, money did indeed flow in a similar path – from FPL through Matrix-controlled entities and Tyson's LPAD to an entity nominally controlled by Alexander to the committees funding the ghost candidates, putting into action the straw donation scheme outlined in the funding structure memo.

173.    The Legal Memo, also dated November 26, 2019, provided information regarding support for federal elections (the box under "Fed Promise C4" in the above flowchart contained a placeholder: "Waiting on lawyers"). The Legal Memo was on Foley & Lardner letterhead, listed its author as the Foley & Lardner attorney Pitts had retained, and was titled "Memorandum Related to Permissible Federal Election Activities by 501(c)(4) Organizations." The Legal Memo noted that "[g]eneral purpose contributors to a C4 are generally not publicly disclosed," but advised that a 501(c)(4) organization could only engage in political activity to the extent "these activities are not the entity's primary purpose." The IRS determined whether political activities were a primary purpose by examining, among other factors, "the extent to which fundraising solicitations indicate funds raised will be used to support or oppose specific candidates." The Legal Memo concluded by warning that nonprofits spending "money directly supporting a candidate" in a federal election might be required to disclose their donors. Therefore "it could be strategic for a C4 who wishes to make Independent Expenditures to do so via a Super PAC."

174.    The November 26, 2019 email message and both November 26, 2019 memos were attached to the Robo Memorandum.

175.    On December 13, 2019, approximately two weeks after Silagy received the Funding Memo and Legal Memo, SUN Marketing & Advertising ("SUN Marketing") was incorporated in Delaware. Defendant Reuter conceded to the *Orlando Sentinel* on December 17, 2021, that FPL contributed $250,000 to SUN Marketing in December 2019 – at most two weeks after its official creation. Reuter also said FPL believed SUN Marketing was controlled by Matrix.

176.    The Robo Memorandum detailed the creation of another 501(c)(4) organization, Grow United in July 2019 – shortly after Newman wrote his memo about mounting a challenge to Sen. Rodriguez and shortly after Martell listed "SD 39" and "SD 37" as items to "go over" with Pitts. The Robo Memorandum described Grow United as "an entity funded by FP&L" and "used by Pitts, the other former Matrix employees, and their FP&L cohorts as a vehicle for covert financial transactions, including an apparent attempted bribe of a public official and disguised political contributions to fund ghost candidates in three Florida Senate races." "Internal

documents," the Memorandum continued, "show that FP&L officers were aware of and used FP&L funds to pay for the creation and subsequent activities of Grow United."

177.    Matrix billed the filing fees charged by the Delaware Secretary of State for the creation of Grow United to FPL. FPL made future payments related to Grow United directly to entities established and run by Pitts and his associates, and the invoices were not submitted to Matrix's bookkeepers.

178.    The Robo Memorandum described and attached communications demonstrating FPL's involvement in the ghost candidate scheme, including the flow of funds from FPL into Grow United and from Grow United to the ghost candidates' political committees during the lead-up to the 2020 election. In September 2020, Pitts invoiced FPL for $3.5 million, purportedly for consulting, research, and communication services. On September 2, 2020, Pitts sent a contract titled "Agreement for Services," to Julie Holmes, a vice president for revenue and rate strategy at NEE specifying that FPL would provide TMP Interactive, a Pitts entity, $1 million for "consulting, research, and communication services." The following day, September 3, 2020, Pitts again asked Matrix's bookkeeper to submit another invoice to Holmes, this one for $1.25 million purportedly for Matrix's work doing initiative consulting and research, but in fact $757,000 was promptly transferred to People Over Profits, an entity controlled by Dan Newman. Pitts asked for the invoice to be amended and resubmitted because he asked the bookkeeper to "take the PO number off."

179.    On September 12, 2020, as demonstrated by an exhibit to the Robo Memorandum, Newman sent a text message to Pitts and MacIver containing a picture of a $1.25 million check made out to Newman's company, ENH Industries, from FPL. Newman wrote: "The eagle has landed." MacIver "liked" the message.

180.    On September 17, 2020, Pitts sent another invoice to Holmes for $1 million, again purportedly for consulting and research. The PO number was left blank on this invoice, which was also attached to the November 3, 2021 Robo Memorandum. Overall, as detailed in the memorandum, Pitts directed $1,994,500 of the FPL funds received in September 2020 into People Over Profits, a nonprofit organization connected to Newman that in turn was a major source of

funds for Grow United, which as described above seeded the two committees used to promote the ghost candidates.

181.    A September 24, 2020 text message thread regarding the District 37 race was also attached to the Robo Memorandum. The thread begins with Ryan Tyson texting a picture of poll numbers in District 37, showing Jose Javier Rodriguez and Ileana Garcia tied, both commanding 32.9% of the vote, but more interestingly, Alex Rodriguez polling at 4.4%. "Well here's a way to start your morning," Tyson wrote in the message to Pitts and MacIver of Matrix and Martell and Holley of FPL. "Guess broadcast still works," Tyson wrote further down in the thread. The discussion then broadened to include District 9 and District 39, the other two ghost candidate races. FPL vice president John Holley affirmed that "[w]e are going to charge full speed ahead" in District 37 and the other races involving ghost candidates.

182.    Less than thirty minutes later, according to an email sent by Odom to a Matrix colleague, Greg Gilbert, and a ledger Gilbert maintained, Matrix wired $5,000 to Grow United and $15,000 to other related entities through "Florida Promise," one of the entities named in the flowchart attached to Pitts' November 26, 2019 memo to Silagy. Odom's September 24, 2020 email and Gilbert's ledger were described in and attached to the Robo Memorandum.

183.    On September 29, 2020, Tyson sent an email from his LPAD email address with the subject line "Wire Request" to representatives of Thomas Howell Ferguson P.A. (a CPA firm) and Hancock Whitney Bank, stating that he needed to "make a contribution via wire from LPAD in the amount for $600,000 to Grow United." That same day, one of the Thomas Howell Ferguson representatives wrote to Tyson that the transaction was confirmed at 4pm that day. Tyson then, also on September 29, 2020, forwarded the email messages confirming the transaction to Odom, Pitts, and MacIver. Tyson's September 29, 2020 email messages were attached to the Robo Memorandum.

184.    In a September 30, 2020 email chain, Newman asked Pitts and Abigail MacIver for the W-9 wiring information for where Matrix wanted him to send "grants." Sixteen minutes later, MacIver forwarded the request to Odom, who herself responded with Grow United's name, address, routing, and account numbers, and attaching Grow United's W-9. These messages too

were attached to the Robo Memorandum.

185.     LPAD's redacted banking records, obtained by the Florida Center for Government Accountability via a public information request to the Miami-Dade State Attorney's Office, show that LPAD received $655,000 in incoming funds in September 2020, the same month it contributed $600,000 to Grow United.

186.     On October 1, 2020, three days after Tyson wired $600,000 to Grow United, Pitts sent a text message to Alex Alvarado – the person in charge of the committees promoting the ghost candidates – copying Odom, asking Alvarado to "send April [Odom] and I the address to fed ex these pac checks to you," referring to Grow United, according to the Robo Memorandum. Alvarado provided the address for the AIF building housing "Our Florida" and "The Truth." Odom replied that the Grow United checks would go out the following day, and on October 2, 2020, texted a picture of the Fed Ex receipt.

187.     Odom then sent a text message to Alvarado four days later on October 5, 2020, asking Alvarado if he could "confirm wires to each account? We got confirmation on this side but want to d[ou]bl[e] c[hec]k with you." Alvarado replied "Yes ma'am" and attached a photo of a spreadsheet showing contributions of $220,000 and $150,000 to "Our Florida," dated October 2, 2020, and $80,000 and $100,000 contributions for "The Truth," also dated October 2, 2020. In total, Grow United provided $550,000 in funding to The Truth and Our Florida – the entirety of the funding received by these two committees which used these funds to promote the ghost candidates.

188.     The text messages between Pitts, Odom, and Alvarado described above in ¶¶186–187 were detailed in and attached to the Robo Memorandum.

189.     Documents produced pursuant to a public records request to the Florida State Attorney's Office, Miami-Dade and Seminole Counties, filed by the Florida Center for Government Accountability, shared with Lead Counsel, confirm the amounts stated above in ¶187 were transferred from Grow United to the Truth and Our Florida. The documents show a $100,000 wire transfer and $80,000 check from Grow United to The Truth on October 2, 2020, just as the

messages describe, and a record from the Florida Department of State Division of Elections showing a $370,000 contribution from Grow United with the reported date of October 3, 2020.

190.    On October 16, 2020, MacIver forwarded a *POLITICO* news story to Tyson, titled "Mystery donor spends $180K on Florida political mail." The story concerned the $180,000 in mailers spent by The Truth, and questioned who was behind its funding. The story reported "[a]s recently as May, the phone number listed as by [sic.] the committee in campaign finance records also appeared in online advertising for female escorts." MacIver wrote: "These dark money groups are be[coming] pervasive…" "[F]or the record," Tyson wrote in a responsive email that same day, "there was no way to know this was an escorts number. That's a random thing they assign AA on the app." "I think it's hilarious and just makes them more confused," MacIver responded to Tyson and Pitts.

191.    On October 27, 2020, less than a week before the November 3 election, a consultant working for Public Concepts, LLC sent an email message to MacIver with the subject line "Danny Request." The consultant, Richard Johnston, and Public Concepts had previously worked with Matrix on an attack campaign against South Miami Mayor Phil Stoddard in 2018, which FPL later admitted it played a role in. Public Concepts also assisted with FPL's control over the Capitolist, described below in Section C.

192.    Johnston's message read: "Danny asked for a report he can show to WS on Friday," including a "[m]ap of the doors canvased in SD 37 and SD 39." On information and belief, the "Danny" referenced in the message is Daniel Martell, who commonly went by "Danny." ME 1, who attended approximately a dozen meetings with Martell at Matrix's offices, referred to Martell as "Danny"; Tyson's email to Martell on October 3, 2019 used the salutation "Danny—"; the Robo Memorandum references a bank account Pitts referred to as the "Danny special"; and Newman by contrast went by "Dan." Further, Martell had previously listed "SD 37" and "SD 39" as things to "go over" with Pitts in June 2019, not long before a meeting Pitts had with Silagy in the latter's office. Additionally, on information and belief, "WS" was meant to refer to Eric Silagy. "W" and "E" are adjacent on a keyboard, making a typo likely, and both Martel and Matrix personnel routinely used "ES" to refer to Silagy in text messages and emails (*e.g.* in a message stating "ES"

wanted the Capitolist to run a story on December 21, 2019; Pitts referred to Silagy as "ES" in a May 7, 2020 email; MacIver referred to Silagy as "es" in an August 27, 2020 email). No other Matrix, Public Concepts, or senior FPL officer, to Lead Plaintiffs' knowledge, had the initials "WS," or for that matter "ES." Accordingly, the email supports the inference that Silagy received reports on canvasing in at least two of the ghost candidate races just a week before the election. MacIver forwarded the message to Pitts on October 29, 2020.

193.    On November 19, 2020, Matrix received an invoice from Foley & Lardner, the law firm which Pitts retained starting in October 2019 to help him and Silagy arrange the chain of entities to allow FPL to discretely fund political activity in the 2020 election. The invoice was discovered in a Matrix internal investigation in a folder labeled: "FPL_2019_Vendor_Invoices." The invoice concerned charges for work performed on behalf of Grow United, including filing IRS submissions and annual reports in Delaware, as well as filings for Proclivity, Inc., Antithesis, Inc., and The Center for Advancement of Integrity and Justice – the entity controlled by Odom which Silagy had previously used in connection with Mothers for Moderation in 2018. According to Matrix's records, the Foley & Lardner invoice was invoiced to FPL and listed as an "FPL_2019 Vendor Invoice." The Robo Memorandum included the invoice as an attachment.

194.    The ghost candidate scheme worked as intended. In each of the three races, FPL's preferred candidate won. In District 37, the ghost candidate sharing Sen. Jose Javier Rodriguez's last name, Alex Rodriguez, received over 6,000 votes despite having done nothing to campaign for himself. This ended up being determinative. Sen. Rodriguez lost to his challenger Ileana Garcia by a mere 32 votes out of over 210,000 cast in the election. Iannotti, meanwhile, received 5,000 votes in District 9, although FPL's preferred candidate ended up winning that race by a 7,000 vote margin.

195.    The ghost candidate scheme came under the scrutiny of prosecutors in Miami-Dade County. On March 18, 2021, Artiles surrendered himself to authorities, a day after police raided his home. He was charged with felony campaign finance violations, including conspiracy to make or receive campaign contributions exceeding legal limits.

196.     On August 24, 2021, the *Orlando Sentinel* reported that Alex Rodriguez had pled

guilty to accepting approximately $45,000 in bribes to run in the District 37 senate race. Rodriguez agreed to three years of probation, including a year under house arrest wearing a GPS monitor, and to cooperate in the investigation against Artiles. According to the *Sentinel*, Rodriguez "was struggling financially when [Sen. Frank] Artiles approached him [in 2020] and offered him $50,000 to file to run as an independent" in District 37's neck-and-neck race.

197.     On January 5, 2022, the *Orlando Sentinel* reported that several people and entities connected to the ghost candidate scandals received "prior to" letters from Miami-Dade prosecutors, including Alvarado, Alexander, Newman, and LPAD. Based on an interview with a Florida International University Law School professor, the story explained a "'prior to' letter from the State Attorney's Office typically alerts someone they are the target of an investigation and gives them a chance to sit for an interview with prosecutors." The story also reported that prosecutors had spoken with MacIver.

198.     According to a July 12, 2021 email sent by the Miami-Dade State Attorney's Office to a Foley & Lardner attorney, billing records produced in response to a subpoena included "billing records between Foley & Lardner and Let's Preserve the American Dream," showing the same firm was representing LPAD and doing work for Matrix (work billed to FPL) to set up a funding structure for the 2020 elections. This email was obtained by the Florida Center for Government Accountability by way of a public records request and provided to Lead Counsel.

199.     On May 25, 2022, the *Orlando Sentinel* reported that Jestine Iannotti, the District 9 ghost candidate, had been arrested and charged with multiple misdemeanors and a felony for her role in the scheme, including accepting an illicit $1,200 straw contribution.

> iii.    *The 2020 Funding Structure for FPL's Spending with Matrix Was Designed to Facilitate the Evasion of Federal Campaign Finance Law*

200.     The same daisy chain that fed FPL money into ghost candidates on the state level also gave rise to potential NEE and FPL liability for violations of federal campaign finance law.

201.     On October 2022, CREW filed a complaint with the Federal Election Commission ("FEC"), asking the agency to investigate Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, Richard Alexander (Odom's brother), "Unknown

Respondents," and several other entities and the persons listed as their chairs for violations of the Federal Election Campaign Act.

202.    The "Unknown Respondents" were identified as the person or persons who were "the true sources of contributions . . . that were falsely attributed to conduit entities Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, and Stand Up for Justice." CREW's complaint, which only concerned five "federally registered super PACs" and only concerned the 2020 election cycle, alleged that $1.27 million had been improperly funneled through five nonprofits and tied Matrix and Pitts to the super PACs.

203.    The CREW complaint contained a chart showing the flow of funds through the five Matrix-controlled entities to the five federally registered super PACs. The chart identified which of these entities were included in the November 26, 2019 memos sent to Defendant Silagy:



204.    Using public records, CREW traced contributions from the five Matrix-controlled entities to federal super PACs involved in federal elections.

205.    On March 31, 2020, for example, Stand Up for Justice gave $50,000 to South Florida Residents First, a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida. Stand Up for Justice was officially chaired by Pitts' longtime friend Anderson.

206.    On July 9, 2020, LPAD transferred $26,000 to Broken Promises, the entity nominally chaired by Pitts' longtime friend Anderson who chaired other entities Pitts assured FPL were "100percent" under Pitts' control. Five days later, on July 14, 2020, Broken Promises donated $20,000 to Concerned Conservatives, Inc., a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida. The contribution was the fourth largest received by the super PAC in the 2020 election cycle.

207.    On October 27, 2020, Grow United contributed $100,000 to Wingman PAC, a super PAC supporting a single candidate for the U.S. House of Representatives in Florida. Grow United gave more than twice as much as the next highest contributor to Wingman PAC during the 2020 election cycle.

208.    Also on October 27, 2020, the Center for Advancement of Integrity and Justice gave $100,000 to a super PAC supporting another single candidate for another U.S. House of Representatives seat in Florida, American Valor PAC. This donation was the largest donation received by American Valor PAC, which spent $286,000 total during the 2020 election cycle. Center for Advancement of Integrity and Justice was registered to Alexander but controlled by Odom and Matrix.

209.    On December 8, 2020, Florida Promise gave $1 million to a super PAC, the Senate Leadership Fund. Alexander was officially the chairperson of Florida Promise, though the entity was in fact controlled by Matrix, as shown in the November 26, 2019 memoranda sent to Defendant Silagy.

210.    A ledger of contributions to the Senate Leadership Fund, produced pursuant to a public records request to the Florida State Attorney's Office filed by the Florida Center for

Government Accountability, shared with Lead Counsel, confirm that Florida Promise made a $1,000,000 contribution to the Senate Leadership Fund on December 8, 2020.

211.    Since FPL was the ultimate source of the funds that were improperly funneled through intermediaries to Super PACs for the express purpose of concealing the identity of FPL, FPL faces potential liability for the scheme as an illicit straw donor. The FEC has yet to take public action on CREW's complaint.

212.    To date, the "ghost candidate" scandal has given rise to multiple investigations, criminal prosecutions and a conviction. Alex Rodriguez, the "ghost candidate" who ran in Florida Senate District 37, pleaded guilty to accepting two or more campaign contributions in excess of legal limits and a related conspiracy charge in exchange for agreeing to testify against Artiles, the former Florida state legislator with longstanding ties to FPL. Artiles' criminal trial for conspiracy to make or accept campaign contributions in excess of legal limits, accepting and making excess campaign contributions, false swearing in connection to an election and submitting false voter information is scheduled for February 5, 2024.

## C.  Silagy Used Matrix to Covertly Gain Control of an "Independent" News Website Which FPL Used to Attack Rivals

213.    Documents reported on in the media, and obtained by Lead Counsel, show that FPL and Matrix arranged for a Matrix-controlled entity to acquire control a of Florida-based news website called "the Capitolist." FPL and Matrix then used the Capitolist to publish articles supporting FPL and NEE-backed priorities—such as rate hikes and the attempted acquisition of JEA—while also denigrating political opponents and media outlets which had reported on the Company unfavorably.

214.    The Capitolist claims to be a digital news website focusing on "Florida business, policy and politics," founded in 2016 by its Publisher and Editor-in-Chief Brian Burgess. Between at least 2018 and 2021, however, Burgess answered to Matrix and FPL when it came to site content. Articles posted on the Capitolist were pre-screened by Matrix personnel and often FPL officers themselves, and in September 2020, a former FPL executive was formally brought in to oversee the site's content.

49

215.    As early as 2018, Silagy and Martell began demanding the Capitolist publish stories attacking specific reporters and political candidates running for office—meaning FPL was effectively spending money on political advertising related to specific elections, just as it had with the mailers sent out in support of the ghost candidates. And as with the ghost candidate schemes, FPL funded and ran the Capitolist surreptitiously, using intermediary "straw" entities under Matrix's control to hide its own involvement. Further underlining the parallels, FPL at one point paid the salary of the ex-FPL executive brought in to manage the Capitolist through SUN Marketing, the entity originally conceived in November 2019 as the first link in the daisy chain for FPL funds to LPAD and political campaigns.

216.    Before SUN Marketing's incorporation in December 2019, however, FPL funds first flowed into the Capitolist through Metis Group LLC ("Metis Group"), an entity owned by MacIver. FPL's funding of the Capitolist via Metis Group began no later than early 2018. A Matrix ledger attached to the Robo Memorandum lists, in columns nested under headings such as "TOTAL FPL Budget BALANCE" and "FPL Amt," several contributions to "Metis Group" with the "Project Notes" specifying the money was for "Capitolist." These include a $12,000 contribution paid January 3, 2018, a $36,000 contribution dated August 1, 2018, and a $41,500 contribution dated August 27, 2018. A slide deck shared among Matrix personnel and Silagy in June 2020 suggests that the investment may have started as early as March 2017.

217.    On October 19, 2018, MacIver texted Martell a link to a Capitolist article critical of a proposal to allow utility customers to choose any electricity provider they wanted. The title of the article was: "Can you hear me now? Verizon hurricane troubles underscore danger of deregulating power companies." MacIver texted Martell asking if he wanted to have the title "changed from specifically mentioning power companies?" She later followed up: "Let me know if you're good." Martell replied: "I think it's ok." MacIver responded with a thumbs-up emoji and asked, "anywhere in particular you want me to target?"

218.    On November 3, 2018, at 12:31 pm, three days before the 2018 election, Martell texted MacIver asking for the Capitolist to publish a piece critical of a gubernatorial candidate, Andrew Gillum. Martell dictated that the article should state Gillum's campaigning had led him to

neglect his duties as Mayor of Tallahassee. Martell suggested language: "Since the primary xxx shootings have happened in Tallahassee." Within three hours, the Capitolist published an article attacking Gillum. The second sentence of the article implied Gillum was responsible for "a crime wave of murders, robberies and shootings in Tallahassee." After MacIver texted him a link to the story at 3:07 pm, Martell ordered: "Promote the @&;$&!!! Out of this."

219.    On March 8, 2019, MacIver forwarded a proposed article by Burgess to Martell's personal gmail.com email address with the subject line "Was about to publish…decided to ask you first." Martell confirmed that he approved of the article.

220.    On April 1, 2019, after a group voiced opposition to FPL's request for taxpayer funds to reimburse its costs burying power lines, Burgess published a story in the Capitolist entitled "Documents suggest Florida's largest companies are secretly sabotaging effort to protect power lines from hurricane damage." The story railed against what Burgess described as a "wealthy special interest group" which he wrote was resisting "funding authorization needed for Florida's major utility companies" to protect Florida's electric grid.

221.    FPL evolved from sponsor to formal overseer of the Capitolist when, on September 20, 2019, MacIver executed a purchase option agreement with the Capitolist on behalf of Metis Group (the September 20, 2019, agreement amended an earlier version dated July 22, 2019). In exchange for $50,000, Metis Group gained "executive control" over the Capitolist and a 1% ownership stake. Metis Group also gained the option to buy a controlling, 52% share in the Capitolist for $195,000 (minus the already-paid $50,000).

222.    According to a slide presentation later shared with Silagy in June 2020, the purchase agreement gave Metis Group "executive oversight of Capitolist operations and functional legal control for the purpose of any branding or merger negotiations." Metis Group was the site's primary sponsor, providing over $17,500 per month in support.

223.    On Saturday, December 21, 2019, Martell texted MacIver a link to a story regarding allegations of ballot collection violations. "Ok so now The Cap needs to weigh in. ES asking," Martell wrote to MacIver. On information and belief, "ES" stood for "Eric Silagy," whom Martell directly reported to at FPL and who was the only other FPL employee documents show had asked

for particular Capitolist stories to be written. MacIver responded, demonstrating the granular level of involvement Matrix and FPL exercised with respect to the Capitolist: "Ok can get that moving. Do we want to wait until the lake county letter goes/confirmed has gone too and do a compilation of both/all the calls for action?"

224.    On April 16, 2020, Pitts forwarded an email message to Silagy's personal Yahoo.com account and Martell's personal gmail.com account from Burgess discussing an idea to purchase additional news outlets "stealthily so we could inject content . . . and nobody has to know who's actually pulling the strings." Pitts wrote to Silagy and Martell: "can discuss in the am," adding later "he has a good concept/observation."

225.    On May 4, 2020, Silagy sent an email to Pitts containing the text of a "Giving Tuesday" fundraising column the *Miami Herald* had posted. The *Herald*, and in particular its bureau chief Mary Ellen Klas, had previously drawn unfavorable attention to FPL through investigative reporting. This reporting angered Silagy, according to an August 2022 *Herald* story. In his email to Pitts, Silagy requested the Capitolist "have a field day" with the *Herald's* fundraising column, even suggesting the Capitolist could include "a cartoon of [Klas] with a tin cup on the street corner."

226.    Two days after Silagy made his request, Burgess emailed a draft story to MacIver and Richard Johnston of Public Concepts stating that the *Herald* was "now begging for handouts." In the body of his email, Burgess wrote "I plan to swap out the image for the suggestion Abbie [MacIver] made about [Klas] panhandling," but that he had not had time to do so. MacIver forwarded the message to Pitts.

227.    The next morning, May 7, 2020, on the same email thread, Pitts asked MacIver if there had been "any update on this," mentioning "I need to update ES on several issues." The Capitolist posted a story that day, titled: "The Miami Herald has turned to begging to support their biased reporting and fear-mongering." The story did not include a picture of Mary Ellen Klas panhandling, but did include a picture of a sign reading "NO PANHANDLING ZONE."

228.    The same day, May 7, 2020, Burgess sent an email to MacIver with the subject line "The MEK photoshop was too insensitive to beggars," attaching a photoshopped image of Klas

begging for "[s]pare change" with a cardboard sign. Burgess promised to use the image for an upcoming weekly newsletter.

229.    On May 5, 2020, Burgess emailed MacIver to ask for "guidance" on whether he should report on a non-FPL utility which had, he said, cut off power to nearly 100 customers. MacIver forwarded the message to Pitts, writing that her "gut" feeling was to "let him" write the story because "it makes him look like he's not in our pocket and it isn't bad for FPL, especially if he highlights them being a good actor."

230.    Soon thereafter, a former FPL executive who had worked directly under Silagy for several years, Tim Fitzpatrick, was brought in to oversee the Capitolist's day-to-day operations. Fitzpatrick had been designated as the official owner and manager of SUN Marketing when it was incorporated in December 2019, according to a December 16, 2019 email from attorneys at Foley & Lardner to Fitzpatrick's personal email account, copying Pitts.

231.    In early February 2020, the Foley & Lardner attorney emailed Fitzpatrick an indemnification agreement, stating that FPL would indemnify SUN Marketing and Fitzpatrick for any taxes, claims, or losses relating to "SUN Marketing's performance of services to" FPL.

232.    On June 9, 2020, MacIver sent a slide deck regarding the Capitolist to Pitts and Fitzpatrick in preparation for an upcoming meeting with Silagy. The next day, Pitts emailed the slide deck to Silagy's personal Yahoo.com email account. On June 15, 2020, MacIver again emailed Pitts and Fitzpatrick writing that she believed Silagy had the slide deck and asking if the others would like to have any "prep discussions before the call with him."

233.    The slide deck Pitts sent to Silagy on June 10, 2020 announced that the Capitolist's readership had "increased exponentially during our three-year investment period" beginning in March 2017, and discussed strategies and "the opportunity" to increase the Capitolist's stature and visibility "to our benefit."

234.    Pitts again sent the slide deck to Silagy on July 15, 2020. Silagy replied, from his personal Yahoo.com email address: "Got it. Thought you'd sent something new. Thanks."

235.    The following day, July 16, 2020, Pitts again emailed Silagy's personal Yahoo.com email address, discussing the Metis Group's option to buy a controlling stake in the Capitolist for

$145,000 ($195,000 minus the $50,000 already paid). Pitts suggested using the $147,160.98 remaining in SUN Marketing from FPL's initial $250,000 contribution in December 2019 and money from other "special projects" to either complete the purchase and increase Fitzpatrick's salary to $20,000 per month, or to "invest in the improvements we discussed on the call" without exercising the option.

236.    In August 2020, Matrix arranged for a new entity called "Vision Insight Holdings" ("Vision") to be incorporated in order to give Fitzpatrick an official role from which he could oversee Burgess and have editorial control over the Capitolist's stories. MacIver was listed as the sole director of Vision Insight Holdings in the entity's August 30, 2020 Operating Agreement. Matrix arranged for Vision to be able to assume Metis Group's rights under the purchase option agreement.

237.    Pitts and MacIver emailed Fitzpatrick an official employment agreement with Vision in September 2020. Vision would pay Fitzpatrick $15,000 per month under the agreement. In emails between Fitzpatrick and Pitts on September 4, 2020, Fitzpatrick discussed his understanding that, under the arrangement, he would cease receiving his regular $5,000 per month from SUN Marketing and instead start being paid by Vision Insight Holdings.

238.    In a September 18, 2020 email, Fitzpatrick wrote to MacIver, Pitts, Burgess, and Richard Johnston of Public Concepts to update them on a meeting he had with Burgess earlier that day. "Brian will be looping me into each days' plans for coverage and sending me articles before publication so I can comment as needed," Fitzpatrick wrote. Internal emails between Fitzpatrick and Burgess show that Fitzpatrick played an active role screening content for the site, including guest editorials.

239.    According to an analysis by the *Miami Herald* in an article titled: *Powerbrokers: How FPL secretly took over a Florida news site and used it to bash critics*, published on July 25, 2022 and updated on August 13, 2022, after Fitzpatrick began overseeing the Capitolist in September 2020, "the number of headlines mentioning FPL and other energy-related topics more than doubled."

240.    However, Fitzpatrick became concerned in late 2020 that the Capitolist's growing influence was a double-edged sword. Success and growth would, he believed, inevitably invite questions about who was funding the site and pulling its strings behind the scenes. Burgess had admitted to Fitzpatrick in a December 8, 2020 email that "pay to play" in media was generally considered "icky" to large corporations, who "definitely don't want it known they were engaged in *that* sort of behavior. So part of our challenge is to transform the perception that we're legit."

241.    On December 20, 2020, Fitzpatrick sent an email to MacIver, which he designated "Confidential," outlining a plan preparing for "the day that could come" when media members began asking questions about the Capitolist's sponsors. "As a tactical matter," Fitzpatrick wrote, "any reporter making an inquiry should be told 'put it in an email' and we will respond (or not, depending on the question) via email as per the draft answers below." Fitzpatrick wrote that the team would need to "ultimately mak[e] sure that our sponsors know that we will not deviate" from the predetermined answers to such questions. In response to the question "Who is paying for this? Who owns you?" Fitzpatrick's script called for Burgess to respond that the Capitolist had a "variety of sponsors" and that "[a]s a matter of practice, we do not publicize our sponsors" because "publicizing their support leads to them receiving many new requests for sponsorships." In response to the question "Isn't this just a 'Pay to Play' platform?" Fitzpatrick wrote: "No," then suggested turning the question around on the inquirer by asking: "Is the (name of the inquiring media outlet) a pay-to-play platform because you accept advertising dollars from businesses?" Fitzpatrick wrote that any other question he had not prepared an answer for should simply be ignored, "including any questions about ownership/management structure."

242.    Meanwhile, Silagy continued to be consulted on the Capitolist's content. On August 27, 2020, Burgess sent a draft article to MacIver regarding JEA. The article asserted that the failure to sell JEA was due to "*really* bad management" by Jacksonville, which had "squander[ed]" an $11 billion opportunity. The article characterized NEE's $11.05 billion bid for JEA as "what should have been the winning bid." The sale, the article asserted, "could have been game changing" for Jacksonville, but there would now be "serious funding holes . . . well into the future." MacIver sent the draft to Pitts that same evening, who asked that the title and some of the

wording be changed, but said he liked the story. MacIver asked Pitts two minutes later if they wanted to wait to receive feedback from Silagy ("es") before publishing. Pitts replied eight minutes later that MacIver could "Put it up and just send me a link if he needs [to] edit we can change in the am."

243.    On August 28, 2020, the following day, the Capitolist published a story titled "How politics cost Jacksonville 11 billion dollars," largely similar in substance to the draft circulated the day before but containing some new language (*e.g.* "Had JEA been sold to NextEra it would have netted the city more than $6 billion in profit" was changed to "Had JEA accepted the offer and sold to NextEra it would have netted the city more than $6 billion in *pure profit*") (emphasis original).

244.    On October 12, 2020, MacIver sent an email to Martell's personal gmail.com email address, asking whether the Capitolist should run a story regarding a proposed solar energy project.

245.    On December 11, 2020, Fitzpatrick sent a NEE press release to Burgess. "We should show them some love and do a little article on these accomplishments," Fitzpatrick wrote.

246.    Internal Matrix financial statements show that Vision continued to oversee and fund the Capitolist through at least 2021 – contributing $200,000 to the Capitolist between January and December 2021. The site continued to publish stories friendly to FPL and NEE during this period, including a July 27, 2021 story insinuating that a group seeking to oppose a proposed FPL rate hike was bankrolled by dark money.

**D. Media Outlets Begin to Report on FPL's Connections to Matrix and the Ghost Candidate Scheme**

247.    On December 2, 2021, the *Orlando Sentinel* published an article titled "Florida Power & Light Execs Worked Closely with Consultants Behind 'Ghost' Candidate Scheme, Records Reveal." The article disclosed that the *Sentinel* had obtained documents, including "checks, bank statements, emails, text messages, invoices, internal ledgers, and more" that were "apparently unearthed during an internal investigation" by Matrix. The article reported that documents showed that Matrix consultants billed FPL for more than $3 million shortly before they began moving the money through Grow United that funded the ghost candidate scheme. The article

56

also reported that the records also showed that Silagy coordinated with Matrix personnel on FPL campaign contributions that Matrix moved through various dark money non-profits—totaling more than $10 million.

248.    The *Sentinel* reported that Robo received the same records in early November 2021, the Robo Memorandum alongside a summary of an internal Matrix investigation of its involvement in FPL's political improprieties.

249.    On December 30, 2021, the *Sentinel* again published an article detailing the ghost candidate scheme. In it, the *Sentinel* again explained that its reporting was based on documents that had been delivered to the paper, including checks, bank statements, emails, text messages, invoices, ledgers, and other documents involving Matrix and FPL and covering the period between 2016 and 2020.

250.    Over the next eight months, Florida newspapers published more than a dozen articles attempting to connect FPL and NEE to the ghost candidate schemes, the Capitolist, surveillance of journalists, and impropriety related to JEA. These reports often drew from internal Matrix documents obtained by the press.

251.    On December 17, 2021, Defendant Reuter acknowledged to the *Orlando Sentinel* that the Robo Memorandum was "shared with us" and that he and others were therefore aware of the funding structure described in the memos sent to Silagy on November 26, 2019.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

#### A.  FPL Falsely Denied Having a Role in the Ghost Candidate Scheme

252.    On December 2, 2021, in response to the *Orlando Sentinel*'s reporting, Reuter denied the company had any role in the ghost candidate scheme. Reuter is quoted in the article as stating the following:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

253.     The statements identified in ¶252 above were materially false and misleading when made. As alleged in ¶¶49–54, 72–775, and 86–211, contrary to these statements, FPL did have involvement in providing funding to organizations that contributed to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. In summary, FPL provided more than $3 million in funding to such organizations during the 2020 election cycle. Matrix billed FPL through entities including TMP Interactive, People Over Profits, and ENH Industries that in turn funded Grow United. Grow United then contributed $550,000 to the political committees The Truth and Our Florida, which entirely funded mailers supporting the ghost candidates' campaigns.

254.     As alleged in ¶¶86–211, there was also a basis to suggest that FPL and certain FPL employees directed others to support "ghost" candidates during the 2018 and 2020 election cycles. At the time Reuter made this statement, the Robo Memorandum had already been sent to Robo and, a mere 15 days later, Reuter acknowledged he too had received the Robo Memorandum, which provided evidence, information and a basis to support a "suggestion" that FPL and certain FPL employees "had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle." The Robo Memorandum also provided evidence, information and a basis to support that FPL, and certain of its "employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle." It included as exhibits, among other things, the November 26, 2019 Funding Memo and Legal Memo that Pitts sent to Silagy proposing a structure for FPL's political campaign spending whereby payments made to Matrix-affiliated entities would be filtered through the network of entities to conceal FPL's involvement.

255.     *The Orlando Sentinel* article in which Reuter is quoted above explained that "The Sentinel sent detailed questions to [Silagy] and other FPL executives about key facts and figures revealed in the documents, which Reuter's statement did not dispute" though Silagy did not respond to a request for comment. On December 17, 2021, concerning the Robo Memorandum, Reuter conceded that the "memo was shared with us," though he did not specify when the Company first reviewed the document. As alleged in ¶¶132–212 above, the evidence in the Robo

58

Memorandum showed, among other things, that FPL funded the dark money nonprofit groups that in turn funded the ghost candidate scheme that is the subject of criminal investigations. Moreover, the Robo Memorandum demonstrated that Silagy and other FPL executives were directly involved in the diversion of corporate resources for such illicit political activities. Thus, at the time of his statement on December 2, 2021, Reuter was at least aware of the key facts and figures contained in the Robo Memorandum because of the questions posed by *The Orlando Sentinel* and either had access to the Robo Memorandum in full or spoke with reckless disregard with respect to its contents.

**B.   FPL Misleadingly Denied Having Involvement with the Creation of Grow United**

256.    On December 10, 2021, in response to questions by the *Orlando Sentinel* and *Florida Times-Union* about the creation of Grow United, Reuter said "**FPL had no involvement in the creation of Grow United**." (Emphasis added). Reuter continued, as quoted in the *Orlando Sentinel*: "Over this past summer, through both questioning from media and our own subsequent investigation, we learned that Joe Perkins' team was responsible for the origins of this non-profit. As we understand it, Mr. Perkins had another client based out of Denver who was advocating nationally for the legalization of marijuana. Grow United was created for that client, who expressed interest in setting up offices in Georgia, Florida and Alabama."

257.    The statements in ¶256 above were materially false and misleading when made and/or omitted facts necessary to make the statement not misleading. As alleged in ¶¶49–54, 72–75, and 143–211, FPL was involved in the creation and funding of Grow United. In summary, an internal Matrix ledger incorporated into the Robo Memorandum showed that Matrix billed FPL for the costs of setting up Grow United with the Delaware Secretary of State and that Matrix employees opened a bank account for Grow United in June and July of 2019. Contemporaneous email correspondence between Matrix employees contained the subject line "FPL Expenses for Grow United c4" and invoices associated with Grow United were stored an electronic folder named "FPL_2019 Vendor Invoices" which contained "numerous other vendor invoices paid with FPL funds." Grow United was incorporated one month after FPL's Vice President of State Legislative Affairs sent an email message to Pitts with the subject line "things to go over" including "SD 39"

and "SD 37" and later received emails explicitly suggesting supporting an independent candidate running in SD 37. Additionally, as set forth in both the July 21, 2021 memorandum describing the "Project Goals" of Grow United and the Robo Memorandum, the dual purpose of Grow United was to facilitate covert political expenditures made by FPL and "provide a job opportunity for District 9 Councilor Garrett Dennis" to advance FPL's effort to acquire JEA. In short, as set forth in the Robo Memorandum, Grow United was an entity "funded by FP&L" and controlled by "Matrix and its cohorts at FP&L."

258.    On December 17, 2021, when asked by the *Orlando Sentinel* about the November 26, 2019 Funding Memo and Legal Memo that Pitts sent to Silagy proposing a structure for FPL's political campaign spending that would "minimize public reporting," Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle." Reuter continued: "**Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501(c)(4) organizations and we had no knowledge of this structure being used by Matrix**. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020." (Emphasis added).

259.    The statements identified in ¶258 above were materially false and misleading when made for the reasons alleged in ¶¶49–54, 72–75, and 132–211. In summary, the Funding Memo and Legal Memo confirm the funding structure Matrix and FPL employed for the 2020 elections. Thereafter, Silagy participated in communications and meetings discussing the funding structure and received proposals for the structure in November 2019 memoranda from Pitts. As alleged above, at the time Reuter made this statement, he admitted to having received the Robo Memorandum which provided evidence that FPL, Silagy and other FPL employees requested, or agreed, with Matrix to establish 501(c)(4) organizations and that FPL contributed to these organizations to advance its political interests in the 2020 election cycle, including through the ghost candidate scheme. Further, the Robo Memorandum provided evidence and information that FPL had been billed for the costs associated with establishing Grow United – a 501(c)(4)

organization – rendering Reuter's statement materially false and misleading when made. The statement that "we found no evidence" that FPL used the November 2019 memoranda is directly contradicted by documents attached to the Robo Memorandum and information provided in the Robo Memorandum. Neither the full November 26, 2019 Funding Memo nor the full Legal Memo that Pitts sent to Silagy proposing a structure for FPL's political campaign spending have been made public.

**C. FPL, Through Reuter, Falsely Denied Any Involvement in the Extension of a Job at Grow United to Jacksonville City Councilor Garrett Dennis**

260.     On December 10, 2021, when asked about the job offer extended to Garrett Dennis, Reuter, serving as FPL's spokesman, said "In July 2019, a Matrix representative working for Joe Perkins approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. **FPL flatly rejected the plan and communicated our lack of interest to Joe Perkins' team.**" (Emphasis added).

261.     The statement in ¶260 above was false and misleading when made and/or omitted to disclose material facts necessary to make the statement not misleading based on the facts in paragraphs alleged in ¶¶49–54, and 56–77. In summary, Grow United was an entity created for FPL by Matrix for the dual purposes of extending a job offer to Councilor Dennis and facilitating the concealment of FPL's political spending. Matrix's internal ledger identified FPL as the client responsible for the incorporation fees charged by Delaware's Secretary of State. Additionally, based on the statement itself, FPL was aware in advance of the proposal to extend a job offer at Grow United to Councilor Dennis. Prior to the job offer being made, FPL provided funding to Fix JEA Now sufficient to cover the proposed salary and travel budget for the director position at Grow United, and the job offer was extended in a manner consistent with the July 21, 2019, memorandum written by April Odom outlining its purpose. The offer was extended to Councilor Dennis and at the request of the Rev. Toons while he was serving as the head of Fix JEA Now, supported by Matrix with FPL's knowledge, advocating for the privatization of JEA, a prerequisite for FPL's potential acquisition. Dennis was a strong opponent of the privatization of JEA, the offer was made during the period under which the Jacksonville City Council was considering privatization, and

the offer was expressly conditioned on Dennis resigning from the Council. Plus, documents attached as exhibits to the Robo Memorandum confirm that Rev. Toons communicated with Pitts via text message about Dennis's purported willingness to leave the Jacksonville City Council in the same time period. In short, Reuter's statement was false and misleading when made as FPL financed and controlled, through Pitts, the entity that extended the job offer to Dennis.

### D. Robo's False and Misleading Statement Denying That There Was Any Basis for Allegations of Wrongdoing

262.    On January 25, 2022, Robo made the following statement on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, **we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their–they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees.** And so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good that **there is no basis to any of these allegations**…[emphasis added].

263.    Robo's statements identified in ¶262 above were materially false and misleading when made based on the facts alleged in ¶¶12–17, 48–54. In summary, Robo was already in possession of the Robo Memorandum which did provide "evidence of" issues including FPL's potential connection to the "ghost candidates" scheme and the funding of Grow United to conceal its involvement in political contributions. The Robo Memorandum also provided evidence and information such that Robo had no basis to state "that there is no basis to any of these allegations." To the contrary, the Robo Memorandum, and its supporting exhibits, establishes that there was, at least, a basis for the allegations.

### E. Silagy and FPL's False and Misleading Statements Regarding Surveillance of Reporters

264.    On June 24, 2022, when asked by the *Orlando Sentinel* and *Florida Times-Union* about FPL's alleged covert monitoring of *Florida Times-Union* journalist Nate Monroe, Silagy responded in an interview with reporters, including Monroe, "**We did not engage in any activities**

**having to do with following people like you, Nate, or taking pictures**." (Emphasis added). That same day, when the *Orlando Sentinel* presented Reuter with text messages and emails indicating that a private investigator paid by Matrix had followed Monroe while updating Martell on the pursuit, Reuter made a statement casting doubt on the authenticity and completeness of the records, saying FPL had "**no digital record of these exchanges and cannot prove their veracity**" and "**[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees**." (Emphasis added).

265.    The statements identified in ¶264 above were materially false and misleading when made. Silagy's blanket denial that "we did not engage in any activities having to do with following people like you, Nate, or taking pictures" was false and misleading when made as, as alleged in paragraphs ¶¶78–85, FPL did "engage in activities" including following Nate Monroe. In summary, contrary to Silagy's statement, FPL Vice President of State Legislative Affairs Daniel Martell was directly involved in surveilling journalist Nate Monroe, receiving real-time updates on the pursuit and responding approvingly, saying "Awesome." Further, Matrix acted on FPL's behalf and as its agent in conducting the surveillance and in preparing the background report on Monroe.

266.    Reuter's statement that FPL had "no digital record of these exchanges and cannot prove their veracity" was at best materially misleading as it falsely cast doubt on the veracity of the allegations concerning covert monitoring of journalists when those allegations were in fact true as described above.

**F.  FPL's False and Misleading Statements Regarding the Capitolist**

267.    On August 13, 2022, the *Miami Herald* reported on FPL's apparent control over the Capitolist. In response to questions about the Capitolist, Chris McGrath, at the time serving as a spokesperson for FPL in his role as Communication Leader – Corporate Affairs, told the *Herald*: "FPL does not have an ownership interest in the Capitolist – either directly or indirectly . . . We also do not have editorial control over what the Capitolist writes or publishes."

268.    The statements identified in ¶267 above were materially false and misleading when made. Documents obtained by Lead Plaintiffs, as described in ¶¶213–246, demonstrate that FPL

did fund and control the Capitolist, going so far as to install a former FPL officer to oversee the website's contents. Silagy and Martell, both high-level FPL employees, each asked for the Capitolist to publish stories on particular subject matters and were consulted on decisions about the content of other articles.

### THE TRUTH EMERGES

269.    On January 25, 2023, NEE filed a Form 8-K with the SEC which, for the first, time, specifically acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives may have orchestrated political misconduct. The Form 8-K stated:

> Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.

> FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL. . . . FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.

> In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

270.    On the same day, January 25, 2023, NEE filed a second Form 8-K disclosing that Silagy would no longer serve as CEO of FPL as of February 15, 2023 and would retire effective May 15, 2023. NEE announced that Silagy would be replaced by a former NEE executive who had previously retired in 2019, Armando Pimentel.

271.    NEE additionally disclosed that Silagy and NEE had entered into a "confirmation of post-retirement covenants agreement" (the "Severance Agreement") whereby Silagy agreed to,

among other things, a release of claims and various restrictive covenants, including non-competition and non-disparagement covenants, in exchange for payments in the form of incentive awards calculated in accordance with NEE's annual incentive plan and equity awards consistent with what NEE characterized as "a normal retirement" of an employee at least age 55 following at least 10 years of service.

272. The Severance Agreement was filed with the SEC as an exhibit to the Form 8-K announcing Silagy's departure as CEO of FPL.

273. Stock market analyst Paul Patterson of Glenrock Associates wrote that NEE's stock price decline on January 25, 2021 was "driven substantially by the unexpected management change and the update they gave on their review into political activity." On January 27, 2023 the *South Florida Sun Sentinel* reported on the 8-K's discussion of the FEC complaint, writing that it "was a tacit admission that $1.3 million from FPL went into the dark money pipeline."

274. As described more fully below in ¶¶288–306, media and analysts covering NEE quickly connected Silagy's abrupt departure and the new risk disclosure described in the 8-K to the political scandals that had engulfed the Company during his tenure. Analysts from Wolfe Research and Evercore ISI wrote on January 25, 2023, for example, that Silagy's departure appeared to be not of his own choosing and driven by the campaign finance scandals.

275. On January 31, 2023, the *Florida Times-Union* published an article titled "FPL CEO's Exit Agreement Includes Claw Back if 'Legal Wrongdoing' is Found, Investment Analysts Say" (the "January 31, 2023 Article"). The article discussed a Bank of America securities analyst report, which followed a meeting FPL executives had with the analysts to explain Silagy's departure. The report revealed that the Severance Agreement contained a "claw back on compensation" if there was a finding of "any legal wrongdoing"—a hedge against precisely the same risk that the Company previously and unequivocally denied the existence of.

## LOSS CAUSATION

276. Throughout the Class Period, Defendants made denials that, when made, were materially false and misleading based on the evidence Defendants possessed at that time. Defendants' false and misleading statements and omissions, including that there was "no basis"

and no "evidence" of any illegality or wrongdoing, served to mislead the market as to whether the Company was in fact exposed to reputational and legal risks. Defendants' material misstatements and omissions had the effect of creating unrealistically positive assessments and characterizations of the Company which caused the Company's securities to be overvalued and artificially inflated throughout the Class Period.

277.    Lead Plaintiffs and other Class members purchased or otherwise acquired NEE securities at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein. The price of the Company's securities declined when the misrepresentations made to the market, and/or the risks alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. Defendants' false and misleading statements were the direct and proximate cause of such losses.

278.    As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements of material fact and omitted to disclose material facts denying FPL's potential connection to alleged political misconduct. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired their shares of NEE securities at the artificially inflated prices at which they were offered.

279.    As certain relevant and true facts became known and/or the consequences of the concealed misconduct began to materialize, NEE's stock price declined in reaction to that news. When the market began to absorb the revealed and materialized risks previously concealed by Defendants' material misstatements and omissions, artificial inflation was removed from the price of NEE's securities, causing the losses of Lead Plaintiffs and other Class members. Thus, the facts concealed by Defendants' material misstatements and omissions were the proximate and foreseeable causes of NEE investors' losses.

280.    The timing and magnitude of NEE's share price declines negates any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Defendants' fraud. Moreover, as analysts at the time recognized and reported, NEE did not report

disappointing financial results in conjunction with the revelations related to Silagy's departure and the risks facing the Company, further negating any inference that NEE's stock declines were caused by facts unrelated to Defendants' fraud.

281.    The truth regarding the Company's misconduct was revealed, and/or the concealed risks materialized, on January 25, 2023 and January 31, 2023.

282.    As noted above, on January 25, 2023, before the market opened, the Company filed two Form 8-Ks with the SEC. A Form 8-K is a report of unscheduled material events or corporate changes at a company that could be of importance to shareholders or the SEC. The SEC describes Form 8-K as the current report companies must file with the SEC "to announce major events that shareholders should know about." Companies have four business days to file a Form 8-K for the events specified in SEC regulations, including the departure of certain officers, and other events "that the registrant considers to be of importance to security holders."

283.    The first Form 8-K issued by the Company on January 25, 2023 included a new disclosure which, for the first time, formally informed investors that they could not "guarantee" or "provide assurances" that the political scandals reported on by the *Miami Herald, Orlando Sentinel,* and *Florida Times-Union* would not "result in a finding that FPL or NEE violated federal campaign finance or other laws" or "result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE," or have "a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities." This was in stark contrast to categorical denials of any suggestion of any involvement in any of these scandals made by NEE, FPL, Reuter, Robo, and Silagy.

284.    Notably, the January 25, 2023 Form 8-K described above also specifically addressed the FEC complaint filed by CREW and did not deny that misconduct had occurred, stating only that NEE would "seek[] dismissal" of the FEC complaint and that the total amount of contributions at issue in the complaint was less than $1.3 million. NEE did not, however, refute the allegations that approximately $1.3 million had been improperly routed through dark money entities, and considering neither NEE nor FPL were explicitly made respondents in the FEC complaint, the announcement was a tacit acknowledgment that FPL was the source of funds

discussed therein and had exposure to an FEC investigation. Additionally, while NEE acknowledged reviewing allegations of both "state and federal campaign finance law violations," the Company stated merely that it did not believe FPL would "be found liable" for any "Florida campaign law violations . . . as alleged in media articles."

285.    Plus, this disclosure was not made in a routine SEC filing, such as a Form 10-Q or a Form 10-K, but on a Form 8-K.

286.    The new risk disclosure was coupled with a second Form 8-K, also filed on January 25, 2023, that announced departure of Silagy as CEO of FPL. The Severance Agreement was filed as an exhibit to the Form 8-K announcing his retirement.

287.    Provision 5.3 of the Severance Agreement entitled "Repayment; Forfeiture; Clawback" stated that Silagy would be required to disgorge and repay his severance in the event of any of the following specified events:

> (i) **your conviction of a felony in violation of state or federal laws**, or your plea of guilty or nolo contendere to any such felony, in each case based on any actions or omissions in which you engaged during your employment with the Company Group or for which you were responsible during your employment; (ii) **your admission to facts that would constitute a felony in violation of state or federal laws** in connection with a deferred prosecution agreement, non-prosecution agreement, or other similar agreement based on any actions or omissions, during your tenure as President and Chief Executive Officer of FPL; or (iii) **the conviction of a felony in violation of state or federal laws, or the admission to facts that would constitute a felony in violation of state or federal laws in connection with a deferred prosecution agreement, non-prosecution agreement, or other similar agreement, by any member of the Company Group that is an entity (i.e., excluding employees that are deemed to be affiliates) based on any actions or omissions, during your tenure as President and Chief Executive Officer of FPL, (x) in which you participated, (y) of which you had actual knowledge, or (z) of which you recklessly or willfully failed to have actual knowledge.** (Emphasis added).

288.    These disclosures partially corrected, and were understood by analysts and the market to partially correct, Defendants' materially misleading statements and omissions described in ¶¶252–268 that there was no evidence or basis for the reports possibly connecting FPL and any of its employees to allegations of campaign finance violations and hidden political spending. Silagy's resignation was a direct and proximate result of the risks concealed by Defendants' Class

Period misstatements and omissions denying that there was any basis to connect Silagy or FPL to any wrongdoing.

289.   Stock market analysts reported and commented on information disclosed in both 8-Ks. Multiple analysts covering NEE concluded that the simultaneous release of both the new risk disclosure and the announcement of Silagy's departure, as well as the content of the disclosure, qualifying the scope of potential exposure rather than denying that the allegations had any basis, supported the conclusion that the two items were causally related.

290.   Stock market research firm Wolfe Research wrote on January 25, 2023, that "investors weren't buying" the Company's explanation that Silagy's departure was not connected to its internal investigation of political misconduct at FPL, and observed that NEE's bringing back a retired executive to replace him belied the notion that there was already a "near-term succession plan" in place, supporting the inference that Silagy's resignation was rushed and not planned in advance.

291.   RBC Capital Markets also issued a "Negative" note on NEE on January 25, 2023, writing that despite "solid [financial] numbers," NEE's stock was expected to be under pressure because of the 8-K's disclosure in which "NEE warned that these allegations could have a material impact on the company, which we view as primarily reputational," and because of Silagy's concurrent resignation "which does not help optics."

292.   Similarly, Credit Suisse wrote on January 25, 2023, that despite financial results "in-line with expectations . . . [o]vershadowing the update was the sequencing of disclosures on FL campaign finance law allegations, the announced retirement of FPL CEO Eric Silagy and new risk disclosures around the event. This was a negative update even when considering reaffirmation / extension of the company's strong financial outlook."

293.   Morningstar, meanwhile, published a report on January 26, 2023, expressing that the regulatory uncertainty could lead to unfavorable changes threatening NEE's otherwise "best-in-class rate regulation," and that it would therefore add a higher uncertainty rating into NEE's model than NEE's utility peers.

69

294.    Evercore ISI published a report on January 25, 2023, as well, stating: "we believe market perception overall is negative on today's update on the announced retirement of Eric Silagy, the chairman, president and CEO of Florida Power & Light. Based on our conversations with investors, it appears they have some concerns about the timing of Silagy's retirement given the campaign finance allegations against FPL…".

295.    Also on January 25, 2023, Bloomberg reported that the "political activity news likely sparked share drop." In the article, *titled NextEra Slides as Florida Executive Departs After Campaign-Donation Probe*, Bloomberg quoted analyst Paul Patterson of Glenrock Associates as saying in an interview that the decline in NEE's stock value that day was "driven substantially by the unexpected management change and the update they gave on their review into political activity."

296.    As a direct and proximate result of the disclosures that Silagy was resigning and that the campaign finance misconduct did create a material reputational and legal risk to the Company, on January 25, 2023, NEE's common stock fell $7.31 per share, or about 8.7%, representing a market capitalization loss of more than $14 billion on unusually high trading volume.

297.    Additionally, and in the alternative, Silagy's resignation was a materialization of the risks concealed by Defendants' false and misleading denials during the Class Period that the allegations of wrongdoing had a basis in fact. Despite Defendants' denials, as described in ¶¶289–296, 298–300, 321, the market understood Silagy's departure to be causally linked to his role in the Matrix-involved scandals. Silagy's premature and rushed resignation was therefore both an implicit acknowledgement of the Company's potential exposure because of Silagy's conduct involving Matrix and a direct, foreseeable, and proximate consequence of his conduct, and was perceived as such by the market.

298.    For example, on January 25, 2023, Bloomberg reported that analyst Paul Patterson of Glenrock Associates said in an interview that the decline in NEE's stock value that day was "driven substantially by the unexpected management change and the update they gave on their review into political activity."

299.    The following morning, on January 26, 2023, Bank of America announced that it was downgrading NEE's stock because of the news related to the scandals in Florida, calling Silagy's departure "surprising" and noting "the long-term subsidiary CEO resigned unexpectedly in the middle of an ongoing Federal Election Commission [FEC] complaint against FPL which management expects to persist until late 2023," and noting that NEE's internal investigation had neither fully concluded nor "[closed] the door on the potential for an unflattering revelation in the future." Bank of America's report continued, saying "the key concern was the sharp inflection in FPL leadership: if the turnover had been planned, the ability to articulate and promote a new COO would have been conveyed earlier."

300.    In an article published on the financial news website *SeekingAlpha* later that day, titled "NextEra Energy cut at BofA as Florida surprise provides cause for caution," a *SeekingAlpha* News Editor quoted Bank of America analyst Julien Dumoulin-Smith as having explained that the earnings news was not positive enough of an "offset to dampen the blow of negative news" from the "Florida developments."

301.    Dumoulin-Smith's assessment was an understatement. NEE's stock price drop on January 25, 2023 was among the largest single-day declines in the Company's history, despite the fact that the Company concurrently released positive financial news on that date. The chart below shows the five worst single-day drops in the Company's share price in 25 years leading up to January 25, 2023:

| Date | % Drop |
|---|---|
| 3/12/2020 | -13.417 % |
| 10/15/2008 | -11.747 % |
| 4/1/2020 | -9.305 % |
| 3/16/2020 | -9.113 % |
| 1/25/2023 | -8.713 % |

302.    Unlike January 25, 2023, the other four drops in the chart above coincided with market-wide shocks, including a nearly 8% decline in the Dow on October 15, 2008 during the beginning of the great financial crisis. Similarly, three other dates coincide with general market

declines during the beginning of the COVID-19 pandemic (March 12, 2020, Dow down 9.99%; March 16, 2020, Dow down 12.93%, April 1, 2020, Dow down 4.65%). By contrast, the Dow *rose* 0.02% on January 25, 2023. The Company's decline on that day was entirely attributable to the news at NEE.

303.    Shortly after the market opened on January 31, 2023, the January 31, 2023 Article reported that NEE acknowledged to Bank of America analysts that the clawback provision of Silagy's severance package was unique to him in case the Company needed to be compensated by Silagy for costs associated with "any legal wrongdoing"—tacitly acknowledging the link between Silagy's conduct and the Company's potential legal exposure and reputational risk as disclosed in the January 25, 2023 Form 8-K, precisely the risk the Company, Robo, Reuter and Silagy had strongly denied existed.

304.    Specifically, the January 31, 2023 Article reported that, following the publication of Bank of America's report on January 26, 2023, the analysts hosted NEE executives in Boston and New York to "talk through Silagy's exit and other uncertainties the analysts had with the company's future." Reportedly, during those conversations, "NextEra executives disclosed to the bank analyst" that the clawback provision of the Severance Agreement for Silagy was not "customary." The January 31, 2023 Article also pointed out that "the company's most recent proxy statement – which was filed last year and summarizes FPL's executive compensation policies from 2021 – does not describe a 'claw back' applying to former executives if they are found to have broken the law or committed other kinds of misconduct."

305.    As a direct and proximate result of this corrective disclosure, which acknowledged that contrary to its prior statements NEE did believe Silagy's conduct created a material risk, on January 31, 2023 NEE's common stock dropped a further $0.42 per share on high trading volume, representing a loss of more than $850 million in market capitalization.

306.    The clawback provision also amounted to a foreseeable materialization of concealed risk. NEE included the clawback provision in Silagy's severance package precisely because the risk the Company had previously denied was a real and material threat from which the Company took steps to protect itself.

### ADDITIONAL INDICIA OF SCIENTER

307.    As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements and omissions set forth above were materially false and misleading when made. The information in this section summarizes certain additional allegations that detail the Individual Defendants' scienter, and the cumulative knowledge of the Company's senior leadership, including the Individual Defendants, regarding the matters addressed herein, properly imputed to the Company.

308.    ***Contemporaneous Documents Confirm that FPL Employees Orchestrated the Ghost Candidate Scheme in Florida***. For allegations of securities fraud, a speaker's contemporaneous possession of documents contradicting their public statements, including statements of opinion, are quintessential evidence of an intent to mislead.

309.    As set out in ¶¶149–178 above, the original plan to mount an independent challenger to Senator Rodriguez was made shortly after Silagy directed Martell to make Rodriguez's life a "living hell." This plan was shared with Martell, and emails confirm that Defendant Silagy was involved in the orchestration of structuring intermediary organizations to facilitate FPL's covert political spending in Florida elections. For example, emails between Pitts and Silagy attaching the November 8, 2019 and November 26, 2019 funding structure memoranda confirm that Silagy was briefed in advance on Matrix's plan to use a series of shell non-profits to obscure FPL's political spending and planned to install an FPL officer to run one of the organizations until it became clear that doing so may require disclosure. Contemporaneous bank records, receipts, and disclosures confirming political expenditures link FPL funds directly to Grow United and the other vehicles used to facilitate the scheme. Additionally, as set out above in ¶¶191–192, emails from October 2020 confirm that Silagy was individually briefed on the political efforts undertaken to unseat Senator Rodriguez the week before election day in 2020.

310.    FPL's categorical denials of not just wrongdoing, but even *involvement* (¶¶252–259, and 262–263) in Grow United and the Ghost Candidate scandal are directly contradicted by the emails, memoranda, and receipts relating to FPL's support for and Silagy's orchestration of the scheme. In particular, Robo possessed the Robo Memorandum, which contained much of the

evidence underlying the media reports of FPL's political activity, before he denied FPL's participation.

311. ***Defendants' Extraordinary Efforts to Conceal Matrix's Work for FPL and NEE Displays Consciousness of Wrongdoing.*** Defendants' blanket denials of any connection to the alleged wrongdoing are curious considering the lengths they went to conceal their involvement with Matrix. As noted above, Defendants' employment of pseudonyms, personal emails, text messages, "off-the-books" spending, and in-person meetings were "an apparent attempt to conceal their communications" according to the Robo Memorandum.

312. Additionally, the establishment of complex networks of shell entities set up by Pitts and his team for the express purpose of benefitting FPL by concealing that FPL was the source of political spending supports a strong inference of scienter because that conduct was specifically calculated to create plausible deniability in the event the scheme came to light. Documents confirm that (1) FPL executives were briefed in advance on the details of the proposed scheme; (2) FPL executives directed the focus of the scheme; (3) FPL was billed for the legal and administrative costs of setting up the key components of the scheme; and (4) FPL executives were briefed on the scheme's progress and expected results before election-day 2020. Critically, those documents were shared with FPL and NEE *before* the false and misleading statements were made.

313. As described in ¶104, in a series of text messages between Martell and Pitts in December 2016 where Martell requested information while he was on the phone with Silagy, Pitts assured Martell that Matrix was in control of the non-profit entities. Martell replied: "This text is self-destructing in 30 seconds." "Yep that's why I like face to face," Pitts texted back. Moving forward, when written communications between Matrix and FPL executives were inevitable, Defendants took steps to minimize and obscure the paper trail. Many such communications went through Silagy's and Martell's *personal* email addresses or, most revealing, Silagy's pseudonym "Theodore Hayes" account. For example, the November 26, 2019 Funding Memo went to the "Theodore Hayes" email account, as did Mothers for Moderation funding requests.

314. Similarly, in October 2018, Silagy contacted Pitts from his personal Yahoo.com email address asking for Pitts to facilitate a political donation through Matrix so that it could not

be "triangulate[d]" back to Silagy – an overt admission that Silagy wished to use a Matrix-controlled non-profit to conceal the true source of the funds, despite federal and state law explicitly forbidding straw donations. This and many of the other communications laundered through personal and pseudonym accounts were included in the Robo Memorandum.

315.    Given Pitts' statement that he preferred "face to face" discussions, there is a strong inference that the communications available pre-discovery – despite Defendants' efforts to hide them – are merely the tip of the iceberg. The manner in which Defendants attempted to conceal their communications strongly supports scienter.

316.    ***Defendant Silagy was Involved in Discussions Regarding FPL's "Budget" With Matrix***. One "face to face" meeting that internal Matrix documents confirm took place occurred on July 19, 2019, in Silagy's office which included at least Silagy, Pitts, and Julie Holmes. In Pitts' calendar, the meeting is titled as being about the "Budget" for the fourth quarter. An internal Matrix ledger, meanwhile, shows that funding projects, such as the Capitolist, attacks on Levine Cava, Mothers for Moderation, Broken Promises, and many others, were itemized and tracked with the amount coming from FPL ("FPL Amt") against the "TOTAL FPL Budget." Accordingly, Silagy exercised oversight over how FPL's "Budget" with Matrix was used, likely on a quarterly basis.

317.    ***Defendants Have Admitted that they Were Presented With Documents Detailing the Underlying Misconduct Before Making Statements Attempting to Obfuscate the Truth***. As noted above, the Robo Memorandum specifically identifying FPL employees as having engaged in "potentially unlawful conduct through third-party consultants and vendors" includes a caption indicating it was sent via FedEx Overnight to Robo on November 3, 2021. On December 17, 2021, Defendant Reuter acknowledged to the Orlando Sentinel that the Robo Memorandum was "shared with us" and that himself and others were therefore aware of the funding structure described therein. Additionally, the Robo Memorandum and media reporting spurred multiple internal investigations including reviews of personal emails and texts. Indeed, on June 24, 2022, Matrix founder Joseph Perkins was quoted in the *Florida Times-Union* stating that Matrix "notified (FPL parent company) NextEra" that "[w]e had rogue employees that from 2016 forward were engaged in activities that we feared could be illegal."

318.     The Robo Memorandum states that Matrix's internal investigation "quickly identified the involvement of FP&L president Eric Silagy . . . vice president for state legislative affairs Daniel Martell, vice president for external affairs and economic development Pam Rauch and NextEra Energy, Inc. vice president for integrated clean energy solutions Julie Holmes" as having been "engaged in an ongoing scheme with Pitts and other to secretly divert corporate resources to off-the-books communications and political campaigns." Those conclusions are corroborated by dozens of exhibits including emails, text messages, bank statements, internal memoranda, ledgers of payment, electronic calendar entries and invoices.

319.     Defendants' review of detailed documentary evidence of Matrix's misconduct and the knowing involvement of FPL officers, including Silagy, strongly supports the conclusion that later statements denying wrongdoing were made with an intent to mislead, or at least with an extreme and reckless disregard for the truth.

320.     ***Defendant Silagy's Abrupt Departure as CEO and the Terms of His Severance Support a Strong Inference of Scienter.*** Several factors relating to the circumstances of Silagy's departure as CEO of FPL support the inference that Silagy departed from FPL, in part, because of his role in orchestrating the political misconduct engaged in by FPL's agents, including Matrix.

321.     First, the timing of Silagy's resignation was abrupt and not by choice. Analysts covering NEE generally agreed that Silagy's departure was "rushed and difficult to separate from recent controversies, including allegations made in a Federal Election Commission complaint." On January 25, 2023, on a call with investors and analysts, in response to a question about whether there was a link between NEE's internal investigation of potential political misconduct and Silagy's departure, NEE CEO John Ketchum deflected by saying "we're not making a connection" but acknowledged "***it's a little earlier than I would have hoped Eric would have wanted to do it***," (emphasis added). Analysts commented that the Company's choice to replace Silagy temporarily with a retired NEE executive indicated a lack of a permanent succession plan in place, further suggesting the resignation was unplanned.

322.     *Second*, Silagy's departure was announced on the same day that NEE finally acknowledged that the political misconduct Silagy orchestrated had created a source of legal and

reputational risk for NEE. Specifically, on January 25, 2023, NEE issued a Form 8-K acknowledging that "FPL and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations" including specifically "media articles . . . that allege, among other things, Florida state and federal campaign finance law violations by FPL" and "a complaint subsequently filed with the Federal Election Commission" referencing the CREW complaint described above.

323.     *Third*, shortly after the announcement of Silagy's departure, NEE acknowledged to analysts for Bank of America that the Company's reservation of the right to claw back some or all of Silagy's severance pay in the event of a finding of "any legal wrongdoing" was unique to Silagy. According to a report published by Bank of America analysts, the claw back provision was not a "customary" component of similar severance agreements. The unique terms of Silagy's exit package are a tacit concession of the link between his resignation and the risks he created for NEE investors because of his orchestration of the unethical and allegedly unlawful misconduct engaged in by FPL's agents.

324.     ***Silagy Has a History of Lying About FPL and NEE's Political Activities.*** Silagy told an express lie to *Florida Times-Union* columnist Nate Monroe regarding scrutiny of FPL's involvement in the JEA scandal. The *Times-Union* reported that in a 2022 interview, Silagy denied that NEE had received a subpoena from prosecutors investigating JEA leadership.

325.     Silagy told Monroe,

> We cooperated with the FBI, we volunteered. And we've told you that repeatedly. . . And we've never been investigated by them. And we've told you that repeatedly. **And we've never been subpoenaed**. And we've told you that repeatedly. And yet you wrote an article that actually said that subpoenas were being sent to NextEra employees.

326.     Silagy's claim that the Company had never been subpoenaed over its involvement in the JEA scandal was false when made. During a May 15, 2023 hearing, the government showed and published a copy of an April 21, 2020 subpoena sent to NEE regarding the JEA scandal. FBI agent Robert Blythe explained to the court that NEE not only provided a document production in

response to the subpoena, but made certain employees available for interviews with the government—including Silagy. Silagy's falsehood regarding the JEA subpoena raises the inference that he further knew or recklessly disregarded that his statements at issue in this case were untrue.

327.    ***Silagy Sold a Significant Volume of Personally-Held NEE Stock One Day Before FPL's First Denials of Wrongdoing Were Published in Print.*** As noted above, the Class Period begins on December 2, 2021, with the publication of media reports linking FPL executives, including Silagy, to the Matrix consultants behind the "ghost" candidate scheme. The *Orlando Sentinel* article entitled "*Florida Power & Light execs worked closely with consultants behind 'ghost' candidate scheme, records reveal*" was published at 9:46 AM on December 2, 2022, and notes that "Silagy did not respond to a request for comment" in response to "detailed questions [sent] to him."

328.    One day earlier, on December 1, 2021, Silagy sold 62,480 shares of personally held NEE stock at a price of $87 per share, representing a total value of $5,435,760.

329.    Both the timing and the amount of the stock sold by Silagy were unusual and suspicious and support an inference of scienter.

330.    With respect to timing, on December 1, 2021, Silagy would have known that a potentially negative news story linking FPL to the conduct of Matrix and the "ghost candidate" scandal was imminent as he had been asked to provide quotes in response to specific questions about the content of the story.

331.    With respect to volume, Silagy sold more shares and made more money on December 1, 2021, than on any other day in his history as an executive at FPL. The 62,480 shares of NEE stock sold by Silagy on December 1, 2021 represent the largest volume of shares bought or sold in a single day of trading throughout his tenure as an officer of FPL going back to November of 2012. Indeed, based on Silagy's SEC filings, the number of shares he sold just before the Matrix scandal came to light was more than double the number of shares traded on any other day on record. The $5,435,760 worth of stock Silagy sold on December 1, 2021 is also the single largest windfall for Silagy on a single date on record.

332.     ***NEE's Political Activity Violated its Own Internal Policies, As Published to Investors***. NEE maintained an Ethics and a Political Engagement Policy and a Code of Business Conduct & Ethics at all relevant times during the Class Period. These policies, which were made publicly available to investors, prohibit the conduct FPL engaged in under Silagy's direction, reveal NEE's internal processes for monitoring political spending, and state that NEE's Chairman and Chief Executive (Robo) has ultimate authority and responsibility over political spending.

333.     At all times during the Class Period, NEE's Code of Business Conduct & Ethics stated: "as part of our commitment to winning business the right way, NextEra Energy will never tolerate bribery in any form. Even if we lose business or encounter delays because of our refusal to do so, **we will never bribe any third party, or allow or condone third parties to do so on behalf of NextEra Energy**." (emphasis added) The policy specified that bribes included "Business or employment opportunities" and political contributions, and could be direct or indirect. The policy also prohibited Company officials from "hir[ing] a third party to do something that you cannot ethically or legally do yourself."

334.     The Political Engagement Policy, as updated in October 2019, which by its terms applied to all NEE directors, officers and employees, including those at FPL as well as "**all other individuals who act in any political process on behalf of one or more of the Company's business**. . ." (emphasis added).

335.     Further, the Political Engagement Policy stated, in relevant part, the following:

> NextEra Energy officers with accountability for political engagement report to senior management of the Company, **which includes the Chairman and Chief Executive Officer of NextEra Energy**. **Senior management provides oversight of the Company's political engagement activities** and ensures they are in alignment with the Company's corporate strategy and objectives. . . .
>
> **NextEra Energy sets high ethical standards when making corporate political contribution decisions. . . . NextEra Energy makes each political contribution with the expectation that it is in full compliance with both the letter and the spirit of the law of the applicable jurisdiction.**
>
> \*          \*          \*
>
> The Governance & Nominating Committee of the NextEra Energy Board of Directors assists the Board in oversight of the Company's political activities. The Governance & Nominating Committee reviews and discusses with NextEra Energy's Executive Vice President and General Counsel, at least annually, the Company's Significant Trade Association Dues, contributions by the NextEra

Energy PAC, the Company's contributions to candidates and committees and the Company's **contributions to all U.S. tax-exempt organizations that are primarily engaged in political activities**.

**Public Disclosures**

As part of the Company's political engagement policy, t**he Company commits to publicly disclose on its website**, within 180 days after the end of each calendar year, its annual Significant Trade Association Dues**, its expenditures for federal and state lobbying**, and contributions from the NextEra Energy PAC, **among other pertinent information**.

(Emphasis added)

336.    By its terms, the Political Engagement Policy applied to Defendants Silagy, Robo, Reuter and Matrix and its operatives in so far as they were acting in the political process on behalf of FPL and NEE.

337.    As described above, FPL's political spending through Matrix and Matrix-controlled organizations in order to conceal the true source of the funding was not in full compliance with the spirit of the law, credibly alleged to be in violation of both state and federal campaign finance law, and not publicly disclosed.

## CLASS ACTION ALLEGATIONS

338.    Lead Plaintiffs bring this action individually and as a class action on behalf of all persons or entities, other than Defendants, who purchased or otherwise acquired NEE securities between December 2, 2021, and January 30, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

339.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(a) and (b)(3).

340.    The members of the Class are so numerous that joinder of all members is impracticable. There are more than 2 billion shares of NEE common stock held by investors. Throughout the Class Period, tens of millions of NEE's shares traded on the New York Stock Exchange on a daily basis. Consequently, the number of Class members is believed to be in the tens of thousands and Class members are likely scattered across the United States. The precise number of Class members is unknown to Lead Plaintiffs at this time but could be determined

following discovery as Record owners and other members of the Class may be identified based on documents possessed by NEE or its transfer agent. Those persons and entities may be notified of the pendency of this action as is typically done in securities class actions.

341.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class and Lead Plaintiffs do not have any interests adverse to the Class.

342.    Lead Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

343.    Additionally, common questions of law and fact predominate over questions affecting any individual Class member.  The common questions include, *inter alia*:

    a.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NEE;

    b.    whether Defendants thereby violated the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5); and

    c.    whether and to what extent Class members have been damaged by Defendants and the proper measure of damages.

344.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for several reasons. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants. Also, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own and the number of Class members makes joinder impracticable.

345.    There will be no difficulty in the management of this litigation as a class action.

346.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## NO SAFE HARBOR

347.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NEE who knew that the statement was false when made.

## FRAUD ON THE MARKET

348.     The market for NEE's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NEE's securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of NEE's securities and market information relating to NEE, and have been damaged thereby.

349.     During the Class Period, the artificial inflation of NEE's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about NEE's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NEE and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result. At all relevant times, the market for NEE's securities was an efficient market for the following reasons, among others:

a. NEE shares met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b. As a regulated issuer, NEE filed periodic public reports with the SEC and/or the New York Stock Exchange;

c. NEE regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. NEE was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

350.    As a result of the foregoing, the market for NEE's securities promptly digested current information regarding NEE from all publicly available sources and reflected such information in NEE's share price. Under these circumstances, all purchasers of NEE's securities during the Class Period suffered similar injury through their purchase of NEE's securities at artificially inflated prices and a presumption of reliance applies.

351.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**CAUSES OF ACTION**
**COUNT ONE**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

352.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

353.    By reason of the conduct herein alleged, each Defendant named herein violated Section 10(b) of the Exchange Act and Rule 10b-5.

354.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase NEE's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

355.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NEE's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84

356.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NEE's financial well-being and prospects, as specified herein.

357.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NEE's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NEE and its business operations and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

358.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NEE's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

359.    As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth herein, the market price of NEE's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired NEE's securities during the Class Period at artificially high prices and were damaged thereby.

360.    At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that NEE was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NEE securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

361.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

362.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

363.    Lead Plaintiffs and the Class have sustained damages because they purchased NEE stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

**COUNT TWO**
**Violation of Section 20(a) of the Exchange Act**
**(Against Robo, Silagy, and Reuter)**

364.    Plaintiff repeats and re-alleges the allegations contained in ¶¶1-351 above as if fully set forth herein.

365.    Robo, Silagy, and Reuter acted as controlling persons of NEE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, Robo, Silagy, and Reuter had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Robo, Silagy, and Reuter were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

366.    In particular, Robo, Silagy, and Reuter had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

367.    As set forth above, NEE and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Robo, Silagy, and Reuter are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment against all Defendants as follows:

1. Ordering that this action may be maintained as a class action and certifying Lead Plaintiffs as Class representatives and their counsel as Class counsel;

2. For actual damages in an amount to be proven at trial;

3. For pre-judgment and post-judgment interest on any such monetary relief;

4. For reasonable attorneys' fees and costs;

5. For costs of suit herein; and

6. For such further relief as this Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Lead Plaintiffs hereby demand a trial by jury on all counts so triable.

Dated: December 1, 2023

*/s/ Chris Gold*
Chris Gold, Esq.
Florida Bar No. 088733
chris@edelsberglaw.com
EDELSBERG LAW, P.A.
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(786) 673-2405 phone

BLOCK & LEVITON, LLP

Jeffrey C. Block, *pro hac vice*
Jacob Walker, *pro hac vice*
Brendan Jarboe, *pro hac vice*
Nathan Abelman, *pro hac vice pending*
Mark Byrne, *pro hac vice pending*
260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
nathan@blockleviton.com
mark@blockleviton.com

Robert D. Klausner
KLAUSNER, KAUFMAN, JENSEN &
LEVINSON, P.A.
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

Attorneys for Lead Plaintiffs the City of Hollywood Police Officers' Retirement System and the
Pembroke Pines Firefighters & Police Officers Pension Fund