**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

MAHA JASTRAM, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff(s),                       **CASE NO. 23-CIV-80833-CANNON**

             v.

NEXTERA ENERGY, INC., FLORIDA
POWER & LIGHT COMPANY, JAMES
ROBO, ERIC SILAGY, and DAVID P.
REUTER,

        Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS'**
**SECOND AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ............................................................................................................................. 4

ARGUMENT ................................................................................................................................... 9

    I.     Plaintiffs Fail to Allege Falsity or Scienter as to Any Alleged
         Misstatement .................................................................................................... 10

        A.     Statement 1 of 8: Robo's One Statement Is Not False or Made
             with Scienter ...................................................................................... 10

        B.     Statement 2 of 8: Silagy's One Statement Is Not False or
             Made with Scienter ............................................................................ 13

        C.     Statements 3-7: Reuter's Five Statements Are Not False or
             Made with Scienter ............................................................................ 15

        D.     Statement 8 of 8: McGrath's One Statement Is Not False or
             Made with Scienter ............................................................................ 18

    II.     Plaintiffs Fail to Plead Loss Causation ........................................................... 19

        A.     The January 25, 2023 Disclosures Did Not Reveal Any Falsity ... 20

        B.     No Loss Causation Is Pled as to January 31, 2023 ......................... 25

    III.    Plaintiffs Fail to Plead a Section 20(a) Control Person Violation ............. 25

CONCLUSION .............................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Mgmt. Inc.* v. *Deme*,
2019 WL 7344795 (S.D. Fla. Mar. 14, 2019) ............................................................. 19

*In re BankAtlantic Bancorp, Inc.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F.3d 713 (11th
Cir. 2012) ................................................................................................................... 24

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) ........................................................................ 15

*Carvelli* v. *Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) .................................................................................... 9

*City of Atlanta Police Officers' Pension Plan* v. *Celsius Holdings, Inc.*,
2023 WL 1998174 (S.D. Fla. Feb. 13, 2023) ............................................................. 15

*City of Hollywood Police Officers' Ret. Sys.* v. *Citrix Sys., Inc.*,
649 F. Supp. 3d 1256 (S.D. Fla. 2023) ................................................................. 12, 15

*City of Westland Police & Fire Ret. Sys.* v. *Metlife, Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015) .......................................................................... 11

*Cordova* v. *Lehman Bros.*,
526 F. Supp. 2d 1305 (S.D. Fla. 2007) ...................................................................... 16

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ....................................................................................... 19

*FindWhat Inv. Grp.* v. *FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ....................................................................... 9, 13, 22

*Fries* v. *N. Oil and Gas, Inc.*,
285 F. Supp. 3d 706 (S.D.N.Y. 2018) ........................................................................ 12

*Garfield* v. *NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .................................................................................. 14

*Henningsen* v. *ADT Corp.*,
161 F. Supp. 3d 1161 (S.D. Fla. 2015), *aff'd*, 660 F. App'x 850 (11th
Cir. 2016) ................................................................................................................... 17

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017) ........................................................................ 11

*In re Jiangbo Pharms., Inc., Sec. Litig.*,
    884 F. Supp. 2d 1243 (S.D. Fla. 2012), *aff'd*, 781 F.3d 1296 (11th Cir.
    2015) ........................................................................................................................14

*In re KLX, Inc. Sec. Litig.*,
    232 F. Supp. 3d 1269 (S.D. Fla. 2017) .......................................................................11

*MacPhee* v. *MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) ...................................................................................25

*McClain* v. *Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015) .......................................................................25

*Meyer* v. *Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...............................................................20, 22, 24, 25

*Miyahira* v. *Vitacost.com, Inc.*,
    2012 WL 12895513 (S.D. Fla. June 28, 2012), *aff'd*, 715 F.3d 1257
    (11th Cir. 2013) ............................................................................................................4

*Mizzaro* v. *Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ................................................................9, 10, 12, 13

*Mogensen* v. *Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014) ........................................................................15

*In re Ocwen Fin. Corp. Sec. Litig.*,
    2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) ............................................................19

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*,
    575 U.S. 175 (2015) ....................................................................................................10

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) .................................................................................23, 25

*Alaska* v. *Ryder Sys., Inc.*,
    603 F. Supp. 3d 1229 (S.D. Fla. 2022) (Cannon, J.) ...............................................9, 10

*Sapssov* v. *Health Mgmt. Assocs.*,
    608 F. App'x 855 (11th Cir. 2015) ..............................................................................25

*Sarei* v. *Rio Tinto PLC.*,
    221 F. Supp. 2d 1116 (C.D. Cal. 2002) ......................................................................24

*Slayton* v. *Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) .......................................................................................12

*In re Sunterra Corp. Sec. Litig.*,
  199 F. Supp. 2d 1308 (M.D. Fla. 2002).....................................................11

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................10

*Theoharous* v. *Fong*,
  256 F.3d 1219 (11th Cir. 2001) .............................................................13

*Thompson* v. *RelationServe Media, Inc.*,
  610 F.3d 628 (11th Cir. 2010) ..............................................................19

*Thorpe* v. *Walter Inv. Mgmt.*,
  2014 WL 11961964 (S.D. Fla. Dec. 23, 2014)...........................................10

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .................................................................11

*Ziemba* v. *Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ..............................................................9

**Statutes**

15 U.S.C. §78u-4(b)(1).........................................................................9, 18

15 U.S.C. § 78u-4(b)(3)(B)........................................................................9

15 U.S.C. § 78u-4(b)(4)...........................................................................20

**Other Authorities**

*Easterbrook*,
  Exchange Act Release No. 996610, 2023 WL 143292, at *7 (Jan. 9,
  2023) (order) .....................................................................................24

Memorandum, Deputy AG Lisa Monaco, *Further Revisions to Corporate
  Criminal Enforcement Policies Following Discussions with Corporate
  Crime Advisory Group*, at 10...............................................................24

NextEra Energy, Inc. ("NextEra" or "NEE"), Florida Power and Light Company ("FPL"), and James Robo, Eric Silagy, and David P. Reuter (the three "Individual Defendants") respectfully move to dismiss the Second Amended Class Action Complaint ("SAC") [ECF No. 68].

## PRELIMINARY STATEMENT

NextEra shareholders assert securities fraud concerning eight purportedly false statements about the alleged political activities of FPL, NextEra's retail electric utility subsidiary. The statements were made after a courtroom feud had erupted between the principals of an FPL outside consultant, non-party Matrix, LLC. Matrix's founder had prepared a memorandum that raised— through inference and innuendo—potential concerns with political activities allegedly undertaken by the other principal—purportedly for FPL's benefit. The memo was sent to NextEra and leaked to the press. In December 2021, the media—based on the leaked materials—began to publish articles raising questions about FPL's possible involvement in Matrix's activities, such as fundraising for certain organizations and support for "ghost candidates." NextEra took the allegations seriously and promptly engaged outside counsel to investigate, but did not find unlawful conduct by FPL. In response to questions about the media reports, the Individual Defendants made eight statements that (i) denied certain aspects of FPL's alleged involvement or (ii) reported that NextEra's investigation had not found unlawful conduct. While Plaintiffs now challenge these statements as false, as addressed in this motion, the SAC does not plead facts showing that they are false, were made with intent to deceive, or caused shareholders any losses.

After more articles were published in summer 2022, NextEra announced a second external investigation, which also concluded without findings of unlawful conduct. The findings from the second investigation were announced on January 25, 2023, as part of NextEra's scheduled release of 2022 financial results. NextEra stated its belief, based on its second investigation, that any

future proceedings based on the allegations reported in the media should be resolved in NextEra's favor.  By separate disclosure that same day, NextEra announced the retirement of FPL's longtime CEO, Silagy.  NextEra's stock price dropped.  Plaintiffs seize on the drop, contending that it was caused by the "revelation" that the eight challenged statements were false.  But neither NextEra nor anyone else disclosed anything new on January 25 that contradicted the eight challenged statements—indeed, there was *nothing new* disclosed about the content of the challenged statements or the outcome of NextEra's first investigation.  Plaintiffs attempt to plead that the challenged statements were nonetheless corrected that day by a risk warning that accompanied NextEra's positive announcement of the results of its second investigation.  But these *same risks* had previously been disclosed months earlier in 2022, and thus were not new.  And in any event, the risk disclosure did not reveal that any prior statement was false; it merely recognized that, although its second investigation did not result in findings of unlawful conduct, NextEra could not guarantee that the Matrix allegations would have no future impact.  Indeed, to this day, there has been no disclosure revealing that any of Defendants' challenged statements are false.

The SAC suffers from multiple defects, each an independent basis for dismissal:

***First***, Plaintiffs have not alleged with the requisite particularity factual allegations pleading that any of the eight challenged statements were false.  The SAC relies heavily on a copy of the "memorandum" compiled by Matrix's owner and his counsel in connection with the Matrix feud (the "Matrix Memorandum").  But the SAC does not plead actual facts—whether from the Matrix Memorandum or otherwise—that contradict the eight challenged statements.  The SAC therefore fails to plead that any of the alleged misstatements are false.

***Second***, Plaintiffs do not plead the requisite strong inference of scienter (*i.e.*, intent to defraud).  They do not allege that *any* Defendant personally benefitted from the alleged fraud.  To

the contrary, Robo and Silagy *significantly increased* their holdings of NextEra stock during the Class Period, undercutting any inference of scienter.  And Plaintiffs have not, as required under Eleventh Circuit law, pled scienter as to *each* statement made by *each* Defendant.  Their allegations mostly ignore Reuter and Robo, who are not alleged to have been involved in any of the underlying political activities.  And Silagy is alleged to have made only one misstatement on one topic, for which no facts supportive of scienter are pleaded.

**Third**, Plaintiffs fail to plead loss causation.  They rely on alleged "corrective disclosures" on January 25 and 31, 2023, but no new facts contradicting the challenged statements were disclosed on either date.  As to January 25, Plaintiffs claim NextEra issued a warning that "for the first time" "formally addressed" the media allegations and "acknowledged" that they exposed it to risks, ¶¶ 8, 269, 283, but that is false.  Contrary to Plaintiffs' allegation that NextEra "did not address any of these allegations in any filing with the SEC, including any . . . risk disclosure or other warning . . . until January 25, 2023," ¶ 8, NextEra issued a materially identical warning on November 3, 2022, in its 10-Q.  There, it "formally addressed" the allegations and "acknowledged" the risks of adverse impacts.  Moreover, a risk factor that simply points out that, even after the favorable conclusions from its second investigation, NextEra could not guarantee it would not face future impacts from the allegations is not a "revelation" that prior denials of wrongdoing were false.  Plaintiffs also cite Silagy's January 25 retirement announcement, but point to no link between it and the challenged statements other than legally insufficient speculation.  As to January 31, Plaintiffs claim that the stock dropped because an article revealed that Silagy's retirement agreement had a claw-back.  But NextEra had *publicly described* the claw-back and *filed* the agreement on January 25, meaning it was not "new" on January 31.  That the public agreement was later discussed by the press on January 31 is not revelatory under Circuit law.

## BACKGROUND[1]

NextEra is a leading clean energy company headquartered in Juno Beach, Florida.  ¶ 27. Its subsidiary FPL is an electric utility that sells power to people across much of Florida.  ¶ 28.

Political consulting firm Matrix was founded and is owned by Joseph Perkins; Jeff Pitts was its long-time CEO. ¶ 33; Ex. A at 4.  After Pitts left Matrix in 2020 to start his own firm with Matrix clients, Perkins sued Pitts and a highly contentious legal battle ensued.  ¶¶ 37, 40; Ex. A at 3.  To support Perkins' lawsuit, Matrix representatives, including Plaintiffs' lone confidential witness ("ME-1"), conducted an "internal . . . investigation" into Pitts' work, which was summarized in the Matrix Memorandum.  ¶¶ 40, 48.  Plaintiffs allege that the Matrix Memorandum was mailed to Robo around November 3, 2021.  ¶ 12.  It was also shared with media outlets, who began reporting on its contents on December 2, 2021.  ¶¶ 41, 45, 247–248.

On December 2, an *Orlando Sentinel* article alleged that Matrix controlled a non-profit called Grow United that contributed funds to political committees that then paid for advertisements for independent candidates—whom the article referred to as "ghost candidates"—intended to derail the campaign efforts of certain Florida legislature candidates. Ex. A at 2.  Additional articles reporting on the Matrix Memorandum followed, including December 10, 2021 articles published by the *Sentinel* and *Florida Times-Union* on a job offer allegedly made by a Matrix intermediary to a Jacksonville City Councilor opposed to the privatization of the Jacksonville Electric Authority ("JEA"), ¶¶ 4, 256, 260, and a December 17, 2021 article published by the *Sentinel* describing memoranda prepared by Matrix and its counsel on proposed funding structures for 2020 election

---

[1] Cites to "¶" are to the SAC.  Cites to "Ex." are to exhibits to the Declaration of Audra J. Soloway, which are SEC filings, transcripts, news articles, and other documents incorporated into the SAC or public records that the Court may consider on this motion.  *Miyahira* v. *Vitacost.com, Inc.*, 2012 WL 12895513, at *1 n.1 (S.D. Fla. June 28, 2012), *aff'd*, 715 F.3d 1257 (11th Cir. 2013).

activities that was allegedly shared with Silagy, ¶ 258.

In the meantime, NextEra had retained an independent law firm to conduct an investigation of the Matrix Memorandum allegations.  Ex. B at 3; ¶ 262.  On January 25, 2022, Robo explained that NextEra had conducted an investigation into the allegations and found no evidence of illegality or wrongdoing by FPL or its employees.  ¶ 262.

Additional allegations were made starting in summer 2022.  In June 2022, a *Sentinel* article alleged that Matrix had surveilled Nate Monroe, a *Times-Union* reporter critical of FPL, ¶ 264, and in August 2022, the *Miami Herald* reported on FPL's and Matrix's alleged links to the digital media firm *The Capitolist*, ¶ 267.  After the new articles, on September 7, 2022, NextEra announced that it had retained a second law firm to conduct a second investigation into the new allegations and FPL's relationship with Matrix generally.  Ex. C at 6.  It disclosed:

> [L]ate last year, we became aware of allegations of criminal law violations related to FPL's work with the consulting firm Matrix. . . .  [W]e took those allegations seriously and [promptly] hired a major Florida law firm to investigate the claims.  Based on information available at that time, our investigation found no reliable evidence of the criminal law violations that have been alleged by Matrix.  Recently, additional reports of alleged wrongdoing have surfaced based on what appears to be new documentation from Matrix.  Again, we take all allegations seriously.  And similar to the action we took earlier this year, we're conducting a thorough review of these new allegations, as well as FPL's past interactions and relationships with Matrix.  Our expectation is that through this review, we'll bring some closure to this matter.

*Id*.  On October 27, 2022, Citizens for Responsibility and Ethics in Washington (CREW), a non-profit "watchdog," filed a complaint with the Federal Election Commission based on the media allegations against certain entities and individuals, as well as "Unknown Respondents" that the complaint speculated "*may or may not include*" FPL.  ¶¶ 115, 201–202; Ex. D at 19.  The next day, October 28, 2022, NextEra disclosed the CREW Complaint and that it fell within the scope of the second investigation.  *See* Ex. E at 12.

The SAC does not dispute that NextEra engaged law firms to investigate or allege that

NextEra misrepresented their findings.  Nor does it allege that any government authority has identified wrongdoing by, or taken any action against, Defendants in connection with Matrix.

Plaintiffs ignore that, during the Class Period, NextEra disclosed the risks it faced from the articles reporting on the Matrix Memorandum and CREW Complaint.  NextEra's November 3, 2022 10-Q, in particular, warned that outside counsel was continuing the second investigation of the allegations, and that those allegations could subject NextEra to adverse impacts:

> Media articles have been published that allege, among other things, campaign finance violations by FPL and certain of its executives.  In addition, on October 27, 2022, a complaint referencing these media articles was filed with the [FEC] by a non-profit corporation alleging certain violations of the Federal Election Campaign Act by various entities and individuals named as respondents in the complaint.  While the complaint does not expressly name FPL or any of its executives as respondents, the complaint identifies FPL as an alleged source of funds to certain Super PACs identified in the complaint.  NEE has engaged outside counsel to conduct a review of potential state and federal campaign finance violations, including the allegations raised in the media articles and the FEC complaint.  The review is ongoing and NEE and FPL cannot predict, as of the date of this report, the outcome of the review.  These allegations could also result in regulatory, investigative and enforcement inquiries by law enforcement or other governmental authorities and any ultimate findings of violations could result in the imposition of fines, penalties or other sanctions or impacts on NEE or FPL.

Ex. F at 57.  This November 3 disclosure, however, did not cause any stock price decline, Ex. G at 7, and Plaintiffs thus omit it.  Ignoring NextEra's September 7, October 28, and November 3, 2022 disclosures, the SAC rests entirely on the false premise that the "first time" NextEra "formally addressed the allegations" was January 25, 2023, when its stock price dropped by 8.7%. ¶¶ 8–9.

But on January 25, 2023, NextEra issued three public disclosures before market open—including its 2022 financial results and the retirement of FPL's long-time CEO—and **not one** of them disclosed any new facts about the allegations in the Matrix Memorandum or media reports:

(1) NextEra reported Q4 and 2022 financial results. Ex. H.  It acknowledged a "challenging macro environment," *Id.* at 2, which analysts cited in the SAC acknowledged had tempered its

ability to increase or maintain existing growth, *see, e.g.*, Ex. I at 1 ("[W]e had been optimistic that management could deliver a positive EPS guidance surprise . . . .").

(2) NextEra disclosed the "substantial[] complet[ion]" of its second investigation, which concluded that NextEra "believe[ed] that FPL would not be found liable for any of the Florida campaign finance law violations as alleged in the media articles." Ex. J at 2.  NextEra explained that it did not believe it was appropriate for the CREW Complaint with the FEC to move forward and that the campaign finance contributions in that complaint were nonetheless immaterial.  *See id.*  NextEra coupled these conclusions with a standard risk disclosure that any predictions that proceedings based on the Matrix allegations would resolve in NextEra's favor were not guarantees. These warnings tracked the November 2022 warnings that Plaintiffs notably ignore:

> [M]edia articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL.  These articles are referenced in a complaint subsequently filed with the [FEC] that alleges certain violations of the Federal Election Campaign Act.  FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred. . . .  FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE . . . .

*Compare* Ex. J at 2 (January 25 disclosure) *with* Ex. F at 57 (earlier November 3 disclosure).

(3) NextEra announced that Silagy would be retiring after 20 years at FPL.  Ex. K at 2.  He would continue as CEO into February, and remain as an executive to assist with the transition of the new CEO into May.  *Id*.  Silagy explained on the earnings call that he had served as FPL CEO for 12 years, long beyond the tenure of most CEOs.  Ex. L at 10.  Following the selection of John Ketchum as the new CEO of NextEra in January 2022, Silagy had told NextEra leadership that he would remain for at least one more year.  Having completed that commitment in January 2023, he stated, "I feel it's best for the transition to take place now and for new leadership to take the helm

of FPL to ensure consistent management heading into a very busy next couple of years." *Id.*
Ketchum explained that the prior year had been difficult on Silagy: "when you think about all the
challenges that he had to overcome, with the hurricanes and with high natural gas prices and
inflation, and the supply chain and the media allegations and all those things, I think it took a toll
. . . on him." *Id.* at 15. Ketchum stated that NextEra was "not making a connection" between
Silagy's retirement and the media allegations. *Id.* NextEra's public disclosure described Silagy's
retirement agreement, and explained that his "payments and benefits under the Agreement are
subject to forfeiture and recoupment in certain circumstances" specified in the agreement. Ex. K
at 2. The agreement was appended to the public disclosure, and contained a common provision,
consistent with best practices endorsed by regulators, allowing NextEra to claw-back
compensation in certain circumstances, including Silagy's conviction for, or admission to, a
felony, based on his tenure as FPL's CEO. Ex. K at 1 (8-K), 11–12 (Ex. 10); ¶ 287.

On January 30, 2023, Bank of America (BofA) analysts published a report discussing
Silagy's (already public) retirement agreement, noting that it includes "a multi-year claw back on
compensation for any legal wrongdoing, and establishes a two-year non-compete. This customary
non-compete limits Silagy's ability to position himself at an adjacent utility." Ex. M at 3.

Plaintiffs claim further losses on January 31, 2023, when the *Times-Union* reported on the
BofA analyst report. ¶ 11. The article did not suggest the claw-back was an unusual provision for
departing CEOs. Ex. N at 2. NextEra's stock price dropped $0.42 on January 31, 2023. ¶ 305.

Plaintiffs assert claims under Section 10(b) of the Exchange Act against all Defendants and
Section 20(a) control person claims against the Individual Defendants for a proposed class of
NextEra shareholders who purchased between December 2, 2021, and January 30, 2023.

## ARGUMENT

To state a Section 10(b) claim, Plaintiffs must allege, among other things, (1) "the existence of a material misrepresentation (or omission)" which was (2) "made with scienter (*i.e.*, 'a wrongful state of mind')" and was (3) "causally connected to . . . plaintiffs' economic loss." *Alaska* v. *Ryder Sys., Inc.*, 603 F. Supp. 3d 1229, 1237 (S.D. Fla. 2022) (Cannon, J.).[2]  To curb abuses of the Section 10(b) private action, Congress imposed a stringent "triple-layered pleading standard," consisting of "federal notice-pleading requirements," the "heightened pleading standards found in [Rule] 9(b)," and the "special fraud pleading requirements" of the PSLRA.  *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1317–18 (11th Cir. 2019).  These requirements obligate plaintiffs to "state with particularity the circumstances constituting fraud," *Alaska*, 603 F. Supp. 3d at 1236, "specify each statement alleged to have been misleading," and state "the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1).  Indeed, discovery is not permitted unless and until a plaintiff can meet these heightened pleading requirements.  15 U.S.C. § 78u-4(b)(3)(B).

The PSLRA also requires that "with respect to each act or omission alleged," a complaint "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter.  *Id.* § 78u–4(b)(2)(A).  Scienter is an "intent to defraud or severe recklessness." *FindWhat Inv. Grp.* v. *FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011).  Severe recklessness requires "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care" such that defendants "must have been aware" of the fraud.  *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).  Plaintiffs must plead particular facts—such as "documentation, communication, or conversation"—showing that Defendants knew contrary information.  *Mizzaro*

---

[2] All emphases added and internal quotation marks and alterations omitted unless noted.

v. *Home Depot, Inc.*, 544 F.3d 1230, 1250–51 (11th Cir. 2008).  Those alleged facts must make the inference of scienter "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  And Plaintiffs must allege facts "supporting a strong inference of scienter for *each defendant* with respect to *each violation*." *Mizzaro*, 544 F.3d at 1238; *Alaska*, 603 F. Supp. 3d at 123.  Plaintiffs must "allege what *each Defendant* knew, how the Defendant knew that information and when *each Defendant knew* or should have known that information." *Thorpe* v. *Walter Inv. Mgmt.*, 2014 WL 11961964, at \*16 (S.D. Fla. Dec. 23, 2014).

## I.   Plaintiffs Fail to Allege Falsity or Scienter as to Any Alleged Misstatement

Plaintiffs' case is premised on **eight** alleged misstatements.  None are alleged with particularity to be false, and no Defendant is alleged to have made any of them with scienter.

### A.   Statement 1 of 8: Robo's One Statement Is Not False or Made with Scienter

**No Falsity**:  The SAC challenges only one statement by former NextEra CEO Robo: his January 25, 2022 statement that NextEra had investigated the Matrix Memorandum and press allegations and identified "no evidence" of illegality or wrongdoing by FPL, and that he "fe[lt] very good that there is no basis to any of these allegations."  ¶ 262.  This statement, which conveyed subjective determinations of NextEra's first investigation and Robo's impression following that investigation, is a non-actionable opinion, subject to heightened pleading standards. *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*, 575 U.S. 175 (2015).

In *Omnicare*, the Supreme Court held that defendants' alleged misstatements about their belief that they were complying with the law were statements of opinion because the statements expressed "a view, not a certainty, about legal compliance," and were thus true even if defendants later "discovered a longtime violation of law." *Id.* at 184.  The Supreme Court held that those opinions were not alleged to be false because plaintiffs did not "contest that [defendants'] opinion

10

was honestly held." *Id.* at 186.  While an investor may reasonably expect that a belief in legal compliance "rests on some meaningful legal inquiry—rather than, say, on mere intuition," investors recognize that "legal opinions can prove wrong in the end." *Id.* at 188.  Accordingly, under *Omnicare*, a statement that a company's investigation has not identified evidence of illegality and that allegations of wrongdoing lack a basis "does not imply that the issuer's conduct is, in fact, lawful, but only that the issuer has conducted a meaningful inquiry and has a reasonable basis upon which to make such an assertion." *Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016).

Here, Plaintiffs do not allege that NextEra did not conduct this first law firm investigation, that Robo misrepresented its conclusions, or that his opinion that he felt good about it was not honestly held, which is dispositive under *Omnicare*.  The SAC does not allege *anything* about the investigation, or its findings, at all.  Absent such allegations, there can be no fraud pleaded: even if Plaintiffs disagree with Robo's opinion, "so long as Defendants conducted a meaningful inquiry and in fact held the stated view, the statements did not mislead in a manner that is actionable." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017); *see also, e.g.*, *City of Westland Police & Fire Ret. Sys.* v. *Metlife, Inc.*, 129 F. Supp. 3d 48, 81–82 (S.D.N.Y. 2015) (statements that allegations were "without merit" were non-actionable opinions).

**No Scienter**:  Separately, Plaintiffs fail to allege the required strong inference of scienter for Robo.  The SAC's scienter allegations at ¶¶ 308–338 barely mention him.  He is not alleged to have had any contemporaneous involvement in or knowledge of the underlying political activities, and had no motive to lie.  *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017) (failure to allege "personal motive" weighed against scienter); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1337 (M.D. Fla. 2002) (absence of allegations as to "motive to commit or participate in fraud" was "significant").  Robo also is not alleged to have sold shares

during the Class Period, which weighs against scienter. *Mizzaro*, 544 F.3d at 1253. To the contrary, he greatly *increased* his NextEra stock holdings during the Class Period by 24.4%,[3] when the price was allegedly fraudulently inflated, which is antithetical to scienter. *City of Hollywood Police Officers' Ret. Sys.* v. *Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, 1268 (S.D. Fla. 2023).

What little Plaintiffs say about Robo's scienter is legally insufficient. They claim that the conduct of FPL executives alleged in the Matrix Memorandum violated NextEra's Code of Business Conduct & Ethics and Political Engagement Policy, ¶ 332, but do not allege that **Robo** violated either policy. They note that bribery is not tolerated under the Code of Business Conduct & Ethics, ¶ 333, but make no allegation that Robo (or any Defendant) engaged in bribery. They also note that the Political Engagement Policy expects political contributions to comply with law, but cite no unlawful contributions involving Robo (or any Defendant). And while they allege that NextEra committed to disclosing lobbying expenditures, ¶ 335, there are no allegations of undisclosed lobbying. Even if they *had* alleged policy violations, that supports only a claim that NextEra did not follow its policies, which, at most, shows non-actionable "mismanagement," not scienter as to Robo's statement about the first investigation's findings. *Fries* v. *N. Oil and Gas, Inc.*, 285 F. Supp. 3d 706, 722 (S.D.N.Y. 2018).

Plaintiffs also allege that Robo had access to the Matrix Memorandum, ¶ 263, but that cuts against scienter: NextEra commenced an investigation *in light of* the Matrix Memorandum and related media stories, ¶ 262, and Robo was simply reporting on its outcome. That NextEra **twice** engaged outside lawyers to investigate weakens an inference of scienter, and certainly does not support a theory that Robo hid the "true" results of the first investigation. *See Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (ordering internal investigation undercuts scienter).

---

[3] Exs. O, P, Q (reflecting Robo net increase of 279,337 shares).

**B.      Statement 2 of 8: Silagy's One Statement Is Not False or Made with Scienter**

**No Falsity**:  Plaintiffs challenge Silagy's June 24, 2022 statement about surveillance of press, stating "we did not engage in any activities having to do with following people like you, Nate [Monroe], or taking pictures [of Monroe]."  ¶ 264.  This statement is not alleged to be false, because the SAC does not allege FPL's involvement in "following" or "taking picture[s]" of Monroe (or anyone).  Rather, the best Plaintiffs can do is rely on a 2019 text from Matrix to FPL's VP of State Legislative Affairs Martell that "[h]e's in an Uber," to which Martell is not alleged to have responded.  ¶¶ 80, 83.  Plaintiffs speculate that this text means Matrix was following Monroe at Martell's direction.  ¶¶ 80–84.  These speculative allegations do not plead with particularity that Silagy or FPL requested or participated in alleged "surveillance" of Monroe.

**No Scienter**:  There are no allegations that plead Silagy's scienter as to his one challenged statement.  There are no allegations that Silagy had any involvement in surveilling Monroe or received any communications related to it.  Although Plaintiffs allege that *Martell* received a background report on Monroe on his personal email and the "Uber" text on his phone, ¶¶ 79, 80, there is no allegation that *Silagy* received either.  Plaintiffs cite ME-1 as reporting that *Martell* had travelled to Matrix for "in-person meetings," and, with no factual support, "that it *seemed* Martell 'reported directly to Silagy,'" ¶ 82, but they do not plead that surveillance of Monroe was discussed at any meeting with Silagy.  *See Mizzaro*, 544 F.3d at 1250–51 (pleading scienter requires specific facts about "documentation, communication, or conversation" contradicting statement).

To the extent that they offer any scienter allegations for Silagy, none have anything to do with his sole alleged misstatement about surveillance, and thus they cannot establish the strong inference of scienter required for that one alleged misstatement.  *See FindWhat Inv. Grp.*, 658 F.3d at 1300 n.18 ("correct to analyze scienter separately with respect to each allegedly false statement"); *Theoharous* v. *Fong*, 256 F.3d 1219, 1225 (11th Cir. 2001) (analyzing scienter

statement-by-statement).  Plaintiffs therefore cannot rely on allegations about Silagy's purported communications about elections in which the "ghost candidates" ran, ¶ 309, or about emails from Matrix related to proposed political funding structures on his personal email account, ¶¶ 313–314, which have nothing to do with his challenged statement.  Nor does a 2016 text exchange between *Martell* and a Matrix employee about preferring "face to face" meetings, ¶ 313, impute scienter to *Silagy*.  The SAC alleges that Silagy was involved in only one meeting with Matrix in 2019, referred to as a "budget" meeting in Matrix's calendar, ¶ 316, but the SAC fails to tie that meeting to the alleged surveillance; there are no allegations that the meeting actually occurred, who attended, what was discussed, or how it contradicted his alleged misstatement.  This cannot establish scienter as to Silagy's statement.  *See Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (rejecting allegations about meeting attendance absent "requisite detail" about "what was said at the meeting, to whom it was said, or in what context").

The allegations as to NextEra's policies fail for the same reasons as they do for Robo—the alleged surveillance is not alleged to have violated the policies, and even if it did, that would not establish scienter for Silagy's statement.  *Supra* at 12.  And while Plaintiffs claim that Silagy must have acted with scienter because he once allegedly incorrectly stated that NextEra had not received a subpoena, ¶ 324, they cannot establish scienter for his challenged statement via unchallenged statements by Silagy for which they allege no scienter.  *See In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1264 (S.D. Fla. 2012), *aff'd*, 781 F.3d 1296 (11th Cir. 2015).

Plaintiffs also attempt to plead Silagy's scienter from his stock sale on December 1, 2021, the day before the first article was published on the Matrix Memorandum.  ¶¶ 327–331.  But that sale was pursuant to an SEC Rule 10b5-1 automatic sale plan, which was put in place in early September 2021, before the Class Period.  Ex. R.  In this Circuit, "automatic sales made pursuant

to Rule 10b5–1 trading plans . . . negate any inference of scienter." *City of Hollywood Police Officers' Ret. Sys.*, 649 F. Supp. 3d at 1268; *see Mogensen* v. *Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014) (taking judicial notice that sales were under 10b5-1 plan so as not to permit inference of scienter).  In any event, Silagy significantly ***increased*** his stock holdings in NextEra during the Class Period ***by 61.2%***,[4] meaning that his trading overall is, like Robo's, antithetical to scienter.  *City of Hollywood Police Officers' Ret. Sys.*, 649 F. Supp. 3d at 1268.

Finally, Plaintiffs allege that Silagy's retirement supports scienter, ¶¶ 320–323, but "[t]he fact that an executive resigned, on its own, does not support an inference of scienter," *City of Hollywood Police Officers' Ret. Sys.*, 649 F. Supp. 3d at 1275.  This is particularly true where, as here, there is a "non-fraud related explanation" for the departure.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–47 (S.D.N.Y. 2005).  NextEra disclosed that Silagy had previously planned to retire, and noted that his last year—which included two hurricanes, supply chain crises, high natural gas prices, and the media reporting on FPL and Matrix—presented a "number of distractions," which "took a toll."  Ex. L at 10, 15.  NextEra stated that it was not making any connection between his retirement and its investigation, *id.*, and there is *no* factual allegation to the contrary.  That he continued at FPL as a senior executive for months after announcing retirement, Ex. K at 2, cuts *against* scienter.  *See City of Atlanta Police Officers' Pension Plan* v. *Celsius Holdings, Inc.*, 2023 WL 1998174, at *11 (S.D. Fla. Feb. 13, 2023) (executive "would have been fully terminated if the . . . Board believed he had engaged in wrongful behavior").

### C.  Statements 3-7: Reuter's Five Statements Are Not False or Made with Scienter

**No Falsity**:  The SAC challenges four statements from Reuter from December 2021 and one statement from June 2022, in response to media reporting.  ¶¶ 252, 256, 258, 260, 265.

---

[4] Exs. S, T (Silagy net increase of 88,707 shares during Class Period).

*First*, the SAC challenges Reuter's (i) December 2, 2021 statement that "[n]either FPL nor [its] employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle," that "[a]ny report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle, is patently false," and that NextEra had found no evidence of "any legal wrongdoing by FPL," ¶ 252; and (ii) his December 10, 2021 statement that "FPL had no involvement in the creation of Grow United," ¶ 256.

The SAC does not allege with particularity that either statement is false.  While the SAC discusses Grow United, a non-profit that allegedly funded political committees that then allegedly funded "ghost" candidates in three state elections, ¶¶ 132–199, it does not allege with particularity that FPL was involved in its creation.  Rather, it alleges that *Matrix* created Grow United, ¶¶ 74–75, that Matrix's internal ledgers allocated certain expenses related to Grow United to FPL, ¶¶ 75, 193, and that an internal "Matrix planning document" brainstormed goals for Grow United, ¶¶ 74, 261.  None of this contradicts Reuter's statement.  *See Cordova* v. *Lehman Bros.*, 526 F. Supp. 2d 1305, 1312 (S.D. Fla. 2007) (refusing "to find misstatements by implication, rather than to analyze the specific wording of statements actually made, as required by the particularity requirement").

Nor does the SAC allege that FPL funded, or asked others to fund, Grow United, or the ghost candidates in 2020.  The SAC glaringly lacks *any allegation* that the money FPL paid to Matrix entities for consulting work was sent, directly or indirectly, to Grow United (much less at FPL's direction).  ¶¶ 178–180, 182–185.  The December 2 *Sentinel* article—which relied on the Matrix Memorandum—itself states there was no evidence of direct funding by FPL to Grow United. Ex. A at 6.  Despite access to the Matrix "investigation," law enforcement proceedings involving the ghost candidates, and years of reporting, Plaintiffs allege no direct link between

16

Defendants and those candidates. They allege only that FPL had discussions with Matrix—its political consultant—about elections in which those candidates ran. ¶¶ 149, 154, 181. Where "[t]here is no contradiction between th[e defendant's] statement and the allegations of the Complaint," the statement cannot "be considered false or misleading." *Henningsen* v. *ADT Corp.*, 161 F. Supp. 3d 1161, 1197 (S.D. Fla. 2015), *aff'd*, 660 F. App'x 850 (11th Cir. 2016). And to the extent that the SAC challenges Reuter's statement that NextEra had found no evidence of "legal wrongdoing," it does not allege anything at all to suggest that NextEra had (or *has ever*) found evidence of legal wrongdoing. *Supra* at 10–11.

*Second*, the SAC challenges Reuter's December 17, 2021 statement, in response to reporting on the "funding structure" allegedly generated by Matrix and its lawyers for political contributions, that NextEra had "found no evidence that FPL" had used the structure during the 2020 election, that "[n]either FPL nor . . . Silagy requested Matrix to set up any proposed funding structure for 501C(4) organizations," and that FPL had no knowledge of the structure ever being used by Matrix. ¶ 258. There are no particularized allegations that FPL or Silagy *did* "request" that Matrix set up the structure it shared with Silagy in November 2019, ¶ 160, that FPL used this structure, or that FPL had knowledge of Matrix using it. While the proposal envisioned FPL contributing money to SUN Marketing, ¶¶ 169–172, there is no allegation that FPL contributed money to SUN Marketing for use in the 2020 election cycle. No falsity is pled on this statement.

*Third*, the SAC challenges Reuter's December 10, 2021 statement that "[i]n July 2019, a Matrix representative . . . approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. FPL flatly rejected the plan and communicated our lack of interest to [Matrix]." ¶ 260. There are no allegations that FPL did not reject this plan or that NextEra's investigation found otherwise. While Plaintiffs allege that **Matrix** had stated in "an internal

planning document" that a goal for Grow United was to create a job opportunity for Dennis, ¶¶ 73–75, there are no allegations that *FPL* authorized Matrix to offer Dennis a job or even knew whether Dennis was offered one.  That Martell once sent an email to Matrix with a reference to "JEA-DG," and Plaintiffs assert "upon information and belief" that it was a typo meant to reference Garrett Dennis, ¶ 72, does not plead that Reuter's statement was false, much less with particularity.  *See* 15 U.S.C. § 78u-4(b)(1) ("information and belief" allegations must state "with particularity" all facts upon which belief is formed).

*Finally*, the SAC challenges Reuter's June 2022 statement that "FPL had no digital record of the exchanges" concerning alleged surveillance of Monroe and could not "prove their veracity." ¶ 266.  But there are no allegations that FPL *did* have digital records of the alleged exchanges between Matrix and Martell on his phone and personal email.  ¶¶ 79, 80.  FPL told reporters that it had reviewed "emails, cell phones, and computer files" and did not find the records, Ex. U at 3, and Plaintiffs do not allege that review was not conducted or that it found such records.

**No Scienter**:  As to each of these five statements, Plaintiffs fail to allege the required strong inference of scienter.  The scienter allegations barely mention Reuter.  Plaintiffs do not allege that he had any motive to lie.  They do not allege that he sold shares during the Class Period or received any other benefit from the alleged fraud.  He is not alleged to have had any contemporaneous involvement in or knowledge of the underlying political activities.  While Plaintiffs allege that he had access to the Matrix Memorandum by December 17, 2021, ¶ 317, three of his five alleged misstatements predate December 17, 2021.  ¶¶ 252, 256, 258.  And, in any event, his specific statements were not contradicted by what was allegedly in the Matrix Memorandum.

### D.   <u>Statement 8 of 8: McGrath's One Statement Is Not False or Made with Scienter</u>

**No Falsity**:  Plaintiffs allege that FPL spokesperson Chris McGrath made a false statement when he told the *Herald* on August 13, 2022, that "FPL does not have an ownership interest in the

Capitolist – either directly or indirectly. . . .  We also do not have editorial control over what the Capitolist writes or publishes."  ¶ 267.  That statement is not alleged to be false.  Instead, the SAC alleges that a *Matrix* entity owned a 1% ownership stake in *The Capitolist*, that certain Matrix-related entities contributed money to *The Capitolist*, that a former FPL employee was involved and was able to comment on articles before publication, and that a handful of times FPL employees provided feedback or requests for articles.  ¶¶ 213–246.  None of these allegations, independently or collectively, mean that FPL *owned The Capitolist* or had editorial *control* over it.

**No Scienter**:  There are no allegations of scienter as to McGrath anywhere in the SAC.  Other than his one statement, his name does not appear in the SAC.  Plaintiffs must allege that a corporate "spokesperson" spoke with the requisite scienter.  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 952 (9th Cir. 2023).  Plaintiffs wholly fail to do so.

* * * *

Absent adequate allegations of falsity and scienter as to each statement and speaker, the fraud claims against FPL and NextEra also fail.  *Thompson* v. *RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) (because corporations "have no state of mind," scienter must be imputed from agents).[5]  Further, if the Court finds that fraud is not adequately pleaded as to certain statements, the fraud claims against the Individual Defendant who made those statements must be dismissed.  *See A&M Mgmt. Inc.* v. *Deme*, 2019 WL 7344795, at *3 (S.D. Fla. Mar. 14, 2019).

## II.   Plaintiffs Fail to Plead Loss Causation

Plaintiffs' claims must also be dismissed for failure to allege loss causation.  Plaintiffs must allege "a causal connection between the misrepresentation and the investment's subsequent decline

---

[5] NextEra repurchased more than 250,000 shares of its stock at prices it purportedly knew were inflated during the Class Period, *see* Exs. V at 34; F at 57; W at 54; X at 49; Y at 34, which undercuts corporate scienter.  *See In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *10 (S.D. Fla. Sept. 4, 2015).

in value." *Meyer* v. *Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013); 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."). To plead loss causation, an alleged "*corrective disclosure must reveal to the market the falsity of a prior misstatement.*" *Meyer,* 710 F.3d at 1200. The SAC alleges that the "truth" was revealed on January 25 and 31, 2023. ¶ 281. However, nothing was disclosed on either date that revealed the falsity of any of the eight challenged statements, and loss causation therefore is not pleaded.

A.      <u>The January 25, 2023 Disclosures Did Not Reveal Any Falsity</u>

Plaintiffs' primary argument is that NextEra's January 25, 2023 disclosures caused their loss. But the January 25 disclosures do not correct any of the eight alleged misstatements.

- **Reuter/Silagy/McGrath Statements:** There were no alleged revelations on January 25 ***at all*** about NextEra's alleged involvement in (i) funding "ghost candidates," (ii) the creation or funding of Grow United, (iii) the job offer to Garrett Dennis, (iv) surveillance of Nate Monroe, or (v) control over *The Capitolist*. The January 25 disclosures are silent on these topics.

- **Robo Statement:** There was also no revelation about NextEra's first law firm investigation, the subject of Robo's alleged misstatement. To the contrary, by January 25, 2023, the first investigation had been superseded: on September 7, 2022, NextEra disclosed that it had engaged counsel for a *second* investigation of FPL's interactions with Matrix, that this second review was ongoing, and that NextEra could not predict its outcome. Exs. C at 7; F at 57. The January 25 disclosures thus revealed nothing at all about the first investigation.

Because Plaintiffs do not allege that the January 25 disclosures "reveal[ed] to the market that [the] company's previous statements were false or fraudulent," *Meyer*, 710 F.3d at 1201, that ends the inquiry, and the claims must be dismissed.

***The "New" Risk Disclosure***:  Plaintiffs attempt to avoid this dispositive disconnect by pleading that NextEra "for the first time" warned the market on January 25, 2023, that it faced risks from the media allegations, and that this "corrected" Defendants' prior statements.  ¶ 283. But Plaintiffs' core assumption is wrong.  ***Nearly three months earlier***, on November 3, 2022, NextEra disclosed the very risks that Plaintiffs now say were first disclosed on January 25—and there was no stock drop.  Referencing the media reports, NextEra's November 3 10-Q warned that counsel's previously disclosed second "review of potential state and federal campaign finance violations" was "ongoing and NEE and FPL cannot predict . . . the outcome."  Ex. F at 57.  NextEra cautioned that the allegations "could also result in regulatory, investigative and enforcement inquiries," and that "any ultimate findings of violations could result in the imposition of fines, penalties or other sanctions or impacts on NEE or FPL."  *Id.*  While Plaintiffs allege that the January 25 disclosure was the first to address the CREW Complaint, ¶ 284, the November 3 10-Q addressed the CREW Complaint as well.  Ex. F at 57.  And while they allege that the January 25 disclosure was the first time NextEra disclosed it had "exposure to an FEC investigation," ¶ 284, the November 3 10-Q had disclosed the risk of an FEC investigation from the CREW Complaint's filing with the FEC, and that NextEra could not predict the outcome.  Ex. F at 57.

Plaintiffs stress that this January 25 disclosure was on "Form 8-K" and not a "routine . . . 10-Q," ¶ 285, but do not plead the significance of this distinction (and there is none under the law): Form 10-Q is for quarterly reports, and Form 8-K is for current reports.[6]  The 8-K announced the substantial completion of NextEra's second investigation, but warned (again) that it could not guarantee with certainty that the allegations would not result in adverse impacts.  Whatever SEC form was used on January 25, that risk disclosure simply was not new.

---

[6] *See* https://www.sec.gov/files/form8-k.pdf; https://www.sec.gov/files/form10-q.pdf

Under binding authority, the failure to allege that a purported corrective disclosure disclosed "new information" is "fatal" to a "claim of loss causation." *Meyer*, 710 F.3d at 1198; *FindWhat Inv. Grp.*, 658 F.3d at 1311 n.28 ("[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information.").

Finally, even if the risk disclosure *had* been new (which it was not), it did not "correct" Defendants' prior statements and thus cannot support loss causation. Merely acknowledging that—while its second investigation had not resulted in findings of wrongdoing—NextEra could not predict the future did not reveal Defendants' prior statements to be false. At most, the disclosure warned of a "*risk* of future corrective action," which would not itself "reveal to the market that [NextEra's] previous statements were false or fraudulent." *Meyer*, 710 F.3d at 1201 (emphasis in original).

***Silagy's Retirement***: Plaintiffs' backup loss-causation theory is that the falsity of the alleged misstatements was revealed by Silagy's retirement announcement that same day. ¶ 286. Again, however, this disclosure revealed nothing about the eight challenged misstatements.

Plaintiffs may attempt to rely on cases where an executive's departure *is* paired with disclosures of new *negative* facts about the underlying fraud, such that the departure is allegedly linked. Here, however, the opposite happened. The only new information released about the Matrix allegations on January 25 was *positive*: NextEra disclosed that it had substantially completed a second investigation and, based on its review, believed that "FPL would not be found liable for any of the Florida campaign finance law violations as alleged in the media articles," that the CREW Complaint should be dismissed, and that it did not expect the CREW Complaint allegations to have any material impact anyway. Ex. J at 2. NextEra did not, as Plaintiffs claim, provide a "stark contrast" to Defendants' prior denials of wrongdoing based on the prior

investigation.  ¶¶ 283–284.  In any event, even if Plaintiffs *had* alleged that Silagy retired as a result of the second investigation—which they nowhere allege—that would be irrelevant to loss causation: the second investigation was expressly a fresh look into the Matrix allegations, and thus *necessarily* could not "correct" statements denying wrongdoing based on the first investigation.

Courts have rejected similar attempts to rely on high-level resignations unaccompanied by material new facts about the supposed fraud.  For instance, in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 513–14 (2d Cir. 2010), plaintiffs sought to recover losses following the announcement of a director's resignation and negative media attention linking it to reports of accounting fraud.  The Court held that plaintiffs had "at best shown that . . . [the] resignation and resulting negative press stirred investors' concerns that other unknown problems were lurking in [the company's] past," but this was "too tenuously connected . . . to the [accounting fraud] to support liability."  *Id*. at 514.  Simply put, "the resignation did not add to the public knowledge any new material fact about the [fraud]."  *Id.*  Here, any supposed connection between Silagy's departure and the underlying alleged conduct is even more attenuated.  In *Omnicom,* it emerged that the director resigned due to concerns about aggressive accounting.  *Id.* at 505–06.  Here, NextEra and Silagy provided reasons for his retirement, and Plaintiffs do not allege those reasons were false.  As in *Omnicom*, "there is no allegation that investors were ever told that [the alleged misconduct] had in fact occurred" in connection with Silagy's departure.  597 F.3d at 514.

Lacking factual allegations tying Silagy's retirement to the challenged statements, Plaintiffs cite analysts who guessed that it was "linked to his role in the Matrix-involved scandals." ¶ 297.  But the analysts conceded that they were reporting only uninformed speculation.  *See* Ex. Z at 1 ("Based on our conversations with investors . . . ."); Ex. I at 3 ("lack of visibility" into retirement).  That certain analysts surmised that investors were skeptical that Silagy's retirement

was not linked to NextEra's investigation, ¶ 290, is irrelevant.  None of the analyst reports cited at

¶¶ 289–295 rely on *any* new facts disclosed on January 25 about the Matrix conduct being

investigated, or any facts linking that conduct to Silagy's retirement, and "evidence of analyst

commentary is little more than well-informed speculation as to whether a price decline is

attributable to one piece of negative information or another," *In re BankAtlantic Bancorp, Inc.*,

2011 WL 1585605, at *20 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F.3d 713 (11th Cir. 2012).  While

Plaintiffs also note the size of NextEra's stock price decline on January 25, ¶ 301, the mere fact of

a price decline does not mean it was due to revelation of a fraud.  *See Meyer*, 710 F.3d at 1202.

Finally, Plaintiffs note that Silagy's publicly filed retirement agreement contained a

standard claw-back provision and speculate that this "tacitly acknowledg[ed] the link between

Silagy's conduct and [NextEra's] potential legal exposure and reputational risk."  ¶ 303.  But if

anything, such a provision "acknowledges" that *at the time of departure* the executive had *not* been

found to have engaged in wrongdoing.  And Plaintiffs do not factually allege there is anything

unusual about provisions that permit companies to claw-back executive compensation upon future

findings of wrongdoing.  Nor could they; such provisions are routine and endorsed by regulators.[7]

While they cite a later January 31, 2023 *Times-Union* article for the proposition that the claw-back

was "unique," ¶ 303, the article does not say that.  Rather, it says that analysts had described one

provision in Silagy's agreement as "customary" and draws an inference from the absence of that

word to describe the claw-back.  Ex. N at 2.  Nothing in the article, underlying analyst report, or

---

[7] *See* Memorandum, Deputy AG Lisa Monaco, *Further Revisions to Corporate Criminal Enforcement Policies Following Discussions with Corporate Crime Advisory Group*, at 10 (Sept. 15, 2022) (companies should consider whether compensation agreements incorporate claw-back provisions "[s]ince misconduct is often discovered after it has occurred"); *Easterbrook*, 2023 WL 143292, at *7 (Jan. 9, 2023) (giving corporation credit for using claw-back provision after CEO's wrongful conduct discovered post-departure); *see also Sarei* v. *Rio Tinto PLC.*, 221 F. Supp. 2d 1116, 1182 (C.D. Cal. 2002) (taking judicial notice of government policies).

SAC, suggests the provision was unique.   For these reasons, neither Silagy's retirement announcement nor the claw-back "reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged."  *Omnicom*, 597 F.3d at 511.

### B.        No Loss Causation Is Pled as to January 31, 2023

Plaintiffs also attempt to plead loss causation based on the January 31, 2023 *Times-Union* article reporting on the previously disclosed claw-back in Silagy's retirement agreement.  ¶¶ 303, 305.  Again, the article contained no acknowledgement that the provision was "unique."  But in all events, the January 31 article cannot be a corrective disclosure because the information it reported was already public.  Silagy's retirement agreement and the claw-back provision therein were described in and appended to NextEra's Form 8-K filed with the SEC on January 25, 2023. Ex. K at 2.  Under controlling law, "when the material portions of articles . . . are gleaned entirely from public filings . . .  the use of that publicly available information is fatal to a claim of loss causation." *MacPhee* v. *MiMedx Grp., Inc.*, 73 F.4th 1220, 1246 (11th Cir. 2023); *see also Sapssov* v. *Health Mgmt. Assocs.*, 608 F. App'x 855, 864 (11th Cir. 2015) ("negative summary of already public information" insufficient).  Loss causation for January 31 is therefore not pleaded.

Not every stock drop reveals a fraud.  Where, as here, the alleged losses are not attributable to the alleged misstatements, strictly enforcing loss causation is needed to ensure that the "federal securities laws do not become a system of investor insurance that reimburses investors for any decline in the value of their investments."  *Meyer*, 710 F.3d at 1196.

### III.      Plaintiffs Fail to Plead a Section 20(a) Control Person Violation

Absent an underlying violation, the control claim against Robo, Reuter, and Silagy should also be dismissed.  *See McClain* v. *Iradimed Corp.*, 111 F. Supp. 3d 1293, 1307 (S.D. Fla. 2015).

### CONCLUSION

For these reasons, Defendants respectfully request dismissal of the SAC with prejudice.

Date: January 12, 2024.

Respectfully submitted,

**Jordi C. Martínez-Cid**

Jordi C. Martínez-Cid
Florida Bar No. 100566
Andy Hernández
Florida Bar No. 1018581

**Martínez-Cid Law**

1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: 305-704-9162
Email: jmartinez-cid@martinez-cidlaw.com
Email: ahernandez@martinez-cidlaw.com
Email: service @martinez-cidlaw.com

**Daniel J. Kramer**

Daniel J. Kramer
New York Bar No. 1979392
(admitted *pro hac vice*)
Audra. J. Soloway
New York Bar No. 4113536
(*pro hac vice* pending)
Joshua Hill, Jr.
New York Bar No. 4297826
(admitted *pro hac vice*)
David P. Friedman
New York Bar No. 5387774
(*pro hac vice* pending)

**Paul, Weiss, Rifkind, Wharton
& Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019-6031
Telephone: 212-373-3000
Email: dkramer@paulweiss.com
Email: asoloway@paulweiss.com
Email: jhill@paulweiss.com
Email: dfriedman@paulweiss.com

*Counsel for NextEra Energy, Inc., Florida Power & Light Company, James Robo, Eric Silagy, and David P. Reuter*

26