**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| MAHA JASTRAM, Individually and on Behalf of All Others Similarly Situated, | Case No. 23-CIV-80833-CANNON |
| Plaintiff, | |
| v. | <u>CLASS ACTION</u> |
| NEXTERA ENERGY, INC., FLORIDA POWER & LIGHT COMPANY, JAMES ROBO, ERIC SILAGY and DAVID P. REUTER, | |
| Defendants. | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**<u>THE SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

GLOSSARY OF DEFINED TERMS ..................................................................................... vi

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 2

    A.    NEE Received the Robo Memorandum Which Contained Facts and
         Allegations Tying FPL and its Employees to a Political Scandal. ..................................... 2

    B.    Defendants Stated That There Was No "Basis" and "No Evidence" for "Any"
         Allegations of FPL's Involvement in Matrix's Conduct. .................................................. 3

    C.    Silagy Abruptly Resigned and NEE issued a New Risk Disclosure, Triggering a
         Historic Stock Drop that Analysts Attributed to FPL's Political Misconduct. ................... 4

III.  ARGUMENT ........................................................................................................... 4

    A.    Defendants Made Actionable Material Misrepresentations. ............................................. 5

      1. Robo Possessed Information Contradicting His Claim That There Was
         "No Evidence of Any Issues at All," and "No Basis" for Allegations of Wrongdoing...... 5

      2. Reuter Misleadingly Denied "Any Involvement" in the Political Scandals. ..................... 7

      3. Reuter Falsely Denied FPL Used the Funding Structure Matrix Proposed. .................... 11

      4. Reuter Falsely Said FPL "Rejected" a Plan to Offer a Job to Garrett Dennis. ................ 11

      5. Defendants Falsely Denied FPL's Involvement in Spying on a Journalist. ..................... 12

      6. FPL Falsely Claimed to Have No "Editorial Control" Over the Capitolist. ..................... 12

    B.    The SAC's Allegations Support a Strong Inference of Scienter. ...................................... 13

      1. Robo and Reuter's Possession of Information Contradicting
         Their Public Statements Supports a Strong Inference of Scienter. ................................. 13

      2. The Totality of the Allegations Support a Strong Inference of Silagy's Scienter. ........... 17

    C.    The SAC Adequately Pleads Defendants' Fraud Caused Investor Losses. ...................... 21

IV.   CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alaska v. Ryder Sys., Inc.*,
  603 F. Supp. 3d 1229 (S.D. Fla. 2022) ........................................................ 4, 5, 6, 13

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005) ............................................................... 9

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................ 24

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1998)........................................................................ 5

*Beckworth v. Senior Home Care, Inc.*,
  2014 WL 12868876 (N.D. Fla. Sept. 5, 2014).................................................. 20

*Bush v. Blink Charging Co.*,
  2023 WL 8263037 (S.D. Fla. Nov. 27, 2023)................................................... 9

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) .............................................................. 6

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010)....................................................... 16

*City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*,
  41 F. Supp. 3d 1369 (S.D. Fla. 2011) ...................................................... 22, 23

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................ 21

*Eastwood Enterprises, LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009).................................................. 21

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ........................................................ passim

*In re Acuity Brands, Inc. Sec. Litig.*,
  2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ................................................ 6, 9

*In re Catalina Mktg. Corp. Sec. Litig.*,
   390 F. Supp. 2d 1110 (M.D. Fla. 2005) ................................................................ 5

*In re Eagle Bldg. Techs., Inc. Sec. Litig.*,
   319 F. Supp. 2d 1318 (S.D. Fla. 2004) ............................................................... 17

*In re Egidi*,
   571 F.3d 1156 (11th Cir. 2009) ......................................................................... 22

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ......................................................... 13, 17

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ............................................. passim

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ................................................................. 19

*In re HD Supply Holdings, Inc. Sec. Litig.*,
   341 F. Supp. 3d 1342 (N.D. Ga. 2018) ............................................................. 20

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
   2016 WL 10592320 (S.D. Fla. June 6, 2016) ................................................... 21

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   620 F. Supp. 3d 1231 (S.D. Fla. 2022) ............................................................. 13

*In re Jiangbo Pharms., Inc., Sec. Litig.*,
   884 F. Supp. 2d 1243 (S.D. Fla. 2012) ........................................................ 22, 23

*In re Nature's Sunshine Prod. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007) .............................................................. 19

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014) ............................................................ 18, 21

*In re Sensormatic Elecs. Corp. Sec. Litig.*,
   2002 WL 1352427 (S.D. Fla. June 10, 2002) ................................................... 20

*Luczak v. Nat'l Beverage Corp.*,
   812 F. App'x 915 (11th Cir. 2020) .................................................................... 25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ....................................................................................... 10, 14

*Maverick Fund, Ltd. v. Mohawk Indus., Inc.*,
  2023 WL 2887603 (N.D. Ga. Mar. 31, 2023) ........................................................ 21

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ............................................................................ 24

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ............................................................................ 17

*Nathanson v. Polycom, Inc.*,
  87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................... 19

*Noto v. 22nd Century Grp., Inc.*,
  650 F. Supp. 3d 33 (W.D.N.Y. 2023) .......................................................... 14, 22, 25

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .............................................................................. 6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ......................................................................... 7, 11, 12, 17

*Owl Creek I, L.P. v. Ocwen Fin. Corp.*,
  2018 WL 4844019 (S.D. Fla. Oct. 4, 2018) ...................................................... 13, 18

*Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
  564 F. Supp. 3d 1272 (N.D. Ga. 2021) .............................................................. 16, 24

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) ....................................................... 18, 19, 23, 24

*SEC v. Alar*,
  2020 WL 10486745 (N.D. Ga. Sept. 21, 2020) ...................................................... 6

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................. 13

*Shash v. Biogen, Inc.*,
  84 F.4th 1 (1st Cir. 2023) ............................................................................... 7, 15

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) .............................................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................... 10, 17

iv

**Statutes**

15 U.S.C. § 78u-4(b)(4) ........................................................................................................... 22

### GLOSSARY OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| Class Period | December 2, 2021, through January 30, 2023, inclusive |
| Company | NEE and FPL collectively |
| SAC | Second Amended Class Action Complaint for Violating the Federal Securities Laws (ECF No. 68). All citations to "¶X" throughout this memorandum are to the referenced paragraphs of the SAC. |
| Defendants | FPL, NEE, Silagy, Robo, and Reuter collectively |
| Exchange Act | The Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) |
| FPL | Defendant Florida Power & Light Company |
| Funding Memo | The memorandum Pitts sent to Silagy's "Theodore Hayes" email account on November 26, 2019, outlining a structure for funding 2020 campaign activities, described in the SAC at ¶¶167-71. |
| JEA | Jacksonville Electric Authority |
| Lead Plaintiffs | Hollywood Police Officers' Retirement System and the Pembroke Pines Firefighters & Police Officers Pension Fund (*see* ECF No. 63) |
| LPAD | Let's Preserve the American Dream |
| Martell | Danny Martell, FPL Vice President of state legislative affairs |
| Matrix | Matrix LLC |
| Motion or MTD | Defendants' Motion to Dismiss Lead Plaintiffs' Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 83) |
| NEE | Defendant NextEra Energy, Inc. |
| Odom | April Odom, Matrix contractor |
| Perkins | Dr. Joseph Perkins, Matrix founder |
| Pitts | Jeff Pitts, former Matrix CEO |
| Reuter | Defendant David Reuter |

| | |
|---|---|
| Robo | Defendant James Robo |
| Robo Memorandum | The memorandum addressed to James Robo dated November 3, 2021, and entitled "Florida Power & Light Officers' Potential Unlawful Conduct Through Third-Party Consultants and Vendors" and the exhibits appended thereto (*See, e.g.*, ¶¶12-17, 41, 48-54) |
| Rule 10b-5 | 17 C.F.R. § 240.10b-5 |
| SEC | U.S. Securities and Exchange Commission |
| Silagy | Defendant Eric Silagy |

## I.   INTRODUCTION

Prior to the start of the Class Period, Robo received a memorandum and documents, likely from Matrix, indicating that Matrix had conducted an internal investigation that "identified the involvement of" Silagy, Martell and others as being "engaged in an ongoing scheme with Pitts . . . to secretly divert corporate resources to off-the-books communications and political campaigns." ¶13. The Robo Memorandum stated that these FPL employees used "Grow United [and] other 501(c)(4) organizations . . . to funnel FP&L funds to various political campaigns . . . that have been described as 'ghost candidates.'" ¶50. Reuter, who admitted that NEE had, in fact, received the Robo Memorandum, categorically denied FPL had any involvement and said any such "report or suggestion" was "patently false." ¶6. Robo also denied any involvement, proclaiming "we found no evidence of any issues at all" and that he felt "very good that there is no basis to any of these allegations." ¶7.

Defendants contend none of their statements were false or misleading, they were not made with the requisite scienter, and there is no loss causation because the news on January 25, 2023 contained "no new" information. These arguments lack merit. The Robo Memorandum contained evidence and information tying Silagy, Martell, and others at FPL to the scheme. At the time Reuter and Robo spoke, they had this information in their possession, directly contradicting their statements. Defendants' attempt to recast what they actually said—that they were merely conveying the results from an independent investigation—is disingenuous.

Defendants' loss causation argument fares no better. There was far more information conveyed to the market in the two Form 8-Ks filed on January 25, 2023, than in the Form 10-Q filed on November 3, 2022. *See* Gold Aff., Ex. A. One Form 8-K conceded that there were at least $1.3 million in dark money contributions at issue, and it was the first time NextEra acknowledged facts potentially tying FPL to the scandal. Plus, on January 25 it was revealed that Silagy would

be out as FPL CEO, which stock market analysts universally viewed as tied to the political scandal. NEE's stock price plummeted by 8.7% that day, the largest one-day stock drop tied to company-specific news in the last 25 years, wiping out over $14 billion in market capitalization. ¶301. Stock market analysts' reaction is best summed up by Credit Suisse, which commented that overshadowing financial results "in-line with expectations" was Silagy's resignation and the "*new risk disclosures*" about the political scandal. ¶292 (emphasis added). "This was a negative update even when considering reaffirmation/extension of the company's strong financial outlook." *Id.*

The SAC pleads valid claims for relief and Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    NEE Received the Robo Memorandum Which Contained Facts and Allegations Tying FPL and Its Employees to a Political Scandal.

On December 2, 2021, media outlets began reporting that FPL and its political consulting firm, Matrix, orchestrated improper political expenditures, including potential violations of state and federal campaign finance laws, during the 2018 and 2020 elections. ¶247. Articles alleged that Matrix, acting on behalf of FPL, used a network of nonprofits to steer funding to spoiler "ghost candidates" intended to siphon votes from Florida state senate candidates. ¶¶247-50. Reports also claimed FPL directed a supposedly independent news website to publish attacks on candidates and reporters and that Matrix spied on journalists critical of FPL. *Id.* Matrix had also reportedly courted a Jacksonville City Councilor opposed to privatizing the JEA with a phony job offer, characterized as an "attempted bribe" in Matrix documents, to help NEE acquire the utility. ¶4.

In November 2022, Robo received a FedEx package containing a memorandum and 155 pages of exhibits, including emails, text messages, checks, invoices, financial statements, legal memoranda, and ledgers linking Silagy and others to what Matrix characterized as "potentially unlawful conduct." ¶¶13, 48-54. The Robo Memorandum states that a Matrix internal investigation

"quickly identified the involvement of . . . Silagy . . . Martell" and other Company officers as having been "engaged in an ongoing scheme with Pitts and others to secretly divert corporate resources to off-the-books communications and political campaigns." ¶49.

The Robo Memorandum described in detail, and its supporting documents provided direct evidence that (1) Matrix worked with Silagy to plan a daisy-chain of Matrix-controlled 501(c)(4) and other entities to conceal FPL political spending for the 2020 election cycle, and FPL funded the creation of one key entity, Grow United; (2) Silagy used a secret pseudonym "Theodore Hayes" and personal email addresses to conceal his communications with Matrix, (3) emails, text messages, and financial records confirmed that FPL executives, including Silagy, approved and orchestrated the selection of which elected officials should be the subject of FPL's concealed political expenditures; and (4) financial records demonstrated that FPL funds established and flowed through a series of intermediaries to dark money groups behind the "ghost candidates" in the 2020 election. ¶¶15, 47. The Robo Memorandum also described and attached "communications" showing "Silagy's knowledge and control of dark money donations." *Id.*

**B. Defendants Stated That There Was No "Basis" and "No Evidence" for "Any" Allegations of FPL's Involvement in Matrix's Conduct.**

Defendants responded to inquiries about FPL's alleged involvement claiming that *no evidence* whatsoever existed connecting FPL to the alleged misconduct. Reuter, responding to media reporting on NEE's behalf on December 2 and 10, 2021, respectively, stated "[a]ny report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false," ¶252, and that "FPL had no involvement in the creation of Grow United," ¶256. Robo addressed the controversy during a conference call with analysts and investors on January 25, 2022, stating NEE had "found no

evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees . . . there is no basis to any of these allegations…" ¶262.

### C. Silagy Abruptly Resigned and NEE issued a New Risk Disclosure, Triggering a Historic Stock Drop that Analysts Attributed to FPL's Political Misconduct.

On January 25, 2023, NEE and FPL simultaneously filed two Form 8-Ks with the SEC.[1] One announced Silagy's resignation, with a clawback of severance for legal wrongdoing. ¶287. The other issued a new risk disclosure cautioning: "FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations," citing "media articles" alleging "campaign finance law violations" as an example. ¶269. The new risk factor cautioned investors that "FPL and NEE cannot provide assurance" such allegations would not result in fines, penalties, sanctions or have "a material adverse impact on the reputation of NEE or FPL" or "their interactions with governmental regulators or other authorities." *Id.*

NEE's stock price fell 8.7% that day. ¶¶3, 301-02. Analysts expressed "surprise" at Silagy's "rushed" resignation that was "difficult to separate from recent political controversies," and saw the "*new* risk disclosures" as a "negative update." ¶¶290, 292, 299, 300, 321 (emphasis added). Analysts attributed the decline to "the unexpected management change," the "update" into "political activity," ¶273, and "concerns about the timing of Silagy's retirement given the campaign finance allegations..." ¶294. On January 31, 2023, the *Florida Times-Union* revealed the severance clawback was not customary and NEE's stock fell another $0.42 per share. ¶¶303-06.

### III.   ARGUMENT

This Court, in *Alaska v. Ryder Sys., Inc.*, 603 F. Supp. 3d 1229, 1236 (S.D. Fla. 2022), set

---

[1] SEC instructions provide: "If the registrant *previously has reported substantially the same information* as required by this Form [8-K], the registrant *need not make an additional report* of the information on this Form." https://www.sec.gov/files/form8-k.pdf (emphasis added).

forth the pleading standards in a PSLRA action. "The PSLRA [does] not alter the required presumption that the court 'give Plaintiffs, not Defendants, the benefit of every favorable inference.'" *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114 (M.D. Fla. 2005).[2]

### A. Defendants Made Actionable Material Misrepresentations.

A securities fraud claim under § 10(b) and Rule 10b-5 requires an actionable misstatement or omission of a material fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1998). "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b–5(b)). Further, "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead. . . . In sum, a defendant may not deal in half-truths." *Id.* (cleaned up).

### 1. Robo Possessed Information Contradicting His Claim that there was "No Evidence of Any Issues at All," and "No Basis" for Allegations of Wrongdoing.

On January 25, 2022, following an inquiry into the "political headlines," Robo stated NEE "found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. . . . I feel very good that there is no basis to any of these allegations…" ¶262. Robo's statement was materially misleading because, at the time it was made, Robo possessed the Robo Memorandum that provided reams of evidence in the form of contemporaneous emails, text messages, legal memoranda, and financial records connecting FPL employees to the conduct orchestrated by Matrix operatives, who were acting on behalf of FPL. ¶¶48-54, 263. Allegations

---

[2] Defendants' do not independently challenge the § 20(a) claim. Thus, if the § 10(b) claim survives, the § 20(a) must as well. *Ryder*, 603 F. Supp. 3d at 1238.

that defendants had access to "contemporaneous reports or data" contradicting their public statements is the "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Defendants characterize Robo's statement as merely reporting on the results of outside counsel's investigation into the matter.[3] Not so. Robo went well beyond characterizing the purported results of an investigation by providing absolute statements beyond the purported investigation's results and offering his own opinion about the allegations. Opinion statements are actionable where a complaint pleads "facts alleging that Defendants possessed information that did not support Defendants' opinions as articulated to investors." *Ryder Systems*, 603 F. Supp. 3d at 1238; *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019). Opinion statements are actionable where "it can be reasonably inferred that Defendants statements did not fairly align with the information they had in their possession at the time," *SEC v. Alar*, 2020 WL 10486745, at *5 (N.D. Ga. Sept. 21, 2020), or where the opinion statements contain "embedded statements of fact" which are "untrue." *Ocwen,* 934 F.3d at 1322. Both prongs are true here.

Here, Robo's "bottom line" was the express claim that there was "no evidence of any issues at all, any illegality or any wrongdoing" and that the allegations had "no basis." ¶262. The embedded factual claim—no inculpatory evidence existed—was untrue. There were reams of evidence connecting FPL officers to potentially illegal conduct that, at a minimum, constituted wrongdoing under NEE's own policies. ¶¶48-54, 263, 333-35. Plus, Robo offered his own

---

[3] Defendants attach 26 extrinsic documents to their Motion. To the extent they are proper at all on a motion to dismiss, the documents may not be accepted for "the truth of matters asserted therein" or to dispute the SAC's factual allegations, as Defendants urge. *E.g. In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *17 n.11 (N.D. Ga. Aug. 12, 2019).

opinion—"I feel very good that there is no basis to any of these allegations"—despite having access to allegations and evidence to the contrary. ¶262. The SAC sufficiently alleges the statements were misleading because they would "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *Shash v. Biogen, Inc.*, 84 F.4th 1, 12-14 (1st Cir. 2023) (statement that "all" data was consistent was actionable opinion where "at least some data" was inconsistent).

### 2. Reuter Misleadingly Denied "Any Involvement" in the Political Scandals.

In December 2021, Reuter stated: "Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns" in 2020, any suggestion FPL "had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false," ¶252, and later that "FPL had no involvement in the creation of Grow United." ¶256. At the time Reuter made these statements, NEE had already received the Robo Memorandum, which attached the Funding Memo and Legal Memo that Pitts sent to Silagy in 2019 proposing a structure in which FPL political spending would be filtered through straw donors to conceal FPL's involvement. ¶¶167-75. Reuter later acknowledged that the Funding "[M]emo was shared with us." ¶251, 255. FPL paid Grow United's filing fees, then funded organizations that contributed directly to Grow United during the 2020 elections in precisely the manner the Funding Memo described and in precisely the races FPL's executives targeted. ¶¶49-54, 72-77, 147-93. The SAC alleges that FPL supported spoiler candidates in 2018 as well. ¶¶103-09, 122-25.

Defendants contend Reuter's statements are not misleading because the SAC "does not allege with particularity that FPL was involved in [Grow United's] creation." MTD at 16. To the contrary, the SAC cites financial ledgers showing that Matrix billed FPL for the costs of setting up Grow United, ¶193, refers to emails between Matrix employees regarding "FPL Expenses for

Grow United c4," ¶73, and describes how Grow United invoices were stored in a folder named "FPL_2019 Vendor Invoices" which contained "numerous other vendor invoices paid with FPL funds." ¶73. These documents supported the Robo Memorandum's conclusion that Grow United was "funded by FP&L" and controlled by "Matrix and its cohorts at FP&L." ¶176, 257. FPL was billed for Grow United's incorporation fees a mere five days after Pitts and Silagy met to discuss FPL's political spending and Odom composed a memorandum describing the dual "Goals" of Grow United as facilitating FPL's covert political expenditures and "provid[ing] a job opportunity" for Councilor Garrett Dennis. ¶¶74, 154-55, 176-77. At a minimum, Reuter's statement omitted material facts.

Defendants further claim that the SAC does not allege "that FPL funded, or asked others to fund, Grow United, or the ghost candidates in 2020." MTD at 16. While the SAC does not allege that FPL directly funded candidates, it does allege that FPL orchestrated a daisy chain of Matrix-controlled entities to make political expenditures, and it was this structure that was used to fund the ghost candidates, making Reuter's statement – "or asked any third party to provide funding on its behalf" – false and misleading. *FindWhat*, 658 F.3d at 1305 (securities laws proscribe "deal[ing] in half-truths"). Finally, Defendants argue that the SAC does not allege "NextEra had (or *has ever*) found evidence of legal wrongdoing." MTD at 17. But this is not what the SAC alleges, nor is it what caused NEE's stock to plummet. Defendants categorically denied that FPL had any connection to the scandal. When NEE changed its tune, issued its new risk disclosure, and announced that Silagy would be out as CEO, coupled with his unorthodox severance agreement, the stock plunged not because NEE or FPL employees were charged with illegal conduct, but because there was a connection that could lead to reputational damage to NEE—precisely what was previously denied.

Moreover, Defendants' demand that the SAC plead smoking-gun evidence misstates the applicable standard. "[I]t is only necessary that the factual allegations are 'enough to make it plausible that Defendants' positive public disclosures were false.'" *Acuity*, 2019 WL 10246166, at *17 (citation omitted). At the pleading stage, a court must "draw reasonable inferences in the plaintiff's favor." *Bush v. Blink Charging Co.*, 2023 WL 8263037, at *4 (S.D. Fla. Nov. 27, 2023). Any "[a]mbiguities are construed in the light most favorable to . . . [p]laintiffs." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005). Allegations supporting the reasonable inference that FPL used the November 2019 funding plan exactly as intended are plentiful. FPL first funded ghost campaigns in 2018. ¶¶103–05, 107, 109, 122–25. Then, Silagy instructed Martell to make life "hell" for District 37's Sen. Rodriguez. ¶149. In June 2019, Martell sent an agenda to Pitts to "go over" items including "SD 37" and "SD 39." ¶154. Not long thereafter, Pitts met with Silagy to discuss how Matrix would spend FPL funds. ¶155. On October 3, 2019, LPAD director Ryan Tyson sent Martell ("Items you requested") a memo Matrix and LPAD contractor Dan Newman wrote outlining "our original proposal" to mount a spoiler candidate against Sen. Rodriguez. ¶156. Six days later, Martell texted Pitts, requesting to "catch up" because Silagy had "an ask." ¶157.

Eleven days later, Martell met with Tyson and Pitts in person. ¶159. Just weeks later, Silagy received a first planning document, ¶161, then a revised version outlining a pathway to conceal FPL political spending in the 2020 elections, in which LPAD would serve as a straw donor because its funding sources were not "disclosable," ¶¶139, 171. The funds would then go to entities nominally controlled by Matrix acquaintances and family members, then to "Florida PCs." ¶¶170-72. In 2020, this is exactly what happened. LPAD passed funds to Grow United, an organization Odom's brother nominally controlled which FPL paid to establish. ¶¶177, 143-44. Grow United

forwarded the funds to two "Florida PCs"—The Truth and Our Florida. ¶186. FPL's consultants arranged this transfer within a week of Tyson exchanging text messages with Matrix and an FPL officer about District 37 and other ghost candidate races. ¶¶181, 183, 187. It also came on the heels of Matrix invoicing FPL for over $3 million, ¶146—a figure precisely within the range Newman's memo estimated FPL would have to provide to mount a spoiler challenge in District 37, ¶178. FPL sent Newman, a contractor for LPAD, ¶151, a $1.25 million check in September 2020, ¶179.

Lead Plaintiffs need not produce smoking-gun evidence of a "direct link" at the pleading stage, and, more importantly, Defendants' misstatements went well beyond merely denying evidence of a "direct link" or "legal wrongdoing." MTD at 16-17. Defendants said there was "no basis" or "evidence" supporting "any issues," "any wrongdoing," or that FPL "directed others" to support ghost candidates. ¶262, 252 ("absolutely no evidence"), 256 ("no involvement" in Grow United). Similarly, in *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), a company released a statement calling reports of adverse reactions to its product "completely unfounded and misleading." *Id.* at 34. The complaint there alleged that defendants received enough information to suggest a "possible link" between the product and the reaction, *id.* at 37, 45, and given the company possessed "evidence" of a plausible "link," calling the reports "unfounded" was materially misleading, *id.* at 46-47. A unanimous Supreme Court agreed, explaining that "respondents need only allege enough facts to state a claim to relief that is plausible on its face," and the "allegations plausibly suggest[ed]" a link, even if alternative explanations were not foreclosed. *Id.* at 45 n.12 (internal quotation marks omitted). The SAC plausibly alleges that Defendants misled investors by denying that there was any evidence linking FPL to Grow United or any wrongdoing, and is not required to plead "smoking-gun" evidence of a link to survive a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

### 3. Reuter Falsely Denied FPL Used the Funding Structure Matrix Proposed.

On December 17, 2021, when asked about the Funding Memo and Legal Memo sent to Silagy's pseudonymous email account, Reuter said, "we have found no evidence that FPL or our employees used this proposal to support . . . activities during the 2020 election cycle." ¶258. Reuter continued: "Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure . . . and we had no knowledge of this structure being used by Matrix." ¶258.

Defendants claim that "there are no particularized allegations that FPL or Silagy *did* 'request' that Matrix set up the structure it shared with Silagy." Literal truth is not the yardstick for securities fraud. *Omnicare*, 575 U.S. at 192. Even if it were, the SAC expressly alleges that "Silagy and other FPL employees requested, or agreed, with Matrix to establish 501(c)(4) organizations" consistent with the Funding Memo, ¶259, and even originally planned to have an FPL executive serve as officer of one of the entities in the chain, but changed this to avoid reporting requirements. ¶¶163-64. FPL knew of the "[funding] structure being used by Matrix" contrary to Reuter's denial. ¶258. Based on communications described in the SAC, it is fair to infer FPL was not a passive recipient of unsolicited emails from its consultants outlining a funding structure for political spending. The Robo Memorandum and its exhibits thus contradict Reuter's claims.

### 4. Reuter Falsely Said FPL "Rejected" a Plan to Offer a Job to Garrett Dennis.

On December 10, 2021, Reuter, said "FPL flatly rejected the plan [to offer Councilor Garrett Dennis a job] and communicated our lack of interest to Joe Perkins' team." ¶260. Reuter omitted that: (1) Pitts created Grow United for FPL in part for the express purpose of extending a job offer to Dennis; (2) that purpose had been communicated to FPL in advance; (3) FPL paid for Grow United's incorporation; (4) FPL provided enough funding to Fix JEA Now to cover the proposed salary and travel budget for the position before the offer was made; and (5) text messages attached to the Robo Memorandum corroborated Dennis' account of the job offer. ¶¶49-54, 56-77.

The SAC alleges that FPL "financed and controlled" Grow United through Pitts, and that the job offer was extended in a manner precisely consistent with Odom's July 21, 2019, memorandum, shared with FPL, outlining Grow United's purpose. ¶261. Rev. Toon arranged for the offer while serving as the head of Fix JEA Now, which, with FPL's knowledge and financial support, advocated for JEA's privatization. *Id.* Having elected to comment on the issue, Reuter needed to be forthright about what FPL had done. *See FindWhat*, 658 F.3d at 1305.

### 5. Defendants Falsely Denied FPL's Involvement in Spying on a Journalist.

When asked about the surveillance of journalist Nate Monroe, Silagy responded: "We did not engage in any activities having to do with following people . . . or taking pictures." ¶264. Reporters presented Reuter with messages to Martell from a private investigator Matrix paid to follow Monroe. *Id.* Reuter cast doubt on the records and denied that they showed wrongdoing. *Id.*

Defendants ignore the statement made by Silagy alleged in ¶264—"we did not" follow journalists—and instead claim that the second half of the statement made by Reuter—that FPL "had no digital records of the exchanges"—was not false because the SAC does not allege that FPL *did have* digital records. Reuter's statement was nonetheless misleading because claiming that "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing" created the misleading impression that FPL did not follow journalists such as Monroe, when the documents and evidence show that they did. ¶¶78-81, 84.

### 6. FPL Falsely Claimed to Have No "Editorial Control" Over the Capitolist.

No reasonable investor considering the statement that FPL had no "editorial control over what the Capitolist writes or publishes" would have understood that the Capitolist received directives from Silagy and Martell, ¶¶217-19, 223, 225, 242, 267, or that FPL's political consultants had "executive control" over the Capitolist, ¶221; *Omnicare*, 575 U.S. at 186 ("[W]hether a statement is misleading depends on the perspective of a reasonable investor.").

**B. The SAC's Allegations Support a Strong Inference of Scienter.**

As this Court stated in *Ryder*, "[t]o determine the sufficiency of a pleading's scienter allegations, 'the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" 603 F. Supp. 3d at 1239 (quoting *FindWhat*, 658 F.3d at 1300). In plain terms, the scienter inquiry asks "whether a reasonable person would infer . . . that there was at least a fifty-fifty chance that each [defendant] knew about the alleged fraud or was severely reckless in not knowing." *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *15 (M.D. Ga. Mar. 23, 2018). Courts can infer scienter when defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1252 (S.D. Fla. 2022) (citation omitted).

**1. Robo and Reuter's Possession of Information Contradicting Their Public Statements Supports a Strong Inference of Scienter.**

As of November 3, 2021, Defendants possessed details and evidence of FPL's involvement in a scheme to divert corporate resources to fund political machinations yet denied that there was any basis to connect any FPL employee to the publicly reported schemes. This is sufficient to plead scienter. *See Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019, at *10 (S.D. Fla. Oct. 4, 2018) ("An inference of scienter may [] arise where the defendants knew facts or had access to information suggesting that their public statements were not accurate") (cleaned up).[4] The

---

[4] Allegations that "identif[y] specific reports or documents" in defendants' possession that contradict their statements suffice to establish scienter. *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481 (S.D.N.Y. 2010); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235 (N.D. Ga. 2019) (finding defendant "knew, or was severely reckless as to the existence of" issues where company received "warnings of serious deficiencies" from consultant). In *Flowers*, defendants ignored a memo warning that a program may be violating the law. 2018 WL 1558558, at *13.

inference of scienter is strengthened by the "circumstances indicat[ing] that public statements were made to placate the market in response to inquiries[.]" *Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 47 (W.D.N.Y. 2023). Here, most of Defendants' misleading statements were made in response to media and analyst inquiries.

Based on his familiarity with the document's allegations and his later admission that its exhibits had been "shared with us," Reuter was, at a minimum, aware of the Robo Memorandum's key points as of December 2, 2021. ¶¶54, 251, 255, 258, 317. If, as Defendants suggest, he first reviewed the document on December 17, 2021, his prior statements were uninformed denials made with reckless disregard for the truth. *See Matrixx*, 563 U.S. at 49.

The substance of the Robo Memorandum and its exhibits contradict Defendants' denials of any evidence of wrongdoing. Both the analysis and exhibits demonstrate, in detail, that Reuter and Robo knew facts contradicting each of their false and misleading statements.

***Statements about the job offer to Garrett Dennis and Grow United***: Contrary to Reuter's statements, ¶¶256, 260, the Robo Memorandum established that "FP&L cohorts" used Grow United "as a vehicle for covert financial transactions, including an attempted bribe of a public official," and that it served a "dual purpose" of "creating an entity for political contributions and also an opening to allow Garrett Dennis . . . to leave the City Council." ¶77. It added that "FP&L officers were aware of and used FP&L funds to pay for the creation and subsequent activities of Grow United." ¶176. The Robo Memorandum includes evidence that FPL paid Grow United's incorporation fees and then continued to make covert payments that funded Grow United's activities. ¶¶73, 75, 177. Thus, the Robo Memorandum contradicts Reuter's later statements that FPL was not involved in Grow United's creation or the attempted bribe.

*Statements about FPL's role in the ghost candidate scheme*: Reuter denied that FPL was in any way involved in funding Grow United or ghost candidates. ¶252. The Robo Memorandum included evidence that "Silagy [and] Martell" worked with Pitts "to use Grow United, other 501(c)(4) organizations . . . to funnel FP&L funds to various political campaigns for the Florida State Senate that have been described as 'ghost candidates.'" ¶50. Attached was the November 26, 2019 email from Pitts to Silagy's pseudonym account and the Funding Memo and Legal Memo which planned FPL's straw donations to "specifically support [] Political Committees in Florida." ¶¶161, 174. Invoices, emails, and text messages showed FPL funds flowing to Grow United via a series of contributions that, once FPL paid, allowed Matrix to direct millions of dollars into entities they controlled, including those supporting the ghost candidates. ¶¶178-80. Matrix gave Martell polling updates on the District 37 ghost candidate's performance mere weeks before the 2020 election. ¶181. In short, Reuter knew of evidence that FPL participated in Matrix's scheme before denying any sign of FPL involvement.

*Robo's statement denying the existence of evidence of wrongdoing*: The Robo Memorandum shows that Robo's blanket denial of *any* evidence of *any* wrongdoing by *any* FPL employee, including that there was "no basis" to *any* allegation, was at least reckless. ¶262; *see Biogen*, 84 F.4th at 11-14 (finding scienter where defendants misleadingly claimed "all data" was consistent with a need for a higher dose of drug despite "knowing that at least some contradictory [] data existed"). The Robo Memorandum's evidence of FPL's involvement in the JEA, ghost candidate, and other schemes showed that there was at least a basis to and evidence for the allegations in media reports. Robo was also aware of FPL employees' attempts to conceal their involvement, including the use of pseudonymous email accounts and requests to make straw donations that could not be "triangulate[d]" back to FPL. ¶¶49, 97, 314.

Silagy's and Martell's violations of NEE policies also support an inference that Robo spoke with scienter when he denied any wrongdoing at all. *See Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 (E.D. Mich. 2010) (finding company ethics code violations supported scienter). NEE's ethical code prohibited "bribe[s]" and "hir[ing] a third party to do something that you cannot ethically or legally do yourself," ¶333, but FPL employees enlisted Matrix to attempt to bribe Dennis and to conceal straw donations. Moreover, NEE's Political Engagement Policy states that NEE makes political contributions "with the expectation that it is in full compliance with both the letter and the spirit of the law," and that NEE publicly discloses "its expenditures for federal and state lobbying . . . among other pertinent information." ¶335. FPL employees violated this policy by using straw donors to contravene campaign finance laws. ¶110. Robo possessed documents confirming as much. His denial of any evidence of "any wrongdoing" was therefore made with scienter.

Robo claims that because NEE purportedly conducted an internal investigation *after* receiving the Robo Memorandum, this undercuts a strong inference of scienter because "Robo was simply reporting on its outcome." Opp at 12. But, as noted above, Robo did more than report on the outcome; he provided his own personal, yet false, assurance that there was "no basis to any of the allegations." ¶262. Robo also did more than say he did not believe there was a basis to conclude FPL employees violated any laws, or based on counsel's investigation he did not believe there was any illegal conduct. He went further, assuring that there was no basis for any of the allegations— a clear statement that FPL faced no risk of charges, an investigation, or potential reputational damage from the scandals despite allegations, facts, and evidence to the contrary in the Robo Memorandum. *See Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1303-04 (N.D. Ga. 2021) (executive who investigated "schemes" that led to officer's

termination acted with scienter when he concealed misconduct and the reasons for the officer's departure). Unlike in *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010), cited by Defendants, the findings of NEE's investigations were not disclosed and there is no basis for inferring who ordered them or when. ¶262. Defendants cannot evade an inference of scienter at the pleadings stage by contending that they disagreed with the contrary information presented to them. *See Equifax*, 357 F. Supp. 3d at 1237. As in *Equifax*, allegations that NEE received warnings from outside consultants support scienter regardless of whether Defendants believed the warnings. *See id.* at 1237. "Plaintiff need not allege that [defendants] agreed subjectively with [the] concerns to establish scienter," *id.* (citing *Omnicare*, 575 U.S. at 188-89), because "[s]uch knowledge, even if [they] disagreed with it, contributes to an inference of recklessness," *id*. at 1240.

That Robo sold no stock is irrelevant to the SAC's theory of scienter. *See Tellabs*, 551 U.S. at 325 (allegations of insider trading not necessary to plead scienter). Robo misrepresented the information in his possession when he spoke, establishing his severe recklessness regardless of whether he separately acquired or sold stock. *Equifax*, 357 F. Supp. 3d at 1233.

**Statements about the Capitolist**: Silagy and others with knowledge either "furnish[ed] information" for this statement, *see Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008), or FPL's spokesperson failed to investigate, thus establishing recklessness. *See In re Eagle Bldg. Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1331 (S.D. Fla. 2004) ("failure to investigate the doubtful gives rise to a strong inference of scienter") (cleaned up). Either way, Silagy's scienter can be imputed to the Company. *See Equifax*, 357 F. Supp. 3d at 1247.

### 2.     The Totality of the Allegations Support a Strong Inference of Silagy's Scienter.

The SAC contains allegations both creating a direct inference that Silagy knew of FPL's surveillance of journalists and creating a more holistic inference of his state of mind. Either is sufficient to establish his scienter. *See Tellabs*, 551 U.S. at 323.

*Silagy Knew of or Recklessly Disregarded FPL's Surveillance of Journalists*: Silagy contends he did not act with scienter when he said "**We** did not engage in any activities having to do with" journalist surveillance because it was Martell, and not Silagy, who received reports about surveilling Monroe. ¶264. Yet Silagy met with Pitts to discuss FPL's budget for Matrix activities in the fourth quarter of 2019, ¶316, *precisely* the period in which Matrix spent thousands in FPL budget on a private investigation firm to follow Monroe, ¶¶79-81, 84. Moreover, given that Martell reported directly to Silagy and often served as a relay between him and Matrix, ¶¶82, 104, 157, 192, 223, "the most plausible inference is that [Silagy] w[as] aware of [Martell's] actions if not directly in control of them," *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 n.80 (S.D.N.Y. 2014) (finding it implausible that CEO would be unaware of reports' actions). Even if Silagy truly did not know if his statements were accurate, "such unawareness would likely constitute 'an extreme departure from the standards of ordinary care'" and therefore recklessness. *Id.*; *Flowers*, 2018 WL 1558558, at *15, 17 (finding scienter despite no alleged "direct interactions" between defendants and CFO because there was "at least a fifty percent chance" defendants "were informed of the risks" based on their roles and "their relationships to [the CFO]"); *Owl Creek*, 2018 WL 4844019, at *11 (defendant's awareness imputed from his "status as a high level executive" even though complaint did not "specifically allege" vice president "conveyed" discovery to him).[5]

*Silagy's Orchestration of Wrongdoing Supports Scienter*: Other allegations support a holistic scienter inference. Silagy's central role in the misconduct shows he "always knew about" the misdeeds. *Thorpe*, 111 F. Supp. 3d at 1359; *see also Mohawk*, 564 F. Supp. 3d at 1303 (finding

---

[5] Additionally, Silagy established a "course of conduct" of lying to the same journalist, *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1375 (S.D. Fla. 2015), claiming, for example, that FPL had "never been subpoenaed" in government investigations of the JEA sale when FPL had been subpoenaed and Silagy himself was made available for an interview. ¶¶324-26.

scienter where defendant "orchestrated, knew of, and received information about the fraudulent schemes"). Silagy engaged Matrix to influence the JEA sale, ¶62, directed FPL funds to shell entities, ¶93, asked Matrix to keep contributions secret, ¶97, received the Funding Memo, ¶167, received progress reports on the ghost candidate races, ¶192, and ordered the Capitolist to publish specific stories, ¶¶223-25, 242. Silagy orchestrated much of the misconduct Defendants denied.

*Silagy's Efforts to Conceal his Wrongdoing Support Scienter:* "Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter." *In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310-11 (D. Utah 2007). That a defendant was even aware of a cover-up supports scienter; active participation in concealment is routinely found to raise an inference of fraudulent intent. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166-67 (D. Or. 2015); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979-80 (N.D. Cal. 2015). The SAC alleges that Silagy took pains to hide his involvement with Matrix's improper activities. ¶¶97 (asking Pitts to "make sure they don't triangulate this donation"); 47, 93, 160, 167 (using "Theodore Hayes" pseudonym); 160-61, 170 (setting up daisy-chain to "[m]inimize all public reporting."). Martell discussed destroying text messages between himself and Pitts, ¶104, and FPL used straw organizations to conceal its Fix JEA Now funding, ¶66, and secretly funded a website to smear a spoiler candidate's opponent in 2018, ¶¶117, 122. The lengths Silagy and his underlings went to hide their misdeeds supports a strong inference of scienter.

*Silagy's Stock Sales Support Scienter*: Insider trades, while not necessary to plead scienter, support scienter "if the sales were done in suspicious amounts or at suspicious times." *Thorpe*, 111 F. Supp. 3d at 1377. Here, Silagy's unprecedented trading right before news broke about FPL's alleged involvement in Matrix's misconduct supports an inference of scienter. On December 1, 2021, Silagy sold $5.4 million worth of shares—the most he ever traded in a single

day—just one day before a negative news story he had been asked to comment on linked FPL to the ghost candidate scandal. ¶¶327, 330-31; *see In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (finding high volume stock sales "just weeks before [a] 'bad news' announcement" supported scienter).

Despite Defendants' contrary claims, "trading through [a] 10b5-1 plan is not automatically immunized because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time and disguise their conduct with a stock plan." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1362 (N.D. Ga. 2018).[6] Silagy adopted his 10b5-1 plan under such circumstances. On July 23, 2021, Matrix sued Pitts and "Fictitious Defendant One," a "publicly traded company . . . with its principal place of business in Juno Beach, Florida"—an obvious reference to NEE. Compl. ¶ 8, *Matrix, LLC v. Canopy Partners, LLC et al.*, No 01-cv-2021-902121 (Ala Cir. Ct. July 23, 2021). Silagy adopted his 10b5-1 plan on September 2, 2021—*the same day* Pitts filed a counter-suit accusing Perkins of threatening to leak details of illegal work for a "Florida client." *See* Compl. ¶¶14, 17, *Canopy Partners, LLC v. Perkins*, No. 1-2021-CA-004783 (Fla. Cir. Sept. 2, 2021).[7] Circumstances suggest Silagy adopted his 10b5-1 plan as soon as he realized that his involvement with Matrix could become public.

**Silagy's Departure and Unique Clawback Support Scienter**: An officer's departure supports an inference of scienter where circumstances suggest that misconduct has occurred. NEE announced Silagy's departure on the same day it recognized a material risk from the misconduct he orchestrated. ¶322. NEE tacitly admitted that Silagy's political activities caused his departure,

---

[6] *See also* Tom McGinty & Mark Maremont, *CEO Stock Sales Raise Questions About Insider Trading*, WALL ST. J. (June 29, 2022) (available at https://on.wsj.com/494s782).
[7] The Court may take "judicial notice of the date and court of filing." *Beckworth v. Senior Home Care, Inc.*, 2014 WL 12868876, at *5 n.20 (N.D. Fla. Sept. 5, 2014).

stating that while NEE was not openly "making a connection," the resignation was "a little earlier than I would have hoped Eric would have wanted to do it." ¶321. Defendants are not entitled to have remarks about the stress of Silagy's job taken at face value. *See OSG*, 12 F. Supp. 3d at 632-33 (resignation supported scienter where "circumstances and timing" were suspicious despite "seemingly pretextual reason" for departure). Analysts concluded that the resignation was "rushed and difficult to separate from recent controversies." ¶321. Silagy's resignation supports scienter.[8]

### C. The SAC Adequately Pleads Defendants' Fraud Caused Investor Losses.

"Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA." *E.g. Maverick Fund, Ltd. v. Mohawk Indus., Inc.*, 2023 WL 2887603, at *5-6 (N.D. Ga. Mar. 31, 2023). A plaintiff must only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," which is "not meant to impose a great burden upon a plaintiff," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), and requires only "that the defendant's fraud—as opposed to some other factor—proximately caused [plaintiff's] claimed losses." *FindWhat*, 658 F.3d 1282 at 1309. The question of what caused a stock decline is ordinarily "a fact-based inquiry that is generally not proper to resolve on a motion to dismiss." *Eastwood Enterprises, LLC v. Farha*, 2009 WL 3157668, at *5 (M.D. Fla. Sept. 28, 2009). Here, the SAC properly pleads loss causation by: "(1) identifying a 'corrective disclosure' . . . (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop…" *FindWhat*, 658 F.3d at 1311-12. The SAC satisfies Rule 8.

---

[8] A resignation suggests scienter where the former officer "was at the epicenter of" the company's business, was "forced to resign," and where evidence suggests that the officer "engaged in improper transactions." *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016).

Defendants denied reports of impropriety, claiming they had "no basis." ¶262; *see also* ¶¶252, 256, 258, 260, 264, 267. Then on January 25, 2023, NEE announced: that it faced a material risk from the allegations, ¶269, the unplanned resignation of Silagy, the allegations' central subject, ¶270, and that Silagy's severance agreement contained a clawback for criminal wrongdoing, ¶287. The market understood this to be new, corrective information inconsistent with Defendants' previous assurances that NEE faced no legitimate risk, ¶¶289-95, 298-300, and read the discussion of the FEC complaint as a "tacit admission" of at least $1.3 million in dark money contributions, ¶¶273, 284. The disclosures revealed, according to analysts, "new," "surprising," and "unexpected" information. ¶¶292, 295, 299; *see City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1397-98 (S.D. Fla. 2011) (analyst statements "indicating surprise" supported loss causation). NEE's stock responded with its largest independent decline in 25 years, wiping out over $14 billion in market capitalization in a single day. ¶¶296, 302. On January 31, 2023, the market learned that Silagy's clawback was not customary, supporting the connection to the misconduct. ¶304.[9]

While Defendants argue that these disclosures did not directly mirror their misstatements, MTD at 20, a corrective disclosure "can take any form from which the market can absorb [the information] and react" and "need not precisely mirror the earlier misrepresentation" so long as it "relate[s] back to the misrepresentation and not to some other negative information..." *FindWhat*,

---

[9] A corrective disclosure is not required by the PSLRA's text, 15 U.S.C. § 78u-4(b)(4), nor required to plead loss causation, where the concealed risk later materialized. *In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1265 (S.D. Fla. 2012), *aff'd sub nom.*, 781 F.3d 1296 (11th Cir. 2015). By insisting the allegations against Silagy were baseless, NEE concealed a risk that materialized when he resigned. ¶¶297, 306; *see Noto*, 650 F. Supp. 3d at 51 (risk "materialized when [CEO] resigned"). Defendants challenge the SAC's pleading of corrective disclosures, but do not challenge the SAC's alternative theory that a concealed risk materialized and have thus waived the argument. *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("[A]rguments not properly presented in a party's initial brief . . . are deemed waived.").

658 F.3d at 1311 n.28 (internal quotation marks omitted). A "Plaintiff need not allege an express admission of fraud" and information "may be disclosed directly or indirectly," in "any form," including an officer's "resignation." *Flowers*, 2018 WL 1558558, at \*19 (citations omitted); *see also FindWhat*, 658 F.3d at 1293-94 (resignation and other disclosures satisfied loss causation); *Aracruz*, 41 F. Supp. 3d at 1398 (announcement including CFO resignation supported loss causation); *Jiangbo*, 884 F. Supp. 2d at 1264-65 ("[P]laintiff need not show that the defendant's disclosure was 'tantamount to a confession of fraud.'"); *Thorpe*, 111 F. Supp. 3d at 1382-83 ("[A] defendant's failure to admit to making a misrepresentation, or his denial that a misrepresentation was made, does not necessarily preclude loss causation" because the "appropriate inquiry is whether the disclosure revealed to the market that there were problems") (internal quotation marks omitted). By their plain language, ¶¶269, 287, and as over a half-dozen analysts understood, ¶¶289-95, 298-300, the disclosures related to the misconduct allegations.

Loss causation based on similar disclosures was adequately pled in *Flowers*, 2018 WL 1558558. Flowers' misstatement that there was "no merit" to claims it had misclassified workers to evade labor laws, *id.* at \*20, were allegedly corrected by a series of events revealing a more serious liability risk than it had previously represented, although none of the disclosures admitted or proved it had misclassified workers or faced actual liability. *Id.* at \*19. The Court there noted that disclosures "need not address the prior misstatements specifically or fact-for-fact as long as they 'share the same subject.'" *Id.* at \*20 (internal quotation marks omitted). A disclosure that Flowers could not "reasonably estimate at this time the possible loss or range of loss, if any, that may arise from" the claims it previously characterized as "without merit" could therefore "reasonably indicate that Flowers had committed fraud or similar wrongdoing." *Id.*

It is irrelevant, then, that NEE did not admit to fraud and offered self-serving, pretextual

explanations for Silagy's resignation, especially where analysts read the disclosures to mean the risks were more serious than NEE had suggested. *Id.* at \*20 ("[A]nalysts' reports 'strengthen the inference that the disclosure revealed a truth to the market'") (quoting *Thorpe,* 111 F. Supp. 3d at 1382); *see also Mohawk*, 564 F. Supp. 3d at 1306-07 (finding loss causation where analysts "express[ed] 'wariness' of [company's] 'story'" despite defendants' "alternative explanations").

Defendants' factual assertion that the November 3, 2022 10-Q ("10-Q") fully disclosed everything that came out on January 25, 2023 is both premature and false. The 10-Q did not reveal Silagy's resignation or the clawback, and it announced only the *initiation* of an investigation. *See* Gold Aff., Ex. A. But the announcement of an investigation "reveals just that—an investigation—and nothing more" and so does not correct past misstatements. *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013).[10] Defendants invert this, arguing that NEE's investigation announcement fully corrected any possible misstatements and foreclosed further corrections. At a minimum, this is a factual dispute. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013).

The January 25, 2023 8-Ks which triggered NEE's historic losses, on the other hand, stated that at its substantial *completion*, the investigation warranted a new risk disclosure (and new leadership). ¶302. Contrary to what Defendants say, MTD at 21, the investigation announcement in the 10-Q was *not a risk factor*. The 10-Q explicitly told investors: "[t]here have been no material changes from the risk factors" previously disclosed. ECF No. 83-7 at 57 (emphasis added). This distinction is important. The SEC mandates disclosure of "material" factors making an investment "speculative or risky,"[11] and warns that "Risk Factors" are "the *most* significant risks that apply to

---

[10] Defendants cite *Meyer* out of context for the proposition that the 8-Ks were not corrective because they only warned of a "risk of future corrective action," MTD at 22. *Meyer* only explains why the mere *announcement* of an investigation is not corrective.

[11] 17 C.F.R. § 229.105; SEC Form 10-K Item 1A, https://www.sec.gov/files/form10-k.pdf.

the company."[12] It is a significant reversal when a company formally acknowledges a risk is among the most serious it faces despite previously asserting that there was no such risk. There is a difference between a company announcing it is looking into allegations and cannot predict what it will find on the one hand, and announcing that the investigation requires an immediate update to the list of material risks on the other. At least a half-dozen analysts understood as much to be "new" and "surprising," ¶¶289-95, 298-300, and, crucially, NEE's stock experienced its largest non-market-based decline in 25 years despite NEE releasing "solid [financial] numbers," ¶¶291, 302. Markets do not react this way without new information. *FindWhat*, 658 F.3d at 1310 (already public information "will not cause a change in the stock price.").[13]

The Eleventh Circuit recently reversed a dismissal on loss causation under similar circumstances in *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915 (11th Cir. 2020). The district court there found publication of an SEC letter merely "confirm[ed]" already-expressed doubts about a company's representations, but the Eleventh Circuit held the letter was corrective because it alerted the market to inconsistencies in the company's statements, and that the already-public information formed the "background" from which the market would understand the disclosure. *Id.* at 922-23. Here too, the investigation announcement formed the background from which the market understood why, inconsistent with prior denials, NEE faced reputational risk and jettisoned Silagy. *E.g.* ¶295 (analyst explaining stock decline due to "update" on political activity).

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.

---

[12] SEC, *How to Read a 10-K/10-Q* (Feb. 8, 2021), http://tinyurl.com/43v3fttw (emphasis added).
[13] Defendants' alternative explanations for why Silagy resigned are alleged to be pretextual and analysts did not believe them. ¶¶274, 290, 294, 299. Plus, statements in incorporated documents may not be accepted "for the truth of the matters they assert." *See Flowers*, 2018 WL 1558558, at *5; *Noto*, 650 F. Supp. 3d at 51 (disputed fact assertion that CEO "resigned for personal reasons" was "inappropriate on a motion to dismiss.").

February 9, 2024

Respectfully submitted,

*/s/ Chris Gold*
Chris Gold
Florida Bar No. 088733
chris@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(786) 673-2405 phone

Scott Edelsberg
Florida Bar No. 0108039
scott@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
(305) 975-3320 phone

*Liaison Counsel for Lead Plaintiff Florida
Retirement Funds and Liaison Counsel for the
Class*

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
Jacob Walker (*pro hac vice*)
Brendan Jarboe (*pro hac vice*)
Mark Byrne (*pro hac vice*)
Nathan Abelman (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
mark@blockleviton.com
nathan@blockleviton.com
(617) 398-5600 phone
(617) 507-6020 fax

*Counsel for Lead Plaintiff Florida Retirement
Funds and Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON, P.A.**
Robert D. Klausner
Florida Bar No. 244082

26

CASE NO. 23-80833-CIV-CANNON

7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiff Florida
Retirement Funds*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this on the 9th day of February, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


_/s/ Chris Gold_
Chris Gold