**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

MAHA JASTRAM, Individually and on
Behalf of All Others Similarly Situated,

  Plaintiff(s),                                              **CASE NO. 23-CIV-80833-CANNON**
          v.

NEXTERA ENERGY, INC., FLORIDA
POWER & LIGHT COMPANY, JAMES
ROBO, ERIC SILAGY, and DAVID P.
REUTER,

      Defendants.
_____/

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS'
SECOND AMENDED CLASS ACTION COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................... 2

    I.    Plaintiffs Fail to Allege Falsity or Scienter as to Any Alleged Misstatement .................................................................................................... 2

        A.    Statement 1 of 8: Robo's One Statement Is Not False or Made with Scienter ............................................................................................ 2

        B.    Statement 2 of 8: Silagy's One Statement Is Not False or Made with Scienter ............................................................................................ 5

        C.    Statements 3-7: Reuter's Five Statements Are Not False or Made with Scienter ............................................................................................ 8

        D.    Statement 8 of 8: McGrath's One Statement Is Not False or Made with Scienter ............................................................................................ 10

    II.    Plaintiffs Fail to Plead Loss Causation ....................................................... 11

        A.    No Loss Causation Is Pled as to the January 25, 2023 Disclosures ................................................................................................ 11

        B.    No Loss Causation Is Pled as to January 31, 2023 ........................ 15

CONCLUSION .......................................................................................................................... 15

The premise of Plaintiffs' response ("Opp.") is that Defendants' mere possession of the Matrix Memorandum ("Matrix Memo" or "Memo") suffices to allege fraud as to the eight challenged statements. But mere possession of the Matrix Memo does not satisfy the PSLRA's heightened pleading standards. Instead, Plaintiffs must point to facts contained in the Memo that contradict the substance of Defendants' remarks in each of the eight challenged statements. Their response fails to do so. Robo's one statement was a report on outside counsel's investigation of the Memo. His opinion about outside counsel's findings does not become false simply because NEE possessed a copy of the Memo (the very reason the investigation was conducted). And, as to the seven other challenged statements, Defendants made narrow statements denying specific allegations from the Memo as reported by the media. Plaintiffs do not allege any facts from the Memo—or anywhere else—that contradict the specific statements Defendants actually made.

Plaintiffs also fail to plead scienter. Under Eleventh Circuit law, Plaintiffs must plead scienter for *each* alleged misstatement by alleging particularized facts showing that the most compelling inference is that the speaker acted with an intent to defraud or must have been aware of the fraud. Again, mere possession of the Matrix Memo is not enough to show intent to defraud because Plaintiffs do not allege any facts from the Memo, or anywhere else, establishing that each speaker knew, or had to know, that the specific statement he was making was false. To the contrary, during the Class Period, Defendants commenced *two* separate outside law firm investigations into the Matrix Memo and *increased* their NEE stock holdings, none of which would make sense if they were lying to investors to inflate the stock price.

Plaintiffs also fail to plead loss causation. They must plead that new information revealed that Defendants' previous statements were false. Their original theory was that NEE "first" issued a "new" risk disclosure on January 25, 2023, but they have abandoned that theory because the

January 25 disclosure was not new, as NEE disclosed the same risks in its November 2022 10-Q. Plaintiffs pivot to now argue that the January 25, 2023 statement contained more significant warnings, but every risk they point to was already disclosed in the November 2022 10-Q. No law supports their theory that reiterating risks is "corrective." Plaintiffs' fallback claim is that Silagy's retirement announcement corrected Defendants' statements by "revealing" his role in allegations they had denied, but their only link between his retirement and the challenged statements is legally insufficient conjecture by a few analysts. They also effectively abandon the second alleged corrective disclosure date, January 31, as they cannot show anything new was disclosed that day.

## ARGUMENT[1]

### I. Plaintiffs Fail to Allege Falsity or Scienter as to Any Alleged Misstatement

#### A. Statement 1 of 8: Robo's One Statement Is Not False or Made with Scienter

**No Falsity**: Plaintiffs concede that Robo's January 2022 statement reporting on NEE's first law firm investigation is an opinion subject to heightened pleading standards. Opp. 6. Plaintiffs also do not identify any factual allegations showing that either (i) Robo did not believe his opinion or (ii) the investigation on which he was reporting was not a "meaningful inquiry" into the alleged Matrix conduct. Mot. 10–11. That alone forecloses a claim on this statement.

Plaintiffs' claim that Robo went "beyond" reporting on the investigation when he said that he felt "very good that there is no basis" to the allegations, Opp. 6, does not avoid this result: Robo's statement was clear that he held this opinion because the investigation had found no evidence of wrongdoing and he "fe[lt] very good about the investigation" itself. ¶ 262. Robo's belief that the allegations were baseless was predicated on NEE's investigation finding no wrongdoing and his confidence in that investigation. Plaintiffs thus cannot plead that Robo's

---

[1] Terms not defined herein retain the meaning ascribed in Defendants' Motion to Dismiss ("Mot."). All emphases added and internal quotation marks and alterations omitted unless noted.

2

opinion was false without alleging facts that suggest NEE's investigation *had* found wrongdoing, and Robo had misrepresented those findings. Mot. 11. Plaintiffs nowhere do so.

Plaintiffs also argue that Robo's statement "did not fairly align with the information" he had, or contained a false "embedded factual claim" that "no inculpatory evidence existed," merely because he allegedly possessed the Matrix Memo. Opp. 6. But Robo did not conceal the existence of the Matrix Memo and its so-called "evidence," whose existence and contents had been reported by the press for months. ¶¶ 44, 54–55. To the contrary, the Memo prompted the investigation in the first place, and Robo was merely offering his belief about the outcome of counsel's investigation into whether the allegations reflected wrongdoing. Plaintiffs' citation to *Shash* v. *Biogen, Inc.*, 84 F.4th 1 (1st Cir. 2023), is inapt because the challenged statement there allegedly concealed clinical trial data known only to defendants. Here, in contrast, the entire world knew about the Matrix Memo allegations, and Robo simply reported—accurately—that an investigation found no evidence of wrongdoing. Plaintiffs' true gripe is that Robo formed his opinion based on outside counsel's investigation, rather than blindly accepting Matrix's (self-serving) allegations as true. They cannot plead falsity on that basis. *See Altayyar* v. *Etsy, Inc.*, 242 F. Supp. 3d 161, 175 (E.D.N.Y. 2017) ("The plaintiffs may disagree with the defendants' opinions, but disagreement does not render the opinions false."), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

**No Scienter**: Plaintiffs do not respond to, and thereby concede, Defendants' arguments that Robo had no motive to lie. Mot. 11. They claim that his failure to sell stock is "irrelevant," but do not dispute that his significant increase in stock holdings during the Class Period strongly *undercuts* scienter. *Id.* at 11–12. Nor do Plaintiffs dispute that the fact that NEE (twice) ordered an investigation by outside counsel strongly undercuts scienter. *Id.* at 12.[2]

---

[2] Plaintiffs' suggestion that "there is no basis for inferring who ordered" the investigations or when,

3

Instead, Plaintiffs rehash their flawed falsity argument, asserting that Robo's statement was at least severely reckless because he possessed the Matrix Memo, which contained purportedly "contradictory" information. Opp. 15. But mere possession of the Memo does not show Robo's intent to lie about it—particularly where NEE twice commissioned a law firm to investigate its allegations. Nor did Robo, as Plaintiffs claim, say that "FPL faced no risk of charges, an investigation, or potential reputational damage," Opp. 16. Rather, he said that NEE's investigation into the Memo had not identified evidence of wrongdoing, he felt good about that investigation, and he thus felt good that there was no basis to the allegations of wrongdoing. ¶ 262. For his statement to be contradicted by information he then possessed, Plaintiffs would need to allege that the investigation *had* identified evidence of wrongdoing and that had been reported to Robo. They have not done so, even though their own cases make this important distinction.[3]

Plaintiffs' reliance on internal company policies also cannot plead the required strong inference of scienter by Robo. Again relying on his mere possession of the Matrix Memo, Plaintiffs argue that Robo should have known Silagy and Martell violated internal policies. Opp. 16. But their sole citation, *Chamberlain* v. *Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010), concedes that such policies are "inherently aspirational and unable, standing alone, to support an inference of scienter." Further, the court only found relevant that a defendant

---

Opp. 17, is both irrelevant and ignores the public statements making clear that NEE ordered each of the investigations and when they did so, Mot. 4–6.

[3] *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *13 (M.D. Ga. Mar. 23, 2018) (defendants' stated belief they were compliant with law when in possession of legal opinion stating they were not compliant); *Pub. Empls.' Ret. Sys. of Miss.* v. *Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1284, 1303–04 (N.D. Ga. 2021) (defendant allegedly aware of fraudulent scheme but "spun" investigation findings to keep scheme hidden); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1240 (N.D. Ga. 2019) (defendant touted cybersecurity despite "knowledge of [consultant's non-public] warnings concerning … deficiencies"); *Sgalambo* v. *McKenzie*, 739 F. Supp. 2d 453, 481–82 (S.D.N.Y. 2010) (internal test data contradicted defendants' statements).

"carefully studied" a policy prohibiting the type of illegal agreements that gave rise to a DOJ investigation into his company. *Id*. Here, by contrast, there is no allegation that Robo reviewed the policies Plaintiffs cite, much less any allegations that he was aware of policy violations by Silagy or Martell. Nor do Plaintiffs actually plead any policy violations: Plaintiffs make a conclusory claim that FPL attempted bribery and "contravene[d] campaign finance laws" in violation of NEE policies. Opp. 16. But they *concede* the "SAC does not allege" that NEE has "*ever*[] found evidence of legal wrongdoing," *id.* at 8, and do not dispute that there has been no finding—by anyone—of wrongdoing by FPL in connection with Matrix. Mot. 5–6.

### B. Statement 2 of 8: Silagy's One Statement Is Not False or Made with Scienter

**No Falsity**: Defendants showed that Plaintiffs failed to allege that Silagy's June 24, 2022 statement that FPL did not engage in following or taking pictures of Nate Monroe was false. Mot. 13. Plaintiffs wrongly claim that Defendants "ignore" this statement. Opp. 12. It is Plaintiffs who fail to respond to Defendants' arguments, and thereby concede that their falsity allegations are insufficient. *Brahim* v. *Holder*, 2014 WL 2918598, at *4 n.7 (S.D. Fla. June 26, 2014). In any event, allegations of a cryptic text message, a photo of Monroe on *Matrix's* system, and invoices to Matrix from an unknown time period for unknown work by an investigative firm, ¶¶ 80–84, do not suffice to allege with particularity that FPL followed or took pictures of Monroe.

**No Scienter**: Defendants showed that the SAC is devoid of allegations as to Silagy's scienter as to his one statement, and Plaintiffs nowhere dispute that they must allege scienter as to that specific statement. Mot. 13–15. None of Plaintiffs' efforts to plead scienter are persuasive.

*First*, Plaintiffs cite an alleged meeting between Silagy and Pitts on July 19, 2019, and speculate that it had to do with alleged surveillance of Monroe in November 2019. Opp. 18. But Plaintiffs allege that this meeting concerned a "Dereg budget," and there are no allegations that this topic had anything to do with surveillance—or even that Monroe was discussed at this alleged

5

meeting (or ever) with Silagy. ¶ 155. They likewise now claim that Matrix spent "thousands" on investigators "precisely" when Monroe was surveilled, Opp. 18, but the SAC does not allege when Matrix allegedly spent this money, that it had any link to Monroe, or that Silagy was aware of it.

***Second***, Plaintiffs incorrectly argue that because Martell reported to Silagy and referenced Silagy in unrelated communications with Matrix, Silagy must have been aware of the alleged surveillance. *Id*. Such bare speculation does not satisfy their obligation to plead "*documentation, communication, or conversation*" showing Silagy had information contrary to his statement. *Mizzaro* v. *Home Depot, Inc.*, 544 F.3d 1230, 1250 (11th Cir. 2008). Plaintiffs cite no document or communication regarding the alleged surveillance that Silagy was aware of or that was available to him. Their cases only undermine their argument because the cases involve allegations that contrary information (i) *was* available to the defendant or (ii) had to be known by the defendant as it was reported to management generally and of critical importance to the company.[4]

***Third***, Plaintiffs claim that Silagy's purported involvement in *unrelated* alleged conduct having nothing to do with alleged surveillance of Monroe somehow shows he "always knew about" any alleged "misdeed[]." Opp. 18–19. This argument runs afoul of the Eleventh Circuit's requirement that there be allegations creating a strong inference of scienter "with respect to each specific alleged misrepresentation." *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *5 (11th Cir. Aug. 8, 2023); *see* Mot. 13–14. In contrast, Plaintiffs' cases involve particularized allegations that an executive "orchestrated" the *specific conduct* underlying *specific*

---

[4] *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 & n.80 (S.D.N.Y. 2014) (attorneys reported unlawful conduct to "senior management" and it was implausible that CEO could be unaware given it was "critical" to defendant's financial health); *Flowers*, 2018 WL 1558558, at *14–15 (executives had access to numerous contradictory reports and CFO raised issues of fraudulent activity that was the "basis of 84% of the defendants' business" with management); *Owl Creek I, L.P.* v. *Ocwen Fin. Corp.*, 2018 WL 4844019, at *11 (S.D. Fla. Oct. 4, 2018) (widespread and longstanding scheme was allegedly reported to compliance executive on multiple occasions).

alleged misstatements. *Thorpe* v. *Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1366–69 (S.D. Fla. 2015); *Pub. Empls.' Ret. Sys. of Miss.*, 564 F. Supp. 3d at 1303.

**Fourth**, Silagy's announcement that he would retire later in 2023 after transitioning to a new role does not support scienter. Mot. 15. Plaintiffs boldly claim that NEE "tacitly admitted" that he retired due to his role in the Matrix allegations—but provide zero support. Opp. 20. The very announcement they cite explained that Silagy fulfilled his commitment of staying "at least 1 more year" and referenced the toll from addressing hurricanes, supply chain crises, inflationary pressures, high gas prices, and the media reporting. Ex. L at 10, 15. Plaintiffs cite no "admission"—tacit or otherwise—linking Silagy's retirement to any alleged misconduct. Plaintiffs' cases involving executives' termination or resignation after *bad* news are worlds away from the announcement of a future retirement following *positive* news of the completion of an investigation without findings of unlawful conduct. *See In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *1, 7 (S.D. Fla. June 6, 2016) (resignation mandated by consent order with regulator); *In re OSG Sec. Litig.*, 12 F. Supp. 3d at 63 (with other factors, weighing termination that occurred after IRS filed claim increasing defendant's exposure by $400 million).

**Finally**, Plaintiffs argue that Silagy's December 1, 2021 stock sale is indicative of scienter. This argument makes no sense: First, that pre-Class Period sale happened *before* Silagy made his alleged false statement—meaning that the sale happened before that statement supposedly inflated the stock price. Second, as Defendants explained, Silagy's sale was subject to a 10b5-1 automatic sale plan, which negates any inference of scienter. Mot. 14–15. Plaintiffs' authority, Opp. 20, is inapt because it involves 10b5-1 plans adopted *during the class period*, not months before the class period as here.[5] Third, Plaintiffs ignore Silagy's *increase* in stock holdings *during* the Class

---

[5] While Plaintiffs note that Silagy adopted a 10b5-1 plan on the day that Pitts countersued Perkins

7

Period—which dwarfed the size of his sale and strongly counsel against scienter. Mot. 15.

C. **Statements 3-7: Reuter's Five Statements Are Not False or Made with Scienter**

**No Falsity**: ***First***, Plaintiffs do not allege with particularity that Reuter's December 10, 2021 statement about FPL's non-involvement in creating Grow United was false. Mot. 16. They rely on allegations that—at most—show only that Matrix listed "goals" for Grow United in an "internal Matrix planning document" that did not reference FPL and internally attributed some funds spent on Grow United to FPL. Opp. 7–8; ¶ 74. But even assuming *Matrix* viewed Grow United as furthering FPL goals, that would not render false Reuter's statement that "*FPL* had no involvement in the creation of Grow United," ¶ 256. Indeed, he explained in the same statement that FPL had learned, based on its investigation, that Matrix had created Grow United for another Matrix client, *id.*, and Plaintiffs allege no facts to the contrary. The Matrix Memo's purported "conclusion[s]" that Grow United was "funded" and "controlled" by FPL, Opp. 8, are just that—conclusions—not well-pleaded facts.[6] Plaintiffs also cite the July 2019 "Dereg budget" calendar entry as evidence of FPL's involvement in Grow United's creation, Opp. 8, but that meeting is not alleged to have been about Grow United. And the alleged facts they claim were omitted from Reuter's statement, Opp. 7–8, were included in the articles to which his statement responded, Supp. Exs. A at 7, B at 8–10. There was no omission, and Reuter's statement is not alleged to be false. *See Hattaway* v. *Apyx Med. Corp.*, 2023 WL 4030465, at *7 (M.D. Fla. June 15, 2023) (dismissing claims where "information Plaintiff claims to be 'omitted' was disclosed . . . or otherwise public").

***Second***, Plaintiffs argue Reuter's December 2, 2021 statement denying involvement in

---

accusing him of threatening to leak information about a Matrix client, Opp. 20, the SAC does not allege Silagy's knowledge of that filing. And Plaintiffs admit that Perkins's suit, filed six weeks earlier, already identified NEE as the client, Opp. 20, so the "counter-suit" revealed nothing new.
[6] While describing the Matrix Memo as containing "conclusions," Plaintiffs themselves allege that the Memo was created for litigation arising from the "ugly corporate breakup of Matrix," ¶¶ 40, 43, and do not allege that the Memo included any actual legal findings or conclusions.

8

funding ghost candidates was false because in 2020 FPL funded campaigns "in precisely the manner the Funding Memo described." Opp. 7. The SAC alleges no such thing. Rather, it concedes that—after Matrix shared a "Funding Memo" listing six entities—the sole alleged payment FPL made to any of them was in 2019, which is not alleged to have had anything to do with ghost candidates, ¶¶ 169–170, 175. The SAC does not allege that FPL made *any* payments to any of the other five entities in connection with 2020 elections. More fundamentally, the SAC does not contain a single allegation that FPL contributed or directed funds to LPAD, the sole source of funds alleged to have gone to Grow United and then to ghost candidates. ¶¶ 178–188. All of Plaintiffs' other citations, Opp. 9–10, are to allegations reflecting that FPL was interested in the elections in which the ghost candidates ran and considered a "primary challenge" that Plaintiffs concede NEE never mounted. ¶¶ 149, 152–156, 181, 192. At bottom, Plaintiffs allege *no facts* that link FPL to funds that went to ghost candidates, and have thus not alleged anything that contradicts Reuter's statement.

*Third*, it is telling that—as to Reuter's December 17, 2021 statement regarding the Funding Memo shared by Matrix in 2019, ¶ 258—Plaintiffs argue that "literal truth is not the yardstick." Opp. 11. In doing so, Plaintiffs concede that Reuter's statement was true, and the SAC contains no alleged facts that rendered his statement misleading. Reuter acknowledged that the Funding Memo was shared with FPL, ¶ 258, but stated that FPL had not requested it or found evidence FPL used it. Plaintiffs do not allege with particularity that FPL *had* requested it, and, as explained above, nowhere allege that this funding structure *was* used. That Matrix and its counsel discussed an FPL employee serving as an officer of one of the listed entities, Opp. 11, is irrelevant.

*Fourth*, Plaintiffs argue that Reuter omitted information from his December 10, 2021 statement that FPL "flatly rejected" a Matrix plan to offer Dennis a job. Yet each allegation they

9

claim was "omitted" from his statement is either nowhere alleged in the SAC, Opp. 11 at (2), or is contained in the articles about the alleged job offer to which Reuter was responding, Opp. 11 at (1), (3), (4), and (5); *see* Supp. Exs. A at 5, 7–11; B at 3–6, 8–10, and therefore was not omitted.

*Finally*, Plaintiffs do not attempt to argue that Reuter's June 2022 statement that "FPL had no digital record of the exchanges" concerning alleged surveillance of Monroe and could not "prove their veracity" was false. Opp. 12. Rather, they claim that Reuter's statement that such records did not "demonstrate[] any wrongdoing" created a "misleading impression that FPL did not follow journalists." *Id*. However, they do not allege with particularity that FPL *did* "follow journalists," *supra* p. 5, or that Reuter believed the records *did* demonstrate wrongdoing, *see Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*, 575 U.S. 175, 184 (2015) (statements of belief in legal compliance are opinion statements).

**No Scienter**: Plaintiffs do not contest that Reuter is not alleged to have benefitted from the alleged fraud. Mot. 18. Rather, they rely solely on his alleged possession of the Matrix Memo. Opp. 13–14. But, as explained above, Reuter's statements were narrow factual statements that are not contradicted by the Memo—and thus, again, mere possession of the Memo is insufficient to show scienter. *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27 (2011), does not support Plaintiffs. There, the defendant denied reports that its drug caused insomnia while (a) possessing contrary data and (b) failing to conduct any studies to disprove that link prior to its denials. *Id.* at 47. Neither circumstance is present here. Plaintiffs do not allege that the Matrix Memo contradicted Reuter's statements, and NEE promptly investigated its allegations and found no wrongdoing. Plaintiffs do not plead the requisite strong inference that Reuter acted with scienter.

**D.** **Statement 8 of 8: McGrath's One Statement Is Not False or Made with Scienter**

**No Falsity**: The SAC offers no *facts* contradicting McGrath's August 2022 statement that FPL did not have editorial control over *The Capitolist*. Mot. 18–19. Plaintiffs' only response are

10

conclusory arguments that *The Capitolist* took "directives from Silagy and Martell," Opp. 12, which does not refute McGrath's statement—much less with sufficient specificity to plead fraud.

**No Scienter**: Plaintiffs do not dispute that the SAC alleges nothing about McGrath's scienter, but instead claim that *Silagy's* scienter can be imputed to NEE because he "furnished information" for this statement. Opp. 17. However, they cite nothing—and nothing exists in the SAC—to support this new claim. Absent "particularized facts" that Silagy furnished information for this statement, they cannot rely on Silagy's alleged scienter. *Tupperware Brands*, 2023 WL 5091802, at **6–7. Alternatively, Plaintiffs say McGrath was reckless, Opp. 17, but the SAC is devoid of *any* allegations about him, much less any that compel the inference that he acted with "severe recklessness." *Sood* v. *Catalyst Pharm. Partners Inc.*, 2014 WL 1245271, at *6 (S.D. Fla. Mar. 26, 2014) (alleging "inexcusable negligence" and "inadequate due diligence" is insufficient).

## II. Plaintiffs Fail to Plead Loss Causation

### A. No Loss Causation Is Pled as to January 25, 2023

Plaintiffs fail to plead loss causation because none of the January 25 disclosures corrected or otherwise revealed new information about any of the eight alleged misstatements. As Plaintiffs do not refute, the January 25 disclosures were silent on the subjects of those eight statements: ghost candidates; Grow United; Monroe; Dennis; *The Capitolist*; and the results of NEE's first law firm investigation. Mot. 20. Rather, the January 25 disclosures concerned NEE's earnings, Silagy's retirement announcement, and the results of NEE's *second* law firm investigation, none of which were the subject of any challenged statement. Plaintiffs thus fail to plead, as they must, the disclosure of "new information" that "reveal[s] to the market that a company's previous statements were false." *Meyer* v. *Greene*, 710 F.3d 1189, 1198, 1201 (11th Cir. 2013).

Plaintiffs seek to avoid this dispositive defect through a hodgepodge of arguments, but each fails under Eleventh Circuit authority. *First*, Plaintiffs do not dispute that the SAC was wrong in

11

alleging that NEE "for the first time" warned investors on January 25, 2023 of the risks from the media allegations—because the November 3, 2022 10-Q contained those same risks. Opp. 24. They now pivot, claiming that the January 25 8-K contained "more information" because it referenced the "$1.3 million in dark money contributions" alleged in the CREW Complaint and "was the first time NextEra acknowledged facts potentially tying FPL to the scandal." *Id.* at 1, 22. Again, this is wrong: the November 2022 10-Q expressly disclosed that the Matrix allegations were directed at FPL, and disclosed that the (public) CREW Complaint "identifies FPL as an alleged source of funds to certain Super PACs," which the Complaint alleged totaled ~$1.3 million. Exs. F at 57; D ¶¶ 2, 42. The information Plaintiffs highlight was not "new" at all.

Plaintiffs next argue that the November 10-Q warning was not labeled a "risk factor" but rather was disclosed under "Item 5." This is irrelevant: regardless of its label, the same risks Plaintiffs claim were new on January 25, 2023 had been disclosed months earlier. *See In re MacPhee*, 73 F.4th 1220, 1246 (11th Cir. 2023) (disclosure which "only repeated information already in the public domain" not corrective). And Plaintiffs selectively quote only the first sentence of NEE's November risk factors as telling investors "there have been no material changes from the risk factors previously disclosed." Opp. 24. Two sentences later, NEE stated "*other information set forth in this report . . . could materially adversely affect NEE's and FPL's business [and] financial condition.*" Ex. F at 57. The "other information" included NEE's warning of the specific risks associated with the alleged political misconduct and CREW Complaint. *Id.*[7]

Plaintiffs likewise have no response to Defendants' showing that—even if the January 25, 2023 risk warning had been new (which it was not)—they cannot plead a "corrective disclosure"

---

[7] Item 5 of Form 10-Q calls for issuers to disclose information they would otherwise report on Form 8-K, Form 10-Q (Instructions) at 9, meaning investors understood that NEE "deem[ed]" the information to be "of importance to security holders," Form 8-K (Instructions) at 37.

based solely on "an added *risk* of future corrective action." *Meyer*, 710 F.3d at 1201 (emphasis in original); Mot. 22. Plaintiffs assert that Defendants cite *Meyer* "out of context," Opp. 24 n.10, but the distinction between disclosures that warn only of "potential future action" and "revelations to the market of some previously concealed fraud" was key to its holding, 710 F.3d at 1200–01. In contrast, in each of Plaintiffs' cases, the alleged corrective disclosures did not simply disclose a *risk* of a future corrective action, but rather new corrective information. For example, in *Flowers*, 2018 WL 1558558, at *20, a company disclosed that a report that it could resolve dozens of lawsuits without a "material impact" was not accurate, and that in fact its potential loss could not be reasonably estimated; the court determined that this disclosure, along with others, reasonably indicated that the company had committed the wrongdoing it had previously denied.[8]

At bottom, NEE disclosed in November 2022 that it was again investigating the Matrix allegations, but that those allegations could also result in enforcement actions, penalties, and other adverse impacts on NEE. And in January 2023, NEE announced that, despite the favorable findings from its investigation, it could not guarantee that those same adverse impacts would not occur. Plaintiffs cite no law for their novel theory that reiterating potential risks is "corrective."

***Second***, Plaintiffs still identify no falsity in any of the eight challenged statements that was revealed by Silagy's January 25, 2023 retirement announcement. Plaintiffs do not dispute that Silagy's announcement was not accompanied by disclosure of wrongdoing, but rather by *positive* news that NEE completed its second investigation and believed that it should not be found liable for the alleged Matrix conduct. Mot. 22–23. Nor do Plaintiffs dispute that claw-back provisions like Silagy's are common and, if anything, indicate that an executive had *not* been found to have

---

[8] *See also Thorpe*, 111 F. Supp. 3d at 1382 (disclosure of "*outcome* of investigation" was corrective); *Luczak* v. *Nat'l Beverage Corp.*, 812 F. App'x 915, 922–23 (11th Cir. 2020) (disclosures of failure to provide basis for sales metrics corrected statements touting those metrics).

13

engaged in wrongdoing at departure time. *Id.* at 24. Instead, Plaintiffs claim that the only reasons provided for the retirement were "pretextual," Opp. 25 n.22, but point to no *pleaded facts* disclosed on January 25, 2023 that linked the retirement to the subjects of any of the eight statements. Plaintiffs rely solely on analyst speculation—but that a few analysts (of many that cover NEE) were allegedly "surprise[d]" or found the retirement "unexpected," ¶¶ 295, 299, does not mean the announcement revealed falsity.[9] This differs from Plaintiffs' cases, where analyst commentary strengthened the inference that falsity was revealed, but where the analysts actually discussed new information directly related to alleged misstatements.[10] None of those cases address retirements accompanied by positive news, like NEE's completion of its second outside counsel investigation.

***Third***, in a footnote, Plaintiffs assert that Defendants did not address their "alternative" theory, under which they claim they need not allege a corrective disclosure, but merely that a "concealed risk later materialized." Opp. 22 n.9. But the Eleventh Circuit has repeatedly declined to adopt this alternative theory, *see Sapssov* v. *Health Mgmt. Assocs.*, 608 F. App'x 855, 861 n.7 (11th Cir. 2015). And Defendants did show that the SAC fails to link the stock decline to any disclosure related to the subjects of the challenged statements—under any theory. Mot. 22–23.[11]

---

[9] *See Meyer*, 710 F.3d at 1199 (analyst "opinion" cannot "reveal to the market the falsity of a company's prior factual representations"); *Wallace* v. *Intralinks*, 2013 WL 1907685, at *10 (S.D.N.Y. May 8, 2013) ("[T]he alleged speculation of some analysts as to the reasons behind the SEC subpoena is insufficient to constitute a disclosure of the truth.").

[10] *See Flowers*, 2018 WL 1558558, at *18–20 (disclosure of, among other things, government review, lawsuits, rising legal costs, and correction of report that exposure was immaterial revealed falsity of statements regarding compliance); *Thorpe*, 111 F. Supp. 3d at 1382 (disclosure of settlement negotiations, likely regulatory penalties, and rising legal costs revealed falsity of statements regarding compliance); *Pub. Empls.' Ret. Sys. of Miss.*, 564 F. Supp. 3d at 1306–07 (disclosure of negative results and excess inventory revealed falsity of statements touting sales results and limited inventory). *City Pension Fund for Firefighters and Police Officers in the City of Miami Beach* v. *Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1397–98 (S.D. Fla. 2011), did not, as Plaintiffs claim, find analyst statements indicating "surprise" as supportive of loss causation, Opp. 22; Plaintiffs cite to a summary of the parties' arguments.

[11] In *Noto* v. *22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 42 (W.D.N.Y. 2023), cited in support

*Finally*, Plaintiffs cite a chart of NEE's five largest stock price declines in 25 years, ¶ 301, and claim that the alleged January 25, 2023 decline of 8.71% (fifth on the list) was the only "non-market-based" decline of the five, Opp. 25. But Eleventh Circuit law is clear that a stock drop—even a large one—is not revelatory of fraud. *See Meyer*, 710 F.3d at 1196. Plaintiffs also assert that "[m]arkets do not react this way without new information," Opp. 25, but Plaintiffs themselves allege there was new information on January 25 (Silagy's retirement, earnings release), ¶¶ 286, 300. And Plaintiffs notably omit that, if their chart had extended to the *sixth* largest drop, it would include the stock decline of 8.33% following Robo's retirement announcement one year earlier, Ex. G at 11 (Jan. 25, 2022), which is not alleged to have revealed any fraud. That NEE's stock price declined by a nearly identical amount when Robo retired only underscores that retirements can be non-fraudulent and still cause stock drops and that Plaintiffs must plead that the disclosure that caused their loss was *corrective* and not just a disclosure. They have not done so.

### B. No Loss Causation Is Pled as to January 31, 2023

Plaintiffs devote one sentence to loss causation based on the January 31, 2023 *Times-Union* article. Opp. 22. They do not dispute that the claw-back discussed in that article was publicly filed and described by NEE on January 25, 2023. Mot. 25. While they assert that the market nonetheless learned on January 31 that the claw-back was "not customary," Opp. 22, they have no response to the showing that neither the *Times-Union* article nor the report on which it relied said that, Mot. 25, and waived any argument on this point. *Brahim*, 2014 WL 2918598, at *4 n.7.

### CONCLUSION

For these reasons, Defendants respectfully request dismissal of the SAC with prejudice.

---

of Plaintiffs' "materialization of a concealed risk" theory, Opp. 25 n.9, there *were* factual allegations, including CW allegations, that the CEO resigned due to misconduct findings, but this was hidden from investors. *See* Am. Compl. ¶¶ 146–151, 19-cv-001285, ECF 31 (Nov. 19, 2019).

15

**REQUEST FOR HEARING**

Defendants believe that an hour hearing would assist the Court in resolving the issues raised in Defendants' motion to dismiss.

Date: February 23, 2024.

Respectfully submitted,

**Jordi C. Martínez-Cid**

Jordi C. Martínez-Cid
Florida Bar No. 100566
Andy Hernández
Florida Bar No. 1018581

**Martínez-Cid Law**

1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: 305-704-9162
Email: jmartinez-cid@martinez-cidlaw.com
Email: ahernandez@martinez-cidlaw.com
Email: service @martinez-cidlaw.com

**Daniel J. Kramer**

Daniel J. Kramer
New York Bar No. 1979392
(admitted *pro hac vice*)
Audra. J. Soloway
New York Bar No. 4113536
(admitted *pro hac vice*)
Joshua Hill, Jr.
New York Bar No. 4297826
(admitted *pro hac vice*)
David P. Friedman
New York Bar No. 5387774
(admitted *pro hac vice*)

**Paul, Weiss, Rifkind, Wharton
& Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000

**CASE NO. 23-CIV-80833-CANNON**

Email: dkramer@paulweiss.com
Email: asoloway@paulweiss.com
Email: jhill@paulweiss.com
Email: dfriedman@paulweiss.com

*Counsel for NextEra Energy, Inc., Florida Power & Light Company, James Robo, Eric Silagy, and David P. Reuter*