EXHIBIT B

**BLOCK & LEVITON LLP**

# *Jastram v. NextEra Energy, Inc., et al.*

Plaintiffs' Demonstrative in Opposition of Defendants' Motion to Dismiss

**BLOCK & LEVITON LLP**

# *Falsity*

Paragraphs of the SAC Supporting Allegations that Statements Were False or Misleading

## Statement 1 (¶262) – James Robo, January 25, 2022

**"We found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees…I feel very good that there is no basis to any of these allegations…"**

¶¶48-49: Robo was sent a memo informing him that Silagy, Martell and other FPL employees "engaged in an ongoing scheme with [former Matrix CEO Jeff] Pitts and others to secretly divert corporate resources to off-the-books communications and political campaigns" concealed by personal emails and pseudonyms.

¶50: "Silagy, Martell, and [Julie] Holmes [an NEE vice president] worked with Pitts and others to use Grow United [and] other 501(c)(4) organizations . . . to funnel FP&L funds to various political campaigns for the Florida State Senate that have been described as 'ghost candidates' . . . tens of millions of dollars" were used to "covertly pay consultants and third-party vendors" and the "funds [] appear to have originated from FP&L" based on Records from the 2018 and 2020 election cycles.

**2018 Election Cycle:**

¶¶89-92: FPL wanted to defeat the State Senate District 8 incumbent. FPL sent money through a Matrix-controlled 501(c)(4) organization, Mothers for Moderation. FPL contributed $14 million to Mothers for Moderation, virtually all of its 2018 revenue. It appeared that the "only purpose" for this entity was to obscure "the source of contributions to political campaigns and third-party vendors."

¶93: Emails sent by Pitts to "Theodore Hays," Eric Silagy's pseudonym email account requesting funding. Most of the letters were addressed to "Florida Power and Light Attn: Eric Silagy." November 5, 2018 requesting $4.3 million for Mothers for Moderation; November 14, 2018 $2.4 million; December 17, 2018 $500,000; December 26, 2018 $45,000; three letters all dated April 9, 2019 requesting $6.6 million, $6 million and $3 million.

¶95: Pitts used these funds to "engage in other political activity on behalf of FPL". Silagy and Martell were "active participants in these contributions."

¶101: FPL paid Mothers for Moderation $14.15 million between August and December 2018.

¶102: Mothers for Moderation ran attack ads against the District 8 incumbent targeted by FPL.

¶104: Matrix established another 501(c)(4) called Broken Promises to also help influence elections on behalf of FPL. Martell asked questions of Pitts via text about who controlled Broken Promises asking Pitts "We need to know who the board members are" and Martell needed an answer "asap" as he was "[o]n phone with eric." Pitts replied "Bottom Line is We are the one with the check books and in control 100percent." Martell responded "This text is self-destructing in 30 seconds."

¶¶105-108: FPL contributed $200,000 to Broken Promises which contributed money to the candidate opposing the District 8 incumbent.

¶¶116-131: FPL contributed to a Matrix controlled 501(c)(4) to oppose Miami-Dade county incumbent candidate Daniella Levine Cava. In August 2020, Cava ran for Mayor of Miami-Dade and the Capitolist ran a story attacking Cava. Silagy texted Pitts about the story saying "Love it!"

## Statement 1 (¶262) – James Robo, January 25, 2022

"We found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees…I feel very good that there is no basis to any of these allegations…"

**2020 Election Cycle:**

¶149: Silagy emails Martell in early 2019 "JRR at it again. I want you to make his life a living hell . . . seriously" referring to Senator Rodriguez in SD 37.

¶¶160-62: Pitts sent to Silagy, via his pseudonym "Theodore Hayes' email address, a Funding Memo and a Legal Memo outlining how FPL could set up various 501(c)(4) entities which could then contribute to other Matrix controlled entities to influence 2020 elections. The "best structure to use" would be an S Corporation as the "SCorp can fund C4 activities without any tax liabilities or public reporting" and there "are no public documents that identify the owner of this SCorp." The memos also stated that the "Goals" were to "[p]rovide funds that can be used for political activities in 2020 – specifically support of Political Committees in Florida" and the structure would "[m]inimize all public reporting of entities and activities."

¶¶167-71: Pitts emailed "Theodore Hayes" with further details about funding: Matrix would set up a C corp, SUN Marketing, that FPL would contribute to and SUN would then contribute to other entities that would fund political activities on FPL's behalf to minimize reporting.

¶175: SUN Marketing was incorporated in Delaware in December 2019 and FPL within weeks of its creation contributed funds to SUN. Reuter admitted FPL contributed to SUN.

¶176: Matrix established Grow United, "an entity funded by FP&L" in part to conceal spending in the 2020 election cycle.

¶¶178-180: Pitts invoiced FPL approximately $3.5 million in September 2020 and, upon receipt, diverted almost $2 million of those funds into People Over Profits which "was a major source of funds for Grow United."

¶181: Matrix updated FPL executives Martell and John Holley, on the SD37 race, highlighting that the ghost candidate Alex Rodriguez – who was enlisted to siphon votes away from the incumbent Sen. Rodriguez – was polling at 4.4%. Holley wrote "[w]e are going to charge full speed ahead" in District 37 and other races involving ghost candidates.

¶¶182-191: FPL's consultants at Matrix coordinated the funding from Grow United to the ghost candidate political committees to influence the elections FPL indicated it was interested in.

¶¶191-92: Less than a week before the election, "Danny [Martell] asked for a report he can show to" Silagy including a "[m]ap of the doors canvased in SD 37 and 39."

¶193: Matrix billed FPL for the legal work to create the funding structure for the 501(c)(4) entities including Grow United.

¶194: The ghost candidate scheme worked as intended as FPL's preferred candidates won their races.

## Statement 1 (¶262) – James Robo, January 25, 2022

"We found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees…I feel very good that there is no basis to any of these allegations…"

**The Phony Job Offer at Grow United and JEA:**

¶¶56-64: The Jacksonville Electric Authority (JEA) was considering going private in 2019 and FPL was interested in acquiring it. Jacksonville City Counsellor, Garrett Dennis, was opposed to the privatization. FPL, through Matrix, sought to offer Dennis a job to induce him to resign from the city council and eliminate opposition to the privatization.

¶66: Matrix sent $180,000 to Fix JEA Now, an organization supporting the privatization of the electric authority. Matrix referenced FPL as the client invoiced for the various payments.

¶¶72-73: Pitts sent Martell an email that among the "things to go over" was "JEA - DG" with DG referring to Dennis. Matrix maintained a folder of "FPL_2019 Vendor Invoices" which included funds used to contribute to Grow United, the entity used to make the job offer to Dennis.

¶74: A Matrix employee wrote a memo that one of the two "Project Goals" in creating Grow United was to "create a job opportunity for District 9's Garrett Dennis" with a proposed salary of $180,000.

¶69: A Matrix affiliate at Fix JEA Now, through an intermediary, offered Dennis a job at Grow United with an annual salary of $180,000 plus travel expenses. The offer was explicitly conditioned on Dennis leaving the City Council.

¶70. Dennis turned down the offer.

## Statement 2 (¶264) - Eric Silagy, June 24, 2022

### "We did not engage in any activities having to do with following people like you, Nate, or taking pictures."

¶78: Nate Monroe, a reporter for the Florida Times-Union, wrote an article criticizing FPL's bid to privatize the Jacksonville Electric Authority.

¶79: Jeff Pitts sent to David Martell a 72-page investigative report on Nate Monroe. The email was sent to Martell's personal and not FPL email address. The report included the names and phone numbers of Monroe's relatives, his social security number, the make and model of his car, his driver's license number, places where he has lived since childhood and a criminal records search.

¶80: Matrix followed Monroe to a wedding he attended in Pensacola, FL. Monroe tweeted "OK Time to get drunk."
A Matrix operative texted a screenshot of this post to Martell to which Martell immediately responded "Awesome." The Matrix operative later wrote "He's in an Uber. 😠 "

¶83: Matrix had a photograph of Monroe, his girlfriend and dog outside his apartment taken two weeks after Monroe wrote a negative story about FPL.

¶84: Matrix paid a private investigations firm Clear Capture Investigations, which advertises "political/corporate surveillance" thousands of dollars and identified FPL as the client associated with many of the payments.

## Statement 3 (¶252) – David Reuter, December 2, 2021

"Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees."

¶¶48-54: Robo Memorandum names specific NEE and FPL employees, including Silagy, worked with Matrix to "use Grow United, other 501(c)(4) organizations for Florida State Senate that have been described as 'ghost candidates' . . ." during 2020 election cycle.

¶¶50, 77, 176: Robo Memorandum contained evidence connecting FPL officers to the "attempted bribe of a public official and disguised political contributions to fund ghost candidates in three Florida Senate races. NEE and FPL employees, including Silagy, used 501(c)(4) organizations to funnel "tens of millions" of FPL funds to political campaigns.

¶72: FPL Vice President of State Legislative Affairs sent an email to Matrix's Pitts about Garret Dennis ("things to go over," "JEA – DG") on June 29, 2019.

¶73: Internal Matrix documents discuss "FPL Expenses for Grow United c4."

¶75: FPL is billed for the fees charged for incorporating Grow United.

¶¶86-88: Matrix kept detailed ledgers of FPL's political spending, which was important to FPL.

¶¶89-131: Silagy and Matrix orchestrated ghost candidate campaigns in 2018.

¶¶132-148: Describing Silagy's and FPL's role in "ghost candidate" scheme in 2020 election cycle.

¶149: Silagy asks Martell to "make [Sen. Rodriguez] life a living hell…seriously."

¶155: Silagy holds meeting on July 19, 2019 with NEE executive and Matrix to discuss "Dereg Budget"—shorthand for political spending.

¶¶158-162: Communications with Silagy about funding structure for political expenditures.

¶¶167-171: Pitts emails Silagy at his pseudonymous "Theodore Hayes" email address Memoranda concerning covert political spending and focused on minimizing public reporting.

¶¶172-211: Emails, text messages and financial records establish that Matrix billed FPL through entities including TMP Interactive, People Over Profits, and ENH Industries that in turn funded Grow United. Grow United then contributed to the political committees The Truth and Our Florida, which supported the ghost candidates' campaigns in exactly the manner proposed in the chart attached to the Funding Memo suggested.

## Statement 4 (¶256) – David Reuter, December 10, 2021
### "FPL had no involvement in the creation of Grow United."

¶¶48–54: Grow United was created by Matrix for the benefit of FPL and for the purposes of concealing FPL's political contributions and creating a "job opportunity" for Garrett Dennis.

¶72: Martell emails Pitts on June 20, 2019, about "things to go over" including "JEA-DG" referring to Garrett Dennis.

¶73: Matrix emails and invoices associated with Grow United identify FPL as the client.

¶74: Matrix employee drafts planning document for Grow United on July 21, 2019.

¶75: FPL was the client billed for Grow United's incorporation fees with the state of Delaware three days after the composition of the memo described above on July 24, 2019.

¶¶143–211: Matrix billed FPL through entities including TMP Interactive, People Over Profits, and ENH Industries that in turn funded Grow United. Grow United then contributed to the political committees The Truth and Our Florida, which supported the ghost candidates' campaigns in exactly the manner proposed in the chart attached to the Funding Memo suggested.

¶257: Summarizing the above.

## Statement 5 (¶258) – David Reuter, December 17, 2021

"[W]e have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle…Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501(c)(4) organizations and we had no knowledge of this structure being used by Matrix."

¶¶48-54: Robo Memorandum names specific NEE and FPL employees, including Silagy, who worked with Matrix to "use Grow United, other 501(c)(4) organizations for Florida State Senate that have been described as 'ghost candidates' . . ." during 2020 election cycle. Robo Memorandum contained evidence connecting FPL officers to disguised political contributions to fund ghost candidates in three Florida Senate races. NEE and FPL employees, including Silagy, used 501(c)(4) organizations to funnel "tens of millions" of FPL funds to political campaigns.

¶¶160-62: Pitts sent to Silagy, via his pseudonym email address Theodore Hayes, a Funding Memo and a Legal Memo outlining how FPL could set up various 501(c)(4) entities which could then contribute to other Matrix controlled entities to influence 2020 elections. The "best structure to use" would be an S Corporation [later changed to a C corp] the "SCorp can fund C4 activities without any tax liabilities or public reporting" and there "are no public documents that identify the owner of this SCorp." The memos also stated that the "Goals" were to "[p]rovide funds that can be used for political activities in 2020 – specifically support of Political Committees in Florida" and the structure would "[m]inimize all public reporting of entities and activities."

¶¶167-70: Pitts emailed "Theodore Hayes" with further details about funding: Matrix would set up an entity a C corp, SUN Marketing, that FPL would contribute to and SUN would then contribute to other entities that would fund political activities on FPL's behalf to minimize reporting.

¶176-177: Matrix established Grow United, "an entity funded by FPL" in part to conceal spending in the 2020 election cycle. FPL invoiced for Grow United's incorporation fees.

¶¶178-180: Pitts invoiced FPL approximately $3.5 million in September 2020 and, upon receipt, diverted almost $2 million of those funds into People Over Profits which "was a major source of funds for Grow United."

¶181: Matrix updated FPL executives Martell and John Holley, on the SD37 race, highlighting that the "ghost candidate" Alex Rodriguez – who was enlisted to siphon votes away from the incumbent Sen. Rodriguez – was polling at 4.4%. Holley wrote "[w]e are going to charge full speed ahead" in District 37 and other races involving ghost candidates.

¶¶182-191: Showing funding of Grow United to influence elections FPL indicated it was interested in.

¶75: FPL was the client billed for Grow United's incorporation fees with the state of Delaware which took place three days after Odom's memo, July 24, 2019.

¶¶132–211: As described above, Silagy directed Martell to make Sen. Rodriguez's life "a living hell" and within weeks, following meetings between Martell and Pitts, Matrix proposed the funding structure to FPL for the purpose of minimizing public reporting. Financial records confirm funding flowed in precisely the manner proposed by the funding memo and Grow United served the role played by the "placeholder C4" in the flow chart composed by Matrix.

## Statement 6 (¶260) – David Reuter, December 19, 2021

"In July 2019, a Matrix representative working for Joe Perkins approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. FPL flatly rejected the plan and communicated our lack of interest to Joe Perkins' team.""

¶¶48–54: Grow United was created by Matrix for the benefit of FPL and for the purposes of concealing FPL's political contributions and creating a "job opportunity" for Garrett Dennis.

¶66: Matrix sent $180,000 to Fix JEA Now in 2018, an organization supporting the privatization of the electric authority. Matrix referenced FPL as the client invoiced for the various payments.

¶72: Pitts sent Martell an email that among the "things to go over" was "JEA-DG" with DG referring to Dennis. Matrix maintained a folder of "FPL_2019 Vendor Invoices" which included funds used to contribute to Grow United, the entity used to make the job offer to Dennis.

¶74: Matrix employee wrote a memo that one of the two "Project Goals" in creating Grow United was to "create a job opportunity for District 9's Garrett Dennis" with a proposed salary of $180,000.

¶69: Matrix affiliate at Fix JEA Now, through an intermediary, offered Dennis a job at Grow United with an annual salary of $180,000 plus travel expenses. The offer was explicitly conditioned on Dennis leaving the City Council.

¶70. Dennis turned down the offer.

**Statement 7 (¶264) – David Reuter, June 24, 2022**

"[FPL has] no digital record of these exchanges and cannot prove their veracity…taken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees."

¶266: Reuter disputed the veracity of text messages between Martell and a private investigator surveilling Nate Monroe and without mention of whether Martell's cell phone records were checked.

¶¶80-81: Matrix operative texted Martell while surveilling Monroe and Martell responded approvingly.

¶84: Matrix records of payment include thousands paid to private investigation firm specializing in "political/corporate surveillance" with FPL noted as the client.

## Statement 8 (¶267) – Chris McGrath, August 13, 2022

"FPL does not have an ownership interest in the Capitolist – either directly or indirectly . . . We also do not have editorial control over what the Capitolist writes or publishes."

¶¶213–15: FPL funded and influenced The Capitolist.

¶216: Financial records showed FPL payments to the Capitolist via Metis Group.

¶¶217-20: Matrix associates emailed Martell to solicit input on upcoming articles in The Capitolist.

¶¶221-222: Matrix affiliate Metis Group purchased The Capitolist.

¶223: Emails indicating Silagy and FPL requested specific articles from The Capitolist.

¶¶225-28: Emails indicating Silagy directed Capitolist to run a negative story about Mary Ellen Klas.

¶229: Capitolist publisher emailed Matrix to ask whether to cover a story on a FPL competitor.

¶¶230: Former FPL executive, Tim Fitzpatrick, brought in to manage The Capitolist. Fitzpatrick indemnified by FPL through an agreement with SUN Marketing (referenced in the chart included with the Funding Memo described above).

¶¶232-35: Slide deck shared with Silagy touting Capitolist's growth in readership.

¶¶236-39: After former FPL officer began overseeing The Capitolist the number of headlines mentioning FPL doubles.

¶¶240-41: Fitzpatrick composes a media plan to address potential media scrutiny of The Capitolist's ownership, emphasizing that questions about ownership/management structure should be ignored.

¶¶242-46: Silagy and Martell solicited coverage of specific stories by The Capitolist while making payment to The Capitolist through a Matrix-controlled intermediary through 2021.

**BLOCK & LEVITON LLP**

# *Scienter*

Paragraphs of the SAC Supporting Allegations that Statements Were Made with Scienter

# Scienter

**Silagy Orchestrated the Alleged Misconduct**

¶¶47, 93, 97, 160, and 167: Silagy took extraordinary steps to conceal his work with Matrix and political spending. *In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310-11 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter.").

¶¶320-23: Silagy's rushed resignation following the completion of the second investigation supports the inference the two were related. *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016) (Officer resignation suggests scienter where the former officer "was at the epicenter of" the company's business circumstances suggest he was "forced to resign.").

¶¶327, 330-31: Silagy sold $5.4 million worth of stock—the most he ever traded in a single day—the day before the publication of a negative news story he had been asked to comment on linked FPL to Matrix and the ghost candidate scandal. *In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (stock sales "just weeks before [a] 'bad news' announcement" supported scienter).

**Robo and Reuter Possessed Documents Contradicting Their Public Denials**

¶¶48, 255, 317: Robo and Reuter had the Memo before making their statements. *In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1252 (S.D. Fla. 2022) (scienter adequately plead where defendants "knew facts or had access to information suggesting that their public statements were not accurate").

Reuter knew of Memo before December 2, 2021 as Memo was dated November 5 and Orlando Sentinel sent exhibits from Memo to FPL prior to publishing story and Reuter specifically commented on them.

**BLOCK & LEVITON LLP**

# *Loss Causation*

# Loss Causation Standard

- Plaintiff must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline."

- "At the pleading stage, it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."

- While "the plaintiff need not show that the defendants' misconduct was the 'sole and exclusive' cause of its injury, it must show that the defendant's act was a 'substantial' or 'significant' contributing cause."

- For a disclosure to be 'corrective' it 'need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company."

- In other words, the "events or information" that are the subject of the stock drop must relate, in some way, to the alleged misrepresentations.

*MacPhee v. MiMedx Group, Inc.*, 73 F. 4th 1220, 1242-43 (11th Cir. 2023)

# Loss Causation
## *National Beverage Corp.*

- Plaintiff alleged company's use of certain types of sales metrics were false and misleading.

- The Securities and Exchange Commission sent National Beverage a letter indicating that there was an inconsistency in the company's description of the sales metrics and its press releases. National Beverage's stock fell in response to the SEC's letter.

- The Wall Street Journal subsequently reported on the exchange between the SEC and the company and that "National Beverage declined to provide [the SEC with] the requested figures." National Beverage's stock fell in reaction to this news story.

- The Eleventh Circuit reversed the district court's finding that stock drops after disclosure of the SEC letter or the Wall Street Journal Story were legally sufficient to establish loss causation.

- The Court of Appeals disagreed with the district court's finding that the SEC letter simply confirmed the "SEC's already established doubt of the veracity" of the sales metrics and that the Wall Street Journal story did not add any "new information."

- The Eleventh Circuit held a corrective disclosure need not "constitute either 'proof of fraud" or 'proof of liability.'"

- Eleventh Circuit found it reversible error to "separate[ly] analy[ze] both" statements as "they cumulatively disclosed" the fraud to the market. *Id.*

- National Beverage did not restate, revoke or withdraw its sales metrics; it simply received a letter from the SEC which alleged the use of the disclosures regarding its sales metrics were inconsistent.

*Luczak v. Nat'l Beverage Corp.,* 812 F'App'x 915, 922-23 (11th Cir. 2020)

# January 25, 2023
# New Facts Moved the Market

- The disclosures on January 25, 2023 must be viewed collectively.

- Disclosures corrected the prior statements that there was "no basis" to allegations that FPL was involved in the political scandal and that there was "no evidence" supporting those allegations.

- On January 25:
  - NEE provided a "negative update," on the investigation, issuing new risk disclosures;
  - NEE announced Silagy was unexpectedly resigning; and
  - Silagy's severance agreement contained an atypical for NEE claw back provision in case of a finding of wrongdoing.

# January 25, 2023
# NEE's New Risk Disclosures

| November 10-Q | January 25 8-K |
|---|---|
| Announcing <u>start</u> of second investigation:<br><br>"There have been <u>no material changes from the risk factors previously disclosed…;</u>"<br><br>"NEE has engaged outside counsel to conduct a review…[t]he review is ongoing…"<br><br>"NEE and FPL cannot predict…the outcome of the review." "[A]llegations could also result in regulatory, investigative and enforcement inquiries…"<br><br>**ECF No. 83-7 at 7 (p.57 of the 10-Q)** | After <u>completion</u> of the investigation:<br><br>**New Risk Factor:** "[A]llegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's or NEE's effectiveness in interacting with government authorities"<br><br>No "assurance" that the political scandal will not lead to a "material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with government regulators or other authorities."<br><br>**ECF No. 83-11 at 3** |

# January 25, 2023
# NEE's "Negative Update" on the Investigation

- Analysts believed the January 25, 2023 disclosures were new and significant:
  - "[N]ew risk disclosures around" political scandal was a "negative update" (¶292)
  - "[P]olitical activity news likely sparked share drop" (¶295)

- *Meyer v. Greene*, 710 F. 3d 1189 (11th Cir. 2013) at 1196-97 (plaintiff properly pleads loss causation by "eliminating other possible explanations for this price drop.")

- *Meyer* contains no broad "policy" directive on what should constitute a corrective disclosure; instead it states the basic proposition that for a disclosure to be corrective it must "correct" a prior representation. Merely announcing the investigation of a matter does not correct a prior representation by itself.

# January 25, 2023
# Silgay's Resignation Was New

- Silagy's resignation on the same day NEE updated its risk disclosures surrounding the political scandals supports loss causation. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1293-94 (11th Cir. 2011) (executive resignation and other disclosures established loss causation).

- Stock drop was "driven substantially by the unexpected management change and the update they gave on their review into political activity" ¶295.

- "[I]nvestors weren't buying" that Silagy's departure was not connected to internal investigation into political misconduct at FPL. ¶290.

- NEE's stock under pressure despite "solid numbers" because of new warning that "allegations could have a material impact on" NEE and Silagy's resignation ¶291.

- "[S]equencing of disclosures on FL campaign finance law allegations, the announced retirement of FPL CEO Eric Silagy and new risk disclosures" caused stock drop. ¶292.

- NEE made no prior disclosure that Silagy was considering resigning despite having supposedly told incoming CEO Ketchum in January 2022 that he would resign in a year. Ketchum said the resignation was "a little earlier than I would have hoped Eric would have wanted to do it." ¶321.

# January 25, 2023
# Silagy's Claw back Was Not "Customary"

- The Claw back provision in Silagy's severance agreement was shared on January 25, 2023. Subsequent reporting revealed it was unusual for NEE.

- NEE executives met with analysts from Bank of America to discuss "Silagy's exit and other uncertainties the analysts had" and NEE executives disclosed them that the claw back provision of Silagy's severance agreement was not "customary." ¶304.

- NEE's proxy statement did not disclose that the company would "claw back" funds from a former executive if they were found to have broken the law or committed other kinds of misconduct," underscoring that the claw back in Silagy's agreement was atypical for NEE. ¶304