```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                      CASE NO. 23-cv-80833-AMC
 3
      MAHA JASTRAM, individually and on      Fort Pierce, Florida
 4    behalf of all others similarly
      situated,
 5
                      PLAINTIFFS,            May 13, 2024
 6
            vs.                              1:40 p.m. - 4:17 p.m.
 7    NEXTERA ENERGY, INC., FLORIDA POWER &
      LIGHT COMPANY, JAMES ROBO, ERIC
 8    SILAGY, and DAVID P. REUTER,

 9                    DEFENDANTS.            Pages 1 to 112
      _____
10
                          MOTION HEARING
11              BEFORE THE HONORABLE AILEEN M. CANNON
                     UNITED STATES DISTRICT JUDGE
12    APPEARANCES:

13    FOR THE PLAINTIFFS:
                          KLAUSNER, KAUFMAN, JENSEN, & LEVINSON
14                        SEAN MICHAEL SENDRA, ESQ.
                          7080 NW 4th Street
15                        Plantation, Florida 33317

16
                          BLOCK & LEVITON, LLP
17                        JEFFREY C. BLOCK, ESQ.
                          JACOB A. WALKER, ESQ.
18                        BRENDAN JARBOE, ESQ.
                          260 Franklin Street
19                        Suite 1860
                          Boston, Massachusetts 02110
20
      FOR THE DEFENDANTS:
21                        PAUL WEISS RIFKIND WHARTON & GARRISON LLP
                          AUDRA J. SOLOWAY, ESQ.
22                        DAVID J. KRAMER, ESQ.
                          DAVID P. FRIEDMAN, ESQ.
23                        KEVIN MADDEN, ESQ.
                          JOSHUA HILL, ESQ.
24                        1285 Avenue of the Americas
                          New York, New York 10019
25
```

```
 1   FOR THE DEFENDANTS:
                         MARTINEZ-CID LAW
 2                       JORDI CARLOSANTIAGO MARTINEZ-CID, ESQ.
                         1 SE 3rd Avenue
 3                       Suite 2300
                         Miami, Florida 33131-1716
 4
     STENOGRAPHICALLY REPORTED BY:
 5
                         LAURA E. MELTON, RMR, CRR, FPR
 6                       Official Court Reporter to the
                         Honorable Aileen M. Cannon
 7                       United States District Court
                         Fort Pierce, Florida
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Call to the order of the Court.)

2          THE COURT:  Welcome.  You may be seated.  Let's call

3     the case.

4          COURTROOM DEPUTY:  Jastram vs. NextEra Energy

5     Incorporated, et al., case number 23-cv-80833.

6          Will parties please make your appearance, starting with

7     plaintiff.

8          MR. SENDRA:  Sean Sendra of Klausner Kaufman Jensen &

9     Levinson.  We are general counsel for the Hollywood Police

10    Retirement System, as well as the Pembroke Pines Police and

11    Fire Retirement System, acting as local counsel for this

12    hearing.  And Mr. Block and his associates are present as well

13    and will be arguing on behalf of the plaintiff.

14         MR. BLOCK:  Good afternoon, Your Honor.  Jeffrey Block,

15    Block & Leviton for plaintiffs.  And with me is Brendan Jarboe

16    and Jacob Walker with my firm.

17         THE COURT:  Okay.  I am not hearing you all very

18    clearly.  So I'm going to ask that you, please, move the bases

19    of the microphones closer to you.

20         And your local counsel, can you please repeat your name

21    for me, please.

22         MR. SENDRA:  Yes, Judge.  Sean Sendra with Klausner

23    Kaufman Jensen & Levinson.

24         THE COURT:  Okay.  How do you spell your last name?

25         MR. SENDRA:  S-E-N-D-R-A.

1          THE COURT:  Mr. Block, are you going to be taking the

2    lead this afternoon?

3          MR. BLOCK:  Yes, I am, Your Honor.

4          THE COURT:  Okay.  All right.  Thank you.

5          Who is here for defendants NextEra Energy, James Robo,

6    Eric Silagy, David Reuter, and FPL?

7          MR. MARTINEZ-CID:  Good afternoon, Your Honor.  Jordi

8    Martinez-Cid on behalf of all of the defendants.  I am joined

9    today by my cocounsel from Paul Weiss who -- I will allow them

10   to introduce themselves.

11         MR. KRAMER:  Good afternoon, Your Honor.  Dan Kramer

12   from Paul Weiss for the defendants.  I will be splitting it --

13   with Your Honor's permission, I will be splitting the argument

14   today with my partner, Ms. Soloway.

15         THE COURT:  Yes.  That's fine.  Did you say "Soloway"?

16         MS. SOLOWAY:  Good afternoon, Your Honor.  Audra

17   Soloway, S-O-L-O-W-A-Y.  Thank you, Your Honor.

18         THE COURT:  Excellent.

19         Okay.  All right.  Well, with the appearances out of

20   the way, then I will just clarify that this is a hearing on

21   defendant's motion to dismiss the second amended complaint.  I

22   have read the motion, the opposition, and the reply, along with

23   the operative pleading.

24         I have also reviewed some of the exhibits attached to

25   the motion, and the additional exhibits, which the Court took

 1    judicial notice of, filed post-operative complaint.

 2         So because it is defendant's motion, I will hear first

 3    from defendants, although I will be likely jumping back and

 4    forth to plaintiffs' counsel for some clarification about the

 5    specific statements that are at issue in the complaint.

 6         So with that, I will open the floor to defense counsel,

 7    and let you proceed with your presentation.

 8         MS. SOLOWAY:  Your Honor, I assume it's okay to

 9    approach the podium?

10         THE COURT:  Yes.

11         MS. SOLOWAY:  Okay.

12         Thank you so much, Your Honor.  So we're going to start

13    today -- I'm going to present the defendant's arguments about

14    the eight challenged statements here, both that they're not

15    adequately pleaded and the -- that they don't meet the legal

16    standard for strong inference of scienter.  And, of course,

17    Your Honor, as you know the law requires us to go statement by

18    statement and defendant by defendant, but I'm going to try,

19    notwithstanding the length of the complaint, to cut right to

20    the heart of the issues and address, as to each statement, what

21    defendants' principal arguments are.

22         And then my colleague, Mr. Kramer, is going to address

23    loss causation, which, as Your Honor knows, is an independent

24    ground for dismissal here.  And if Your Honor determines that

25    it's appropriate to dismiss on loss causation grounds, then you

1   don't need to wade statement by statement on the falsity and

2   analysis -- falsity and scienter analysis.

3          So, Your Honor, let me just start by taking a step back

4   and sort of setting the scene and the key context for the

5   allegations of securities fraud in this case.

6          So at the center of this case, Your Honor, is this

7   nonparty, Matrix.  And Matrix was an outside consultant to FPL.

8   It provided political consulting to its clients, FPL being one

9   such client.  And what happens here, Your Honor, is that

10  Matrix's founder, Joseph Perkins, gets into a courtroom dispute

11  with a former CEO of Matrix, Jeff Pitts.  And they're throwing

12  accusations at each other; one accuses one of cheating him out

13  of fees and the other says that you are engaging in extortion.

14  And as part of this dispute between the two of them, there is

15  an investigation conducted.  And this memo, which we call the

16  Matrix memorandum, gets written.

17          THE COURT:  Do you know why plaintiffs call it "the

18  Robo memo"?  He didn't author it; correct?

19          MS. SOLOWAY:  He did not author it, Your Honor.  I

20  believe -- of course, you can ask the plaintiffs, but I believe

21  they call it that because it was sent to NextEra Energy.  And,

22  of course, the CEO of NextEra Energy is Mr. Robo, but Mr. Robo

23  had nothing to do with creating the memo.  And, in fact -- and

24  I will get to this -- Mr. Robo isn't alleged to have had

25  anything to do with the underlying allegations at all.  He is

1      the recipient of the memo, which just arrives out of the blue.

2              THE COURT:  So we will just call it "the memo."

3              MS. SOLOWAY:  Thank you, Your Honor.  We will call it

4      "the memo."

5              So two things happened after this memo gets sent;

6      right?  One it goes to reporters, and that happens in late

7      2021.  And reporters start reporting on it.  And it also gets

8      sent, as I mentioned, to NextEra, which is FPL's parent

9      company.  And the press starts reporting, based on information

10     in the memo.  So this is not some secret document.  It's not,

11     you know -- it's not like the only person who has ever heard of

12     it is -- is FPL or, excuse me, NextEra.  It's in the hands of

13     reporters.

14             THE COURT:  But the memo itself is not -- is not

15     attached to the complaint in this case?

16             MS. SOLOWAY:  Correct, Your Honor.  It has not been

17     attached to the complaint in this case.  The plaintiffs, in

18     their complaint, describe it, but they did not provide it to

19     Your Honor.

20             THE COURT:  Okay.  Keep going.

21             MS. SOLOWAY:  So the next thing that happens,

22     Your Honor, is that NextEra retains outside counsel and they do

23     this on two occasions to investigate the issues that are raised

24     in the memo and in the media reports.  And both outside counsel

25     investigations are reported to conclude with no findings of

1    illegal conduct by FPL.

2             Now, the plaintiffs --

3             THE COURT:  Where are we -- where are we timewise when

4    this is happening, this first investigation with negative

5    findings?

6             MS. SOLOWAY:  Good question, Your Honor.  So just to

7    situate you in time, the memo is dated November.   The press --

8             THE COURT:  November of?

9             MS. SOLOWAY:  2021, Your Honor.

10            THE COURT:  Okay.

11            MS. SOLOWAY:  And the press starts reporting on it in

12   December of 2021.  And then the first investigation

13   happens immediately upon receipt of the memo.  So that one

14   wraps up and is reported on in January of 2022.  And that's

15   the -- as Your Honor may be headed there -- the one statement

16   by Mr. Robo is a statement about the conclusion of that first

17   investigation; so that's late January of 2022.

18            And then what happens, Your Honor, is that some

19   additional media reports come out in the summer of 2022.  And a

20   second law firm is brought in to investigate, and that wraps up

21   and is reported in January of 2023.  So that is, sort of, the

22   timeline here.

23            And the plaintiffs don't allege that NextEra has ever

24   been charged by a government authority for the conduct that

25   discussed in the memo or in the media reports.  And Mr. Kramer

1    will get to this, but the alleged corrective disclosure also is

2    not -- is not some disclosure that the company has made

3    findings of misconduct.

4         So what this case is really about, the reason that

5    we're here, is that against this backdrop, the plaintiffs point

6    to eight statements.  There are statements that were made while

7    NextEra was conducting its own investigation into the Matrix

8    memo and the media reports in which four individuals addressed

9    certain specific factual issues, largely in response to

10   questions from reporters.  And the plaintiffs say that these

11   eight statements are false.

12        Now, as Your Honor knows, the pleading burden for

13   securities fraud is very high.  Of course, there is the

14   standard 9(b) pleading standard, right, which is the who, what,

15   where, when, and how of fraud.  But you also have the PSLRA

16   imposed on top of that, which requires us to also assess

17   weighing all the inferences, whether the plaintiffs have an

18   inference of fraud that is at least as compelling as the

19   non-culpable inferences.

20        And so, before I start digging in statement by

21   statement, I think we kind of need to take a step back here and

22   look at the inferences that arise out of this fact pattern.  I

23   mean, there are very compelling inferences here that the

24   defendants did not have intent to defraud.  Based on the fact

25   that they received this Matrix memo literally out of the blue

1    from these warring principals of Matrix who are themselves

2    engaged in some disputes.  It arrives on their doorstop.  They

3    promptly conduct an investigation.  They twice retain outside

4    counsel to investigate whether FPL has engaged in any

5    misconduct.  They announce that they're doing these

6    investigations, and they announce ultimately that they find no

7    findings of illegal conduct.  And they warn -- and this is in

8    November of 2022 -- in particular, that any adverse findings in

9    connection with the media reports could result in penalties,

10   fines, and sanctions.

11          So during this time period the company is, you know,

12   reporting on what it's doing to address the allegations.  It's

13   warning that there could be -- there could be consequences.

14   And then in addition, Your Honor, during the proposed class

15   period, both the CEO of NextEra, the parent company, and the

16   CEO of FPL increase their stockholdings of NextEra.  And that,

17   Your Honor, weighs strongly against any inference of fraud.

18   Insiders don't increase their positions in the company at a

19   time when the stock is alleged to be artificially inflated by

20   fraud.  That's just inconsistent with intent to deceive

21   shareholders.

22          THE COURT:  And the class period, remind me, is from --

23          MS. SOLOWAY:  Absolutely.

24          THE COURT:  -- when to when?

25          MS. SOLOWAY:  The class period that's pleaded here is

1    December 2, 2021, to January 30, 2023.

2            THE COURT:  Okay.  Just looking at the SAC, at docket

3    entry 68 --

4            MS. SOLOWAY:  Yes, Your Honor.

5            THE COURT:  -- can you tell me the specific paragraphs

6    that correlate with the eight statements.

7            MS. SOLOWAY:  Yes.  In fact, actually, we made a

8    summary sheet, which, if it would be okay, my colleague could

9    approach and give you and your law clerk a copy of?

10           THE COURT:  That's fine.

11           MS. SOLOWAY:  What we tried to do was, for each of the

12   eight statements, identify which are the key areas of the

13   complaint where the factual allegations appear.

14           THE COURT:  Have you shared this with plaintiffs'

15   counsel?

16           MS. SOLOWAY:  We will give them a copy right now.

17           So, Your Honor, these inferences that I just went

18   through of the, sort of, course of conduct up until now, need

19   to be weighed under that PSLRA strong inference requirement.

20   And then, of course, we also -- we also need to go statement by

21   statement, defendant by defendant, to see whether falsity and

22   scienter are pleaded.  And, of course, that comes from, among

23   other cases, the Mizzaro case, Your Honor, which is an

24   11th Circuit case that says for each defendant, with respect to

25   each violation, right, we assess scienter.  And that's at page

1    1238 of that case.

2           So, Your Honor, I'm going to walk through each of the

3    statements and try to, as I said, focus on the key facts.  And

4    we have created -- just to make it easier for Your Honor, we

5    have made a slide for each statement, which also gives what

6    paragraph of the complaint the statement appears in.  And my

7    colleague will put that up on the screen as I'm going through

8    them.

9           So the first alleged misstatement is the only alleged

10   misstatement by Mr. Robo.  So Mr. Robo is the CEO of NextEra,

11   not FPL.  He is not personally alleged to have been involved in

12   any misconduct or ever to have interacted with Matrix, this

13   outside political consultant, at all.  And as I mentioned,

14   Mr. Robo also increased his holdings of NextEra stock during

15   the class period; and in his case he increased his holdings by

16   24.4 percent.  So, again, totally inconsistent with intent to

17   deceive.

18          His one statement, Your Honor, is this statement from

19   January 25, 2022, reporting on the outcome of this first law

20   firm investigation.  And he says:  This is the outcome and I

21   feel good about it.  That is an opinion about an opinion.  And,

22   in fact, the plaintiffs here admit, and this is on page 6 of

23   their opposition brief, that this statement by Mr. Robo is an

24   opinion.

25          And as Your Honor is aware, under the Supreme Court

1   decision in Omnicare, an opinion can only be false if the

2   speaker who expresses it does not genuinely believe it.  And

3   that's at page 186 of the Omnicare decision, Your Honor.

4          THE COURT:  But they say, "Opinion statements are

5   actionable where a complaint pleads facts alleging that

6   defendants possessed information that did not support

7   defendant's opinions as articulated to investors."

8          And so the argument, I think, is that they were in

9   possession of a memorandum with underlying materials, emails,

10  et cetera, and so although he is stating publicly that he feels

11  good about the investigation, he was in possession of contrary

12  information.

13         MS. SOLOWAY:  But that is exactly the argument that the

14  plaintiffs are making.

15         THE COURT:  Okay.  So why is that incorrect in your

16  view?

17         MS. SOLOWAY:  In our view that is incorrect.  Omnicare

18  says that a statement of opinion is false if you either -- and

19  in this case the statement about the investigation would be

20  false --

21         THE COURT:  Just slow down a tad.

22         MS. SOLOWAY:  Yes.  Thank you, Your Honor.

23         If Mr. Robo incorrectly reported the outcome of the law

24  firm investigation, so if he misrepresented that the finding of

25  the loss -- of the investigation when he said that they found

1   no evidence of illegality or wrongdoing -- so it would be false

2   if Mr. Robo misrepresented that, but that's not pleaded in the

3   complaint.  And/or it would be false if Mr. Robo dishonestly,

4   not -- as a subject matter, did not accurately portray his own

5   feeling about the investigation when he said, "I feel very good

6   that there is no basis to these allegations."  So those

7   statements can only be false if the plaintiffs plead that he

8   misrepresented the outcome or he misrepresented his

9   honestly-held view.

10          What the plaintiffs -- they don't plead that.  What

11  they, instead, say is:  Well, he had the memo.  So how can he

12  possibly have held this opinion?  Or how could the outside

13  lawyers have possibly come to this conclusion?  But that

14  argument is sort of like saying anytime you have a

15  whistleblower complaint or an employee who comes and says, "I

16  think you did something wrong," and your lawyers investigate,

17  and they don't find wrongdoing, the company would be -- would

18  have lied about that because there was a complaint that came in

19  that they investigated and they drew a different conclusion.

20          And so it cannot be the case that anytime you have

21  information that you go out and investigate, simply by virtue

22  of having that information, you have lied about it.  You hired

23  lawyers to investigate.  Here, there is no allegation we didn't

24  hire lawyers to investigate or that Mr. Robo misrepresented

25  their findings.  So mere possession of the memo clearly isn't

1    enough.

2          And, in fact, Omnicare, interestingly, is on a very

3    similar fact pattern.  Omnicare is also a case where the

4    company says, you know -- the statements in Omnicare are about

5    the practices of companies engaging in being lawful.  And what

6    the Supreme Court said in that case is, if a CEO says, "I

7    believe our practices are lawful" and genuinely did believe

8    that at the time, even if it's later discovered that there is a

9    long-time violation, which didn't happen here, Your Honor, that

10   statement of belief is still lawful as long as the defendant

11   hasn't misrepresented some fact about the investigation.  And

12   here, Mr. Robo is not alleged to have misrepresented some fact

13   about the investigation.

14         THE COURT:  So is there -- they cite to Ryder, a

15   district court case, and then another, Carvelli,

16   Eleventh Circuit.  Is it your view that there is maybe some

17   tension in the case law, perhaps?

18         MS. SOLOWAY:  I don't know that there is tension in the

19   case law.  I think that it really comes down to what facts you

20   plead.

21         I think if the plaintiffs here had come forward and

22   they had said anything about this investigation, that Mr. Robo

23   misrepresented its findings, this would be a

24   different -- you're not allowed to misrepresent.  Of course,

25   Your Honor, if your lawyer said that they did find illegality

1    or wrongdoing, and Mr. Robo said this, then an opinion on an

2    opinion can still be false because you've misrepresented the

3    outcome.  But that's not pleaded here.

4         THE COURT:  But what about the, "We found no evidence

5    of any issues at all"?  They would maybe say, "Well, that's

6    false because you were in possession of various documents."

7         And that's my question, is, is there anything in that

8    pile of paperwork that was attached to the memorandum that

9    would have indicated, quote, "evidence of any issues at all."

10        MS. SOLOWAY:  So the plaintiffs are trying to take, I

11   think, that phrase out of context.  When Mr. -- first of all,

12   the "any issues at all," to the extent that the plaintiffs are

13   arguing that this somehow glosses over the existence of the

14   memo, I don't think that works here.  The memo is in the hands

15   of reporters.  They have been reporting on it for months.  The

16   whole world is aware that there are -- allegations have been

17   made here.

18        I think the only reasonable way to read this statement

19   is that he stops himself and he says "any illegality or any

20   wrongdoing on the part of FPL."  The whole world knows that

21   there are issues that are being looked into.  What Mr. Robo is

22   saying is, the bottom line is that our investigation found no

23   evidence of illegality or wrongdoing.  And ignoring the words

24   "illegality" or "wrongdoing," and just reading it as any issues

25   at all is, I think, given the context, right, where the

1    reporters are all reporting on this memo, and everyone

2    understands that it exists, I don't think that is a reasonable

3    reading of the statement.

4            THE COURT:  Okay.

5            MS. SOLOWAY:  And, of course, there are no allegations

6    in the complaint about Mr. Robo having intent to commit fraud

7    with respect to this statement.  That first law firm

8    investigation is only talked about in paragraph 262, where this

9    statement appears.  The plaintiffs don't have any allegations

10   in the complaint that Mr. Robo, who, again, was not involved in

11   any of this Matrix stuff at all, had any knowledge that is

12   inconsistent with his statement.

13           So, Your Honor, unless there are other questions, I

14   will move on to the second statement.

15           THE COURT:  You can move on.

16           MS. SOLOWAY:  Thank you, Your Honor.

17           Moving on to the second statement.  Now, this is

18   actually the only statement by Mr. Silagy.  So Mr. Silagy --

19   this is from June of 2022.  It concerns a narrow issue.  He is

20   the CEO of FPL.  And what he says is, "We did not engage in any

21   activities having to do with following people like you, Nate,

22   or taking pictures."  And, of course, this concerns the narrow

23   issue of whether FPL was following reporters and taking

24   reporters' pictures.

25           THE COURT:  One moment.  So in the second amended

1    complaint, we have paragraph 252; that's the one we just

2    discussed.  The next statement that is, sort of, singled out as

3    false, I believe, comes from paragraph 256.

4         MS. SOLOWAY:  So I may be going out of order of the

5    complaint, Your Honor, because I'm going defendant by

6    defendant.

7         THE COURT:  Okay.  So just to keep track of this, your

8    statement number 2 is not necessarily -- or maybe the parties

9    have briefed this in the same way.  But I want to make sure

10   that when I'm referring to statement 2, everybody knows that

11   that's paragraph 264.  Is that how the opposition was drafted?

12        MS. SOLOWAY:  We drafted our moving brief in this

13   order, and I believe the plaintiffs followed our order.  So I

14   think -- I think we're aligned on what the different statements

15   are.

16        THE COURT:  All right.  Well, then we will treat 264 as

17   statement 2.

18        MS. SOLOWAY:  Thank you, Your Honor.

19        So this statement, of course, has to do with this

20   narrow issue of whether FPL is following reporters or taking

21   their pictures.  And the "Nate" in that sentence is Nate Monroe

22   who is a reporter.  And Mr. Silagy is talking to him.  This is

23   a statement that was made during a meeting between Mr. Silagy

24   and some reporters.

25        Now, this statement, Your Honor, can only be actionable

1    as fraudulent if the plaintiffs plead both that FPL did surveil

2    reporters and that Mr. Silagy knew it when he spoke.  And,

3    Your Honor, neither of those things are pleaded here.  The

4    complaint pleads that on one occasion Matrix -- Matrix, not

5    FPL -- followed this reporter, Mr. Monroe, not FPL.  And that's

6    in paragraph 80 of the complaint, Your Honor.  And that on that

7    occasion, Matrix told an FPL employee -- his name is

8    Mr. Martel -- that it observed Mr. Monroe getting into an Uber.

9    This is a text chain that is talked about in the complaint.

10   And the complaint speculates that Mr. Silagy must have known

11   that Matrix was surveilling Mr. Monroe because this other

12   employee, Mr. Martel, texted with Matrix on that one occasion

13   when the "he got in an Uber" text is sent.

14        THE COURT:  And who is Mr. Martel?

15        MS. SOLOWAY:  So Mr. Martel is alleged to be an

16   employee who works at FPL, but he is not a defendant in the

17   case, Your Honor.

18        THE COURT:  But what is his position?

19        MS. SOLOWAY:  He is alleged to be a vice president of

20   state legislative affairs.

21        THE COURT:  So he has a pretty high position?

22        MS. SOLOWAY:  Well, vice president, while it sometimes

23   sounds like a high position, I would submit that, doing this

24   job for many years, I have discovered it's not quite so high.

25   But the plaintiffs don't really -- in the complaint, so far as

1    I know, the plaintiffs don't really provide any explanation of

2    exactly what Mr. Martel's job is, other than giving his title.

3         There is also a confidential witness in the -- there is

4    one confidential witness, not an FPL employee, a Matrix

5    employee, who, it's unclear what perspective this person brings

6    to the table.  And I think he says that it seemed like

7    Mr. Martel reported to Mr. Silagy, but the complaint doesn't

8    have a well pled factual allegation that, in fact, Mr. Martel

9    did report to Mr. Silagy.  There is no -- there is a hole in

10   the complaint on that respect.

11        THE COURT:  So your ultimate point is that even if we

12   accept as true that this VP of legislative affairs was in

13   communication with a Matrix employee about following a

14   journalist, that Mr. Silagy wouldn't have known about it or the

15   allegations don't plead that he did?

16        MS. SOLOWAY:  Correct, Your Honor.  What is actually

17   happening at this meeting where Mr. Silagy makes this

18   statement, is that he is being shown that text exchange.  In

19   fact, if you look at the article, there is a photo -- it's in

20   Exhibit B, at page 3.  Mr. Silagy is being shown this text

21   exchange, and he is looking at it with the reporters, and his

22   statement comes out of this meeting.  He is saying, "We, FPL,

23   did not engage in surveillance."  So you have to understand the

24   text exchange in the context of the statement being made, where

25   Mr. Silagy is being shown this text exchange.

1          There is no allegation in the complaint, Your Honor,

2     that Mr. Martel ever told Mr. Silagy that on this one instance

3     he was told by Matrix that they were following Mr. Monroe.

4     That's just missing from the complaint.

5          THE COURT:  But this is saying "we" did not engage in

6     any activities.  Who is the "we"?

7          MS. SOLOWAY:  Well, I think that -- actually,

8     Your Honor, if you read the article, Mr. Silagy alternates

9     between saying "I" and "we"; in one place he says "I" and in

10    another place he says "we."  But I think what he is trying to

11    convey is that we, FPL, did not -- we're -- we did not engage

12    in this surveillance.  And --

13         THE COURT:  So if that's true --

14         MS. SOLOWAY:  Yes.

15         THE COURT:  -- then isn't it the case that there would

16    have been an FPL employee who did, even if Silvagy didn't know

17    about it?  Or "Silagy," excuse me.

18         MS. SOLOWAY:  Well, I think -- yes, Your Honor.  I

19    think what the plaintiffs are saying is, on this one instance

20    because of the text exchange, Mr. Martel must have known

21    because he has this text exchange with Matrix while Matrix is

22    doing the surveillance.  And I think the key legal issue here,

23    Your Honor, is that the plaintiffs never plead anywhere that

24    Mr. Silagy himself knew about, much less directed or instructed

25    others to engage in this surveillance.  And I think that's --

1    as a pleading issue, it's a hole in the complaint.

2          You know, Your Honor, in the Mizzaro case, for example,

3    the Eleventh Circuit says we should be very careful,

4    particularly with big corporations -- in that case it was Home

5    Depot, here it's FPL -- attributing weight to allegations that

6    senior folks -- here, the CEO of FPL -- knew something simply

7    because junior people or people who work at FPL did.

8          And Mizzaro says you have to actually plead the facts

9    showing the knowledge.  So here Mr. Silagy is being shown this

10   text message and he is saying we didn't direct surveillance.

11   That's his knowledge at the time.  And there is no --

12         THE COURT:  But maybe you're tightening the allegation

13   of it.  You are saying, "We didn't direct surveillance" and

14   this is, arguably, broader.  We, FPL, writ large, did not

15   engage in any activities having to do with following people

16   like you, Nate, or taking pictures.

17         MS. SOLOWAY:  I think even reading it the way

18   Your Honor just articulated it, there is still this missing

19   link.  Because the plaintiffs can't point to an allegation in

20   the complaint that shows that any one at FPL had knowledge that

21   Matrix was engaging in those activities, until this text

22   message emerges and is shown to Mr. Silagy at this meeting.

23         And that's the missing link, Your Honor.

24         THE COURT:  But this statement -- this is made in

25   June 24th -- on June 24th of 2022.

MS. SOLOWAY: That's right.

THE COURT: Okay. When is this text message said to have surfaced?

MS. SOLOWAY: So the text message is -- you know what, Your Honor, I think the text message is in Mr. Silagy's hand at this interview, and you can see that on that -- in that photo, but I can't say for sure when the text message first surfaced. I don't believe that's pleaded in the complaint.

THE COURT: Okay.

MS. SOLOWAY: So, Your Honor, I think that, sort of, the critical issue here is the lack of this connection between Mr. Silagy and knowledge of surveillance. And that, Your Honor, we would submit under Eleventh Circuit law you can't just assume the CEO knows something is happening simply because, perhaps, here on one occasion another employee at FPL, Mr. Martel, may have known that it was going on.

Your Honor, I'm going to turn to the next group of statements which we've sort of numbered. There are five statements by Mr. Reuter who is NextEra's corporate spokesperson. And I'm going to try to walk through them by topic. So what we're calling statement 3 and 4 are statements in the second amended complaint, paragraph 252 and 256. And what I would like to start with is just, taking a step back and talking about Mr. Reuter and the lack of scienter allegations as to him.

 1          And so, again, Mr. Reuter is a corporate spokesperson.

 2     He is not alleged to have had any contemporaneous involvement

 3     or knowledge of the underlying political activities.  What's

 4     going on here is he begins receiving questions from reporters

 5     about the topics in the -- in the memo which the reporters

 6     have; and which, of course, NextEra itself is investigating.

 7     And as the spokesperson for NextEra, Mr. Reuter is trying to

 8     get answers in realtime for these reporters, and he is very

 9     clear that his responses are based on NextEra's investigation.

10          So he talks about, for example, in these two statements

11     "we have found absolutely no evidence" or "in our own

12     subsequent investigation."  So what he is saying is we have

13     looked into these allegations and my statements are based on

14     what we have found.

15          Now, the plaintiffs say that five of Mr. Reuter's

16     statements are false.  And they don't plead any motive for

17     Mr. Reuter, who is not alleged in any of this Matrix-related

18     conduct, to lie.  But they say that he -- that his statements

19     are false because of information that they claim was known to

20     him at the time.  But the problem, Your Honor, is that they

21     don't identify information that's known to Mr. Reuter that

22     makes any of these statements false.  And I'm going to go

23     through what, sort of, the three topics are that these -- that

24     this first set of statements is about.

25          The first topic is this -- is this entity called

1   Grow United.  So the core of the plaintiffs' fraud claim about

2   Grow United is that Mr. Reuter lied when he said that FPL was

3   not involved in creating Grow United and didn't provide it

4   funding, or ask anyone to provide it funding.  And he explains

5   that based on his understanding -- and, again, NextEra is doing

6   its own investigation -- Grow United was created for another

7   Matrix client in Denver to advocate for marijuana legalization,

8   which, you know, sounds consistent with the name "Grow United."

9   In opposition, the plaintiffs concede -- and this is at page 8

10  of the plaintiffs' opposition -- that FPL did not provide any

11  direct funding to Grow United.  So plaintiffs concede that at

12  least part of Mr. Reuter's statement is accurate.  They don't

13  claim that FPL did provide direct funding to Grow United.  But

14  their theory is that FPL must have directed its creation based

15  on some internal records of Matrix's which allocated certain

16  costs for Grow United to FPL.

17         And just to give Your Honor the pincites, those are

18  referenced in the complaint in paragraphs 73 and 75.  So,

19  essentially, what the plaintiffs are saying is the Matrix memo

20  had these internal Matrix records attached to it.  And what it

21  looks like from these internal records is that Matrix allocated

22  responsibility for certain costs for Grow United to FPL, and

23  Mr. Reuter is being asked about those internal Matrix records.

24  And there are actually photos of the internal Matrix records in

25  the article that Mr. Reuter is being quoted in.

 1              And what he says is, based on our own investigation, we

 2    did not create Grow United, we didn't direct funding to it.

 3    And the complaint doesn't identify any documents that are

 4    available to Mr. Reuter that suggests that, based upon FPL's

 5    own investigation, they did find any evidence that FPL directed

 6    any money to Grow United.  So that statement is -- is not

 7    alleged to be false, Your Honor.

 8              The second topic, if we turn to the next slide,

 9    Your Honor, is about this -- so-called ghost candidates.

10    And --

11              THE COURT:  So -- but stopping for a moment on Grow

12    United.  So that concerns creation of Grow United and funding

13    of Grow United.

14              MS. SOLOWAY:  I tried to group them together to address

15    them both, but the point, I think, is the same for both of

16    them, Your Honor, which is that there are no documents that

17    suggest that Mr. -- there is no calls Mr. Reuter participated

18    in, no meetings he attended, no documents he is alleged to have

19    seen that would suggest that FPL did either create Grow United

20    or direct funding to Grow United.  He is being shown these

21    internal Matrix records.  And, again, if you look at Exhibit A,

22    there is actually a picture of one of these internal records in

23    the article he is being quoted in, and he is saying, based on

24    our investigation, we haven't found evidence that we created

25    Grow United or that we directed money to it.

1          Okay.

2          THE COURT:  Okay.  Continue, please.

3          MS. SOLOWAY:  The next topic, Your Honor, is this ghost

4     candidate issue.  And we have put up on the screen, Your Honor,

5     from paragraph 252, Mr. Reuter's statement about ghost

6     candidates.  And he says:  We haven't found evidence.  We have

7     found absolutely no evidence of legal wrongdoing by FPL or its

8     employees.  And the issue is whether FPL had involvement in or

9     financially supported or directed others to support ghost

10    candidates during the 2020 election cycle.

11         So the plaintiff again has admitted -- and this is at

12    page 8 of the opposition brief -- that the SEC does not allege

13    that FPL directly funded ghost candidates.  Meaning the

14    plaintiffs' allegation here isn't that FPL took money and

15    directly handed it to the ghost candidate campaigns, which

16    means that at least a portion, again, of Mr. Reuter's

17    statement, the plaintiffs admit, is true.

18         What the plaintiff is arguing is that this statement is

19    false because FPL must have asked a third party -- "must have,"

20    I put that in quotes -- to direct money to ghost candidates.

21    And the theory that the plaintiffs have is that this entity,

22    which is referred to as LPAD, passed money to Grow United, and

23    that Grow United then passed money to these groups called

24    The Truth and Our Florida, and that some of that money was used

25    to support ghost candidates in the 2020 elections.

1              And this is laid out, Your Honor, in the SEC, including

2      in paragraphs 143 and 253.  And the plaintiffs say that this

3      helped Republican candidates get elected in the 2020 election

4      cycle; that's in 194 of the complaint and in Exhibit A, which

5      is the article that references this.

6              And Your Honor --

7              THE COURT:  You're citing paragraphs in your chart?

8              MS. SOLOWAY:  I'm --

9              THE COURT:  Under the topic --

10             MS. SOLOWAY:  Yes, they also should be in the chart,

11      Your Honor.

12             THE COURT:  I want to make sure that the paragraphs

13      you're citing actually fall within the ranges in your chart.  I

14      think we're on the funding of Grow United piece/spoiler

15      candidates.

16             MS. SOLOWAY:  Yes, Your Honor.  Let me just pull up the

17      chart.

18             Yes, Your Honor, that's correct.

19             THE COURT:  Okay.

20             MS. SOLOWAY:  Yeah, I think all the paragraphs I just

21      cited fall within those ranges.  We tried to be inclusive and

22      give bigger ranges, but --

23             THE COURT:  Okay.

24             MS. SOLOWAY:  Okay.  So there is a missing link here,

25      Your Honor, again.  There is no factual allegation in the

1    complaint that FPL directed anyone to fund ghost candidates.

2    So again there is no meeting between Matrix or -- and FPL or

3    emails between Matrix and FPL, or any other communication where

4    FPL says to Matrix, go give money to ghost candidates.  It's

5    not in there -- about the 2020 election cycle, which is what

6    Mr. Reuter's statement is about, it doesn't exist.

7         THE COURT:  But what if -- what if you read this, it's

8    not strictly about funding, it's just having involvement in?

9         MS. SOLOWAY:  So I think involvement -- I think

10   involvement in it wouldn't matter, frankly, Your Honor, because

11   there is nothing about ghost candidates in the 2020 election

12   cycle at all.  Truly, there is no meeting, email communication,

13   between Matrix and FPL that suggests that FPL even had

14   knowledge about ghost candidates during the 2020 election

15   cycle.

16        What happens here, Your Honor, is that the complaint

17   says, oh, Matrix, you billed FPL millions of dollars in

18   consulting fees for the 2020 election cycle, and this Matrix

19   memo claims that some small amount of that money made its way

20   to these organizations, you know, The Truth or -- the Florida

21   Promise and The Truth -- did I get those names right?  Hang on.

22   Yes, Your Honor.  And -- The Truth and Our Florida, excuse me.

23   And the plaintiffs' theory:  Is FPL must have directed the

24   money ultimately to get through this daisy-chain of entities to

25   land with those entities; but the problem is, that's not pled

1      anywhere in the complaint.

2           The complaint pleads that Matrix created this system of

3      entities, but it doesn't say anywhere that FPL directed them to

4      put this money with the ghost candidates.  That is not pled

5      anywhere in the complaint.  And, again, Mr. Reuter, who is

6      reporting on their investigation, he is saying we don't find

7      evidence, based on our investigation, that there was

8      involvement in, financial support, or directing others to

9      support ghost candidates.  And, Your Honor, that is not

10     rebutted by any well-pled fact in the complaint.  At most --

11     yes, Your Honor.

12          THE COURT:  In paragraph 9 -- excuse me -- page 9 of

13     the opposition, there is some argument here about Silagy

14     instructing Martel to "make life hell" for a certain candidate.

15          MS. SOLOWAY:  Yup.

16          THE COURT:  Then Martel sending an agenda to someone, I

17     guess, at Matrix to go over items, including particular

18     districts.

19          MS. SOLOWAY:  Yup.

20          THE COURT:  All right.  What do you say about those?

21          MS. SOLOWAY:  So each of these allegations say nothing

22     about ghost candidates.  Let me -- let me give you a couple of

23     examples.

24          So in paragraph 149 of the complaint, there is an email

25     from January of 2019, so this is almost two years before the

1    2020 election, where Mr. Silagy says -- I forget the exact

2    quote, but something to the effect of "make hell for JJ --

3    JRR -- JJR."  Excuse me.  So he is -- he is saying that there

4    is a candidate that he is not a fan of that is running in the

5    election.  Saying "make hell for someone" is not the same as

6    "go fund a ghost candidate" in an election two years from now.

7              THE COURT:  By the way, what is a ghost candidate?

8              MS. SOLOWAY:  So I think the idea here, Your Honor, is

9    that you will have -- an election has usually two party

10   candidates, right, a Democrat and a Republican.  And the theory

11   is that this ghost candidate is some nonparty candidate who is

12   thrown into the mix because they will siphon votes off.  And

13   the allegation here is that supporting a ghost candidate was a

14   way for the -- the supporters or detractors from one of the

15   party candidates to siphon votes off to someone else.  And the

16   theory is that by, you know, allocating money to these

17   candidates, that this is, you know, somehow improper.

18             Now, there are allegations in the complaint,

19   Your Honor, and this does not involve FPL, but that, in the

20   connection with some of those elections, there were payments

21   made by people to the candidates to run.  But FPL is not

22   alleged to have been involved in that.  The allegation is that

23   some FPL money purportedly made its way to organizations that,

24   for example, sent out marketing in support of these ghost

25   candidates.

1          And so the problem for the plaintiffs is that they

2     don't have any email, memo, any factual link tying FPL with the

3     ghost candidates for the 2020 election.  Another allegation,

4     Your Honor, that the plaintiffs rely on -- I'm just going

5     through a couple of the points they make on that page of the

6     opposition.  They say, well, you, FPL, were very interested in

7     those races; right?  You were interested in the races for SD37,

8     you were interested in the races for SD39.  But, again, being

9     interested in the outcome of a race is a far cry from saying

10    "go use our money to help support ghost candidates."

11         So the types of allegations that the plaintiffs have

12    put together here are not specific to ghost candidates at all;

13    they're simply about various election activities.

14         Okay.  We will turn to the next statement which is the

15    funding memo statement.  I will try to be very quick on this

16    one because I actually think the plaintiffs have largely

17    conceded that the statement is not false.  So this is a

18    statement by Mr. Reuter about a funding memo that was

19    circulated that had a structure for how donations would be made

20    or how -- how -- I guess the theory is, this daisy-chain of

21    entities, how money would be allocated through these entities,

22    and how these 501(c)(4) organizations would be set up.  And

23    what Mr. Reuter says is that we are aware of the proposed

24    structure, as the legal memo was shared with us.  And this

25    refers to a memo that Matrix was working on with its lawyers at

1    Foley & Lardner.

2         So Mr. Reuter acknowledges:  We saw a version of that

3    proposed funding structure.  But then he says, it was created

4    by Joe Perkins' team to fund their client's outreach

5    activities.  And he says:  We found no evidence that FPL or our

6    employees actually used this proposal to support our

7    communication and outreach activities.  And, in fact, the

8    complaint alleges or concedes that a draft proposal was shared,

9    which is consistent, of course, with what Mr. Reuter says, but

10   not that there was any final presentation that Matrix,

11   you know, provided to FPL that it was actually used to support

12   the funding activities.

13        And the plaintiffs, by the way, argue in connection

14   with this statement.  They say at page 11 of their opposition,

15   "Literal truth is not the yardstick."  So I think what they

16   mean is this statement is actually true, and they haven't

17   actually alleged any facts from which you could conclude that

18   this statement is false.

19        THE COURT:  But what if -- okay.  So what about

20   paragraph 259, where they say --

21        MS. SOLOWAY:  Let me just flip to that paragraph,

22   Your Honor.

23        THE COURT:  -- "Silagy participated in communications

24   and meetings, discussing the funding structure, and received

25   proposals for the structure in November 2019."

1           MS. SOLOWAY:  Yes.  And, Your Honor, I think that's

2       exactly consistent with what Mr. Reuter said.  He says in

3       this -- in this document -- excuse me -- in this statement, "We

4       are aware of the proposed structure as the legal memo was

5       shared with us."  And that refers to a memo that was prepared

6       by Matrix and Foley & Lardner that was provided to Mr. Silagy

7       at some point.  So it's consistent.  There is no inconsistency

8       between that allegation and the complaint and what Mr. Reuter

9       actually says.

10          THE COURT:  So what kind of allegation would be

11      required to prove falsity, hypothetically?

12          MS. SOLOWAY:  I mean, I think the plaintiffs would have

13      to plead that contrary to what Mr. Reuter said where he says,

14      "We have found in evidence that FPL or our employees used this

15      proposal to support our communication and outreach activities."

16      They would have to plead that FPL did, in fact, find evidence

17      that the proposal was used to support the communication and

18      outreach activities, but, instead, the complaint here pleads

19      that a draft was shared and that there is no well-pled

20      allegation here, Your Honor, that ultimately FPL was aware of

21      what structure was actually used at the end of the day.

22          THE COURT:  Okay.  And Reuter's position, again, was

23      spokesperson, did you say?

24          MS. SOLOWAY:  He is a corporate spokesperson for

25      NextEra, that is correct.

1           THE COURT:  Okay.

2           MS. SOLOWAY:  He is reporting on NextEra's own

3     investigation.

4           Okay.  Next statement, Your Honor.  We're up to 6 of 8,

5     and this is Mr. Reuter's statement about Mr. Dennis.  So the

6     theory in the complaint, Your Honor, is that Matrix had a plan

7     that they would offer Mr. Dennis, who is a city council person,

8     a job working to decriminalize marijuana which would cause him

9     to resign from the city council.  And what Mr. Reuter says in

10    this statement is, yes, we were approached about that plan; we

11    said we don't want any part of it.  We flatly rejected it.  And

12    we told Matrix we weren't interested.

13          There is no factual allegation in the complaint that

14    that is not a true statement.  The complaint pleads that there

15    was a plan, and it says that Mr. Dennis was approached about

16    this -- this job offer, but it does not plead anywhere that FPL

17    didn't reject the plan.

18          Your Honor, I'm going to turn to Mr. Reuter's final

19    statement, statement 7 of 8.

20          THE COURT:  What about these other things on page 11?

21    They say...

22          MS. SOLOWAY:  Page 11 of the opposition brief,

23    Your Honor?

24          THE COURT:  Yes.

25          MS. SOLOWAY:  Okay.  Let me turn to it.

1          THE COURT:  So Pitts is who again?  He works for

2     Matrix?

3          MS. SOLOWAY:  That's correct, Your Honor.

4          THE COURT:  Okay.

5          MS. SOLOWAY:  So, Your Honor, what the plaintiffs, I

6     think, are saying is -- and I'm going to read between the lines

7     a little bit.  They say Reuter said that FPL flatly rejected

8     the plan and communicated our lack of interest.  Now their

9     theory is, okay, maybe that was actually a true statement; but

10    it's false because they omitted something.  So now they're

11    flipping to an omissions theory, and they're saying that

12    somehow this statement has become false because Mr. Reuter

13    omitted these other things.

14         I don't think that works here, Your Honor.  Mr. Reuter

15    was very candid.  We did hear about that plan.  We rejected it.

16    The only way this statement becomes false is if FPL didn't

17    actually reject the plan, which isn't pled.  But, as we argue

18    in our reply brief, Your Honor, all of these things that the

19    plaintiffs now say were omitted, they're all public

20    information.  They're not omitted.  They're in the news reports

21    that -- that Mr. Reuter is reacting to, and that he is

22    responding to requests from reporters about.  So, for example,

23    they say, as one of the examples here, they say FPL paid for

24    Grow United's incorporation.  I don't know why that would make

25    the statement false.  This statement is about whether or not

1   Mr. Perkins approached FPL about a plan to offer Garrett Dennis

2   a job offer.  The Grow United issue does not, in my view, make

3   this statement false.

4        But, in any event, Number 3 here:  FPL paid for Grow

5   United's incorporation.  What they're referencing is that

6   internal Matrix record that says "we billed FPL for this cost

7   of creating Grow United" that was an internal Matrix record

8   that we're not alleged to ever have seen until it became

9   public.  That's public.  It can't have been omitted.  It's in

10  the public record.  It's out in the first article that comes

11  out about this on December 2nd.  And --

12       THE COURT:  But even if it weren't public, do you think

13  that would make a difference?

14       MS. SOLOWAY:  No.  Because, at the end of the day, a

15  statement can only be false if you either, make a

16  misrepresentation of fact, which isn't alleged here anymore,

17  the plaintiffs seem to have abandoned that theory, or something

18  is omitted that makes this statement misleading.  And here

19  there is nothing omitted that is actually about this plan to

20  offer Mr. Dennis a job.  They're pointing to a whole bunch of

21  other things.  And that can't make the statement false,

22  Your Honor.

23       THE COURT:  Okay.  Let's go to the 7th.

24       MS. SOLOWAY:  Okay.  This is a -- I think, a pretty

25  straightforward one, Your Honor.  Mr. Reuter is being asked

1   about this surveillance issue, which we talked about earlier

2   with respect to Mr. Silagy.  And what he says is we didn't have

3   a digital record of these exchanges and we cannot prove their

4   veracity.  And I think the plaintiffs have seized on the "no

5   digital record of these exchanges" piece of this.  But there is

6   no allegation in the complaint that when Mr. Reuter said we

7   went back and collected or -- and this is in the article,

8   Your Honor.  It's Exhibit U at page 3.

9          What Mr. Reuter is explaining is that we went back and

10  looked at emails, cell phones, computer files, and we didn't

11  find these records.  And the complaint pleads -- and this is at

12  paragraph 79 and 80 -- that these communications were on

13  people's personal devices.  So when Mr. Reuter says, "We don't

14  have a digital record of these exchanges and we cannot prove

15  their veracity," there is nothing in the complaint to refute

16  that.  In fact, the plaintiffs themselves concede that these

17  were exchanges on personal devices.

18         Your Honor, the final statement here -- and this is --

19  should be an open-and-shut one, statement 8.  This is a

20  statement by Mr. McGrath.  Mr. McGrath is a corporate

21  spokesperson for FPL.  There is literally nothing in the

22  complaint about Mr. McGrath.  His name appears in paragraph 267

23  of the complaint.  It doesn't say anything about him, his

24  intent to lie, what he knew, when he knew it.  The who, what,

25  where, when, and how for Mr. McGrath is plainly not pleaded,

1    and that alone is dispositive of this statement.

2           But even putting that aside, it's also not false.  The

3    statement is about whether FPL has an ownership interest in

4    this publication called The Capitolist.  And the allegation in

5    the complaint, Your Honor, is that Matrix had a 1 percent

6    interest in The Capitolist.  This is pleaded in paragraphs 221

7    to 22.  So that is Matrix, not FPL, having an ownership

8    interest.  And we also say we didn't have editorial control.

9           And what the complaint really pleads here,

10   Your Honor -- and this is in paragraphs 217 to 19, 223, 225,

11   242 -- is that the people from The Capitolist, reporters,

12   called FPL.  They sought feedback from them; they sought

13   guidance from them; they sought background information from

14   them.  That's not unusual that reporters will seek information

15   or guidance from people involved in the industry on which

16   they're reporting.  But even assuming that FPL, you know,

17   pushed them to publish on one thing or not publish on another

18   thing, editorial control is what a publisher has over a

19   newspaper.  Having some articles where FPL said let me give you

20   some background information on this, that, or the other thing,

21   that's not editorial control, and the statement is not pleaded

22   to be false.

23          So, Your Honor, I'm going to just try to wrap up and

24   let Mr. Kramer get in here, but I think we tried to put

25   together one demonstrative that would sort of summarize the

1    fraudulent versus the non-fraudulent inferences here.  And I

2    think it's very clear that the non-fraudulent inferences really

3    vastly outweigh the fraudulent inferences here.  The plaintiffs

4    largely rely on mere possession of the Matrix memo.  They

5    basically are saying you had this memo; you, therefore, had the

6    information in it; therefore, everything you said must have

7    been false and you must have known it.

8          And what we're saying is we did our own investigation.

9    We looked into these facts.  And the Matrix memo itself was

10   created under very suspect circumstances.  It deserves less

11   weight, sort of akin to confidential witness allegations where

12   you don't really know where the information is coming from, or

13   you don't know what motive the person who is supplying it to

14   you would have.  And NextEra did all of these things that are

15   just inconsistent with intent to defraud.  They did an

16   investigation.  They hired law firms to assist.  They warned

17   that the outcome here was uncertain.  Their -- their -- two of

18   the senior people here increased their holdings of stock,

19   instead of decreasing their holdings.  And seven of the eight

20   statements were made by people who weren't even alleged to be

21   involved in the underlying misconduct at all, and are not

22   alleged to have had any intent to lie.

23         And I think one final point to point out, there is no

24   confidential witness here, Your Honor, from NextEra.  And these

25   cases, as you know, very often there is a former employee from

1    the defendant company itself who can actually provide some

2    insight into what defendants knew, what they meant when they

3    said X, Y or Z, what meetings they were at.  That's just

4    missing from this complaint.

5          I just -- also, one final point before I turn it over

6    to Mr. Kramer.  Because of the rule that we go statement by

7    statement, defendant by defendant, I just want to point out

8    that if Your Honor were to find that, for example, Mr. Robo's

9    statement is out of the case, that means Mr. Robo is out of the

10   case.  Same thing for the one statement by Mr. Silagy.  And so

11   we have to take this defendant by defendant, even assuming

12   Your Honor doesn't find that all eight statements are not

13   adequately pleaded.

14         THE COURT:  Okay.  Before you sit down, I just -- in

15   terms of the various exhibits that are attached to your motion,

16   is there any dispute between the parties that I can consider

17   those attachments for their truth because they are central to

18   the second amended complaint and cited liberally throughout it?

19         MS. SOLOWAY:  So the plaintiffs have not opposed

20   defendant's use of those documents.  I think they drop a

21   footnote in there opposition, but don't actually oppose use of

22   the documents.  And, Your Honor, I believe we actually cited

23   some authorities in our brief.  The Miyahiri [sic] -- hira

24   case, and -- and a couple of others that say that in ruling on

25   a motion to dismiss, courts are allowed to consider documents

1    that are quoted in or incorporated by reference into the

2    complaint.

3           All of the documents that we've cited, Your Honor, are

4    either incorporated in the complaint or are quoted in it, or

5    they're SEC filings that courts routinely take judicial notice

6    of.  And so --

7           THE COURT:  And you haven't seen any challenge to the

8    authenticity of any of those exhibits; correct?

9           MS. SOLOWAY:  The plaintiffs have not challenged the

10   authenticity of them.  In fact, most of the documents are

11   ones -- for example, the press reports are ones plaintiffs

12   themselves rely on in their complaint.  And -- and the other

13   documents, Your Honor -- we also cited some stock information

14   for Mr. Silagy and Mr. Reuter; that comes from SEC filings

15   called Form 4s.  And courts also routinely take judicial notice

16   of stockholdings based on Form 4s.  And that is actually also,

17   Your Honor, in the Miyahira case which is 2012 WL 12895513 at

18   1, note 1, which says that the Court can consider documents

19   filed with the SEC and matters of public record, including

20   press releases.

21          And another case that actually considers Form 4s

22   specifically that is cited in our papers is the City of

23   Hollywood Police Officers case vs. Citrix, 649 F.Supp 3d 1256.

24          THE COURT:  Okay.  I have another question.

25          MS. SOLOWAY:  Yes, Your Honor.

1      THE COURT:  Have there been other similar lawsuits

2  filed in this district against your client?

3      MS. SOLOWAY:  There is no -- so, to my knowledge,

4  Your Honor, there is no other class action lawsuit pending or

5  individual fraud lawsuit pending.  There is, my recollection,

6  one derivative case pending.  It's not in front of Your Honor,

7  it's in front of another judge, and it has been stayed.  My

8  understanding is that the case is currently stayed.

9      THE COURT:  So is there anybody relationship between

10  that stay and this case?  I have a vague recollection that it

11  was maybe before me or -- obviously, I must be wrong about

12  that, but I --

13      MS. SOLOWAY:  I think what happened, Your Honor, is it

14  may have come before you as a question of whether it was

15  related.  And I believe it ended up in front of another -- it

16  ended up in front of another judge in the district.

17      MR. MARTINEZ-CID:  I believe it's Judge Scola.

18      THE COURT:  Okay.  And that case is stayed.  Do you

19  know if it is stayed, pending resolution of this case, or some

20  other thing?

21      MS. SOLOWAY:  I'm getting a nod that it -- Joshua, you

22  want to take this one?

23      MR. HILL:  Your Honor, this is Joshua Hill for the

24  defendants.  That case is stayed pending the outcome of the

25  motion to dismiss, I believe.

 1            THE COURT:  In this case.

 2            MR. HILL:  In this case.

 3            THE COURT:  Okay.  That's what I was curious -- do you

 4    have a case number?

 5            MR. HILL:  We can provide that.  We will have to look

 6    that up, Your Honor.

 7            THE COURT:  Okay.  All right.

 8            Okay.  Well, I know this is a bit of a tough question,

 9    Ms. Soloway, but if you were to guess or think or evaluate,

10    what is an easier way to resolve this case, in your view?  The

11    statement by statement, defendant by defendant, or loss

12    causation?

13            MS. SOLOWAY:  So, Your Honor, it's clearly easier to

14    resolve this case on loss causation grounds because the

15    statement by statement is -- and we don't think the allegations

16    are there, but the plaintiffs have put in a very long

17    complaint, which requires Your Honor to wade through all of

18    these factual allegations.  But, respectfully, we think both

19    arguments are grounds for dismissal here.

20            And Mr. Kramer is going to address loss cause

21    causation, but it has the benefit of not requiring Your Honor

22    to go statement by statement, defendant by defendant, to decide

23    scienter and falsity.

24            THE COURT:  Okay.  Before I hear from Mr. Kramer, so

25    that we can stay conceptually within the same format, I am

1    going to hear from Mr. Block on the statement by statement.

2            MS. SOLOWAY:  Thank you, Your Honor.

3            MR. BLOCK:  Thank you.  And good afternoon, Your Honor.

4    Jeffrey Block for --

5            THE COURT:  Oh, please, I'm going to ask not -- not for

6    you to move that.  That's outwardly facing on purpose.  So just

7    leave that as is.

8            MR. BLOCK:  Don't touch it.  I just want to make sure

9    that I'm talking loud enough so you can hear me.

10           So let me, if I can, Your Honor, just start off a

11   little bit with a bigger picture, and then I will go through

12   each of the statements, why we say they're false and

13   misleading, and why we think there are facts that support

14   scienter.

15           THE COURT:  And I'm going to have -- let you have

16   enough time, certainly, to go through this, but I -- there is a

17   feeling in this case that we're sort of glossing over a lot of

18   the details on the basis of the memo, which you have described

19   as -- as the -- what's his name?  Robo memo.

20           And I want to be careful that we're not, kind of,

21   falling into that tempting spot to say, oh, well, you had a

22   memo, hence false.  And so it does require that very careful

23   and cumbersome task of evaluating each and every statement

24   without just, sort of, instinctively drawing that falsity

25   conclusion.

1          So I -- that's sort of the general framework.  I want

2     to make sure that we're going through that statement by

3     statement analysis.

4          MR. BLOCK:  Understood, Your Honor.  Let me first just

5     talk about the memo.  And what Ms. Soloway argued towards the

6     end there, she said that the memo is sort of like confidential

7     witnesses.  You know, what's their motive?  Why are they saying

8     what they're saying?  Where did it come from?  Do we even know

9     what they're saying is accurate?  And I know Your Honor

10    addressed this in the Ryder case, where even though the

11    Eleventh Circuit has said you can look at confidential

12    witnesses skeptically, but if they do provide specific

13    information, that allows the Court to now say, yes, I can

14    believe them.

15         So what about this memo?  Well, what's the motive?

16    Well, we know what the motive is.  Joe Perkins was interviewed

17    by a bunch of newspapers in 2022.  And I believe it's

18    paragraphs 40 and 41 of our complaint.  And he says, first,

19    all -- all the documents that were attached to the memo are

20    authentic.  They took them from Jeff Pitts' laptop; so that's

21    where all those documents came from.  So we know these are real

22    documents that Jeff Pitts had on his laptop.  Motive.  He said

23    "we" wanted to bring to NextEra's attention that we think our

24    people and some of their people were involved in something that

25    may be illegal.  So he wanted to let NextEra know, you guys

1    might have a problem, I want to let you know what is going on

2    here.  So that's the basis for the memo.

3          Now, what we have is -- we have, yes, the newspapers

4    get a hold of -- they don't get -- they get a hold of the memo.

5    And I want to be clear.  As far as we understand, the entire

6    memo itself and the exhibits to the memo have never been fully

7    published.  So, for example, the Orlando Sentinel sent some

8    documents to the company in early 2021 and said we have

9    questions about these documents; please provide us with

10   answers.  And Mr. Reuter responded -- provided a response, and

11   you saw what he said.  And our argument as to why those are

12   false statements -- and I'm going to get into the detail -- is

13   basically:  We, at FPL, we're not involved in this.  This

14   is -- there is no connection to us.  We have nothing to do with

15   this.  There is no evidence.  We weren't involved.

16         And Mr. Robo largely echoed the same thing when he

17   said:  I feel good.  There is no basis to these allegations.

18   So what does that tell an investor?  An investor is investing

19   in a public utility.  And they're doing it because the public

20   utility is a safe, secure investment.  You are buying it

21   probably for the dividends.  And you are not buying it because

22   you think this company may be involved in a political scandal.

23         So when the company says, yeah, we see what's in the

24   newspapers.  Not true.  It's not us.  We were not involved in

25   that.  Investors can take some comfort in the fact that they're

1   not involved.

2       THE COURT:  Well, just -- and just so I understand,

3   just as a matter of background, has there been any finding of

4   liability?  We talk about, sort of, allegations of wrongdoing

5   and criminality.  Can you just pinpoint exactly what would be

6   the crime and has there been any finding of such a crime?

7       MR. BLOCK:  No, there has not been a finding of a

8   crime.  But I think in this case it doesn't matter if there is

9   not a finding of crime.  And I want to get to --

10      THE COURT:  What about a finding of a regulatory

11  violation?

12      MR. BLOCK:  There has not been one either.

13      THE COURT:  Okay.

14      MR. BLOCK:  But --

15      THE COURT:  So I guess what exactly is wrong that was

16  allegedly done?

17      MR. BLOCK:  Understood.

18      THE COURT:  Okay.

19      MR. BLOCK:  And I'm going to just talk a little bit

20  about January of 2023, but I'm not going to get into the

21  details as to why we establish loss causation.  But let's fast

22  forward to January of 2023.  And what happens is new

23  information comes into the market in the 8-K.  One is, the

24  company says:  We have now completed our second investigation

25  into the media stories and what I will call the ghost

1    candidates and the political scandal, and we're now going to

2    tell you that we -- for the first time, we can't give you any

3    assurance that this is not going to lead to problems for us.

4    We can't give you any assurance that somebody might start an

5    investigation or that this could be problems for us with our

6    regulators.  And on the same day we tell you this, we announce

7    that Eric Silagy is resigning.  And we know that there is this,

8    as we say, as has been reported, unusual clawback provision.

9         So stock market analysts that we quote in the paper --

10   in our complaint say:  Wow.  This is new negative news.

11        And I think it's important to remember, they say in

12   spite of the company reporting strong financial numbers, this

13   is now a negative overhang.  And you see that big stock drop.

14   8.7 percent, $14 billion in market capitalization is wiped out

15   in one day on this news.  Not that, "We want to let you know

16   there is a criminal investigation."  Not that, "We want to let

17   you know we may be charged."  It's, "There is a risk here,

18   folks.  The risk is we may get caught up in this."  And if

19   you're an investor, you now say this company is a more risky

20   investment today than it was yesterday.  And what that does is,

21   when I bought may stock during that class period, I'm buying,

22   thinking "no risk to any of this" because I'm told there is "no

23   evidence, there is no basis, we didn't know anything about it,

24   it wasn't us."  And all of a sudden, now the company is

25   saying," Eh, not so fast.  I mean, there could be an issue."

1          So that's when I --

2          THE COURT:  Okay.  Let me just stop you for a couple of

3     technical points.  Just, can you answer my question as far as

4     the exhibits to the motion to dismiss?  Do you dispute that I

5     can consider them because they're central to your pleading and

6     their authenticity is not challenged?  And by "the exhibits,"

7     I'm talking about the ones attached to the motion to dismiss,

8     not the others that, were filed after the fact.

9          MR. BLOCK:  I think on those exhibits, Your Honor, I

10    think you can take judicial notice of the fact that they are

11    out there, that there was a newspaper story that was published,

12    or that there was -- something was said in a transcript of a

13    conference call, but I don't think you can accept it as

14    truthful to create, sort of, a counterfactual argument to what

15    is in the complaint.

16         THE COURT:  Well, then that doesn't really help me.

17    Because you're citing to all these things in your own

18    complaint.  What about the articles, for example, would

19    be -- would be inconsistent with your allegations?  Is there

20    some paragraph in one of the articles that I should ignore

21    while -- while reviewing what you have cited?

22         MR. BLOCK:  Well, I think -- Your Honor, as I'm

23    thinking about the different exhibits in my mind, I think the

24    newspaper articles you can look at.  I think, in particular,

25    one of the exhibits is a transcript of a conference call when

1    they're talking about Mr. Silagy's resignation.  And, again, I

2    can talk about -- about that during loss causation which --

3    where it may fit in better.

4            But what you get there is, sort of, the counterfactual

5    argument that, "Well, here is the real reason why he resigned,

6    and you should accept that as true, and make that finding

7    instead of what's pled in the complaint."

8            THE COURT:  Okay.  Let me -- I guess let me just be --

9    maybe a more direct question.  Is there a single exhibit

10   attached to the motion to dismiss whose authenticity or truth

11   you dispute?

12           MR. BLOCK:  We don't dispute the authenticity of any of

13   them.

14           THE COURT:  Do you disagree that you've cited to those

15   documents in your complaint?

16           MR. BLOCK:  Some of them, not all of them.  So, for

17   example, that -- that --

18           THE COURT:  Okay.  Which one is not cited?  Because I

19   believe there was an affidavit filed by defense that went

20   through each of the exhibits and said they're cited there,

21   they're cited there, et cetera.  And I didn't do a double-check

22   to see if every single thing was actually there, but that's

23   what I'm wondering.  Is there anything in your complaint,

24   compared with the exhibits, that I should say to myself, "No.

25   It wasn't really cited in the pleading, so I'm just going to

1    set those aside"?

2           MR. BLOCK:  Well, I know all the Form 4s, which are the

3    stock purchases, were not cited.  I know the transcript of the

4    conference call on January 25, 2023, was not cited.  So I know

5    those were a few examples that we did not cite.

6           THE COURT:  Okay.  So the Form 4s and the transcript.

7           MR. BLOCK:  Right.

8           THE COURT:  All right.  Okay.  Then I -- I got you off

9    track a little bit.

10          But I didn't really see any substantive challenge in

11   your opposition to any of those exhibits --

12          MR. BLOCK:  Right.

13          THE COURT:  -- which really should have been made if

14   you didn't want me to consider them.

15          So, I guess, just so I can wrap this up, you're saying

16   I should, in your view, not consider the Form 4s or the

17   transcript -- I'm not sure what the exhibit numbers are --

18   because they weren't cited in your complaint.  And what else?

19          MR. BLOCK:  We will pull those out.  Can we just get a

20   list of those exhibits?

21          THE COURT:  Okay.

22          MR. BLOCK:  I will get them and I will tell you what

23   they are.

24          THE COURT:  Okay.  All right.  Then let's put a pin in

25   that and continue.

1          MR. BLOCK:  Okay.  So let me go to the first statement

2     Ms. Soloway talked about, Mr. Robo's statement on January 25th.

3     And what we allege is -- there are really two things he said

4     that we say are false and misleading.  He says, "One is, and

5     the bottom line is" --

6          THE COURT:  What paragraph are you looking at right

7     now?

8          MR. BLOCK:  This is paragraph 262 of our complaint.

9          THE COURT:  What is misleading about this?  "The bottom

10    line is we found no evidence of any issues at all, any

11    illegality or any wrongdoing on the part of FPL or any of its

12    employees."

13         MR. BLOCK:  Okay.  I think what is false about that

14    statement, Your Honor, is the embedded factual representation

15    "we found no evidence of any issues at all."  And the memo

16    certainly provides a lot of evidence of --

17         THE COURT:  Okay.  So you want me to read that and,

18    like, snippet and just, sort of, cherry-pick it out.  Which I

19    understand.  I mean, I can understand why you would make that

20    argument, but I'm obligated to look at the statement in context

21    together.

22         MR. BLOCK:  Right.  I understand, Your Honor.  But I

23    think when you look at the statement as a whole, when you make

24    that sort of a factual representation that we say is false,

25    based on the memo, what it does is it bolsters and adds more

1    support when you say, "So we didn't do anything wrong.  There

2    is no basis to the allegations.  There is no evidence to

3    support anything, so we didn't do anything illegal."

4    You're -- you're now, sort of, adding that extra color to it

5    that the memo contradicts.

6            THE COURT:  Okay.  But -- and what exactly is the

7    contradiction that you see?  I guess, what in the memo would be

8    contradictory with the entity's conclusion post-investigation

9    that it hadn't committed any wrongdoing?

10           MR. BLOCK:  Well, again, we -- we are limiting our case

11   to that -- we haven't found any issues -- I mean, evidence of

12   any issues at all, and then his statement that, "I feel very

13   good.  There is no basis to any of these allegations."

14           So, for example, what we have alleged -- and let me

15   find a reference to the paragraphs, Your Honor.

16           But let's first talk about the issues with Grow United.

17   So -- and I know what you heard from Ms. Soloway was that -- I

18   want to make sure I get it right.  So I believe "there were no

19   communications at all between Matrix and FPL about funding

20   Grow United."  And what we have alleged in the complaint is

21   that there were communications.  And what you have -- I want to

22   make sure I go to the right paragraphs, paragraphs 157 to 164

23   of our complaint.  And what that is, is we allege and we say,

24   based on the documents from the memo, that Jeff Pitts from

25   Matrix sent two memos two Eric Silagy; one we call the legal

1    memo, one is called the funding memo.  And what they both do is

2    they lay out:  Here is how you can fund entities.  And you can

3    do it in a way so that FPL doesn't have to disclose who they

4    are.  And we can then fund these entities and take it

5    and -- and fund Grow United, so we can fund what we have been

6    discussing, which are ghost candidates and elections.

7          Now, Jeff Pitts sent that email to Eric Silagy at his

8    pseudonym email address, Theodore Hayes.  So Silagy gets the

9    memo and, lo and behold, as we have alleged, funding flows from

10   FPL to a (c)(4) entity, and then Grow United receives funds in

11   almost the exact same amount in very similar time periods that

12   FPL sends to the (c)(4)s, that then go to Grow United.

13         So, now, did FPL directly send money to Grow United?

14   No.  But that was the whole point of the scheme was to, kind

15   of, hide FPL's involvement in it; and that's why it was all set

16   up.  And that's exactly, as we allege and as the memo is

17   saying, was part of the memo; the funding memo and the legal

18   memo all say this is how we can do it.  And that's how it was

19   done.

20         So the memo has the funding memo and the legal memo

21   attached, and it then has invoices and ledgers showing the flow

22   of money.  So that is one way in which you can see how there is

23   evidence that would support what the allegations are, and that

24   there was a basis to the allegations.  Now, does it mean that

25   it violated campaign finance law?  No.  And they're certainly,

1    you know, free to have said based on an investigation, we don't

2    believe we violated at law.  Period.  They could have said

3    that.

4         But what's misleading about it is -- is the factual

5    representation and bolstering that by saying there is no

6    evidence.  So that's why we think it's more than just "they got

7    a memo."  They got a memo that laid out evidence, that laid out

8    details, as far as their possible involvement in this scandal.

9    And they went to lengths to say "we were not involved, it's not

10   us."

11        So that -- those were Mr. Robo's statements.  And I

12   think, Your Honor, that's why we say they are false and

13   misleading to investors.

14        Now, let me talk about scienter.  Certainly Mr. Robo,

15   I'm sure, received a copy of the memo because it was addressed

16   to him.  And it's hard to imagine that if he is talking about

17   this memo -- or about the results of this investigation, that

18   he never looked at any of the information; I think that would

19   be, in and of itself, reckless.

20        So you have this memo that goes to him.  And I think,

21   Your Honor, it's sort of akin to the confidential witnesses

22   that you had in Ryder where the witnesses were telling the

23   executives -- or were saying our valuation is off and the

24   executives --

25        THE COURT:  I don't want to get into, is this like a

1   CW?  I think that that is just, sort of, a red herring, and

2   there in that case there were a number of them.  And I just

3   think it's more useful for me to look at the allegations and

4   say, okay, well, what is actually false, when made, about this

5   statement?

6          MR. BLOCK:  Okay.  So I think I explained, Your Honor,

7   why we think those statements -- those two factual statements

8   are false.

9          THE COURT:  But you don't suggest that he had a

10  subjective belief that his investigation actually did uncover

11  wrongdoing, for example, or illegality?  That, I don't think

12  you plead.

13         MR. BLOCK:  No, we don't plead his subjective

14  knowledge.  I don't think we can, nor do we have to.  Under

15  Tellabs we don't have to plead a smoking gun.  We don't have to

16  plead direct evidence.

17             And I think we cite to, Your Honor, the Equifax case

18  which I think is -- on this issue is on point where the

19  Courts -- where the defendant there argued, well, you don't

20  plead that I subjectively believed the negative information

21  told to me.  And the Court said that's not what the plaintiff

22  has to plead; the plaintiff has to plead a red flag.

23             THE COURT:  But you can see that sort of surfacing in

24  other hypotheticals.  Somebody accuses a company of wrongdoing

25  or a director of wrongdoing.  The company engages an outside

1   firm.  They deny wrongdoing.  They say it's our position that

2   there is no basis to any of these allegations, and that's the

3   statement.  So why would we then say it's false when made?

4          MR. BLOCK:  Because here, in this case, they have the

5   memo which provides a basis for the allegations and evidence of

6   the allegations.  Now, they --

7          THE COURT:  Just so that I can really understand, what

8   exactly in the memo, in your mind, would be that sort of

9   evidence that would clearly indicate to a director or officer

10  that, yes, there is a factual basis for a finding of

11  wrongdoing?  I think you mentioned the daisy-chain sequence of

12  funding for the Grow United entity.  Is there anything else?

13         MR. BLOCK:  Well, also funding of the Grow United.  I

14  think also -- and I will get into it -- it's the job offer for

15  Garrett Dennis at -- in Jacksonville to get him off.

16         THE COURT:  Even though they rejected that plan?

17         MR. BLOCK:  Well, yeah, they say they rejected it, but

18  what we plead -- I just want to get to the actual paragraphs

19  that we plead.  But we plead more than that.  We plead -- and

20  it's paragraph 72 to 76 of our complaint, Your Honor.  I'm

21  flipping there.

22         Oh, I'm sorry.  I apologize, Your Honor.

23  That's -- that's the following of the journalist.  And

24  those --

25         THE COURT:  What are your best allegations for the

1   "let's offer a job to Mr. Dennis" so he creates a vacancy on

2   the council?

3           MR. BLOCK:  Yes, I'm just -- I was going there right

4   now.  I had my notes prepared, I'm sorry, chronologically.  And

5   I know we're going a little bit differently, so I do apologize

6   for that.

7           Okay.  So what we have, Your Honor, is we have

8   allegations -- I believe this was paragraph 56 to 77 -- where

9   Jeff Pitts says there was a memo prepared by Matrix --

10          THE COURT:  Which paragraph?

11          MR. BLOCK:  I believe it's paragraph 57.  Let me see.

12  No.

13          I apologize, Your Honor.  It's a little bit further.

14  Paragraph 65.  Thank you.  Starting there.

15          What we have are a series of allegations that talk

16  about how Fix JEA was largely -- largely a -- covertly funded

17  by FPL through a network of intermediary organizations.  And

18  what we have is allegations showing how the organization was

19  founded, how it was billed by Matrix to FPL.  FPL paid those

20  funds.  There was sufficient funds to allow Fix JEA Now to make

21  a job offer to Garrett Dennis, paragraph 72.  It says on

22  June 20, 2019, FPL's vice president of state legislative

23  affairs, Mr. Martel, sent an email to Jeff Pitts with the

24  subject line "Things to Go Over."  And the first item was JEA

25  DG, but we think that was GD, Garrett Dennis.

1          And then you have an email from a Mr. Odom from Matrix,

2    which has a subject line "FPL expenses for Grow United (c)(4)"

3    which has an invoice, and then you have "Folders At Matrix"

4    which contains invoices that went to FPL having to do with

5    Grow United.  And, you know, the allegation is that --

6          THE COURT:  Okay.  So then let's turn to the statement

7    that you say is false, and let's try to see if the allegations

8    get you to falsity.

9          MR. BLOCK:  Okay.  So what you have with Mr. Robo is,

10   again, we found no evidence of any issues at all.  And I think

11   just based on the -- the JEA allegations and the Grow United

12   allegations, there are evidence of issues.  There is a

13   possibility that FPL may have engaged in misconduct.

14         THE COURT:  That seems awfully attenuated, to be frank.

15   Can you give me anything more specific with respect to this

16   particular individual, Mr. Dennis?

17         Is there a later statement where they say, "No, we did

18   actually agree to that plan or fund a plan" or -- what's the

19   false statement?

20         MR. BLOCK:  Well, there is no specific false statement

21   by Mr. Robo about that in particular.

22         THE COURT:  Okay.  So this is the statement number 1 we

23   have to be sort of looping in this -- this Mr. Dennis category?

24         MR. BLOCK:  Correct.

25         THE COURT:  Okay.

1          MR. BLOCK:  It's more of a -- he has a more generic

2    statement of there is no basis to any of these allegations.

3    And as, I think, we set out in the complaint, you see evidence

4    from the memo which does provide a basis for the allegations.

5          THE COURT:  But what -- okay.  So what about -- isn't

6    there a statement Number 6?  I think we went over that with

7    Ms. Soloway.

8          Which is that statement?  That one concerns this Dennis

9    job proposal too?

10         MR. BLOCK:  Right.

11         THE COURT:  So what's that allegedly false statement?

12         MR. BLOCK:  Well, what we say on that statement,

13   Your Honor, is that -- I'm trying to get to my notes.

14         Again, it's -- it's -- okay.  I believe it's

15   paragraph 260, Your Honor, I'm told.

16         THE COURT:  Okay.  So that's this "we flatly rejected

17   the plan" allegation?

18         MR. BLOCK:  Right.  That's the statement.

19         THE COURT:  Okay.  So what's false about this?

20         MR. BLOCK:  So what we say is that Grow United

21   was -- and this is paragraph 261 -- was an entity created for

22   FPL by Matrix for the dual purpose of extending a job offer to

23   Counselor Dennis and facilitating the concealment of FPL's

24   political spending.  Matrix's internal ledger identified FPL as

25   the client responsible for the incorporates fees.  Prior to the

1   offer being made, FPL provided funding to Fix JEA Now

2   sufficient to cover the proposed salary and travel budget for

3   the director position at Grow United.

4       And the job offer was extended in a manner consistent

5   with a July 21, 2019, memorandum written by Odom outlining its

6   purpose.  So Matrix prepared a memorandum saying this is what

7   we can do and how we can set up something to make a job offer

8   to Dennis.

9       THE COURT:  Okay.  But Matrix is not a defendant in

10  this suit.

11      MR. BLOCK:  Right.  But it was done for FPL.  So that

12  would provide a basis for why FPL -- there is a basis to these

13  allegations.  There is evidence to support --

14      THE COURT:  Okay.  I think you're going back to

15  Mr. Robo's, and I take your point there --

16      MR. BLOCK:  Okay.

17      THE COURT:  -- creating some arguable basis there about

18  issues.

19      MR. BLOCK:  All right.

20      THE COURT:  But what I'm talking about now is

21  paragraph 260.

22      MR. BLOCK:  Okay.  Oh, his statement.  Okay.

23      THE COURT:  Reuter's statement.

24      MR. BLOCK:  Well, I think his statement is false

25  because FPL didn't flatly reject the plan.  FPL actually funded

1   in compliance with what the plan would be; it's that Dennis

2   didn't accept the job offer.  He didn't want it.

3          THE COURT:  So, I guess, which allegations in your

4   complaint show that FPL funded the plan to offer Garrett Dennis

5   a job?

6          MR. BLOCK:  Well, it's -- we say specifically it's --

7   paragraphs 49 through 54 and 56 to 77 talk about the funding.

8   And then in paragraph 261, it is summarized by saying

9   they -- they followed their plan.  They followed the funding

10  plan.

11         THE COURT:  Who is "they"?

12         MR. BLOCK:  FPL followed the funding plan.  They sent

13  the funds to Matrix so that Matrix would have the funds in

14  order to make the job offer.  So that's how they followed the

15  plan.  And that would be the basis.  And Dennis rejected the

16  job.  So he never took it, so they -- it never went through.

17  But when Reuter says we -- we rejected -- rejected it, that was

18  false because FPL didn't reject the plan.  The plan never

19  worked because Dennis didn't accept the job offer.

20         THE COURT:  But I thought the statement concerns a plan

21  to offer a job.

22         MR. BLOCK:  No.  Yeah, well, it does.  He says, "A

23  Matrix representative working for Joe Perkins approached FPL

24  about a plan to offer Garrett Dennis a job.  Working to

25  decriminalize marijuana, FPL flatly rejected the plan and

1    communicated a lack of interest to the team."

2         And what I'm saying is, that's a false statement

3    because FPL never rejected the plan.

4         THE COURT:  The plan to offer the job?

5         MR. BLOCK:  Yes, correct, the plan to offer the job.

6         THE COURT:  And that's alleged in your complaint, that

7    they never rejected the plan to offer the job?

8         MR. BLOCK:  Right.  Because they -- well, what we say

9    is what we have alleged and what the memo shows is that they

10   funded exactly in accordance with the plan.  So their actions

11   were we want -- we're going to follow through on this plan to

12   make the offer.  So by saying we rejected it is false because

13   their actions were to the contrary.

14        THE COURT:  Okay.  So just -- so the best allegations

15   you have on this topic would be 49 through 54, and 56 through

16   77; is that right?

17        MR. BLOCK:  Yes.  Yes, Your Honor.

18        THE COURT:  Okay.  All right.  Let me just sort of let

19   you go through any of the remaining statements.  I have had you

20   jumping around a bit, so I want to make sure you can go through

21   your presentation as systematically as you can, trying to avoid

22   duplication.

23        MR. BLOCK:  Sure.  Thank you, Your Honor.

24        Well, let me talk about Mr. Reuter's statement on

25   December 2nd where he says, "Neither FPL, nor our employees

1   provided funding or asked any third party to provide funding on

2   its behalf to Grow United in support of any Florida state level

3   political campaigns during the 2020 election cycle."  He says,

4   "Any reporter's suggestion that we had involvement in,

5   financially supported, or directed others to support any ghost

6   candidates during the 2020 election cycle is patently false."

7        And I think I just went through -- and I don't

8   want/need to go through it again, I hope -- the -- the whole

9   plan involving Grow United with the legal -- with the legal

10  memo, the funding memo, how that was sent by Jeff Pitts to Eric

11  Silagy at his pseudonym email address which -- and the funds

12  flowed from FPL to the entities that then went into Grow

13  United.  So Mr. Reuter's statement is false, based on what was

14  in the memo.

15       He also -- on his next statement, when he says FPL had

16  no involvement in the creation of Grow United -- now, what we

17  know is that Matrix set up Grow United and billed FPL for the

18  fees to create Grow United.  So that certainly contradicts what

19  Mr. Reuter says, that they had no involvement, but yet their

20  consultant billed them for the creation of that specific

21  entity.  So I think those are facts that support that that

22  statement was false.

23       Next, Mr. Reuter says, "Any reporter's suggestion that

24  we had involvement in, financially supported, or directed

25  others to support any ghost candidates during 2020 is false."

1    And, again, the whole purpose of the plan between Jeff Pitts

2    and Eric Silagy was that FPL could fund, but they could do it

3    secretly.  So that -- and that's exactly how those memos

4    worked, and -- or suggested they worked.  And that's how the

5    money flowed.

6         So, again, there was evidence and a basis to support

7    those allegations; and Mr. Reuter's statement categorically

8    denying it is false.  On December 17th when Mr. Reuter says,

9    "Neither FPL, nor Eric Silagy, requested Matrix to set up any

10   proposed funding structure for 501(c)(4) organizations, and we

11   had no knowledge of this structure being used by Matrix."

12        Now, that's false because, again, Jeff Pitts sent those

13   memos to Eric Silagy in 2019.  And it was at his pseudonym

14   email address, but they were sent to Eric Silagy.  So he was

15   aware of it.  One, he had knowledge of it and, two, that's

16   exactly how they worked; they followed those plans.  So that

17   statement by Mr. Reuter also is a false statement.

18        And those -- very specifically, Your Honor, it's

19   paragraphs -- I think the best ones on that are 160, 161, and

20   162.  They attach the memos, and they say, "The goal is to

21   provide funds that can be used for political activities in

22   2020, specifically supported political committees in Florida

23   and other states at the state level, provide funds that can be

24   used for political purposes, minimize all public reporting of

25   entities and activities."

1          So that's what they're being told, and it contradicts

2    what Mr. Reuter is saying.

3          You know, let me just talk about the scienter

4    allegations with Mr. Reuter and also sum up with Mr. Robo.

5          You know, I understand the argument is they were not

6    involved directly in anything going on here; so there is no

7    scienter.  But our case is not that they may have violated a

8    campaign finance law or committed some crime along those lines.

9    Our case is:  You made misstatements to your investors.  So

10   when you made your statements about "there is no evidence here,

11   there is no basis for the allegations, we have no knowledge of

12   any of this," those are false statements.  And the fact that

13   you have this memo which provides a contradiction to what

14   they're saying is the basis for the scienter.

15         THE COURT:  But how can that be, if there is -- if the

16   statements themselves incorporate the company's investigation,

17   which had found no illegality, and so they're reporting on the

18   results of the investigation?

19         MR. BLOCK:  Well --

20         THE COURT:  How could the inference be compelling of

21   scienter?

22         MR. BLOCK:  Well, I think -- I think the inference is

23   compelling for scienter, Your Honor, because what they are

24   saying is they're going to more than just simply saying that

25   there was an investigation and found "we didn't engage" -- or

1    "we don't believe we've engaged in any illegal conduct."

2    They're saying there is no basis to the allegations, there is

3    no evidence; that was untrue.  There was a basis and there was

4    evidence or basis to these allegations.

5         And, again, when an investor sees this information --

6    and, again, the newspapers were reporting on this.  They're

7    putting out in their news stories, you know, some of these

8    memos and some of these facts; and the company says no, not us.

9    Investors take that to mean, okay, I guess they weren't

10   involved, the newspapers got it wrong.  And then later on, it

11   turns out, while we can't give you any assurance that this

12   won't come back to hurt us, this could be a problem, for an

13   investor, it's a different set of risk factors that they look

14   at for this company.  And that's why, in this case, those

15   embedded factual statements of saying we were not involved, it

16   makes them false and misleading.  Because it's -- you're

17   assuring your investors, we see what's in the press, but, "No,

18   no, no, it's not us.  There is no basis to it."

19        And remember, there was snippets of the memo that went

20   out to the -- that were reported on, but not the whole thing.

21   So people didn't see everything that was in that memo.

22        THE COURT:  What's your best case -- similar case,

23   anywhere in the country, that would have addressed similar

24   allegations, for example, like Mr. Robo's, and found there to

25   be adequate pleading for purposes of a Rule 12 motion?

1          MR. BLOCK:  I don't think we found a case like this

2     where you have -- you know, a company receives a memo which

3     sort of describes that there may be improper conduct, and then

4     the company comes out and says, "We didn't do anything wrong."

5     And then later on they say, "Well, you know, there could be an

6     issue here," and the stock price falls.

7          I mean, I think an analogous case would be the Matrix

8     decision by the Supreme Court.  And what you have there was you

9     have -- there were allegations that the company's product,

10    Zycam, caused what's called anosmia which is loss of smell.

11    And the company made a statement which says Matrix believes --

12    opinion statement -- statements alleging that intranasal Zycam

13    products cause anosmia are completely unfounded and misleading.

14    So the company says those statements aren't true.

15         And -- but the company had gotten some information

16    which said there can be a link between Zycam and loss of smell.

17    And what the Supreme Court found unanimously was that was a

18    false and misleading statement because information provided to

19    Matrix by medical experts revealed a plausible causal

20    relationship between Zycam Cold Remedy and anosmia.  And that's

21    563 U.S. 27, and it's at 46 to 47.

22         Now, there wasn't a finding that Zycam caused anosmia.

23    There was no conclusive determination, but there was a

24    plausible connection.  So by just categorically saying "it's

25    completely unfounded and misleading," the Supreme Court said,

 1   "Well, that's a false, misleading statement."  Here, by saying:

 2   "There is no basis to these allegations, there is no evidence

 3   to connect us, we didn't know about the funding memo," it's a

 4   factual representation to distance themselves from what is in

 5   the press because, as a public utility, when you had this kind

 6   of a risk, investors are going to say, "Why should I invest

 7   that that utility?  I can invest in another one that is less

 8   risky."

 9          And so that -- that, Your Honor, is why we say these

10   statements are false and misleading, and that's why investors

11   took them the way they did, and then -- and we will talk about

12   the loss causation, and you see the stock price reaction.  And,

13   again, not because anybody was indicted or -- not even because

14   there was a criminal investigation, but because the company

15   changed its risk profile and said there could be an issue here.

16   And that --

17          THE COURT:  "Issue" meaning we're going to get sued or

18   what?

19          MR. BLOCK:  There could be a problem with us on

20   these -- on this political scandal issue, I will call it.  We

21   could have problems with our regulators just going down the

22   road, which may hurt us.  And that -- and, again, Your Honor,

23   if I can just -- I think one of the analyst's reports that we

24   cite to, I think, hits the nail on the head.

25          THE COURT:  Well, if we're going to talk about loss

1    causation, then I will ask you to just sit down for now.

2            MR. BLOCK:  Okay.  Sure.

3            THE COURT:  All right.

4            MR. BLOCK:  Unless Your Honor has anything else.

5            THE COURT:  Not at this time.  Thank you.

6            MR. BLOCK:  Thank you, Your Honor.

7            MR. KRAMER:  Good afternoon, Your Honor.  Dan Kramer

8    from Paul Weiss for the defendants.  I will address the issue

9    of loss causation.  As Ms. Soloway indicated earlier, it's a

10   separate element, as you know.  And if you agree with our

11   argument that it's not pleaded here, that alone is sufficient

12   basis to grant our motion to dismiss.

13           And I'm going to talk for a brief moment about the

14   standard.  And when we think about the standard, I think there

15   is really only one decision Your Honor needs to consult, and

16   that is the Eleventh Circuit's decision in Meyer vs. Greene,

17   710 F.3d 1189.  And this is what Meyer tells us.  Meyer tells

18   us that "To plead loss causation, an alleged corrective

19   disclosure must reveal to the market the falsity of the prior

20   misstatement.  It must disclose facts that are new, that is,

21   publicly revealed for the first time.  And a failure to allege

22   that a corrective disclosure disclosed new information, showing

23   the falsity of the misstatement, is fatal to a claim of loss

24   causation."  And that's because, as Meyer explained,

25   Section 10(b) is a scalpel, not a meat axe.  Its purpose is not

1    to provide investors with broad insurance against market

2    losses, but to protect them against the economic loss that

3    misrepresentations actually cause.  And I'm quoting Meyer at

4    1202, and Meyer is quoting the Supreme Court in Dora.

5          So while the corrective disclosure doesn't have to

6    precisely mirror the representation, it has to relate back to

7    the misrepresentation in the case.  So the bottom line,

8    Your Honor, and what I believe the Eleventh Circuit was saying

9    to the courts in this district is that they must ensure that

10   only losses actually attributable to a given misstatement are

11   cognizable.

12         And how did Meyer do it, in the Meyer case itself?

13   Meyer affirmed the dismissal of the 10(b) claim on loss

14   causation grounds.

15         THE COURT:  That was at the Rule 12 stage?

16         MR. KRAMER:  That was at the Rule 12 stage, Your Honor.

17         And in that case the allegation was that this company

18   called St. Joe, a real estate company, had overstated its

19   assets because it hadn't recognized an impairment, right?  That

20   assets were impaired.

21         And there were two things that the plaintiffs alleged

22   were disclosed that made the risk of an impairment, the risk of

23   a problem, far, far greater than investors may have thought.

24   The first was that David Einhorn, he was a famous analyst, did

25   a very large public presentation where he went through the

1    information about St. Joe and gave his analyst opinion that the

2    assets, in fact, were impaired.  And the second is that the SEC

3    started an investigation and issued a formal order of

4    investigation into the company's assets.

5           Now, why is it that the analyst's statement or

6    presentation about "impairment wasn't sufficient for loss

7    causation" -- certainly made the risk of a claim greater, as we

8    keep hearing here, the risk; you know, investors worry about

9    the risk.  Certainly led to a stock loss.  It didn't satisfy

10   loss causation because there was nothing in that presentation,

11   no new fact that made the company's statements false.  And why

12   is it that the SEC investigation and the SEC formal order

13   didn't satisfy for loss causation?  Certainly made the risk of

14   exposure to the company greater, the reason is because merely

15   the fact of the investigation didn't give the market new facts

16   that undermined the prior statements.

17          And so that is the prism through which the

18   Eleventh Circuit looks at these cases.  And we've cited to

19   Your Honor, you know, three or four cases in the last 10 years

20   where the Eleventh Circuit affirms dismissal, 10(b) cases in

21   12(b) context, for lack of loss causation.  And every one of

22   them is based on the premise that, even though information came

23   out to the market that made the risk of some exposure to the

24   company greater, that information was not new information about

25   the actual misstatement.  And we cite MacPhee, 73 F.4th 1220,

1    for that.  We cite Sapssov, which is 608 F.App'x 855, for that

2    proposition.  And, of course, I just went through Meyer vs.

3    Greene.

4         And so when we look at the disclosures in this case

5    that the plaintiff claims are the corrective disclosures, they

6    alleged thereto -- it's in paragraph 281 of their amended

7    complaint.  And they cite the corrective disclosures came out

8    on January 25th and January 31st.  And the reason those

9    disclosures don't work here is because on neither date is there

10   the disclosure of new facts contradicting any of the eight

11   statements Your Honor just went through with defense counsel

12   and plaintiffs' counsel.

13        The disclosures on the 25th and the 31st are silent on

14   the subjects of the eight statements.  They don't mention ghost

15   candidates.  They don't mention creating or funding

16   Grow United.  They don't mention funding structures for

17   contributing to political campaigns.  They don't mention the

18   job offer to Garrett Dennis.  They don't mention the

19   surveillance of reporters like Nate Monroe.  They don't mention

20   control over The Capitolist.  And they don't mention the first

21   law firm investigation.

22        In other words, even though plaintiffs' counsel will

23   get up here and tell you that these disclosures made investors

24   nervous and made the stock price go down, he won't be able to

25   point to anything on those two dates that actually address the

 1   topic of the eight statements.  And, therefore, under Meyer and

 2   the other cases I have cited from the Eleventh Circuit, it's

 3   insufficient to state loss causation here in this case.

 4        Now --

 5        THE COURT:  It seems like this is a questions of, like,

 6   the level of abstraction, how narrow --

 7        MR. KRAMER:  Yes.

 8        THE COURT:  -- or broad are we looking at this.

 9        So can you do, like, a compare and contrast with the

10   corrective disclosure versus the prior statement?  Because I

11   assume the plaintiffs are going to say this is -- this is not

12   as granular as you're making it.

13        MR. KRAMER:  Yes.  That -- you have anticipated the

14   next part of my argument.  Absolutely.

15        And so they won't be able to get up and talk about the

16   topics.  You can ask them, but they're going to say -- I

17   believe they're going to say three things to you, which are the

18   three arguments that they presented in their briefs.  They will

19   say, NextEra issued a risk disclosure, right, that

20   raised -- that could lead -- that the -- that the issues raised

21   in the media about Matrix could lead to legal proceedings and

22   exposure.  That's the first argument they're going to make; and

23   I will address that.  Then they will say, NextEra announced

24   Mr. Silagy's retirement, and that there was a claw -- and that

25   he was retiring after 20 years, and that that shows loss

1     causation.  And I will address that and explain why, as a legal

2     matter, that doesn't work.

3          And then they will say Mr. Silagy's agreement contained

4     a clawback provision, in the event there was ever a criminal

5     proceeding finding wrongdoing; and I will explain why that

6     doesn't work either.

7          So I think those are going to be the arguments they

8     make, and I will explain why none of those is granular enough

9     to satisfy the Meyer test and -- and create a corrective

10    disclosure that, in fact, discloses the falsity of the actual

11    misrepresentation, which is what Meyers says you have to do.

12         So let me start with the first one, Your Honor, the

13    risk disclosure.  The complaint charges that January 25th was

14    the first time NextEra warned the market that it faced legal

15    risks from the media allegations about Matrix.

16         Well, there are a number of problems with that

17    argument.  The first is that, in Meyer, the Eleventh Circuit

18    said that disclosing a potential future risk cannot be a

19    corrective disclosure; and that's Meyer 1201.  It just can't

20    be.  Courts don't go there, saying you have a future risk.  It

21    doesn't show your prior statements are incorrect.  And I think,

22    as a matter of policy, courts don't want to have companies not

23    disclose future potential risks.  So Meyer rules it out.

24         Even if Meyer didn't rule it out, the fact is that

25    January 25th is not the first time that NextEra warned that the

 1   media allegations could lead to legal risk.  They made that

 2   disclosure.  They made that materially identical disclosure

 3   three months earlier on November 3rd, when they warned that

 4   there were media reports that alleged campaign finance

 5   violations by FPL.  They stated that a complaint had been filed

 6   with the Federal Election Commission alleging violations of

 7   federal law, and identifying FPL as a source of the funds.  And

 8   they said that NextEra's review of the potential campaign

 9   finance violations was ongoing and it cannot predict the

10   outcome.

11          So the notion that January 25th was the first time that

12   investors learned that there was a risk of potential future

13   actions -- first of all, I don't -- I think under Meyer, saying

14   there is a risk of potential actions isn't -- isn't the

15   corrective disclosure, but even if it were, it's got to be new

16   information.  It's got to be new facts.  And this was -- was

17   disclosed three months earlier on November 3rd.

18          THE COURT:  Does the second amended complaint contain a

19   paragraph related to the November 2020 disclosure that you have

20   referenced?

21          MR. KRAMER:  You know, I don't know -- I don't know if

22   it's -- no.  My team is saying no.  They -- they decided not to

23   put it -- Your Honor can take judicial notice of it because

24   it's a press release, and you can -- you can take notice of it

25   for -- that it issued the warning, not that the warning was

1  correct or incorrect or whatever.  But we have that before you.

2  And we have it, docket 8 -- 83, Exhibit F at 57, is where you

3  will find the November 3rd disclosure.  Docket 83, Exhibit F at

4  page 57.  Now --

5       THE COURT:  So where does -- looking at that exhibit,

6  where does it say that?

7       MR. KRAMER:  Sure.

8       So under -- under Item 5, other information, if you see

9  that.

10       THE COURT:  Yes.

11       MR. KRAMER:  Okay.  Media articles have been published

12  that allege, among other things, campaign finance violations by

13  FPL.  It's -- when I was making my argument to the Court a

14  minute or two ago, I was actually quoting from this, this

15  disclosure.

16       In addition, a complaint referencing these articles was

17  filed with the Federal Election Commission, okay, alleging

18  violations.  While not expressly naming FPL, it identifies FPL

19  as a source of funds to certain PACs identified in the

20  complaint.  So -- so the company -- and then I will get to the

21  next paragraph which goes further.  So the company is giving a

22  warning on November 3rd that these media allegations exist, and

23  that they allege campaign finance violations.  They

24  involve -- there is a complaint before the FEC, and it names

25  FPL.

1            So then the next paragraph says NextEra has engaged

2    outside counsel to conduct a review of potential state and

3    federal campaign finance violations, including the allegations

4    raised in the media articles and the FEC complaint.  The review

5    is ongoing.  And NEE and FPL cannot predict, as of the date of

6    this report, the outcome of the review.  These allegations

7    could result in regulatory, investigative, and enforcement

8    inquiries by law enforcement or other government authorities,

9    and any ultimate findings of violations could result in the

10   imposition of fines, penalties or other sanctions or impacts.

11           So the notion that January 25th is the first time that

12   an investor learns of these issues or learns that there might

13   be some exposure is not correct.  That the -- the disclosure on

14   November 3rd is pretty good.  It may not be perfect, but it's

15   pretty good.  And it says to the world:  We have these

16   allegations.  We're looking at it.  We can't predict the

17   outcome.  And it could lead to fines, sanctions, penalties, and

18   other issues.

19           So, Your Honor, the November 3rd disclosure is ignored

20   by plaintiffs.  I'm told it's not in the complaint.  And I

21   think we all know why.  It's not in the complaint because

22   NextEra's stock went up on November 3rd.  Following this

23   disclosure, the stock price went up, and that's included

24   in -- in Exhibit G to our motion to dismiss, and paragraph 8 of

25   the Soloway declaration.  And stock prices are subject to

1    judicial notice, that's the Lanfear case, Eleventh Circuit

2    case, at 679 F.3d 1267.

3        So with the risk disclosure, plaintiffs are doing

4    exactly what Meyer said you can't do.  Meyer said in order to

5    have a corrective disclosure, you have to allege a new fact

6    that shows your misstatements were improper, and January 25th

7    saying "we have these allegations and we could be subject to

8    problems," they disclosed that on November 3rd.  So --

9        THE COURT:  When did Mr. Robo make the statement, the

10   first statement on which plaintiffs rely, that we talked about

11   for a while, related to the illegality?

12       MR. KRAMER:  Give me one second.

13       MS. SOLOWAY:  Your Honor, the one statement by Mr. Robo

14   was January 25th, 2021.  Excuse me.  2022.  Excuse me.  Thank

15   you.

16       MR. KRAMER:  And, Your Honor, so the question is:  Did

17   a disclosure come out that disclosed the facts -- new facts

18   showing that the statements were false, right, that caused the

19   stock to drop and, therefore, it is -- is the actual cause of

20   their loss?  And they can't allege it as to November 3rd

21   because the stock price goes up.  And November 3rd is a very

22   full risk disclosure.  You can quibble with a word here or

23   there, which I'm sure plaintiffs will do, but you can't say

24   that an investor who read that disclosure was under any

25   illusion other than there could be exposure here.

1          So January 25th, as a matter of law, doesn't work as a

2     risk disclosure.  It's simply not new facts as -- as required

3     by Meyer.

4          Now, plaintiffs argue, Your Honor, in their brief that,

5     well -- in their brief they sort of back away from what's in

6     the second amended complaint.  They don't really say, well,

7     it's a -- you know, it's the first time people found out there

8     is a risk.  They said there were two pieces of information on

9     January 25th that were new.  They say in their brief, on pages

10    1 and 22, that this was the first time NextEra acknowledged

11    facts potentially tying FPL to the scandal.

12         Well, we know that's not right because we just read the

13    November 3rd disclosure.  And we read that -- that -- that the

14    allegation was that FPL had funded the PACs.  So we know that's

15    not right.

16         And then they say it's the first time -- January 25th

17    is the first time that one -- the number $1.3 million in

18    contributions as alleged in the CREW complaint.  That's a

19    complaint before the FEC -- FEC was made public.  But that's

20    wrong.  This is all public, well before January 25th.  Because

21    the CREW complaint was on CREW's website on October 27th.

22    And -- it's Exhibit D to our motion.  And plaintiffs cite to it

23    in their complaint in paragraphs 200 to 211.  And they cannot

24    allege that the CREW complaint was not public before

25    January 25th.  And the CREW complaint has the $1.3 million.

1          So that fact, the $1.3 million, is not a new fact on

2    January 25th.  It's a fact that was in the market months

3    before.

4          So -- so their argument that there are new facts on

5    January 25th just isn't correct.

6          THE COURT:  What about the argument -- just the more

7    general, Mr. Robo stated in January of '22 that there were no

8    bases to the allegations, and then January 25 -- where is the

9    actual exhibit with the January 25 -- 25th disclosure?

10          MR. KRAMER:  That's docket 83, exhibit J, at 2.

11          And here again, a risk factor -- you know, the -- the

12    investigations found that there was no basis for violate -- to

13    find violations or illegality.  But notwithstanding that, the

14    company still says, as it said on November 3rd, that

15    allegations of violations by FPL or NextEra have the potential

16    to result in fines, penalties, or other sanctions.

17          So you can do all the investigations you want.  You can

18    come up with your findings.  You find that there is no -- that

19    you haven't found a violation, but you're still telling your

20    investors this is what we found, but to be prudent, we're

21    telling the world that we can't guarantee that there isn't

22    going to be investigations.

23          You know there was a request for investigation with the

24    Federal Election Commission that the FEC denied, but they could

25    have, you know, said, okay, we will have an investigation.

1      That could have happened, even though your law firm finds that

2      there is no basis for a violation.

3            So these are not -- this is good risk disclosure.  This

4      is good, prudent risk disclosure.  And this disclosure does not

5      say we lied to you when we told you that the investigation

6      concluded that there were no violations.  It's not what this

7      says.  It says that we can't guarantee things and there could

8      be investigations, there could be -- if there are, you know,

9      fines and other things.  You know, the business could be

10     adversely affected.  That's a risk factor.  But let's remember,

11     Meyer says that disclosures of future potential risks don't

12     constitute loss causation.  And they say it for a very good

13     reason, Your Honor.  It's because you want companies to say,

14     look, we investigated this, we don't think there is a problem.

15     But there is always a risk.  That's good corporate disclosure,

16     and -- and Meyer recognized that.  And I think Meyer doesn't

17     want to get in the business of saying to companies, you can't

18     make this type of disclosure.  It's exactly what they should be

19     doing.  And it does not -- it does not create a new fact

20     indicating that anything in those eight statements was false.

21            THE COURT:  Is there nothing, in your view,

22     inconsistent about the 8-K on January 25th and Mr. Robo's prior

23     statement in January of 2022?

24            MR. KRAMER:  I don't think so because, you know, I can

25     tell clients -- I give clients advice all the time.  And I say

 1    to them, you know, I don't think anyone did anything wrong

 2    here, right?  I don't think anyone violated the law.  But I

 3    can't give you a guarantee that the SEC won't investigate or

 4    that a shareholder won't bring a lawsuit; right?  I can't give

 5    you a guarantee you're not going to have to spend money or be

 6    distracted.  I actually think it's not inconsistent, and it's

 7    really good advice and really good disclosure.  And I think

 8    Meyer supports that.

 9         And Meyer requires more.  Meyer requires some

10    new -- because, let's remember, what happened in Meyer?  In

11    Meyer the SEC said we're issuing a formal order of

12    investigation, right?  We're going to issue a formal order of

13    investigation.

14         Well, that -- that wasn't enough, even though it

15    increased the risk that there might be an investigation or a

16    problem, that wasn't enough to create loss causation because

17    it's not a new fact that made the --

18         THE COURT:  What do you say about analysts apparently

19    feeling like something new or --

20         MR. KRAMER:  Yeah.  So, again, you have to look at the

21    analysts, and the fact that analysts -- when stock price goes

22    down -- and, by the way, NextEra's stock price went down

23    8 percent when the prior CEO of Florida Power & Light retired,

24    and there was no implication.

25         THE COURT:  I know, but I can't look at all that stuff

1    in a motion to dismiss.

2         MR. KRAMER:  All I'm saying -- oh, but you can because

3    they put it at issue because they give you a list of all the

4    stock drops.  But let me put it aside.

5         Analysts who say they were surprised, they have to come

6    up with a new fact.  They can't -- they can't just say we're

7    surprised the stock price goes down and there is loss

8    causation.  That type of uninformed, nonfact-based issue

9    doesn't work.  And let me -- let me tell you what Meyer -- it's

10   why I said the one case to read is Meyer.  Here is what Meyer

11   says about that.  Meyer says, if every analyst's opinion, based

12   on already public information, could form the basis for a

13   collective disclosure, then every investor who suffers a loss

14   in the financial markets could sue under Section 10(b) using an

15   analyst's negative analysis of public filings as a corrective

16   disclosure.  That cannot be, nor is it the law.

17        So the fact that you have analysts saying, oh, we're

18   surprised, oh, there is something new, that is not enough.

19        THE COURT:  Okay.  What about the departure of

20   Mr. Silagy?

21        MR. KRAMER:  Mr. Silagy announced on January 25th that

22   he would be retiring after 20 years at FPL, after 12 years as

23   the CEO, but he would continue on for five months to assist in

24   the transition.

25        The retirement of an officer or a director doesn't

1    reveal the falsity of alleged misstatements.  What you need is

2    information in that statement that identifies a new fact that

3    renders the prior statement false.  And so let me go through

4    the case law on this because I think Your Honor will find that

5    the cases that mention officer or director retirement, or even

6    resignation, right, as a -- as -- as a corrective disclosure,

7    are all cases that have, in addition to the fact of the

8    retirement or the resignation, a new fact that makes the prior

9    statement at issue false.  And the cases --

10          THE COURT:  Well, wouldn't the new fact here be the

11   clawback?

12          MR. KRAMER:  Well, let me get to the clawback.  The

13   answer is no.  The answer is no.  But if I may, because I want

14   to respond directly, let me finish responding to the first

15   thing and get through the second thing, is that okay?

16          THE COURT:  Yes.

17          MR. KRAMER:  All right.  So if we look at the Omnicom

18   case, there shareholders sought to recover losses after a

19   director announced his resignation, right, that happened at the

20   same time there were negative media reports, right, of

21   accounting fraud of the company.

22          And the Court, in this case the Second Circuit, it's

23   597 F.3d 501, at 513 to 14, said that doesn't create -- that

24   doesn't satisfy loss causation.  They said that plaintiffs had,

25   at best, shown that the resignation and resulting negative

1    press stirred investors' concerns that other unknown problems

2    were lurking in the company, that that is too tenuously

3    connected to the alleged accounting fraud to support liability.

4    Simply put, quote, "the resignation did not add to the public

5    knowledge any new material fact about the fraud."  And that's

6    how the cases separate.

7         It's not the fact that an officer or director resigns.

8    It's whether, in connection with that resignation, new public

9    facts are revealed that make a prior misstatement untrue.  And

10   that's the Meyer framework.

11        And the two cases that the plaintiffs cite from this

12   circuit on this issue both use that distinction, okay?  Both

13   find loss causation because the executive's departure is paired

14   with alleged new facts about the fraud.

15        The first case they cite is the FindWhat case,

16   658 F.3d 1282, it's an Eleventh Circuit case.  And even the

17   plaintiffs, in their opposition brief at 23, said that the

18   resignation and other disclosures satisfied loss causation.

19   Even the plaintiffs, when they're talking about the case,

20   talks -- talk not just about the resignation, but other

21   disclosures.  And what was the other disclosure made with the

22   director resignation in FindWhat that satisfied loss causation?

23   They revealed to the public that click fraud had been

24   responsible for a good part of the company's revenues after the

25   company had told the world that it had procedures to address

1    click fraud, and click fraud was not any material part of its

2    revenue.

3            THE COURT:  Okay.  I get you on all of this.

4            By the way, was the resignation unplanned?

5            MR. KRAMER:  No.  It's his 20 years.  It was his 20

6    years.

7            THE COURT:  But they called this an "unplanned

8    resignation."  Was there a prior disclosure of some kind that

9    indicated he would be getting ready to retire?

10           MR. KRAMER:  I don't know of any.

11           THE COURT:  Okay.  What about the clawback?  I want to

12   get moving here.

13           MR. KRAMER:  I don't think that makes it unplanned.

14           Okay.  So let's get to the clawback.  So they -- their

15   second date is the January 31 date.  And what do they say is

16   the new fact on January 31?  They say the new fact is that a

17   Times-Union article revealed that Silagy's retirement agreement

18   had a clawback and that the provision was unusual.  Well,

19   that's not true.  The clawback was not new on January 31; it

20   was disclosed on January 25th, one week earlier.  And it was

21   appended to the filing.

22           So January 31 is not the first time the world is

23   learning about the clawback.  And when they say the world

24   learned it was not customary, what is their basis for saying

25   that?  It's the Times-Union article.  But, Your Honor, the

1    Times-Union article does not say it was unique or not

2    customary.  It simply doesn't say it.

3         So they have no basis for that claim, but even if they

4    did, the clawback doesn't render anything said in the eight

5    statements untrue.  And, once again, I don't think Meyer would

6    accept it, and it is -- as we have -- cite in our brief, we

7    cite case law for this, it's simply good practice to have

8    clawback provisions which say if there is ever a criminal

9    finding, you're going to pay the money back.  That is -- that's

10   good corporate governance again.  And the notion that that

11   would be the basis for a securities fraud lawsuit, that's

12   really bad policy.  But it doesn't work because it wasn't new

13   on January 31st.  It didn't say it was unique.  And it doesn't

14   render anything -- any of the eight statements false or

15   misleading.

16        Your Honor, we have been here a really long time.  But

17   I definitely want to answer any question or issue --

18        THE COURT:  I don't have any questions for you on the

19   loss causation piece.  So, thank you.

20        MR. KRAMER:  Thank you, Your Honor.

21        THE COURT:  I do have a little bit of follow up on the

22   falsity.  And, of course, I want to hear from Mr. Block on the

23   loss causation.  So you may be seated --

24        MR. KRAMER:  Thank you, Your Honor.

25        THE COURT:  -- Mr. Kramer.

 1          Mr. Block, just on the loss causation, can you just

 2   address the arguments raised by Mr. Kramer today that the

 3   November disclosure would have alerted the public, much in the

 4   same way that the January 25th one did, and that there is

 5   really nothing new in January of '23 or in January 31.

 6          MR. BLOCK:  Certainly, Your Honor.  I think what we did

 7   was we submitted, as Exhibit A to our opposition, a side by

 8   side comparison between the November 10-Q and the January 25

 9   8-K.  And there are significant differences between the two.

10          First of all, the 10-Q says we are letting you know --

11   what they say is NEE has engaged outside counsel to conduct a

12   review of potential state and federal campaign finance

13   violations.  Okay.  So they are saying we are starting an

14   investigation.  January 25th their 8-K says we have concluded

15   our investigation, and after concluding our investigation, one,

16   they're saying the total amount at issue now that could be

17   attributable to us is 1.3 million, as alleged in the FEC

18   complaint.  So this is now a fact tying FPL to potential

19   issues, and it's not that $1.3 million is a material amount to

20   FPL.  It's, there is, now, this potential connection.

21          And also, they say for the first time that they can't

22   give any assurance to their investors that there won't be

23   further investigations; there won't being criminal charges; and

24   in particular, that this may not have a material adverse impact

25   on the reputation of NextEra or FPL, or the effectiveness of

1    their interactions with government regulators or authorities.

2    And that's what is new.

3        And when you look at what the analysts say -- and I

4    think that's why the analysts' reports here are significant.

5    And I will talk about Meyer vs. Green in -- but in

6    particular -- and we talk about the analysts' reports at

7    paragraphs 289 to 295 of the complaint, but -- and I had

8    mentioned I was going to refer to this earlier -- the

9    Morningstar analyst says in a report they published the next

10   day, January 26th, 2023, the regulatory uncertainty could lead

11   to unfavorable changes, threatening NEE's otherwise

12   best-in-class rate regulation; and that it would, therefore,

13   add a higher uncertainty rating into NEE'S model, than NEE's --

14   NEE's utility peers.

15       So certainly what Morningstar is saying is --

16       THE COURT:  But before you get to what other people are

17   thinking, I want to do a closer comparison.

18       MR. BLOCK:  Yes.

19       THE COURT:  So what exactly is new?

20       MR. BLOCK:  Well, first of all, what is new is,

21   November of '22 they say we're starting an investigation.

22       THE COURT:  Hold on.  Let's get the -- let's get the

23   text of the November --

24       MR. BLOCK:  Okay.  So November --

25       THE COURT:  It says, "We've engaged outside counsel.

1    The review is ongoing.  These allegations could result in

2    inquiries by law enforcement or other governmental authorities,

3    and any ultimate findings of violations could result in fines,

4    penalties, or other sanctions."

5            MR. BLOCK:  Right.  In January --

6            THE COURT:  So then show me -- let's compare this --

7            MR. BLOCK:  Okay.

8            THE COURT:  -- with what comes in January, and explain

9    to me what is really new.

10           MR. BLOCK:  Well, what's new is, in January of '23,

11   they complete the investigation.  So we're now done.

12           THE COURT:  Okay.

13           MR. BLOCK:  And it's, I think --

14           THE COURT:  But just the mere completion of the

15   investigation is not actually what you're relying on; it's some

16   degree of material adverse impact.  So show me that language.

17           MR. BLOCK:  Well, I think the material adverse impact

18   is them saying that this could lead to problems with our

19   regulators down the road, which is the first time now they're

20   saying this.  And that' --

21           THE COURT:  Okay, okay.  Where is the exhibit for the

22   25th disclosure?  Which is it?

23           MR. BLOCK:  Well, I know we submitted our Exhibit A to

24   our opposition to the motion to dismiss.

25           THE COURT:  Do the defendants have that as an exhibit

1   to the motion?

2          MR. KRAMER:  Your Honor, the January 25th, we have as

3   docket 83, Exhibit J, at 2.

4          THE COURT:  Okay.  So I'm looking at docket entry 83,

5   12.  Where, Mr. Block, would I find this?

6          MR. BLOCK:  Well, I don't have that exhibit,

7   Your Honor.

8          THE COURT:  Is that it, 83, 12?

9          MS. SOLOWAY:  Your Honor, I think it's 83, 11.  And if

10  you're using the page number by ECF, it's page 3 of 4.

11         THE COURT:  Okay.

12         MS. SOLOWAY:  Do you the see the section that says

13  "Section 8 other events"?

14         THE COURT:  Yes.  Okay.  I see that.  This is 83, 11.

15  Okay.

16         So if I were to compare the language.

17         MR. BLOCK:  So if you compare that language,

18  Your Honor, the last paragraph which starts "in addition,"

19  the -- the ending of that section says -- it does say "will not

20  result in the imposition of fines, penalties or otherwise

21  result in other sanctions, or will not have a material adverse

22  impact on the reputation of NEE or FPL on the effectiveness of

23  their interactions with government regulators or authorities."

24         So what they're saying is that -- and they're a

25  regulated entity -- they're saying that these allegations -- we

1    have done our investigation.  This may impact our ability to

2    work with our regulators, which may impact our ability or --

3    what's happening to us down the road.  And it changes the

4    company's risk profile which is why you see what the analysts

5    say.

6            And that's why I think the Morningstar report hits the

7    nail on the head for an investor, saying you now have this

8    regulatory uncertainty with this utility.  They've changed what

9    they have been saying.  And, again, if you look at what the

10   analysts say -- you know, just a couple of them -- we quote

11   from Wolfe Research.  It says, "Investors weren't buying the

12   company's explanation that Silagy's departure was not connected

13   to its internal investigation of political misconduct.  And

14   bringing back a retired executive belied of the notion that

15   there is a plan in place."

16           THE COURT:  Wait.  You have to say that again.  When

17   you hit the mic, she can't hear what you are saying.

18           MR. BLOCK:  I do apologize, Your Honor.

19           And that bringing -- "belied the notion that there was

20   already a new term, succession plan in place, supporting the

21   inference that Silagy's resignation was rushed and not planned

22   in advance."  Credit Suisse wrote, "Despite financial results

23   in line with expectations, overshadowing the update was a

24   sequence of disclosures on FPL campaign finance law

25   allegations.  The announcement -- the announced retirement of

1    FPL CEO Eric Silagy, and new risk disclosures around the event,

2    this was a negative update, even when considering reaffirmation

3    extension of the company's strong financial outlook."

4          And, you know, I know Mr. Kramer wants to engage in a

5    factual argument disputing or undermining what the analysts

6    said, that it's just speculation, but, one, I think that's

7    improper on a motion to dismiss.  Facts are accepted as true.

8          And second, Your Honor, courts will look at what

9    analysts had to say to understand how the market was digesting

10   and reacting to information.  And the case we cited for that,

11   Your Honor -- I'm just trying to find it in my outline.

12         THE COURT:  So, just so I understand, for you the new

13   piece of information disclosed in the 8-K on November --

14   excuse me -- January 25th of 2023, is that the allegations of

15   violations --

16         MR. BLOCK:  Well --

17         THE COURT:  -- could have a material adverse impact on

18   the reputation, et cetera, finishing that sentence.

19         MR. BLOCK:  Yes, there is three things.  That is one.

20   Two, it's Silagy's resignation.  And, three, it's the clawback

21   which we've pled and it's --

22         THE COURT:  But the resignation standing alone, is it

23   tied to any other wrongdoing?

24         MR. BLOCK:  Well, you can look at them all together,

25   and that's what the cases say.  You look at -- you can look at

1    all those facts on that day to see whether or not that would

2    create a plausible claim for loss causation.  And --

3            THE COURT:  But you would agree, I think, with the

4    description of the case law by your opposing counsel that all

5    of the cases, where there has been a resignation, contained

6    additional allegations.

7            MR. BLOCK:  Yes.  And I think here --

8            THE COURT:  So in this case, what would those extras

9    be?

10            MR. BLOCK:  The new risk disclosures in the 8-K.

11            THE COURT:  Well, what if I don't agree with you that's

12    really new, when you compare the language in November?

13            MR. BLOCK:  Also, the clawback.  The unusual clawback

14    provision.

15            THE COURT:  Where are you getting that it's unusual?

16    And where, in your complaint, are you saying that it's unusual,

17    given the article which you cite in the complaint, and which I

18    understand there is no dispute I can refer to?

19            MR. BLOCK:  Well, we allege in paragraph 304 of the

20    complaint that the article says it's unusual.  So I don't agree

21    with Mr. Kramer that it doesn't say it.  And that's our

22    allegation.

23            THE COURT:  Does it actually say that?

24            MR. BLOCK:  I believe it does, Your Honor, yes.

25            THE COURT:  Well, we should be able to see if it really

1    does or doesn't.

2          MR. BLOCK:  What -- what the article says is, it's not

3    customary.  So that is not a customary provision, is what the

4    article says.

5          Also, Your Honor, let me talk about briefly --

6    Mr. Kramer talked about there has to be new information in the

7    market.  And I think we went over -- the analysts all viewed

8    this risk disclosure as new, as providing new information --

9          THE COURT:  Well, maybe they just didn't read the

10   November one carefully enough; I don't know.  But just looking

11   at the papers, as far as what's actually new, what's actually

12   new?

13         MR. BLOCK:  Well, I think it's that updated disclosure

14   about the problems with the regulators.  I think it's -- that

15   we have now completed our investigation, and based on that

16   we're telling you that there could be these problems down the

17   road.  It's Mr. --

18         THE COURT:  That seems awfully close to what they said

19   in November about sanctions, fines, et cetera.  I mean, that's

20   fairly ominous, and it's out in the market three months before

21   the cited disclosure that you say triggers your loss.

22         MR. BLOCK:  It is, Your Honor.  But, again, I just

23   think the difference is one is saying we're starting an

24   investigation, which I agree Meyer says just because you're

25   investigating doesn't mean anything.  But when you conclude

1   your investigation and you say "we're warning you now there

2   could be problems," that's telling people we're not out of the

3   woods here, and that's how investors took that new risk

4   disclosure.

5           On -- on Mr. Silagy's --

6           THE COURT:  What is your best case for loss causation,

7   given these disclosures?

8           MR. BLOCK:  Well, our best case is that, one, when you

9   look at the new risk disclosures, after they completed an

10  investigation, another one, they say we're warning you, we may

11  have problems with our regulators.

12          THE COURT:  Right.  No.  No.  No.  I know factually.

13  I'm saying what legal authority, like what case, what decision

14  would be your best case for withstanding a Rule 12 motion on

15  loss causation grounds in this context?

16          MR. BLOCK:  I think Flowers.  The Flowers decision --

17          THE COURT:  Flowers.

18          MR. BLOCK:  -- is right on point.  I think the FindWhat

19  decision, where the Eleventh Circuit said a resignation and

20  other disclosures satisfied loss causation.  The Aracruz case.

21          THE COURT:  The what case?

22          MR. BLOCK:  Aracruz?

23          THE COURT:  How do you spell that?

24          MR. BLOCK:  A-R-A-C-R-U-Z.  And I can give you the full

25  cite, if you --

1            THE COURT:  Okay.  No, I will find it if it's cited.

2    Okay.  So those three cases?

3            MR. BLOCK:  And that case also says that a Court can

4    look to what the analysts were saying, sort of, is a gauge for

5    how the market was taking information.

6            And just to contrast, and I know Mr. Kramer made a lot

7    of argument about the Meyer vs. Greene case -- but two things

8    about Meyer vs. Greene.  One is when the Court there was

9    talking about analysts' reports.  What the Court was saying

10   was, an analyst in that case gave a presentation about problems

11   of the company.  And what the Eleventh Circuit said was there

12   was nothing new in that particular analyst's report that could

13   provide information to the market.

14           We're not looking to the analysts' reports here to

15   provide new information to the -- to the market.  We're saying

16   the analysts are telling you how the market and they are

17   interpreting the information that came out; and that can

18   support loss causation.  What we have to do -- allege facts.

19   Is it plausible that the reason why this stock price fell is to

20   correct the prior misrepresentations?

21           THE COURT:  Okay.

22           MR. BLOCK:  And --

23           THE COURT:  Now, let me ask you just a general

24   question.  If I grant the motion in part or in whole, let's

25   say, are there any additional facts that you think you could

1   plead in the form of a final amended pleading that potentially

2   could cure some of the issues we're discussing?

3           I know this is the second amended complaint, and I

4   believe there was at least one prior opportunity to amend, but

5   I want to ask that specific question.  Are there any additional

6   facts that you could plead at this stage?

7           MR. BLOCK:  Let me just check if I can, Your Honor.

8           The only thing I think we could do, Your Honor, is we

9   can amend and we could attach the memo, which you would see

10  exactly what is in the memo and all the exhibits.  But is there

11  a new fact or a new witness that we're going to say is going to

12  tie this all together?  No.  But we can attach the memo.

13          THE COURT:  Okay.  But you could have attached the memo

14  before.  I assume you have had it in your possession.

15          MR. BLOCK:  We did.  We had it, but we know it wasn't

16  made public anywhere else, so we didn't do it.

17          THE COURT:  Okay.

18          MR. BLOCK:  And let me just say, Your Honor.  I know

19  you asked about, was there prior disclosure of Silagy's

20  resignation?  We don't believe so.  We have not found any.  And

21  the transcript from the call from January of 2023, they talk

22  about how Mr. Silagy had expressed a year earlier he wanted to

23  resign or he was thinking of resigning.  Never came out.  Was

24  never made public.

25          THE COURT:  But that's in your complaint that he had

1   expressed some desire to retire?

2          MR. BLOCK:  No, that is not in our complaint.

3          THE COURT:  That's not in your complaint.

4          MR. BLOCK:  That's in their exhibit.

5          THE COURT:  Okay.

6          MR. BLOCK:  And, if I can, Your Honor, I will just --

7   on the exhibits, the ones that we don't think you can take

8   judicial notice of are Exhibits C and E, which are transcripts

9   of calls, and then Exhibits O, P, Q, R, S, T, which are the

10  Form 4s.

11         And what you will see -- if you -- if you did look at

12  the Form 4s, Your Honor, what you are going to see are most of

13  the stock purchases are awards in connection with executive

14  incentive plans.

15         THE COURT:  Did you cite any of those materials in your

16  complaint?

17         MR. BLOCK:  We did not.

18         THE COURT:  Not a single time?

19         MR. BLOCK:  No, we did not.

20         THE COURT:  Okay.  Not a quote from any of the

21  transcripts?

22         MR. BLOCK:  No.  Not those, no.

23         THE COURT:  Okay.  All right.  Then let me hear,

24  finally, Ms. -- from Ms. Soloway, just on any narrow rebuttal

25  on the false statements, please.

1          MS. SOLOWAY:  Your Honor, I will try to keep this very

2     short.

3          On that final point about the Form 4s, the plaintiffs

4     actually do cite the Form 4 at paragraph 328 of the complaint.

5     They talk about a stock sale by Mr. Silagy.  And they're

6     talking about a stock sale they know about from a Form 4.

7     Exhibits O, P, Q, R, S, and T, which are the Form 4s, I think

8     we -- I may have given you one citation before for the

9     proposition that courts do routinely look at them.  There is

10    another one which is the Mogensen case, 15 F.Supp 3d 1191, at

11    1222.

12         So, Your Honor, we would submit that those are properly

13    before the Court, particularly since the plaintiff put

14    Mr. Silagy's stock sale, one of them, at issue.  And these

15    various Form 4s we've put before you just give you the full

16    picture, as the plaintiffs have relied on one of them.

17         The other issue, Your Honor -- you had asked earlier

18    about Exhibit L which is a transcript of the January 25, 2023,

19    call.  And I believe the plaintiffs weren't certain whether

20    that appears in the complaint.  It does.  It's in paragraph 321

21    of the complaint.

22         So I think we -- our view is that all of the exhibits

23    that we have attached are either cited in the complaint and,

24    therefore, properly before the Court or are SEC filings, which

25    the Miyahira case says the Court can take judicial notice of.

1   And I believe I gave you the citation for the Miyahira case

2   earlier.

3          THE COURT:  So on 321, Mr. Block just said it wasn't

4   quoted.  So is that just an error?

5          MR. BLOCK:  Yeah, I do apologize, Your Honor.  That's

6   an error.  And we will withdraw our -- any objection to your

7   considering all the Form 4s.

8          THE COURT:  Okay.  What about the transcript now that

9   you quoted, at least in part, in paragraph 321?

10         MR. BLOCK:  Well, we will -- one, we will withdraw

11  that, but that was not one of the transcripts that I had said

12  we would object to, which would be Exhibit C and E, which my

13  understanding is C is September 7, '22, and E is October 28th

14  of '22.  No objection to January of '23.

15         MS. SOLOWAY:  And, Your Honor, I think our position on

16  those would be that this falls well within the law on allowing

17  defendants to cite things that the Court can take judicial

18  notice of, which both the Miyahira case discusses and the

19  Michigan Carpenters case discusses, which is 2019 WL 1429667 at

20  page --

21         THE COURT:  I just think you get a little beyond a

22  12(b) motion when now we're talking about transcripts that

23  weren't actually quoted in an amended complaint; and you're

24  saying, well, they cited one transcript, so let's just loop

25  them all in.  I think you're really starting to get closer and

1    closer to the summary judgment line, and I'm not sure I'm

2    comfortable with that.  But, at the very least, what I see is a

3    transcript from January 25, '23, and then no opposition to the

4    Form 4s, or -- is it -- yeah, Form 4s.

5         Okay.  What else would you like to tell me,

6    Ms. Soloway?

7         MS. SOLOWAY:  Your Honor, one point on the first

8    statement by Mr. Robo, which some time was devoted to during

9    plaintiffs' counsel's argument, the plaintiffs -- I believe I

10   heard them agree that the complaint doesn't plead that he

11   didn't subjectively hold the opinion that he offered, which we

12   would respectfully submit is dispositive under Omnicare.  They

13   also agreed that there has never been a finding of illegal

14   conduct or wrongdoing, which was the basis for the opinion.

15        I think what the plaintiffs have relied on are two

16   cases:  The Matrix case from the Supreme Court and the Equifax

17   case.  And I pulled the relevant language from both of those

18   cases, and I really think they're distinguishable in ways that

19   are demonstrative of the point we're making here.

20        So in Equifax, the alleged misrepresentation was that

21   the company had received advice from a cyber security expert.

22   So the theory was, this is an opinion you are getting from a

23   cyber security expert.  And what the Court said is that the

24   defendant's statements touting cyber security, despite his

25   knowledge of experts' advice to the contrary, were actionable.

1      And the theory was that there was this undisclosed

2   opinion from your expert that actually said:  Your cyber

3   security isn't as you make it out to be.  Whereas, here there

4   is no allegation that the first law firm investigation didn't

5   reach the conclusion that the plaintiffs, excuse me, that the

6   defendants projected.

7      And with respect to the Matrix case -- and, by the way,

8   Your Honor, that --

9      THE COURT:  That's okay.  I can find it.

10     MS. SOLOWAY:  Okay.  The Matrix case, which is the

11  Supreme Court decision, the defendants there had allegedly

12  misrepresented scientific evidence.  So scientific evidence is

13  a form of opinion, what clinic trial studies say.  But what the

14  Court said was not okay was that they suggested that the side

15  effect didn't exist, it was loss of smell, when they had not

16  conducted any studies relating to that.  And the scientific

17  evidence at the time, according to a panel of scientists, was

18  insufficient.

19     So, again, it was a misrepresentation about the opinion

20  itself; whereas, here we don't have a misrepresentation about

21  the opinion itself, or what the experts, the lawyers, were

22  saying.  So I think that distinguishes those two cases.

23     A lot of the other paragraphs that plaintiffs' counsel

24  pointed Your Honor to are paragraphs that are about what Matrix

25  was doing, what Matrix was looking at, where Matrix was sending

1    money.  Almost none of them had anything to do with what FPL

2    knew or didn't know.

3           And I just -- I neglected to mention the Tupperware

4    case earlier, but I think it's really -- it's illustrative.

5    It's a recent 2023 Eleventh Circuit case.  And in that case the

6    subsidiary was unquestionably involved in a revi (phonetic)

7    recognition scheme; that was, sort of, agreed upon by the

8    parties.  But the question was, the parent company which had

9    reported revenue out from the subsidiary, had they made

10   misstatements with scienter?  And the Court again says, we

11   can't just assume that people at the parent company know

12   something just because a subsidiary is engaged in this conduct;

13   even though, of course, the revenue recognition scheme benefits

14   the parent company which is the public reporting company.

15          Now, here, I think that's even more extreme.  Because

16   this isn't even a subsidiary.  It's a subsidiary -- FPL is a

17   subsidiary of NextEra, but the entity that has the knowledge

18   that the plaintiff is pointing to is a third party.

19          So I would submit, Your Honor, that the Tupperware case

20   is even more on point here because so much of the knowledge

21   resided with the third party, not even with the subsidiary, and

22   certainly not with the parent company.

23          And I would just point out that the case says -- and

24   this is actually a quote from the Supreme Court:  Omissions and

25   ambiguities cut against scienter.

1          And I think here there are so many omissions and

2    ambiguities about the pleading that fail to connect FPL to the

3    requisite knowledge.  And that's a major hole, Your Honor, in

4    their case.

5          Just quickly on the Garrett Dennis job offer issue.

6    The plaintiffs pointed you towards a number of paragraphs in

7    the complaint.  But, at the end of the day, the question is

8    whether the statements that was actually made is false, right?

9    Whether -- when we said we knew about the job offer, but we

10   rejected the plan, whether that's false.

11         Now, the plaintiffs pointed you to paragraph 67, which

12   is about money that was -- they basically said "follow the

13   money," Your Honor.  But the money discussed in that paragraph

14   is for this organization called JEA.  And in paragraph 67, it

15   says FPL acknowledges it did pay money to JEA for polling and

16   outreach.  So this is like a red herring, because if you

17   actually follow the allegations in the complaint, the money

18   went to JEA for other things, and not for the Garrett Dennis

19   job offer.

20         And the other thing that -- when Your Honor asked

21   plaintiffs' counsel and said, well, where are the

22   communications directly between FPL and Matrix, the plaintiff

23   said, well, the Grow United evidence is demonstrated by that

24   funding memo that Mr. Silagy received.  And they pointed

25   Your Honor to paragraph 171.  So we look at paragraph 171.

1   It's that flowchart that shows the entities from this funding

2   memo that was shared with Mr. Silagy.  Grow United isn't in the

3   funding chart.  There is no ghost candidate issue allegedly

4   referenced in the funding chart so this funding memo doesn't

5   connect the dots either.  And that's what the plaintiffs

6   pointed Your Honor to.

7           I think other than that, Your Honor, unless you have

8   questions, I will reserve the rest of this.

9           THE COURT:  All right.  If you had any particular

10  rebuttal, I don't want to cut you off.  If there was some

11  specific point --

12          MS. SOLOWAY:  Let me check with the team and make sure

13  there is nothing that we have a burden -- and I'm sure the

14  plaintiffs would like a minute as well.  And then we will -- I

15  will be right back, Your Honor.

16          THE COURT:  Okay.

17          MS. SOLOWAY:  Thank you so much for the time today.  We

18  are so appreciative of the amount of time you have given us.

19  Thank you very much.

20          THE COURT:  Okay.  Anything further, Mr. Block?  I will

21  give you a couple of minutes, if you want to --

22          MR. BLOCK:  Yeah, just a couple of very brief points,

23  Your Honor.

24          Just specifically in the complaint -- it's paragraphs

25  160 and 161, which talk about the communications between Matrix

1    and FPL/Silagy.  There is this -- there is this connection

2    between Matrix and Silagy.  So this idea that it's all at

3    Matrix and FPL knows nothing, I think, is -- belies what we

4    have alleged.

5             THE COURT:  Okay.

6             MR. BLOCK:  As far as the funding memo goes, yes, we

7    have the chart which doesn't have Grow United, but in

8    paragraph 172 we allege that the money flowed from FPL to

9    Matrix-controlled entities, and then we later allege that there

10   were changes made and that the money flowed to support --

11   specifically reallege that the money flowed to support ghost

12   candidates, which comes from the memo.

13            And we have allegations -- I'm not going to go through

14   all of them, but -- because I know it's late.  But if you look

15   at paragraphs 175 through 198 -- no, not that far.  195.  It

16   talks about all the money that's flowing from FPL to Matrix for

17   the intended purchase -- purpose of the ghost candidate scheme.

18            So there are specific allegations in the complaint that

19   show how this money flowed and how FPL certainly was aware of

20   it.

21            THE COURT:  Okay.  All right.  Thank you.  I think this

22   is one of those cases where details really will matter, and the

23   Court will have to go through the specific allegations.

24            So in service of that exercise, I'm going to ask the

25   parties to do the following:  First off, I think it would be

1  helpful, just as an exhibit to this hearing, to have the

2  defendants' presentation docketed as a supplement to the

3  motion, along with the citation guide that was provided.

4       And then, likewise, I want to give plaintiff an equal

5  opportunity to prepare any sort of chart or list that actually

6  ties the false statements that you say are false to the

7  allegations in the complaint, so I can follow along clearly.

8       I don't perceive this as any sort of advocacy, although

9  I will give you a little bit of leeway because their

10 presentation does -- does do some of that.

11      So the net here is to submit, no later than a week from

12 today, which would be May 20th, any sort of, like I said,

13 chart/citation guide that itemizes the statements with the

14 corresponding paragraphs in the SAC, and then any little bit of

15 advocacy you wish to add in a very restrained fashion.

16 Because, like I said, I don't want to open up the briefing

17 again.  I just want to see exactly which statements are tied to

18 which allegations.

19      I also want the parties to meaningfully confer about

20 the various exhibits that are attached to the complaint, and

21 just in one submission indicate what exactly the parties agree

22 the Court can consider, given its reliance or use, I should

23 say, in the second amended complaint.  And then if there is any

24 disagreement about that, then you should note that in the joint

25 report.

1              So that's just a conferral on the exhibits that are

2       attached to the motion to dismiss.

3              Any questions so far?

4              MS. SOLOWAY:  We will do that, Your Honor.

5              MR. BLOCK:  One question, Your Honor.  The joint

6       report, you want that also in a week?

7              THE COURT:  Yes, please, unless that's not -- unless

8       that's not enough time.  Is that enough time?

9              MS. SOLOWAY:  I think we can make that happen.

10             MR. BLOCK:  We will do our best.

11             THE COURT:  Okay.  Well, do you need more time?

12             MR. BLOCK:  I don't think so.

13             THE COURT:  Okay.  Then May 20th it is, seven days from

14      today.  I will await those two extras.  And then I will take

15      the motion under advisement.

16             So thank you all for your helpful presentation.  It's

17      been a while.  Thank you to our court reporter, who I normally

18      do not keep this long without a break.

19             So thank you.  The Court is in recess.

20         (These proceedings concluded at 4:17 p.m.)

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4     I hereby certify that the foregoing is an accurate

 5     transcription of the proceedings in the above-entitled matter.

 6

 7
       DATE:  05-24-2024         /s/Laura Melton
 8                               LAURA E. MELTON, RMR, CRR, FPR
                                 Official Court Reporter
 9                               United States District Court
                                 Southern District of Florida
10                               Fort Pierce, Florida

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```