UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80833-CIV-CANNON

**MAHA JASTRAM**, individually and on
behalf of all others similarly situated,

      Plaintiff,
v.

**NEXTERA ENERGY, INC.** *et al.,*

      Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND CLOSING CASE

**THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss Lead Plaintiffs' Second Amended Complaint (the "Motion") [ECF No. 83]. The Court has reviewed the Motion, Lead Plaintiffs' Response in Opposition [ECF No. 85], Defendants' Reply [ECF No. 90], and the full record [*e.g.*, ECF No. 68; ECF No. 105-1; ECF No. 112-2; ECF No. 95 (taking judicial notice of ECF No. 91-2); ECF No. 115].[1] The Court also held a hearing on the Motion [ECF No. 114], after which the parties filed a joint status report on the propriety of taking judicial notice of various exhibits attached to and/or in support of the Motion [ECF No. 109]. For the reasons discussed below, the Motion [ECF No. 83] is **GRANTED**.

---

[1] On July 25, 2023, the City of Hollywood Police Officers' Retirement System, and the Pembroke Pines Firefighters & Police Officers Pension Fund ("Retirement Funds"), Jackson County Employees' Retirement System, and Richard Barcelona each moved for Appointment as Lead Plaintiff and Selection of Lead Counsel [ECF Nos. 25, 27, 30]. The Court heard argument on the motions [ECF No. 62], and appointed Retirement Funds as Lead Plaintiff ("Lead Plaintiffs") [ECF No. 63].

**FACTUAL BACKGROUND**[2]

This securities-fraud case stems from allegations that Defendants, NextEra Energy, Inc. ("NEE"), Florida Power & Light Company ("FPL"), and individual officers James L. Robo, Eric Silagy, and David P. Reuter (collectively, the "Defendants"), made false and misleading statements and omissions in response to claims by the media that FPL used corporate funds to influence state and local elections, targeted elected officials who opposed its initiatives, employed a news outlet to support its efforts against these officials, and intimidated journalists critical of FPL's actions [ECF No. 68 ¶¶ 2, 4]. The allegations center on FPL's engagement in what Lead Plaintiffs describe as improper political expenditures through its political consulting firm Matrix LLC ("Matrix") [ECF No. 68 ¶ 4]. Around November 3, 2021, a Memorandum was mailed to Robo, then-CEO of NEE, containing 155 pages of exhibits indicating that FPL, through Matrix, had engaged in a series of "concealed political expenditures" [ECF No. 68 ¶ 15].[3] According to Lead Plaintiffs, the Memorandum demonstrated that, under the direction of Silagy and his subordinates at FPL, a non-profit organization called Grow United was created and used to channel corporate resources to a network of nonprofits that funded "ghost candidates" to undermine state legislative campaigns of candidates deemed unfavorable by FPL [ECF No. 68 pp. 23–52]. Additionally, a "phony job offer" was allegedly made to a Jacksonville City Councilor through Grow United to facilitate NEE's potential acquisition of the Jacksonville Electric Authority [ECF No. 68 pp. 19–21].

---

[2] The following background is drawn from the allegations in Lead Plaintiffs' Second Amended Complaint, which are accepted as true for purposes of this Order as supplemented by the existence of the contents of judicially noticed materials [ECF No. 68]. *See Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993).

[3] The Memorandum is not attached to the Second Amended Complaint but is described therein [ECF No. 114 p. 100].

A few months later, the media obtained a copy of the Memorandum and began to publish articles raising questions about FPL's involvement with Matrix [ECF No. 68 ¶¶ 247–250].  In reaction to the reports, Reuter, NEE's Vice President and Chief Communications Officer, repeatedly denied any involvement by FPL or NEE in the allegations detailed in the Memorandum.  For instance, on December 2, 2021, Reuter stated that "we have found absolutely no evidence of any legal wrongdoing by FPL or its employees" regarding the ghost candidate scheme [ECF No. 68 ¶ 252 (Reuter Statement 1)].  On December 10, 2021, Reuter denied any involvement in FPL offering a fake job to a Jacksonville city councilor, stating, "FPL flatly rejected the plan and communicated our lack of interest" [ECF No. 68 ¶ 260 (Reuter Statement 2)].  That same day, Reuter said, "FPL had no involvement in the creation of Grow United," and "[o]ver this past summer, through both questioning from media and our own subsequent investigation, we learned that [Matrix] was responsible for the origins of this non-profit [Grow United]" [ECF No. 68 ¶ 256 (Reuter Statement 3)].  Again, on December 17, 2021, he declared, "[w]e have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle" [ECF No. 68 ¶ 258 (Reuter Statement 4)].

On January 25, 2022, Robo addressed the issue for the first time, telling media outlets that NEE had carried out an "extensive and thorough investigation" that found no evidence of illegality or wrongdoing by FPL or its employees [ECF No. 68 ¶ 262 (Robo Statement)].  Robo added that he personally had confidence in the investigation and its findings [ECF No. 68 ¶ 262].

In the summer of 2022, additional allegations emerged against Defendants.  A series of news articles claimed that FPL had covertly surveilled a journalist who authored negative reports about FPL [ECF No. 68 pp. 22–23] and that FPL, through Matrix, had taken control of a supposedly independent news website, the *Capitolist*, and directed it to publish attacks on

candidates running for office as well as reporters who had previously investigated FPL [ECF No. 68 pp. 52–59]. On June 24, 2022, Silagy stated that "[w]e did not engage in any activities having to do with following people like you, [journalist], or taking pictures" [ECF No. 68 ¶ 264 (Silagy Statement)]. That same day, Reuter asserted that FPL had "no digital record of these exchanges and cannot prove their veracity" and "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees" [ECF No. 68 ¶ 264 (Reuter Statement 5)]. Regarding the allegations that FPL possessed an interest in the media outlet the *Capitolist*, on August 13, 2022, FPL spokesperson Chris McGrath announced that, "FPL does not have an ownership interest in the *Capitolist*—either directly or indirectly . . . . We also do not have editorial control over what the *Capitolist* writes or publishes" [ECF No. 68 ¶ 267].

On November 3, 2022, NEE for the first time publicly acknowledged through a 10-Q filing with the SEC,[4] that there existed allegations against FPL executives exposing the company to legal and reputational risks (hereinafter "November 3, 2022 disclosure") [ECF No. 83-7 (Ex. F)]. Despite this warning to investors, the stock price of NEE did not plummet and instead continued to steadily rise [*see* ECF No. 83-8 pp. 6–8]. Several months later, on January 25, 2023, NEE filed a Form 8-K disclosure with the SEC,[5] again recognizing that the allegations against FPL executives could subject the company to both legal and reputational risks (hereinafter "January 25, 2023 disclosure") [ECF No. 68 ¶ 8; ECF No. 83-11]. On the same day, through an additional

---

[4] A "Form 10-Q" is a comprehensive quarterly report that companies must file with the SEC that "provides a continuing view of the company's financial position during the year." https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-q

[5] A "Form 8 K" is the "current report" that companies must file with the SEC "to announce major events that shareholders should know about." https://www.sec.gov/answers/form8k.htm

Form 8-K disclosure dated January 23, 2023 (hereinafter "January 23, 2023 disclosure") NEE announced that Silagy would no longer serve as CEO of FPL, retiring effective May 15, 2023 [ECF No. 68 ¶ 270; ECF No. 83-12]. The January 23, 2023 disclosure also included a copy of Silagy's retirement agreement [ECF No. 83-12 pp. 2, 6–20]. Lead Plaintiffs allege that January 25, 2023, disclosure resulted in a substantial decrease in the value of NEE securities [ECF No. 68 ¶ 9]. Additionally, Lead Plaintiffs allege that a January 31, 2023 article by the *Florida Times-Union* referencing Silagy's clawback provision in his severance amounts to second "corrective disclosure," resulting in a further stock drop [ECF No. 68 ¶¶ 303–305; ECF No. 83-15].

## PROCEDURAL HISTORY

On May 26, 2023, this action commenced when Plaintiff Maha Jastram filed an action on behalf of a putative class of investors who purchased NEE securities between December 1, 2021, and February 1, 2023 (the "Class Period") [ECF No. 1]. The Complaint asserted violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all Defendants (Count I) and violations of Section 20(a) of the Exchange Act against Robo (Count II) [ECF No. 1]. Plaintiff subsequently filed an amended complaint on June 8, 2024 [ECF No. 14], after the Court dismissed the complaint as an impermissible "shotgun pleading" [ECF No. 13].

Following appointment of Lead Plaintiffs [ECF No. 63], Lead Plaintiffs filed the operative Second Amended Complaint—again asserting violations of Section 10(b) and Rule 10b–5 against all Defendants (Count I) [ECF No. 68 ¶¶ 352–63], and violations of Section 20(a) against Defendants Robo, Silagy, and Reuter (Count II) [ECF No. 68 ¶¶ 364–67]. Defendants filed the instant Motion to Dismiss [ECF No. 83], which is ripe for adjudication [ECF Nos. 85, 90].

## LEGAL STANDARDS

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). That Rule requires a party to "state with particularity the circumstances constituting fraud or mistake," but allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Under Rule 9(b), it is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and

then allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237.

Further, to survive a motion to dismiss, a securities-fraud claim brought under § 10b–5 must also satisfy the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act (PSLRA). *See* 15 U.S.C. § 78u–4. The PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It also requires, "with respect to each act or omission alleged," that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). The required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (internal quotation marks omitted). And a "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007); *see also Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

Additionally, a securities-fraud claim brought under § 10b–5 must also plead loss causation. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1241 (11th Cir. 2023). To plausibly allege loss causation for a § 10(b) claim, "a plaintiff must offer 'proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.'" *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997)); 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). Stated another way, in a fraud-on-the-market

theory like the one Lead Plaintiffs advance here, "the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'" *Meyer*, 710 F.3d at 1195 (quoting *Hubbard v. BankAtlantic Bancorp., Inc.*, 688 F.3d 713, 725 (11th Cir. 2012)). "Merely showing a security was purchased at a price that was artificially inflated by a fraudulent misrepresentation is insufficient." *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 862 (11th Cir. 2015) (citing *Hubbard*, 688 F.3d at 725).

## DISCUSSION

### A. Attachments to Defendants' Motion

As an initial matter, the Court must determine whether the exhibits attached to the Motion may be properly considered, and if so, to what extent. Lead Plaintiffs contend that the Court may take judicial notice of all exhibits except for exhibits C and exhibit E, which consist of public investor call transcripts [ECF No. 109 pp. 1–2]. More broadly, Lead Plaintiffs take the position that none of the exhibits should be considered for the truth of the matter asserted, although they acknowledge referencing and relying upon at least some of the subject exhibits in the Second Amended Complaint [ECF No. 109 pp. 2–3]. Defendants, on the other hand, believe that judicial notice is appropriate for all of the exhibits attached to Defendants' Motion, and they argue further for judicial consideration of the truth of the contents contained therein—both as a matter of judicial notice and through the doctrine of incorporation by reference [ECF No. 109 pp. 3–6]. No party disputes the authenticity of the subject exhibits [ECF No. 114 p. 51].

Courts may take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be

accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Further, pursuant to the doctrine of incorporation by reference, a district court at the Rule 12(b)(6) stage may consider a document not attached to a complaint so long as the document is central to the plaintiff's claim and is undisputed. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298–99 (11th Cir. 2024).

Upon review of the parties' judicial-notice dispute, the Court incorporates by reference the exhibits referenced in the Second Amended Complaint, which are central to Plaintiffs' claims and undisputed in terms of authenticity. *See Johnson*, 107 F.4th at 1298–99; ECF Nos. 83-2, 83-3, 83-5, 83-10, 83-11, 83-12, 83-13, 83-14, 83-15, 83-22, 83-27]. As for the balance of the exhibits, the Court takes judicial notice of the existence of their contents only, with the exception of Exhibits C and E, which the Court does not consider in light of Lead Plaintiffs' objection [ECF Nos. 83-4, 83-6; ECF No. 109 pp. 1–2].

### B. Motion to Dismiss

Defendants seek dismissal of Count I on two grounds: (1) failure to adequately plead falsity and scienter in the statements allegedly made by FPL and NEE employees, and (2) failure to adequately plead loss causation. The Court determines that the latter ground is sufficient for resolution of the Motion and therefore assumes the adequacy of the falsity/scienter allegations.

In a fraud-on-the-market-case such as this case, a plaintiff can plead loss causation by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

9

*MacPhee*, 73 F.4th at 1242 (citing *Meyer*, 710 F.3d at 1197); *FindWhat*, 658 F.3d at 1311–12. A corrective disclosure reveals the falsity of a previous representation to the market. *Meyer*, 710 F.3d at 1197; *see FindWhat*, 658 F.3d at 1311 n.28. "To be corrective, a disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some negative information about the company." *Meyer*, 710 F.3d at 1197.

Upon careful review of the SAC, the Court determines that Lead Plaintiffs have failed to identify a corrective disclosure that reveals a truth that was previously concealed or obscured by Defendants' alleged fraud.

### 1. January 25, 2023 Disclosure

The Court begins with the January 25, 2023, Form 8-K disclosure, which is the crux of Lead Plaintiffs' loss-causation argument [ECF No. 68 ¶ 268]. That disclosure, reproduced below in the manner quoted in the Second Amended Complaint, states the following:

> Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.
>
> FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL. . . . FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.
>
> In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC

> complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

[ECF No. 68 ¶ 269; ECF No. 83-11].

The January 25, 2023 8-K does not qualify as a corrective disclosure for purposes of Section 10(b) or Rule 10b-5.

First, the January 25, 2023 disclosure does not mention any of the alleged misstatements upon which Plaintiffs base their claims of fraud and does not reveal that any of the prior statements were false or fraudulent. As noted, the prior alleged misstatements concerned various topics—ghost candidates; creating or funding Grow United; funding structures for contributing to political campaigns; the job offer to Garrett Dennis; the surveillance of reporters like Nate Monroe; and control over the website the *Capitolist* [*see* ECF No. 114 p. 74]. The January 25, 2023 disclosure does not reference those topics. It *does* reference the existence of allegations that FPL and NEE committed campaign finance law violations; it advises that such allegations "have the potential to result in fines, penalties, or other sanctions or effects"; and then it expressly disclaims any attempt to guarantee that no adverse effect will result from those allegations [ECF No. 68 ¶ 269]. But nothing in the January 25, 2023 disclosure corrects the prior alleged misstatements on which Plaintiff relies or suggests that any such prior statements were false or fraudulent. *Meyer*, 710 F.3d at 1201; *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 894 (11th Cir. 2012) ("[S]ince nothing in the statements corrects any prior disclosures by [defendant] or reveals any omissions on [defendant]'s part that negatively affected the price of [defendant's] common stock, Appellant has failed to adequately allege loss causation.").

Second, although the January 25, 2023 disclosure does mention a potential *future* risk caused by the allegations of violations of law by FPL or NEE (and potential investigations/proceedings arising from such allegations), such references to future risk, standing alone, are insufficient to establish a corrective disclosure. As the Eleventh Circuit stated in *Meyer*, "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." 710 F.3d at 1201 (citing *In re Almost Family, Inc. Sec. Litig.*, No. 3:10–CV–00520–H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."); *see also Durham v. Whitney Info. Network, Inc.*, No. 06–CV–00687, 2009 WL 3783375, at *21 (M.D. Fla. Nov. 10, 2009); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008); *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 888 (N.D. Cal. 2008). As such, insofar as the January 25, 2023, disclosure portends a risk of future corrective action, that prospective possibility does not, in and of itself, disclose that Defendants' prior statements were false or fraudulent. *See Meyer*, 710 F.3d at 1201 ("To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (explaining that disclosures of SEC investigations may be "indicators of risk because they reveal the potential existence of future corrective information," but they are not corrective disclosures for purposes of loss causation).

Finally, and importantly, three months before the purported January 25 corrective disclosure, Defendants issued a Form 10-Q disclosing the very risks that Plaintiffs now say were

first disclosed on January 25, 2023. Specifically, the November 3, 2022, 10-Q disclosed the following, in pertinent part:

> Media articles have been published that allege, among other things, campaign finance violations by FPL and certain of its executives. In addition, on October 27, 2022, a complaint referencing these media articles was filed with the Federal Election Commission (FEC) by a non-profit corporation alleging certain violations of the Federal Election Campaign Act by various entities and individuals named as respondents in the complaint. While the complaint does not expressly name FPL or any of its executives as respondents, the complaint identifies FPL as an alleged source of funds to certain Super PACs identified in the complaint.
>
> NEE has engaged outside counsel to conduct a review of potential state and federal campaign finance violations, including the allegations raised in the media articles and the FEC complaint. The review is ongoing and NEE and FPL cannot predict, as of the date of this report, the outcome of the review. These allegations could also result in regulatory, investigative and enforcement inquiries by law enforcement or other governmental authorities and any ultimate findings of violations could result in the imposition of fines, penalties or other sanctions or impacts on NEE or FPL.

[ECF No. 83-7 p. 7]. The statements in the November 3, 2022 disclosure are substantially similar to the statements in the January 25, 2023 purported corrective disclosure [ECF No. 68 ¶ 283]. The statements both reference the existence of campaign-finance allegations against Defendants; they both reference the same complaint filed in federal court alleging such violations; and they both unequivocally state that such allegations may result in investigations that could have an adverse impact on NEE or FPL. Indeed, the January 25, 2023, disclosure expressly references the prior revelations on November 3, 2022 [ECF No. 83-11 p. 3 ("As a reminder, we reported last quarter that we were reviewing allegations of Florida state and federal campaign finance law violations raised in media articles and a related complaint filed in October 2022 with the Federal Election Commission."). For this additional reason, despite Plaintiffs' arguments to the contrary [*see* ECF No. 114 pp. 90–96], the January 25, 2023 disclosure did not reveal any new information that was previously concealed or obscured, and therefore does not constitute a corrective disclosure. *Meyer*, 710 F.3d at 1198; *FindWhat*, 658 F.3d at 1311 n.28 ("[B]ecause a corrective disclosure must reveal

a previously concealed truth, it obviously must disclose new information."); *see* ECF No. 90 pp. 13–14; *see also* ECF No. 114 pp. 10, 77–80].

### 2. Silagy's Retirement Announcement and Clawback Provision

Lead Plaintiffs also urge the Court to construe loss causation from Silagy's retirement announcement and a related "clawback" provision in Silagy's retirement package [ECF No. 85 pp. 30–33; *see* ECF No. 68 ¶¶ 270, 287, 288–300; ECF No. 114 pp. 95–99]. Silagy announced his retirement as reflected in a Form 8-K dated January 23, 2023 [ECF No. 83-12], and in an NEE earnings call on January 25, 2023 [ECF No. 83-13]. The *Florida Times-Union* also published an article on January 31, 2023, reporting Silagy's retirement and noting the existence of a clawback provision in his severance package [ECF No. 83-15; ECF No. 68 ¶¶ 303–04; ECF No. 85 p. 20]. According to Lead Plaintiffs, Silagy's resignation announcement—viewed in conjunction with the remainder of the January 25, 2023 disclosure—"was a materialization of the risks concealed by Defendants' false and misleading denials" and therefore creates a plausible claim for loss causation [ECF No. 114 p. 96; *see* ECF No. 68 ¶ 303].

Lead Plaintiffs' effort to plead loss causation on the basis of Silagy's retirement fails. As Lead Plaintiffs acknowledge, the retirement of a CEO, by itself, is insufficient to establish loss causation. Persuasive here is the case of *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), where plaintiffs sought to recover losses following the announcement of a director's resignation and negative media attention linking it to reports of accounting fraud. *Id.* at 513–14. The Second Circuit held that plaintiffs had, "at best[,] shown that . . . [the] resignation and resulting negative press stirred investors' concerns that other unknown problems were lurking in [the company's] past"—a showing that was "too tenuously connected . . . to the [accounting fraud] to support liability." *Id.* at 514. As a result, the court held, "the resignation did not add to

the public knowledge any new material fact about the [fraud]." *Id.* Likewise here, any supposed connection between Silagy's departure and the underlying alleged conduct is even more attenuated, as nothing in the announcement comes with disclosures of new negative facts about the underling fraud. Silagy announced that he had previously planned to retire after 20 years at FPL [ECF No. 83-13 p. 11]; the company disclaimed any connection between Silagy's resignation and the FEC investigation [ECF No. 83-13 p. 16]; and the incoming executive explained that Silagy would serve as a senior executive for several months following his resignation as CEO [ECF No. 83-12 p. 2]. Nothing in those statements ties back to the challenged fraudulent statements. As in *Omnicom*, "there is no allegation that investors were ever told that [the alleged misconduct] had in fact occurred" in connection with Silagy's departure. 597 F.3d at 514. Nor can the balance of the January 25, 2023 disclosure fill the gap in missing loss-causation allegations, for all of the reasons already stated.

This leaves Lead Plaintiffs' reliance on Silagy's claw back provision, which Lead Plaintiffs say was unusual and/or not customary and therefore amounts to a tacit acknowledgment of a link "between Silagy's conduct and [NEE's] potential legal exposure and reputational risk" [ECF No. 68 ¶ 303; 83-15]. This strained and speculative contention fails too. To begin, the cited article does not classify the provision as unique or not customary; it says only that "[i]t's unclear if all the terms of Silagy's exit, including the claw back, are standard for FPL leaders" [ECF No. 83-15 p. 4]. More fundamentally, Lead Plaintiffs do not offer any allegations to suggest that the clawback provision itself revealed facts about the specific alleged misrepresentations. In sum, the *Florida Times-Union* article does not reveal any undisclosed fact regarding the specific misrepresentations alleged. *See Omnicom*, 597 F.3d at 511.

Lead Plaintiffs have not sufficiently alleged loss causation to withstand Defendants' motion to dismiss.

### 3. Violations of § 20(a) of the Exchange Act (Count II)

Lead Plaintiffs' second claim for relief asserts a claim for controlling person liability under § 20(a) of the Exchange Act against the individual Defendants. In the absence of a viable Section 10(b) or Rule 10b–5 claim, however, an action against controlling individuals pursuant to Section 20(a) cannot stand. *See e.g., McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1307 (S.D. Fla. 2015).

### CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss [ECF No. 83] is **GRANTED**.

2. Lead Plaintiffs' Second Amended Complaint [ECF No. 68] is **DISMISSED WITH PREJUDICE**.[6]

3. The Clerk of Court is directed to **CLOSE** this case. Any pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 27th day of September 2024.

_____
**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

[6] Leave to amend would be futile; there have been two prior amendments in this case, and nothing that Lead Plaintiffs could add at this juncture (e.g., a copy of the Memorandum [*see* ECF No. 114 p. 100] would alter the loss-causation analysis in this Order.